UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION OF MANUFACTURERS, | ) ) ) |
| v. | ) Case No. _____ |
| HONORABLE JEFFREY A. TAYLOR, et al. | ) ) ) |

### PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM OF LAW

Pursuant to Fed. R. Civ. P. 65, Plaintiff National Association of Manufacturers ("NAM") moves for a preliminary injunction barring Defendants from implementing or enforcing § 207 of the Honest Leadership and Open Government Act of 2007, Pub. L. No. 110-81, 121 Stat. 735 ("Amendments"), against the Plaintiff or any other party until this Court issues a final, unappealable ruling on the merits of this case. The grounds are stated below and in the Declaration of Jan Sarah Amundson (attached as "Exhibit 1").

Because the first report under § 207 is due on April 21, 2008, Plaintiff respectfully requests a ruling as promptly as possible and, in any event, by April 14, 2008.

### INTRODUCTION

Through this action, the NAM seeks to prevent serious and irreparable injury to itself, its members, and the public by temporarily enjoining certain newly-enacted membership disclosure obligations until the merits of the NAM's First Amendment challenge can be heard. The challenged provision subjects core First Amendment speech, petitioning, and association to burdensome and intrusive requirements expressed in vague and sweeping terms that carry the possibility of substantial criminal and civil penalties. Moreover, in enacting these new requirements, Congress failed to achieve its stated

purpose of revealing the interests behind so-called "stealth coalitions" while needlessly burdening a wide range of established and well-known organizations that lobby in their own names for known interests.  The statute recognizes its constitutional sensitivity, specifying that it must not be "construed to prohibit or interfere with … the right to petition the Government for the redress of grievances [or] the right of association." 2 U.S.C. § 1607(a).  Consistent with that mandate and the fundamental public interest it reflects, the NAM requests that the challenged new provision receive judicial review before the very First Amendment rights this provision seeks to preserve are irreparably impaired.

The NAM's Complaint challenges certain changes made to the Lobbying Disclosure Act of 1995, 2 U.S.C. § 1601 *et seq.* ("Act"), by § 207 of the Amendments. Professing concern that so-called "stealth coalitions" lobby on behalf of undisclosed or deceptively-identified interests, Congress adopted the Amendments, requiring all organizations that employ lobbyists to identify on a quarterly basis all organizational supporters who (i) "actively participate[] in the planning, supervision, or control" of any "lobbying contacts and efforts in support of such contacts, including preparation and planning activities, research and other background work that is intended, at the time it is performed, for use in contacts, and coordination with the lobbying activities of others," and (ii) contribute more than $5,000 to such activities.  §§ 1602(7), 1603(b)(3)(A)-(B), 1604(b)(1).[1]

---

[1]    All statutory citations are to Title 2 of the United States Code unless otherwise noted.  A version of the Code in which the Amendments have been integrated can be found at: www.senate.gov/legislative/Lobbying/Lobby_Disclosure_Act/compilation.pdf.

For organizations like Plaintiff that are democratic in governance and rely extensively on member volunteers, this vague and sweeping requirement could mean almost anything. Moreover, because violations of the Act may have serious consequences, including civil and criminal fines and imprisonment for up to five years, there will be enormous pressure to, in the Supreme Court's words, "hedge," "trim," and "steer clear" of possible legal uncertainty. *See Buckley v. Valeo*, 424 U.S. 1, 76, 78 (1976) (explaining the high First Amendment cost of vagueness). That same pressure will chill participation by the NAM's members who have good reason not to be publicly connected to the association's lobbying activities, either generally or as to hot-button issues such as global warming, asbestos, nuclear power, or globalization. To be sure of avoiding disclosure in the face of the amended Act's vague and broad statutory language, such members must refrain from a wide range of core First Amendment activities, impairing their First Amendment rights, as well as those of the NAM, similar organizations, and the public.

Ironically, inflicting this high First Amendment cost reaps no benefit. The public policy interests represented by the NAM are well known and clearly "advertised" in its name. Congress has no legitimate interest in forcing detailed disclosure of the involvement of specific organizational members, particularly when such disclosures so heavily burden an association like the NAM.

Members of the NAM already are pressing for guidance and assurance as to their disclosure risks, and the curtailment of speech, petitioning, and association will increase if preliminary relief is denied here. In addition, developing and implementing procedures to collect and evaluate the extensive membership information that would be necessary to

attempt to comply would further accelerate the curtailment, would disrupt ongoing and planned speech, petitioning, and associational activities, and would require large and unrecoverable diversions of resources intended for such activities.

Remarkably, all this injury is threatened by an Act that misses its intended target. So long as the coalition does not employ or retain lobbyists in its own name – but instead relies on the lobbying activities of its members and their own lobbyists – the coalition itself has no disclosure obligations. And even though some participants in the coalition may be required to report, the mandated disclosures need not refer to the coalition or to participation in it. Thus, the amended Act leaves those inclined to organize and operate a "stealth coalition" free to do so. Moreover, because the amended Act exempts individuals from disclosure, even the wealthiest and most powerful individuals can financially support and actively participate in a lobbying coalition while remaining completely anonymous. Yet long-standing and well-known groups like the NAM must disclose detailed information about their members for which Congress has no need to accomplish its objective.

As is discussed below, the NAM expects ultimately to show that the challenged provision is fatally vague, untailored, and under- and over-inclusive, both facially and as applied to the NAM and similar organizations. These are serious issues – arising in an area of law fraught with constitutional difficulties – that deserve orderly consideration. Moreover, the Amendments were not adopted in response to a time-sensitive emergency, but are instead part of an evolving process to further limit a form of advocacy that is as old as the Republic itself. In this context, it is appropriate to allow judicial assessment before subjecting the NAM, its contributing members, other organizations, and the public

to irreparable First Amendment harm.  In the meantime, the NAM is willing to continue to register and report as it has for many years under the pre-2008 version of the Act.

<u>**STATEMENT OF FACTS**</u>

The Declaration of Jan Sarah Amundson and judicial notice establish the following facts:

**Parties**

Plaintiff, the NAM, is a non-profit trade association founded in 1895 to promote trade, advocate for economic growth, and represent the interests of its members.  For over a century, it has represented those interests in petitioning, speaking to, and otherwise dealing with government, including members and employees of the United States Senate and House of Representatives, as well as policy-level employees and officers of the Executive Branch.  As its website explains, the NAM advocates "on behalf of its members to enhance the competitiveness of manufacturers by shaping a legislative and regulatory environment conducive to U.S. economic growth and to increase understanding among policymakers, the media and the general public about the vital role of manufacturing in America's economic and national security for today and in the future."  NAM, *About Us*, http://nam.org/s_nam/sec.asp?CID=4&DID=2 (last visited Feb. 4, 2008).  The NAM does not publish its membership list, though its website and other readily-available materials make clear the types of interests it represents and lists member firms represented on the NAM's board and in some other leadership positions. The association is incorporated in New York and is recognized as tax exempt under § 501(c)(6) of the Internal Revenue Code.

Defendants are persons within the Government who are responsible for implementation and enforcement of the amended Act.  The Honorable Nancy Erickson is

Secretary of the Senate of the United States, and the Honorable Lorraine C. Miller is

Clerk of the House of Representatives of the United States. Their responsibilities include

receiving mandatory reports concerning lobbying activities, reviewing them for

deficiencies, and referring cases of apparent noncompliance to the United States Attorney

for the District of Columbia for enforcement action. § 1605(a)(8).[2]

The Honorable Jeffrey A. Taylor is the United States Attorney for the District of

Columbia. His responsibilities include enforcement of the penalty provisions of the Act.

*Id.* Because the Act requires reporting within the District of Columbia, that is where such

offenses typically will be prosecuted.

### The Challenged Provisions

Congress has made periodic efforts to limit the First Amendment right to petition

the Government, and the courts have curtailed the excesses of such legislation. *See, e.g.*,

*United States v. Harriss*, 347 U.S. 612 (1954) (limiting a broad statute to apply only to

direct contacts with Members of Congress concerning pending or proposed legislation).

Since 1995, the Act has imposed various reporting obligations on lobbyists and their

employers that the NAM does not here challenge. Then, last year, Senate leaders

introduced a bill designed to, among other things, increase the disclosure obligations for

certain "ad hoc" or "stealth" coalitions. S. 1, 110th Cong. § 207 (2007). As Senator

---

[2]      Defendants Erickson and Miller are directed by the amended Act to "provide guidance and
assistance on the registration and reporting requirements of the Act and develop common standards, rules,
and procedures for compliance." § 1605(a)(1). Pursuant to this provision, they have issued a document
entitled *Lobby[ing] Disclosure Act Guidance*, which is available at:
http://www.senate.gov/legislative/resources/pdf/S1guidance.pdf . However, the first section of that
document correctly states that the Act "does not provide the Secretary or the Clerk with the authority to
write substantive regulations or issue definitive opinions on the interpretation of the law," and that the
"guidance document does not have the force of law, nor does it have any binding effect on the United
States Attorney." *Id.* at 1. In short, the guidance document serves to confirm the vagueness and lack of
tailoring of the amended Act, but it does not and cannot cure the problem.

Lieberman noted in his remarks describing the original version of the bill, the purpose of the disclosure provision was to:

> [R]emove the cloak obscuring so-called stealth lobbying campaigns which occur when a group of individuals, companies, unions, or associations ban [*sic*] together to form a lobbying coalition.  These coalitions frequently have innocent-sounding names that give the impression they are promoting positive mom-and-pop, apple pie goals.  But, in fact, they lobby on a range of issues that could never be identified by the name of the coalition.

153 Cong. Rec. S260 (daily ed. Jan. 9, 2007) (statement of Sen. Lieberman).

That same purpose was reaffirmed in discussions regarding the version of S. 1 that was ultimately enacted into law.  As part of a detailed, written analysis "endorsed by the three principal Senate authors of the legislation: [Senator Feinstein], Chairman Lieberman, and Majority Leader Reid," Senator Feinstein emphasized the reasons for including the new coalition disclosure requirement in the bill:

> This section amends existing rules …. The bill closes a loophole that has allowed so-called "stealth coalitions," often with innocuous-sounding names, to operate without identifying the interests engaged in the lobbying activities.

*Id.* at S10708-09 (daily ed. Aug. 2, 2007) (statement of Sen. Feinstein).  Senators Lieberman and Reid confirmed the point.  *See id.* at S10601 (statement of Sen. Lieberman) (Aug. 2, 2007) ("[a]mendments to the [LDA] will also shine a spotlight on so-called stealth coalitions"); *id.* at S10716 (statement of Sen. Reid) (Aug. 2, 2007) ("we have sweeping reform legislation in a whole host of areas [including] stealth coalitions").  Thus, from beginning to end, the professed purpose of the challenged provision was to force stealth coalitions to identify the interests for which they were acting.

The amended Act retains the obligation on lobbyist employers like the NAM to file public registration and disclosure statements with the Secretary of the Senate and

Clerk of the House, although the new law requires reporting on a quarterly (rather than a semiannual) basis. §§ 1603(a)(2), 1604(a). As a result of the statutory changes, however, the amended Act now requires much more than simply identifying actual lobbyists, their areas of activity, and their clients. Under the amended Act, the registration and disclosure statements must, among other things, provide the "name, address, … and principal place of business" of any organization that "(A) contributes more than $5,000 to the [organization] … in the quarterly period to fund the lobbying activities of the registrant; and (B) actively participates in the planning, supervision, or control of such lobbying activities." §§ 1603(b)(3)(A)-(B), 1604(b)(1).[3]

The phrase "lobbying activities" is broadly and vaguely defined to encompass "lobbying contacts and efforts in support of such contacts, including preparation and planning activities, research and other background work that is intended, at the time it is performed, for use in contacts, and coordination with the lobbying activities of others." § 1602(7). A "lobbying contact" means any communications with Members and employees of the Senate or House of Representatives, § 1602(4), or with senior employees or officers of the Executive Branch, § 1602(3), on a wide range of subjects, § 1602(8)(A)(i)-(iv).

The Act does not define "actively participates" or other key terms such as "planning activities, research and other background work" or "coordination." It does not say whose intent to advance lobbying contacts controls – the individual, the employer, the working group, or the NAM as a whole. Nor does it impose any obligation on members to disclose their intent. On its face, the language encompasses activities that are

---

[3]    The disclosures do not name individuals, but instead the groups by which they are employed and for which they are acting.

at least twice removed from lobbying contacts, such as planning for planning activities for lobbying contacts. Indeed, it may be read to reach activities that are thrice removed – planning for planning for background research for lobbying contacts. And as long as participation in such activities is "active" – whatever that means – there is no requirement that it be substantial.

Ironically, the amended Act is not sufficiently tailored to require disclosures by stealth coalitions and will not reach them under many circumstances. This is because, if a coalition does not "employ[] or retain[] another person for financial or other compensation to conduct lobbying activities on behalf of" the coalition – but instead relies on the lobbying activities of its members and their retained lobbyists – the coalition itself has no disclosure obligations. § 1602(2) (defining a lobbyist's "client"); §§ 1603(a)(1) & (2), 1604(a), 1602(10) (requiring registration and reporting under the Act only if a lobbyist is "employed or retained by a client"). Moreover, the coalition's participating organizations, if they are required to submit disclosures at all, have no obligation to mention the coalition. Their reporting obligations are satisfied by providing an undifferentiated list of specific issues dealt with by their lobbyists and of the houses of Congress or federal agencies those lobbyists contacted at some time during the quarter. § 1604(b).

On the other hand, formally-organized and long-standing organizations like the NAM must file detailed disclosures, even though there is no doubt what interests they represent. Such organizations must collect extensive internal data in a struggle to determine whether, in a particular quarter, a member has "actively participat[ed] in the planning, supervision, or control," § 1603(b)(3)(B), of "lobbying contacts and efforts in

support of such contacts, including preparation and planning activities, research and other background work that is intended, at the time it is performed, for use in contacts, and coordination with the lobbying activities of others," § 1602(7). Ironically, this burden can be alleviated if an organization lists its membership – an option contrary to NAM policy – on the Internet. Yet in that case, Congress does not receive information as to which members "actively participate[d]" in lobbying. § 1603 ("[n]o disclosure is required … if the organization … is listed on the client's publicly accessible Internet website").

Interestingly, the Act also does not require disclosure in the case of actively-involved individuals who support such stealth coalitions. § 1603 (no "disclosure of any information about individuals who are members of, or donors to" a coalition or association is required). Norman Lear, George Soros, or any other individual, no matter how wealthy and influential, may lobby through deceptively-named groups and remain utterly exempt from disclosure.

Actual or perceived violations of the Act may have serious, adverse consequences, up to and including "a civil fine of not more than $200,000," or a criminal fine or "imprison[ment] for not more than 5 years," or both. § 1606. Moreover, accusations of non-compliance, particularly from the Defendants, may have other, very serious repercussions. The only way to avoid disclosure is to refrain from any conduct that arguably might trigger regulation.

### Injury

The NAM has over 11,000 corporate members whose interests are allied with America's manufacturing sector. The NAM is a member-led organization, and its members participate in a wide range of committees and related activities to advance the

NAM's goals.  These members participate in approximately 100 meetings per month and engage in a wide range of other contacts and activities, including telephone calls, emails, and mailings.  Hundreds of the NAM's corporate members make annual contributions that meet the financial prong of the amended Act's disclosure obligations.  (The actual number varies depending on how contributions are allocated and what the NAM is doing at a given time.)  Some of these members have dozens of employees who participate in different ways in multiple NAM committees and other activities.

Many of the NAM's activities involve communicating with the federal government to advance and protect member interests.  These activities include a large number of federal lobbying contacts on a wide range of subjects.  The NAM has approximately 35 employees that regularly engage in such contacts and that it has identified in various filings since adoption of the Act in 1995.[4]  The NAM is well known to the public and to the elements of the federal government with which it deals.  There is no doubt that it represents U.S. manufacturing interests.

The NAM regularly lobbies on a variety of hot-button issues, including global warming and nuclear power, that may lead to adverse consequences for members identified as "actively participat[ing]" in such efforts.  The Court is familiar, for example, with the mob violence that has been directed at firms targeted by anti-globalization forces and the more extreme advocates of global warming.  *See, e.g.*, David Rising, *Clashes Break Out Ahead of Summit*, Associated Press, June 3, 2007.  Prominence on labor issues can have well-understood repercussions.  *See e.g.*, *IBEW, Local 1547 v. Alaska Util.*

---

[4]    Current registration forms, which may be somewhat overinclusive, list a few more employee lobbyists than this.  The NAM does not concede that the 1995 Act is constitutional, but it has chosen not to challenge the underlying law in this proceeding.  It is prepared, during the pendency of the requested preliminary injunction, to continue to comply with the Act as it existed before the Amendments.

*Constr., Inc.*, 976 P.2d 852, 859 (Alaska 1999) (describing "ongoing acts of intimidation, violence, [and] destruction of property" by union members in a labor dispute). Firms that are identified as actively lobbying on issues related to on-going litigation, e.g., asbestos, risk becoming litigation targets. *See, e.g.*, Peter Geier, *Sea Change in Asbestos Torts is Here; New Strategies, New Defendants Seen*, National Law Journal, Oct. 31, 2005. Taking policy positions that are unpopular with some groups may lead to boycotts, shareholder suits, demands for political contributions or support, and other forms of harassment. *See, e.g.*, Robert Pear, *Doctors in Antitrust Fight Boycott Merck Products*, New York Times, May 23, 2000 (corporation forced to "distanc[e] itself from a coalition that opposes [antitrust] legislation" after the company was "'inadvertently listed' as a member of the coalition"); Harry Stoffer, *Toyota Joins Detroit 3 in CAFE Fight*, Automotive News, July 30, 2007 (noting environmental groups' criticism of Toyota for supporting the lobbying efforts of an automobile manufacturing coalition); Jim Lobe, *ExxonMobil Takes Heat on Global Warming*, Inter Press Service News Agency, July 12, 2005, *available at* http://www.ipsnews.net/print.asp?idnews=29469 (last visited Feb. 4, 2008) (describing boycott of corporation's products for "undermining efforts to combat global warming and lobbying Congress to open the Artic National Wildlife Refuge (ANWR) to drilling"). Regardless of whether the threats facing a particular company are severe enough to support an absolute privilege against disclosure, they are sufficiently troubling to chill First Amendment rights. Likewise, such disclosure impairs the right of anonymous speech on public issues – a right that was vigorously exercised by Alexander Hamilton, John Jay, and James Madison when they argued in favor of Constitutional ratification. *See infra* at 22.

In addition to the numerous burdens described above, experience has shown that publicly linking a NAM member to the association's lobbying activities often results in legislators and other groups with policy-influencing ability making demands for contributions and other support from individual members. The NAM frequently receives requests from legislators and others to identify its membership, and it uniformly refuses. As a matter of policy, the NAM does not make its membership list public, much less publicly identify the list of members active on particular issues (although individual members may elect to publicize their position). Members of the NAM have made clear that this protection is important to their decision to support the NAM. What is more, members of the NAM are not always of one mind. Often, when a group considers how to proceed on a particular lobbying issue, some members may favor a different position than that ultimately reached by the association, while others may oppose any action at all. Identifying those members with the NAM's lobbying efforts is unfair to these members and could actually mislead legislators, executive branch officials, and the general public.

Since the Amendments were signed into law, the NAM has received many inquiries from its members asking whether their involvement in the NAM's lobbying activities would need to be disclosed. As noted above, public association with the NAM's lobbying activities may make members a target for a wide range of adverse actions, ranging from publicity campaigns to boycotts to solicitations to labor disputes to local political pressure. This may vary according to the issue and the member. Faced with the potential negative consequences, some of the NAM's members will limit their support for and participation in the NAM in order to avoid the risk of disclosure under the amended Act's registration and reporting requirements.

Because the challenged provision of the Amendments, § 207, is so vague and broad, the NAM is not able to provide clear, advance guidance to its members as to what activities will or will not lead to public disclosure. Since a violation of the new law may have serious consequences, there is strong pressure for the NAM to over-report, thus increasing the risk to participating members. Moreover, the amended Act permits Defendants Erickson and Miller to demand further disclosures if what is filed is deemed inadequate. *See* § 1605. Thus, the only way that the NAM's members confidently can protect themselves is to avoid any activities that, on the broadest possible reading, might be thought to require disclosure. In short, they must hedge, trim, and steer clear of possible risk, foregoing the full exercise of their First Amendment rights and impairing those of the NAM.

At the same time, the NAM finds itself competing at a disadvantage against so-called stealth coalitions that, because they rely on their participating members' lobbyists rather than hiring their own, are not required to register and file disclosure reports. Similarly, the amended Act does not require a coalition funded by wealthy individuals to disclose the identities of its donors and decision-makers, even though such a coalition may expend millions of dollars attempting to influence public policy. Requiring the NAM to disclose its active members – while imposing no such obligation on competing groups – puts its First Amendment activities at a needless disadvantage.

Uncertainty over the meaning and intrusiveness of the challenged provision is widespread and not limited to the NAM. Other, similar groups face the same difficulties just described. Until and unless legal relief is provided, attempts to interpret and apply

the law will impose a continuing and substantial burden on and deterrent to a wide range

of association lobbying protected by the First Amendment.

## ARGUMENT

Four factors govern the award of preliminary relief: (1) plaintiff's likelihood of

success on the merits; (2) the threat of irreparable injury to plaintiff; (3) effects on third

parties; and (4) the public interest. *Chaplaincy of Full Gospel Churches v. England*, 454

F.3d 290, 297 (D.C. Cir. 2006). But in First Amendment cases, a substantial likelihood

of success typically satisfies all four factors. *See Phelps-Roper v. Nixon*, 2007 WL

4258633, at *2 (8th Cir. Dec. 6, 2007) (reversing denial of preliminary relief);

*Connecticut Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (collecting authority);

*Wil-Kar, Inc. v. Village of Germantown*, 153 F. Supp. 2d 982, 987 (E.D. Wis. 2001)

(noting that while these elements are theoretically distinct, "in the First Amendment

context they essentially reduce to the question of whether plaintiff is likely to succeed on

the merits"). In addition, any loss of First Amendment freedoms is irreparable injury as a

matter of law. *England*, 454 F.3d at 303; *Elrod v. Burns*, 427 U.S. 347, 373 (1976)

(plurality opinion). Moreover, members of the public and the Government all share a

vital interest in protecting First Amendment rights from threat. *Phelps-Roper*, 2007 WL

4258663 at *2; *PETA v. Gittens*, 215 F. Supp. 2d 120, 134 (D.D.C. 2002) ("the public

interest favors a preliminary injunction whenever First Amendment rights have been

violated"); *Connecticut Distrib. Co.*, 154 F.3d at 288 (the government's interest lies in

protecting First Amendment rights). Thus, showing a likelihood of success on a First

Amendment claim satisfies all four preliminary injunction factors.

To obtain a preliminary injunction protecting its First Amendment rights, the

NAM's merits showing need not be conclusive or even predominant. To the contrary, the

NAM need only raise a "serious legal question" as to why its activities will suffer an unconstitutional burden. *Ramirez v. U.S. Customs and Border Protection*, 477 F. Supp. 2d 150, 155 (D.D.C. 2007) (collecting authority). *See also Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) (preliminary injunction justified where a First Amendment plaintiff advanced a "plausible" position which the government failed to refute), *England*, 454 F.3d at 302 (noting that the *Elrod* plaintiffs could obtain a preliminary injunction where "they showed a probability of success on the merits"); *Phelps-Roper*, 2007 WL 4258633 at * 2 (any "fair chance of prevailing" is enough) (citation omitted). Moreover, the "burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). Because Defendants ultimately must justify burdening core First Amendment rights, once a serious First Amendment question is raised, a preliminary injunction is warranted unless Defendants clearly show they will meet their merits burden. *Id.*; *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

Here, the NAM's merits showing is compelling and the other factors also favor relief, as we now show.

## I.    THE NAM'S FIRST AMENDMENT CHALLENGE HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS

### A.    The First Amendment Strongly Disfavors Legislative Burdens On Public Policy Speech, Petitioning, And Expressive Association

The First Amendment mandates that "Congress shall make no law … abridging the freedom of speech, … or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend I. The Supreme Court recently admonished that, although this seemingly flat prohibition does not receive an

"absolutist interpretation[,] … it is worth recalling the language we are applying." *FEC v. Wisconsin Right to Life, Inc.*, 127 S. Ct. 2652, 2674 (2007) (hereinafter, "*WRTL*").[5]

In harkening back to the First Amendment's text, *WRTL* emphasized that the case involved "political" speech. *Id.* at 2665, 2673. That mattered because the First Amendment's central purpose is to protect free discussion and participation in how we are governed. *See First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 776-77 (1978) ("a major purpose of [the First] Amendment is to protect the free discussion of governmental affairs," including discussions by business corporations). Because the term "political speech" may imply partisanship to some, the NAM will refer instead to its "policy" speech and activities, but this term references the same central First Amendment protections invoked by the *WRTL* term "political."

The First Amendment expressly protects speech and assembling to petition the government. However, its core protections also extend to so-called "expressive association," i.e., "associat[ing] for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances." *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984).[6] When any of these rights are exercised for public policy purposes, the First Amendment's protection is "at its

---

[5]    Unless otherwise noted, citations to *WRTL* are to the controlling opinion by Justices Roberts and Alito, which functions as the opinion of the Court. *See Marks v. United States*, 430 U.S. 188, 192-93 (1977); *Horn v. Thoratec Corp.*, 376 F.3d 163, 175 (3rd Cir. 2004).

[6]    *Roberts* notes that the First Amendment also provides some protection for intimate personal relationships, e.g., marriage, family church, and some social groups. *Id.* The NAM's case here concerns aspects of "expressive association," not "intimate association."

zenith." *Barker v. State of Wisconsin Ethics Bd.*, 841 F. Supp. 255, 259 (W.D. Wis. 1993) (internal quotations marks and citation omitted) (collecting authority).[7]

First Amendment rights are protected against both "heavy-handed frontal attacks [and] also from being stifled by more subtle governmental interference." *Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 485 U.S. 360, 367 n.5 (1988). Where the burden imposed on core protected rights is direct or substantial, the legislation is invalid unless the demands of strict scrutiny are met. *Id.*; *see WRTL*, 127 S. Ct. at 2664 ("Because [the challenged statute] burdens political speech, it is subject to strict scrutiny"); *Buckley*, 424 U.S. at 75 (applying strict scrutiny to provision infringing on associational rights); *ACLU of New Jersey v. New Jersey Election Law Enforcement Comm'n*, 509 F. Supp. 1123, 1129 (D.N.J. 1981) (statute compelling disclosures by lobbying groups must be justified by a "compelling" interest and employ the "least restrictive means"). *See also Roberts*, 468 U.S. at 623 (infringements on the "right to associate for expressive purposes … may be justified by … compelling state interests").

Strict scrutiny is truly demanding. The Supreme Court has summarized its requirements as follows:

> [S]trict scrutiny means that the [legislation] is not entitled to the usual presumption of validity, that the State rather than the complainants must carry a heavy burden of justification, that the State must demonstrate its [legislation] has been structured with precision and is

---

[7]     In *Regan v. Taxation With Representation*, 461 U.S. 540 (1983), the Court assumed an organization had a First Amendment right to lobby, and the three-justice concurrence expressly stated that "lobbying is protected by the First Amendment." *Id.* at 552. In *Heartland Surgical Specialty Hospital, LLC v. Midwest Div., Inc.*, 2007 WL 825521, at *2 (D. Kan. 2007), the court held that an association of hospitals had a First Amendment right to associate for purposes of exercising the rights of speech and petition, i.e., "expressive association." Similar recognition appears in *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984).

> tailored narrowly to serve legitimate objectives and that it
> has selected the less drastic means for effectuating its
> objectives.

*San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16 (1973) (internal quotation marks

and citations omitted). Although *Rodriguez* referred to "legitimate objectives," abundant

precedent makes clear the objectives must be "compelling." *See, e.g.*, *WRTL*, 127 S. Ct.

at 2664; *Buckley*, 424 U.S. at 75.

Where strict scrutiny applies, defendants must demonstrate affirmatively that each

aspect of the standard is met. *O Centro Espirita*, 546 U.S. at 438 (where the government

failed to "*submit* evidence addressing the international consequences," its argument that

international conventions required the U.S. to forbid religious use of peyote was

inadequate); *WRTL*, 127 S. Ct. at 2664 ("the *Government* must prove" strict scrutiny is

satisfied). This burden must be met both as to the statute on its face and as to its

application in the particular case. *Id.* Indeed, even where a lesser standard than strict

scrutiny applies, the trenchant language of the First Amendment places on the

Government the burden of persuasively justifying any burden on the rights it protects.

For example, under the limited protection given purely commercial speech (e.g., price

advertising), "speculation and conjecture" will not do, and "a governmental body seeking

to sustain a restriction … must demonstrate that the harms it recites are real and that its

restriction will, in fact, alleviate them to a material degree." *Greater New Orleans*

*Broadcasting Ass'n v. United States*, 527 U.S. 173, 188 (1999) (quotation marks

omitted).

The "precision" of regulation that must be demonstrated where core First

Amendment rights are burdened also is much more demanding than the generally-

applicable due process standard of fair notice, and that is even more true where, as here,

civil and criminal punishment are threatened.  *See Buckley*, 424 U.S. at 40-41.  Core First

Amendment rights simply are too precious to diminish them by the need to hedge, trim,

and steer clear of possible legal risk.  *Id.* at 41; *WRTL*, 127 S. Ct. at 2680-81.  An

objective bright line is required.  *Id.* at 2682.

**B.**     **The Challenged Provision Substantially Burdens The Exercise Of Core First Amendment Rights**

The challenged provision here targets and substantially burdens the exercise of

*core* First Amendment rights.  The burdens are triggered by a "lobbying contact," which

the Act defines as "any oral or written *communication*" to government personnel

concerning "formulation, modification, or adoption" of government policy.

§ 1602(8)(a)(i)-(iii) (emphasis added).  The First Amendment protects such a policy

communication both as speech and petitioning.

The demanded disclosure extends broadly to organizations making "efforts in

support of such [lobbying] contacts, including preparation and planning activities,

research and other background work that is intended, at the time it is performed, for use

in contacts, and coordination with the lobbying activities of others." § 1602(7).  Such

activities are necessary to permit core speech to be effective.  *Buckley* held that, because

spending money is essential to effective political speech, restrictions on such spending

are restrictions on speech itself.  424 U.S. at 19.  Similarly, because preparing, planning,

and researching lobbying speech are essential to such speech, burdens on those activities

are burdens on core speech itself.

Moreover, the targeted activities are undertaken in association with others who

are working together to achieve shared policy objectives.  These expressive and political

associational activities are protected by the First Amendment.  *See supra*, at 17 (defining

-20-

expressive association).  And abundant authority holds that intrusions into the

associational privacy that permits free cooperation is a substantial burden that requires

compelling justification.[8]

     This remains true even though the disclosure applies to organizations, rather than

to the individuals who act for them.  *See WRTL*, 127 S. Ct. 2678 (Justice Scalia's

concurrence collecting authority that corporations have "full First Amendment

protection"); *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11

(1972) (the First Amendment "rights of association and of petition" allow "groups with

common interests" – a group of trucking companies – "to advocate their causes and

points of view respecting resolution of their business and economic interests"); *Eastern

R.R. President's Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137-38 (1961)

(construing antitrust laws narrowly to preserve the right of a group of railroads to petition

the government); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) (the First

Amendment protects speech on public policy issues, regardless of whether the speaker is

a corporation or individual).[9]

---

[8]    *Buckley* held that compelled disclosure of associational acts was a sufficient burden to trigger exacting scrutiny.  424 U.S. at 64.  *Roberts* said that requiring "disclosure of the fact of membership in a group seeking anonymity" or "interference with the internal organizational affairs" of an expressive association were examples of burdens that triggered strict scrutiny.  468 U.S. at 623 (collecting authority). *Heartland Surgical* ruled that impairment of a lobbying association's privacy interests in a way that would have "a chilling effect on members" infringed upon the First Amendment.  2007 WL 852521, at *4.  Where litigation discovery is sought concerning such internal associational matters, the courts regularly recognize a presumptive First Amendment shield that can be overcome only by a tailored showing of necessity.  *Id.* at *6 (discovery concerning internal affairs of lobbying association denied for failure to show "a truly compelling need" for information); *FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380, 389-90 (D.C. Cir. 1981); *FEC v. Larouche Campaign*, 817 F.2d 233, 234-35 (2d Cir. 1987); *NAACP v. Alabama*, 357 U.S. 449, 460-64 (1958).

[9]    In some instances, the corporate form may justify certain restrictions on these First Amendment rights.  *See Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990).  However, whether a compelling interest justifies a tailored restriction is a different question from whether the rights exist.  *Id.* at 666 (applying strict scrutiny test to limits on corporate speech).  *See also WRTL*, 127 S. Ct. at 2679-80 (Justice Scalia's concurrence questioning *Austin*'s authority).

The disclosure required by the amended Act also directly impairs the First Amendment right of anonymous speech and expressive association. Our country has a "respected tradition of anonymity in the advocacy of political causes" and "an advocate [properly] may believe her ideas will be more persuasive" if anonymity is preserved. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342-43 (1995).[10] Because compelling identification of those involved in "core" First Amendment speech destroys anonymity and may chill and suppress such speech, it triggers "exacting scrutiny" and demands proof that the particular disclosure requirement is "narrowly tailored to serve an overriding state interest." *Id.* at 347-48 (holding that "assuredly legitimate" but "ancillary benefits" could not justify an "extremely broad" disclosure requirement).[11] Like other First Amendment protections, the right to anonymity is not absolute and some disclosure requirements have been sustained, but the particular requirement must survive exacting scrutiny. *Buckley v. American Const. Law Found.*, 525 U.S. 182, 203 (1999) (sustaining limited disclosures but holding that "the added benefit of revealing [certain] names ... has not been demonstrated").[12]

Recognizing the constitutional threat posed by the Act, Congress adopted an unusual directive to construe the Act to avoid impairing First Amendment rights.

---

[10]    For example, much of the lobbying for ratification of the Constitution was carried out through anonymous publications, "most famously ... the Federalist Papers." *McIntyre*, 514 U.S. at 342-43 & n.6.

[11]    Indeed, the First Amendment right of anonymity extends even to commercial speech, and may be overridden only if the requirement is narrowly tailored to a substantial interest. *NLRB v. Midland Daily News*, 151 F.3d 472, 474-75 (6th Cir. 1998) (protecting from NLRB subpoena the sponsor of an anonymous help-wanted ad to avoid a "chilling effect" on such ads).

[12]    As the directly-regulated entity, the NAM may assert the interests of its members that are germane to its purpose and do not require individualized participation. *Nuclear Energy Inst. v. EPA*, 373 F.3d 1251, 1265 (D.C. Cir. 2004); *Hunt v. Wash. State Apple Adv. Comm'n*, 432 U.S. 333, 343 (1977). This is even more so in the First Amendment context where standing is less demanding. *See Sec'y of State of Md. v. Joseph H. Munson, Co.*, 467 U.S. 947, 956 (1984).

§ 1607(a).[13]  Congress' concern was well founded.  In *United States v. Harriss*, 347 U.S. 612 (1954) – a case decided long before First Amendment analysis assumed its present form – the Court held the First Amendment applicable to a statute compelling lobbying-related disclosures, though once it had sharply narrowed the statute, it found the First Amendment burden justified.  Importantly, *Harriss* clearly recognized the First Amendment applied, and it stressed how narrowly it had construed the statute in finding it to be justified.  *Id.*

Following modern First Amendment analysis and guidance from *Buckley*, the landmark campaign finance case in 1976, the Eighth Circuit subjected a state lobbying statute "similar to" that in *Harriss* to strict scrutiny, demanding justification by a "compelling interest."  *Minnesota State Ethical Practices Bd. v. NRA*, 761 F.2d 509, 511-12 (8th Cir. 1985).  Similarly, the New Jersey Supreme Court held that the lobbying restrictions challenged there were not entitled to "the traditional presumption in favor of constitutional validity" and demanded justification by a "compelling governmental interest."  *New Jersey State Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n*, 411 A.2d 168, 174 (N.J. 1980).

In short, the challenged provision raises substantial First Amendment concerns. Thus, the issue is whether Defendants can show that the First Amendment burdens are narrowly tailored to serve sufficiently compelling interests and are expressed with the high degree of objective precision the First Amendment requires.

---

[13]    This provision does not cure the constitutional defects.  The Constitution does not permit a legislature to "set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained."  *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (internal quotation marks and citation omitted).  But it does confirm that (i) NAM's First Amendment concerns are substantial and (ii) Congress gives priority to respecting the First Amendment.

**C.      The Definition Of Lobbying Activities Is Unconstitutionally Vague On Its Face And As Applied To The NAM And Similar Organizations**

The most obvious problem with the challenged provision is that it fails to provide the precise guidance the First Amendment demands, particularly where criminal sanctions may result.  In the 1954 *Harriss* decision, the Supreme Court greatly narrowed a statute requiring disclosure of contributions or expenditures for lobbying purposes.  For example, the statute spoke of transfers of value to affect "(a)  The passage or defeat of any legislation by the Congress … (b)  To influence, directly or indirectly, the passage or defeat of any legislation by the Congress of the United States."  347 U.S. at 619 (internal quotation marks omitted).  The Court sharply narrowed those provisions to apply only to "[1] direct communication [2] with members of Congress [3] on pending or proposed federal legislation."  *Id.* at 620.[14]

*Harriss* held that this narrowed standard was compelled by the due process requirement that a criminal statute must give "a person of ordinary intelligence fair notice."  *Id.* at 617.  Today, however, it is settled that, "[w]here First Amendment rights are involved, an even 'greater degree of specificity' is required."  *Buckley*, 424 U.S. at 77; *see WRTL*, 127 S. Ct. at 2666, 2669 n.7.

*Buckley* confronted a statute that, on pain of possible criminal penalty, required independent groups to disclose the amounts and sources of contributions used "for the purpose of … influencing" federal campaigns.  424 U.S. at 77.  The Court held this standard fell far short of what the First Amendment required.  *Id.* at 77-79.  To preserve the disclosure requirement, *Buckley* imposed an objective bright-line test that was

---

[14]      The New Jersey Supreme Court likewise performed "judicial surgery" to clarify the lobbying restrictions challenged there.  *New Jersey State Chamber of Commerce*, 411 A.2d at 178.

triggered only where receipts were used for speech containing "explicit" words such as "vote for" or "defeat" to "expressly" advocate the election or defeat of a clearly identified candidate. *Id.* at 44-49, 79-80. The recent *WRTL* opinion explicitly reaffirmed *Buckley*'s demand for objective precision. 127 S. Ct. at 2666-69 (even in an "as applied" challenge to a facially constitutional bright line, any standard "must be objective" and satisfy "the imperative for clarity in this area").

Here, the challenged provision requires the NAM to disclose, on pain of criminal penalty, if a member has participated "actively ... in the planning, supervision, or control," § 1603(b)(3)(B), of any "preparation or planning activities, research or other background work that is intended at the time it is performed for use in [lobbying] contacts," § 1602(7). This poses an immediate vagueness defect because standards turning on assessment of "intent and of effect" are impermissible. *WRTL*, 127 S. Ct. at 2665 (collecting authority). The vagueness is particularly acute because intent must be assessed with respect to contacts with a wide range of legislative and executive personnel, rather than just Members of Congress, § 1602(3)(4), and with respect to a wide range of subjects far removed from passage or defeat of a specific bill, such as:

> (i) the formulation, modification, or adoption of Federal legislation (including legislative proposals);
>
> (ii) the formulation, modification, or adoption of a Federal rule, regulation, Executive order, or any other program, policy, or position of the United States Government;
>
> (iii) the administration or execution of a Federal program or policy (including the negotiation, award, or administration of a federal contract, grant, loan, permit, or license); or
>
> (iv) the nomination or confirmation of a person to a position subject to confirmation by the Senate.

§ 1602(8).  Similarly, it is unclear whether the relevant intent is that of the member, the small group with which the member is working, the reporting organization, or some objective intent to be inferred from the circumstances.  Moreover, it is common experience that various participants in a meeting may have different intents, and the intent of the group as a whole may be hard to ascertain.

This vague and sweeping new standard bears no resemblance to the precise and narrow construction imposed by *Harriss* and then sustained.  The pool of government personnel with whom the communication is limited is hundreds of times larger than just Members of Congress, and the range of restricted topics reaches oceans beyond pending or proposed legislation.  Nor does this standard approach the precise and objective bright line that *Buckley* imposed on the disclosure standard at issue there.

Indeed, the actual language of the provision is so broad and elastic that it invites ludicrous applications.  For example, exploring the health of an executive official who might be a nominee requiring Senate confirmation would fit within the statute's coverage of background research and, hence, could be deemed "lobbying activity."  Thus, exchanging common pleasantries – e.g., "How are you feeling" – literally could qualify as reportable activity.  Obviously that is not what the law means, but that is what it says.  The Supreme Court has been clear that, when First Amendment rights are at stake, "[i]t will not do to say that a prosecutor's sense of fairness and the Constitution" would prevent unreasonable application of a vague standard.  *Baggett v. Bullitt*, 377 U.S. 360, 373 (1964).[15]

---

[15]    The courts will not conjure up fanciful and improbable facts to find vagueness, but this is different from overlooking the potential for unreasonable application of statutory language to common facts.  *Baggett v. Bullitt*, 377 U.S. 360, 373 (1964).

Thus, the challenged provision is vague on its face.  And that vagueness becomes much greater when the provision is applied to an organization like the NAM.  The Court can imagine the difficulty of attempting to review all of the activities of the NAM's 100+ monthly meetings, plus other ad hoc groups, to see if this standard has been met.  For example, how can the NAM determine what each member representative intended at the time of each possibly-reportable activity?  Accurate compliance would be literally impossible.

Moreover, the effort to make such determinations each time a member makes a comment during a meeting distracts the NAM from its constitutionally-protected goal of developing and carrying out speech on behalf of the manufacturing economy.  The NAM cannot simply assume that all members in a meeting have the same intent.  To the contrary, it is common for some members to be participating with the intent of preventing lobbying on an issue, while others may be actively pressing for the NAM to lobby, and still others may form their positions in response to the discussion, perhaps changing their intent *sub silentio* as the meeting progresses.  For the NAM to identify certain members as actively supporting its lobbying activities while they were actually opposing such efforts would place them in a false light and mislead Congress.[16]

As *WRTL* just made clear, Defendants bear the burden of showing that the challenged provision meets strict First Amendment standards of protection, both facially and as applied.  *See* 127 S. Ct. at 2663-64.  They cannot meet that burden, and certainly cannot now eliminate any serious First Amendment concern.

---

[16]    Because Congress has no need to know the activities of particular manufacturers, the greater of these injuries is to the wrongly identified member.  But if Congress did have a substantial interest in the views of particular manufacturers, then its injury also would be significant.

**D.    The Challenged Provision Is Not Narrowly Tailored**

Because the challenged provision is so vague and sweeping, it inherently is untailored to any interest. But there is a further difficulty. As noted above, the stated purpose behind the new provision was to force disclosure of the true interests behind so-called "stealth coalitions" whose innocuous or misleading names concealed the interests being represented. Yet, even if such a need could be established and shown to be compelling – the burden being on defendants, *see id.* – the amended Act would do little to achieve that purpose while simultaneously imposing extensive, needless burden on the First Amendment rights of the NAM and similar organizations.

As discussed above, the amended Act does not reach stealth coalitions unless they happen to hire their own lobbyist(s), rather than relying on the lobbyists of participating organizations. §§ 1602(2), (10), 1603(a)(1) & (2), 1604(a). Nothing in the legislative record shows that so-called stealth coalitions regularly hire such lobbyists, much less that they will do so when, under the challenged provision, the result will be disclosures they want to withhold. Also, the Act does not reach wealthy and powerful individuals lobbying through stealth coalitions. Thus, Defendants cannot prove that the challenged provision is well-suited to its professed objective.

Moreover, the NAM is not a stealth coalition, nor are the large number of other established, tax-exempt groups that have constituencies everyone understands and, in many cases (such as the NAM), are reflected in their names. When the NAM or a similar organization lobbies in its own name, there is no reason – much less a compelling reason – to require it to try to identify which particular members happen to have "actively" participated in planning or research for the contact. Yet that is what the challenged provision demands.

-28-

Part of Defendants' burden is to show that Congress carefully assessed possible alternative approaches, weighed the costs and benefits, and selected an approach that avoids needless cost. They can make no such showing here. For example, there is no showing that Congress reasonably evaluated or correctly rejected alternative ways to target stealth coalitions or ways to avoid demanding detailed disclosures from long-standing, formally-organized groups like the NAM that hold tax exempt status. Nor is there proof that such approaches cannot work.

In short, far from being narrowly tailored, the challenged provision is over-inclusive because it needlessly burdens established and well-known organizations such as the NAM, even when they lobby in their own name, and it also is underinclusive because it does not reach coalitions that elect not to retain their own lobbyists.

## II.    THE NAM AND ITS MEMBERS FACE IRREPARABLE INJURY

As detailed in the attached Declaration of Jan Sarah Amundson, the NAM's core petitioning activity importantly depends on the active support of members, both sweat-of-the-brow and financial. Members are urgently asking for guidance as to whether planned participation will expose them to disclosure, particularly in light of the fact that Congress will likely tackle a number of issues of importance to the manufacturing community in the upcoming legislative session. Francesco Guerrera, *World News: Businesses Push for US Tax Cut on Asset Sales*, Financial Times USA, Feb. 4, 2008; Doreen Hemlock, *Congress Urged to Pass Free Trade Pact with Columbia*, South Florida Sun-Sentinel, Jan. 29, 2008; Press Release, NAM, *NAM President Engler Says Manufacturers Support Bush's Focus on Economic Growth* (Jan. 28, 2008) *available at* http://www.nam.org/s_nam/doc1.asp?CID=14&DID=239923&rcss=print (discussing, among other things, the benefits of the President's plan to "increase our reliance on safe,

clean nuclear energy"); Peter Cohn, *NAM to Push Hard for Extension of R&D Credit in Stimulus*, Congress Daily, Jan. 23, 2008. This suppression of First Amendment rights is irreparable injury as a matter of law.

The NAM members also face direct impairment of their right to anonymous speech. *See McIntyre*, 514 U.S. at 341-43. Obviously, that right is not absolute and yields to sufficiently necessary and tailored disclosure requirements. But the right exists, and the threat of unwanted disclosure is a threat of First Amendment injury. *See American Const. Law Found.*, 525 U.S. at 199-204. That is doubly so where, as here, the loss of anonymity threatens adverse consequences, ranging from boycotts to political pressures.

Moreover, the NAM has no existing mechanisms that would allow it to track the activities of its members and committees in a way that could produce accurate reports and disclosures under the challenged provision. It is difficult to imagine how it ever could do so, even if the provisions were far clearer. But in the absence of a preliminary injunction, the NAM would be forced to begin developing an attempted compliance scheme. Those efforts would cause irreparable injury in several respects:

- First, substantial resources would have to be diverted to the project from intended First Amendment uses. The law provides no means for those resources ever to be compensated. Thus, in addition to the resulting First Amendment injury caused by diversion, the NAM and its members would suffer resource losses that could not be remedied.

- Second, the NAM would have to develop much more targeted management and record-keeping mechanisms for its operations, both to

track what is going on and to preclude activities that carry too high a risk of triggering unacceptable disclosure obligations. This interference with long-established methods of expressive association would be irreparable First Amendment injury, as would the activities foregone in an effort to avoid possible risk.

- Third, the NAM would have to begin alerting its members that, if they do not want to be the subjects of disclosure, they must either limit their allocatable financial contributions to $5,000 per quarter or limit the participation of their personnel in a wide range of activities. This would cause irreparable injury to the NAM's member relations and, hence, to its core First Amendment activities.

- Fourth, curtailment of member financial support will reduce the NAM's ability to carry out its core mission.

Also, the NAM's confidential membership list is a valuable proprietary asset in the nature of a trade secret. Forcing the NAM to disclose key members in public lists would impair its ability to preserve the confidentiality necessary to that property right. This is irreparable injury that could even amount to an unconstitutional taking. *See Philip Morris, Inc. v. Reilly*, 312 F. 3d 24 (1st Cir. 2002) (en banc) (compelled public disclosure of trade secret is a forbidden taking).

In short, the presumed irreparable injury that flows from the NAM's substantial First Amendment claims will concretely materialize if preliminary relief is not granted.

**III.    THE INTERESTS OF THIRD PARTIES, THE GENERAL PUBLIC, AND THE GOVERNMENT ALSO FAVOR PRELIMINARY RELIEF**

As already discussed, third parties, the general public, and the Government all share a strong interest in avoiding threats to First Amendment rights. *See supra* at 14-15. Beyond that, in this case the Act itself declares that it must not be construed to impair First Amendment rights. § 1607(a). Since a threat to such rights is demonstrated above, this declared policy favors deferring the effective date of the challenged provision until the Court can assure that the First Amendment will not be impaired.

Moreover, this is not a case in which Congress responded to an unanticipated emergency with time-sensitive legislation that must take effect now or never. To the contrary, lobbying has existed since the earliest days of the Republic. Robert V. Remini, *The House: The History of the House of Representatives* 38-39 & n.4 (2007). Indeed, lobbying for or against ratification of the Constitution famously involved a range of pseudonyms. Moreover, the amended Act is intended to apply for the indefinite future. Thus, taking time to be sure the challenged provision is constitutional before it is implemented will not materially impair the intended benefits of the amended Act.

## **CONCLUSION**

For these reasons, the motion for preliminary injunction should be granted and

Defendants should be forbidden to implement or enforce the challenged provision until

after a decision on the merits.  A proposed form of order is attached.


February 6, 2008                                     Respectfully submitted,


                                                     Thomas W. Kirby  (Bar No. 915231)
                                                        E-mail: tkirby@wileyrein.com
                                                     Jan Witold Baran  (Bar No. 233486)
                                                        E-mail: jbaran@wileyrein.com
                                                     Andrew G. Woodson  (Bar No. 494062)
                                                        E-mail: awoodson@wileyrein.com
                                                     WILEY REIN LLP
                                                     1776 K St., NW
                                                     Washington, D.C. 20006

                                                     202.719.7000

                                                     Counsel for Plaintiffs

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION OF MANUFACTURERS, Plaintiff<br><br>v.<br><br>HONORABLE JEFFREY A. TAYLOR, et al., Defendants | )<br>)<br>)<br>) Case No. _____<br>)<br>)<br>)<br>)<br>) |

### DECLARATION OF JAN SARAH AMUNDSON

1.    I am Jan Sarah Amundson, Senior Vice President and General Counsel of the National Association of Manufacturers ("NAM").  I make this Declaration in support of the motion of the NAM for a preliminary injunction.

### Foundation

2.    I have been with the NAM for 30 years.  On July 10, 1978, I was hired as an Assistant General Counsel.  In 1981, I became the NAM's Deputy General Counsel, and I was elected General Counsel in 1983.  I became a member of the NAM's Senior Management Committee in 1983, serving until 1990, and added the title of Vice President in 1986.  I was made a Senior Vice President in 2002 and rejoined the Senior Management Committee at that time.  I am a member in good standing of the District of Columbia bar.

3.    As General Counsel of the NAM, I have broad responsibility for legal issues affecting the organization.  In addition to contracts, leases, and the like, I review all documents that involve NAM corporate and issue policies.  I am charged with

interpreting the NAM Constitution and By-Laws.  Also, as a corporate officer, I

frequently interact with the membership, including the Executive Committee, Finance

Committee, members of the NAM Board of Directors, as well as NAM committee and

subcommittee members.  On the subcommittee task force level, I have direct interaction

with representatives of member companies other than Board members.  I am also

available for any member inquiry about policy, legal issues, or any general association

question.  I have managed issue coalitions of the NAM.  In 1998 and 1999, I managed the

Y2K Coalition, and I also was the head of the Asbestos Alliance from 2001 through

2006.  I have been a registered lobbyist since 1998, and I consider myself well informed

on the practice of federal lobbying and related public policy advocacy.

4.      I have direct responsibility for the NAM's lawsuit challenging the new disclosure

obligations imposed by amendments to the Lobbying Disclosure Act of 1995, 2 U.S.C.

§ 1601 *et seq*. ("Act"), made by the Honest Leadership and Open Government Act of

2007, Pub. L. No. 110-81, 121 Stat. 735 ("Amendments").  It is my job to try to figure

out what the Amendments mean for the NAM, I would have to sign off on any

procedures developed to comply, and I have been responding to increasingly anxious

inquiries from contributing members as to what the Amendments mean for them.  As is

discussed in more detail below, the NAM and I have been unable to understand what the

law requires, facially or as applied to the NAM, although it is obvious that attempted

compliance would reveal a great deal of our confidential associational activities.

Through my frequent contacts with peers of other, similar associations and the press, I

know that the NAM's uncertainties are widespread.

5.      I have reviewed the NAM's Complaint and Memorandum and verify that the

factual statements made there are true, based on my personal knowledge and experience

in my position.

## The National Association of Manufacturers

6.      The NAM is a non-profit trade association founded in 1895 to promote trade,

advocate for economic growth, and represent the interests of its members.  The NAM has

over 11,000 corporate members whose interests are allied with America's manufacturing

sector.  For over a century, the NAM has represented those interests in petitioning,

speaking to, and otherwise dealing with government, including members and employees

of the United States Senate and House of Representatives, as well as policy-level

employees and officers of the Executive Branch.  As our website explains, the NAM

advocates "on behalf of its members to enhance the competitiveness of manufacturers by

shaping a legislative and regulatory environment conducive to U.S. economic growth and

to increase understanding among policymakers, the media and the general public about

the vital role of manufacturing in America's economic and national security for today and

in the future."  NAM, *About Us*, http://nam.org/s_nam/sec.asp?CID=4&DID=2 (last

visited Feb. 4, 2008).

7.      The NAM is a member-led organization, and its members participate in a wide

range of committees and related activities to advance the NAM's goals.  Employees of

contributing members participate in approximately 100 meetings per month and engage

in a wide range of other contacts and activities, including telephone calls, emails, and

mailings.  Hundreds of the NAM's corporate members make annual contributions that

meet the financial prong of the amended Act's disclosure obligations. (The actual number in any quarter varies depending on how contributions are allocated and what the NAM is doing then.) Some of these members have dozens of employees who participate in different ways in multiple NAM committees and other activities.

8.     For at least 30 years I have been with the NAM, and during that time our membership list has been kept confidential. Of course, some firms disclose their membership in the NAM, and disclosure is necessary for members represented on our board and in some other leadership positions. But the considered judgment of the NAM is that the membership as a whole values that confidentiality, the membership has supported that position over the decades, and my contacts with members confirm this point.

9.     Many of the NAM's activities involve communicating with the federal government to advance and protect member interests. These activities include a large number of federal lobbying contacts on a wide range of subjects. The NAM has approximately 35 employees that regularly engage in such contacts and that it has identified in various filings since adoption of the Act in 1995.[1] The NAM is well known to the public and to the elements of the federal government with which it deals. There is no doubt that it represents U.S. manufacturing interests.

---

[1]     Current registration forms, which may be somewhat over-inclusive, list a few more employee lobbyists than this. The NAM does not concede that the 1995 Act is constitutional, but it has chosen not to challenge the underlying law in this proceeding. It is prepared, during the pendency of the requested preliminary injunction, to continue to comply with the Act as it existed before the Amendments.

10.    The NAM regularly lobbies on a variety of hot-button issues, including global warming and nuclear power, that may lead to adverse consequences for members identified as "actively participat[ing]" in such efforts.  For example, mob violence has been directed at firms targeted by anti-globalization forces and the more extreme advocates of global warming.  *See, e.g.*, David Rising, *Clashes Break Out Ahead of Summit*, Associated Press, June 3, 2007.  Prominence on labor issues can have well-understood repercussions.  *See e.g.*, *IBEW, Local 1547 v. Alaska Util. Constr., Inc.*, 976 P.2d 852, 859 (Alaska 1999) (describing "ongoing acts of intimidation, violence, [and] destruction of property" by union members in a labor dispute).  Firms that are identified as actively lobbying on issues related to on-going litigation, e.g., asbestos, risk becoming litigation targets.  *See, e.g.*, Peter Geier, *Sea Change in Asbestos Torts is Here; New Strategies, New Defendants Seen*, National Law Journal, Oct. 31, 2005.  Taking policy positions that are unpopular with some groups may lead to boycotts, shareholder suits, demands for political contributions or support, and other forms of harassment.  *See, e.g.*, Robert Pear, *Doctors in Antitrust Fight Boycott Merck Products*, New York Times, May 23, 2000 (corporation forced to "distanc[e] itself from a coalition that opposes [antitrust] legislation" after the company was "'inadvertently listed' as a member of the coalition"); Harry Stoffer, *Toyota Joins Detroit 3 in CAFE Fight*, Automotive News, July 30, 2007 (noting environmental groups' criticism of Toyota for supporting the lobbying efforts of an automobile manufacturing coalition); Jim Lobe, *ExxonMobil Takes Heat on Global Warming*, Inter Press Service News Agency, July 12, 2005, *available at* http://www.ipsnews.net/print.asp?idnews=29469 (last visited Feb. 4, 2008) (describing

boycott of corporation's products for "undermining efforts to combat global warming and lobbying Congress to open the Artic National Wildlife Refuge (ANWR) to drilling").

11.     In addition to the risks described above, experience has shown that publicly linking a NAM member to the association's lobbying activities often results in legislators and other groups with policy-influencing ability making demands for contributions and other support from individual members.  The NAM frequently receives requests from legislators and others to identify its membership, and we uniformly refuse.  Members of the NAM have made clear that this protection is important to their decision to support the NAM.

12.     Importantly, members of the NAM are not always of one mind.  Often, when a NAM committee considers how to proceed on a particular lobbying issue, some members may favor a different position than that ultimately reached by the committee, while others may oppose any action at all.

13.     Recently, I have received a rising tide of membership inquiries concerning what the Amendments mean for their participation in activities of the NAM and asking what guidance and assurances we can give concerning disclosure.  So far, I have been able to respond that we are challenging the Amendments in this action, and we hope compliance will be postponed until the new requirements are clarified or invalidated.  Obviously, that response is not entirely reassuring, and it becomes less so as the first April 21 disclosure deadline approaches.  If the time comes that we have to tell the membership that the NAM is going to have to try to comply with the new disclosure requirements, that will

cause considerable membership concern and reduction in support for the NAM's public policy activities.

## **Vagueness**

14.     Under the Amendments, the disclosure obligation of organizations that employ lobbyists has been expanded to require the public identification on a quarterly basis of all organizational supporters who (i) "actively participate[] in the planning, supervision, or control" of any "lobbying contacts and efforts in support of such contacts, including preparation and planning activities, research and other background work that is intended, at the time it is performed, for use in contacts, and coordination with the lobbying activities of others," and (ii) contribute more than $5,000 to such activities.  §§ 1602(7), 1603(b)(3)(A)-(B), 1604(a), (b)(1).[2]

15.     The term "lobbying contact" is very broadly defined in § 1602(8)(A) to encompass contacts with a wide range of legislative and executive personnel, rather than just Members of Congress, § 1602(3) & (4), and with respect to a wide range of subjects far removed from passage or defeat of a specific bill such as:

> (i) the formulation, modification, or adoption of Federal legislation (including legislative proposals);
>
> (ii) the formulation, modification, or adoption of a Federal rule, regulation, Executive order, or any other program, policy, or position of the United States Government;

---

[2]     All statutory citations are to Title 2 of the U.S.C. unless otherwise noted.  A version of the Code in which the Amendments have been integrated can be found at: http://www.senate.gov/legislative/Lobbying/Lobby_Disclosure_Act/compilation.pdf.

>    (iii) the administration or execution of a Federal program or
>    policy (including the negotiation, award, or administration
>    of a federal contract, grant, loan, permit, or license); or
>
>    (iv) the nomination or confirmation of a person to a
>    position subject to confirmation by the Senate.

16.    Those standards are vague on their face, and I cannot imagine how they could be

faithfully and confidently applied to the complex activities of the NAM's contributing

members.  For example, the provision requires the NAM to determine if a member has

been "actively participating" during the quarter.  By what standard is the NAM to

determine if conduct is "active" or not?  Is that standard to be applied separately to each

meeting, conversation, or similar discrete act by a given member's employee, or is all

conduct over the quarter to be viewed holistically?  If the latter, since the standard speaks

of the conduct of the employer member, does this mean that the NAM must somehow

keep track of and bring together for assessment all of the various activities by a given

member's various employees?

17.    The language of the provision would require the NAM to determine whether any

"active" participation by a contributing member's employees was "intended at the time it

is performed" for use in lobbying contacts.  § 1602(7).  Whose intent controls – the

individual employee, all employees of a given employer, the committee or other group, or

the NAM as a whole?  Assuming an individual employee's intent controls, how is the

NAM to determine what he or she intended at the time?  Must the NAM ask at the time,

ask later, or attempt to draw inferences from what occurred?  If the latter, is the NAM

required to have observers present, keeping records?  Or, if the employer's/member's

institutional intent controls, how is the NAM to ascertain that intent?

-8-

18.     Members of the NAM are not always of one mind about its lobbying. Suppose several members are pursuing a research effort in the expectation that information will be developed that will support an ongoing lobbying effort by the NAM, and another member participates to develop information it hopes will preclude use in the lobbying effort. Is the NAM required to perceive the intent of each such member and its employees?

19.     The provision speaks of efforts "in support of [lobbying] contacts, including" an act "intended, at the time it is performed, for use in [such] contacts." §1602(7) (emphasis added). Does this mean that some conduct may be an act "in support" even though it was not intended to be so used at the time? If so, what standard is the NAM to apply to identify such supporting conduct? If work is actually used in a contact, does that retroactively reclassify it as "in support" of that contact, imposing a member to unforeseen disclosure?

20.     The statutory language is so broad and vague that it can be literally applied to a wide range of common conduct that it would be absurd for the NAM to have to report. But the NAM is not skilled at mind reading and it cannot be confident that, in the swirl of political interests and pressures, enforcement personnel will always share our ad hoc judgments as to what is absurd. To take an extreme example, contacts concerning nominations are lobbying, and research and other background work relating to a possible nomination may trigger disclosure. The health of both incumbents and possible nominees is relevant to nominations. Thus, if an employee of a contributing member of the NAM greeted an incumbent or possible nominee with a conventional "How are you today?" the provision literally could apply.

21.     That absurd example (I hope that it is absurd) shades into a wide range of other communications. Employees representing contributing employees of the NAM may often discuss matters that relate, more or less directly, to an issue on which the NAM is active. If, during such a discussion, an employee recognizes that information being developed may be useful in supporting lobbying contacts, does continuing the conversation become an activity "in support of" a lobbying activity (e.g., "planning activities, research, and other background work")? Also, who controls or supervises the conversation – all participants, the dominant speaker, or someone else? The NAM should not be forced to risk penalties based on some judgment as to the intent of its core First Amendment activities.

22.     These questions are not unique to the NAM. Other similar organizations will face similar difficulties.

## Poor Tailoring

23.     The new law was portrayed and justified as a means of forcing "stealth coalitions" to identify the interests they represent. But the new law does little to achieve that. Lobbying coalitions can take various forms. It is possible for a coalition to hire its own lobbyist, in which case it would incur some reporting obligations. But it is not usual for a coalition to operate through a lobbyist hired by the cooperating members. Any "stealth coalition" that wants to conceal its membership can simply rely on the lobbyists retained or employed by the coalition's members, as some coalitions have done in the past. As I read the challenged provisions, such a coalition would have no disclosure obligation.

Based on my experience, I believe any coalition that wants to operate on a stealth basis will do so despite the new provision.

24.     The Amendments also exempt individuals from any disclosure, no matter how wealthy and powerful they may be, how much they contribute, how much control they exercise, and how active they are.

25.     Indeed, the primary impact of the new disclosure obligations will be on well-established groups who have been lobbying under well-known names for years. If there were a compelling need to require stealth coalitions to provide more disclosure of the interests they represent, alternative standards that would better target such coalitions are available. For example, stealth coalitions tend to be short-lived, because the basic interests they represent quickly become known. So a more-tailored standard might focus on length of existence. To be clear, I am not advocating such legislation, but merely making the point that the present provision is not narrowly tailored.

## Injury to the NAM and its Members

26.     Unless enjoined, the new disclosure provision will injure the NAM and its members in a variety of ways. Most simply, it threatens self-censorship that will impair the NAM's core First Amendment functions. As I discuss above, the risk that contributing members will be publicly identified as involved in the NAM's lobbying has become a matter of growing concern that my inability to provide clear guidance has done nothing to quell. Based on recent contacts from members, it is clear that members of the NAM who object to disclosure already are beginning to take that risk into account, self-

censoring in deciding whether to participate in the NAM's public policy initiatives. Because that is true, the NAM itself also must self-censor, taking into account the potential for reduced member participation when considering hot-button issues. Since our planning is an ongoing process, that injury already is occurring. (For obvious reasons, I am unwilling to identify members who are unwilling to be identified, but specific examples exist).

27.    With respect to self-censorship, I should note that both the NAM and its member manufactures are very averse to incurring any risk of even allegations of wrongdoing. Businesses want to be, and be seen as, good citizens. They do not want to risk injury to their business operations or shareholders in pursuit of public policy goals. The NAM is very conscious that if contributing to its membership activities is seen as risky, membership involvement will dry up. We need clear and precise standards because it is vital to us and our members to be confident we are in compliance. Where there are gray areas, we and our members will steer far clear, giving up protected rights to avoid risks.

28.    The new disclosure provision also threatens serious and unrecoverable losses to the NAM. At present, the NAM has no mechanisms for collecting and evaluating the information that would be necessary to attempt to comply, e.g., data on the level of activity of the various employees of contributing members and the intent with which they are acting. Attempting to design and implement such mechanisms would impose unrecoverable costs, and the resources would be diverted from core First Amendment activities the NAM otherwise would be pursuing. Moreover, the process would increase membership concern, as well as interfere with and reduce the effectiveness of meetings

and conversations. I personally have had to cancel meetings and postpone other affirmative activities in a fruitless effort to figure out what our compliance obligations might be and how they might be met. The same is true of other NAM staff. The NAM has lost tens of thousands of dollars worth of time, and spent large sums out of pocket, that otherwise would have advanced our policy agenda.

29.    Also, both the NAM and its members will be directly deprived of their First Amendment privacy and confidentiality interests. Contributing members who are disclosed will lose their right to anonymous speech, and they will risk consequences ranging from boycotts or mob violence to political harassment.

30.    The NAM's trade secret and similar proprietary right in its membership list will be impaired. From time to time, the NAM allows carefully-selected firms to use the list in return for payments that support the NAM's core First Amendment mission. By imposing careful controls, we can realize some economic value while preserving confidentiality. The NAM's right to control its list, however, depends on carefully preserving its confidentiality. Forced disclosure of the NAM's most active members would substantially erode the NAM's control and the confidentiality that is essential to continued protection.

31.    Finally, the NAM will be forced either to over-report, thus injuring its key member relationships, or under-report and incur the risk of adverse action, ranging from publicity to enforcement actions or even criminal prosecution. The presently unsettled political situation makes it particularly unfair to force the NAM to file reports that then may be exploited against it in the future. At a minimum, the Court should assure that our

-13-

disclosure obligations are precisely defined and narrowly tailored before we start filing reports that will expose us to enforcement actions for years.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing declaration is true and accurate. Executed in Washington, D.C. on February 5, 2008.

Jan Sarah Amundson

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| **NATIONAL ASSOCIATION OF** )<br>**MANUFACTURERS,** )<br> )<br>**v.** )<br> )<br>**HONORABLE JEFFREY A. TAYLOR, et al.** ) | **Case No.** _____ |

**PROPOSED ORDER**

Upon consideration of Plaintiff National Association of Manufacturers' ("NAM")

Motion for a Preliminary Injunction barring enforcement of section 207 of the Honest

Leadership and Open Government Act of 2007, Pub. L. No. 110-81, 121 Stat. 735

("Amendments"), this Court hereby finds as follows:

1.     Plaintiff has shown a substantial probability that it will succeed on the

merits of its claim that section 207's disclosure provision is vague, untailored, and

overbroad.

2.     Plaintiff has demonstrated that it and its members will suffer irreparable

injury if a preliminary injunction is not granted in the form of self-censorship, loss of

confidentiality, and uncompensable diversion of resources from core First Amendment

activity.

3.     Neither the U.S. Attorney for the District of Columbia, the Secretary of

the Senate, nor the Clerk of the House of Representatives will suffer harm if they are

enjoined from enforcing the challenged provision.  To the contrary, they share in the

public's strong interest in protecting core First Amendment rights.

4.     In light of the substantial First Amendment issues raised by this litigation

the public interest favors a preliminary injunction.

**NOW THEREFORE,** this _____ day of _____ 2008, it is hereby ordered as follows:

1.    Defendants and their agents are preliminary enjoined from enforcing section 207 of the Amendments against Plaintiff NAM.

2.    Plaintiff is not relieved from filing disclosure reports in accordance with the version of 2 U.S.C. § 1603(b)(3) that existed prior to the adoption of the Amendments.

3.    This Order shall expire upon entry of a final and unappealable judgment in this action.

4.    No security is necessary or appropriate.

_____

Hon. _____
United States District Judge