UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
NATIONAL ASSOCIATION OF                   )
MANUFACTURERS,                            )
                                          )
                        Plaintiff,        )
                                          )        No. 1:08-cv-00208-CKK
              v.                          )
                                          )        Assigned to Judge Colleen Kollar-
TAYLOR, *et al*.,                         )        Kotelly
                                          )
                        Defendants.       )
                                          )
_____ )

**MOTION OF THE CAMPAIGN LEGAL CENTER, DEMOCRACY 21 AND PUBLIC
CITIZEN TO PARTICIPATE AS *AMICI CURIAE*
WITH SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES**

The Campaign Legal Center (the "CLC"), Democracy 21 and Public Citizen, Inc.
respectfully move this Court for leave to participate in this case as *amici curiae* in support of
Defendants[1] in the above-captioned matter and to file the attached Memorandum of Points and
Authorities in Support of Defendants.

As grounds for this motion, *amici* would show unto the Court that:

1.      The CLC is a nonpartisan, nonprofit organization which works in the areas of
        campaign finance, voting rights and governmental ethics. The CLC participates
        in state and federal court litigation throughout the nation regarding campaign
        finance disclosure and regulation, campaign finance enforcement, voting rights
        and governmental integrity laws. The CLC also works with Congress to promote

_____
[1] The defendants herein are Jeffrey A. Taylor, U.S. Attorney for the District of Columbia; Nancy Erickson,
Secretary of the U.S. Senate; and Lorraine Miller, Clerk of the House of U.S. Representatives.

campaign finance and lobbying reform, and to strengthen federal ethics rules and enforcement.

2.    Democracy 21 is a nonprofit, nonpartisan organization dedicated to making democracy work for all Americans. Democracy 21, and its education arm, Democracy 21 Education Fund, work to eliminate the undue influence of big money in American politics and to ensure the integrity and fairness of government decisions and elections. The organization promotes campaign finance reform and other political reforms to accomplish these goals. It also participates in rulemakings and advisory opinion proceedings, and other administrative proceedings, at the FEC.

3.    Public Citizen, Inc. is a nonprofit, membership advocacy organization dedicated to openness in government and the protection of individuals against overreaching by government and corporate entities alike. Public Citizen appears on behalf of its nationwide membership before courts, the Congress, and executive agencies to promote these goals. In particular, Public Citizen has long been active in the struggle to rein in corruption and the appearance of corruption of elected officials through the enactment of meaningful campaign finance and lobbying reforms. Public Citizen has taken part in various capacities in many legal cases testing the meaning and constitutionality of such reform measures.

4.    The CLC, Democracy 21 and Public Citizen's Litigation Group have provided legal counsel to parties and *amici* in numerous campaign finance cases at the federal and state court levels, including representing intervening defendants in *McConnell v. FEC*, 540 U.S. 93 (2003). *Amici*'s attorneys have also participated

as counsel in the recent Supreme Court cases, *Randall v. Sorrell*, 126 S. Ct. 2479 (2006) and *FEC v. Wisconsin Right to Life, Inc.*, 127 S. Ct. 2652 (2007).

5.  The present case concerns a facial and as-applied challenge to the constitutionality of Section 207 of the Honest Leadership and Open Government Act ("HLOGA"), Pub. L. 110-81, 121 Stat. 735 (2007).  S*ee* S.1, 110th Cong. § 207 (2007), *codified at* 2 U.S.C. § 1603(b).  This section amends the Lobbying Disclosure Act of 1995 ("LDA"), Pub. L. 104-65, 109 Stat. 691 (1995), to require lobbying coalitions to identify all member organizations that both finance and actively participate in the coalition's lobbying activities.  By requiring the disclosure of member organizations active in a coalition's lobbying efforts, Section 207 prevents circumvention of the LDA's registration and reporting requirements.

6.  The issues raised by this case directly impact the interests of the *amici curiae*. *Amici* were active in the drafting and debate of HLOGA in Congress, including providing policy papers and legal memorandum, and lobbying individual Senators and Members.  *Amici* also participate in a coalition of reform groups that advocates for stronger lobbying disclosure laws and governmental ethics rules in the media and before Congress.

7.  The CLC, Democracy 21 and Public Citizen request leave to file the attached memorandum in support of defendants.  *Amici* believe that this brief will assist the Court's understanding of the law relating to the constitutionality of lobbying disclosure laws and related campaign finance laws, and will offer legal authorities and arguments not advanced in the briefs of the parties.

8.    Counsel for Plaintiff (Thomas Kirby) and counsel for Defendant Taylor (Justin Sanberg), Defendant Erickson (Thomas Caballero) and Defendant Miller (Richard Kaplan) have been contacted about their consent to the participation of *amici* in this case.  Counsel for all Defendants have consented to the participation, and counsel for Plaintiff has consented.

9.    This filing is timely because this motion and the attached memorandum are being filed on the date that the principal brief of Defendants is due.  Participation by *amici* will not delay these proceedings in any way or burden any party.

WHEREFORE, premises considered, the CLC, Democracy 21 and Public Citizen respectfully pray that this Court will grant this motion and permit their participation in this case as *amici curiae*.  A proposed Order is attached.

**Respectfully submitted,**

/s/ J. Gerald Hebert
J. Gerald Hebert
(D.C. Bar No. 447676)
Paul S. Ryan
(D.C. Bar No. 502514)
THE CAMPAIGN LEGAL CENTER
1640 Rhode Island Ave., N.W.
Suite 650
Washington, D.C.  20036
Tel: (202) 736-2200

/s/ Donald J. Simon
Donald J. Simon
(D.C. Bar No. 256388)
SONOSKY, CHAMBERS, SACHSE,
ENDRESON & PERRY, LLP
1425 K Street, N.W.
Suite 600
Washington, D.C. 20005
(202) 682-0240

Fred Wertheimer
(D.C. Bar No. 154211)
DEMOCRACY 21
1875 I Street, N.W.
Suite 500
Washington, D.C. 20005
(202) 429-2008

*Counsel for Amici Curiae*

**Dated: February 29, 2008.**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
NATIONAL ASSOCIATION OF                             )
MANUFACTURERS,                                      )
                                                    )
                          Plaintiff,                )
                                                    )     No. 1:08-cv-00208-CKK
                  v.                                )
                                                    )     Assigned to Judge Colleen Kollar-
TAYLOR, *et al.*,                                   )     Kotelly
                                                    )
                          Defendants.               )
                                                    )
_____)

## <u>ORDER</u>

Pending before the Court is a motion by the CAMPAIGN LEGAL CENTER,

DEMOCRACY 21 and PUBLIC CITIZEN for leave to appear in this cause as *amici curiae*

and to file the Memorandum in Support of Defendants.  For good cause shown, the motion

for leave to participate as *amici curiae* is hereby GRANTED and the memorandum of *amici*

*curiae* shall be filed in this case.

This _____ day of February, 2008.


                                        _____
                                        United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing motion with proposed order and the supporting memorandum of points and authorities have been filed via email, pursuant to Part I(II)(F) of the "Clerk's Office General Information & Civil Filing Procedures" (Documents Exempt From the CM/ECF System), on this 29th day of February, 2008.  In addition, the following counsel have been served with copies of the foregoing motion for leave to participate as *amici curiae* with proposed order and the supporting memorandum of points and authorities order via email (where email addresses are available and known) and via first-class mail, postage pre-paid.

**Attorneys Representing Plaintiffs:**

Thomas W. Kirby
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
Email: tkirby@wileyrein.com

**Attorneys Representing Defendants:**

Justin Sanberg
United States Department of Justice
P.O. Box 883
Washington, DC 20044
Email: j.sanberg@usdoj.gov

Thomas Caballero
Assistant Senate Legal Counsel
Office of the Senate Legal Counsel
Hart Building, Suite 642
U.S. Senate
Washington, DC 20510
Email: thomas_caballero@legal.senate.gov

Richard Kaplan
Office of the General Counsel
U.S. House of Representatives
Washington, DC 20515
Email: richard.kaplan@mail.house.gov

                                        /s/ Tara Malloy
                                         Tara Malloy

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————

)
NATIONAL ASSOCIATION OF                     )
MANUFACTURERS,                               )
                                             )
                         Plaintiff,          )
                                             )          No. 1:08-cv-00208-CKK
            v.                               )
                                             )          Assigned to Judge Colleen Kollar-
TAYLOR, *et al.*,                            )          Kotelly
                                             )
                         Defendants.         )
                                             )
———————————————————————)

# MEMORANDUM OF
## CAMPAIGN LEGAL CENTER, DEMOCRACY 21 AND PUBLIC CITIZEN
### AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS

Donald J. Simon                          J. Gerald Hebert
(D.C. Bar No. 256388)                    (D.C. Bar No. 447676)
SONOSKY, CHAMBERS, SACHSE,               Paul S. Ryan
ENDRESON & PERRY, LLP                    (D.C. Bar No. 502514)
1425 K Street, N.W.                      THE CAMPAIGN LEGAL CENTER
Suite 600                                1640 Rhode Island Ave., N.W.
Washington, D.C. 20005                   Suite 650
(202) 682-0240                           Washington, DC  20036
                                         Tel: (202) 736-2200

Fred Wertheimer
(D.C. Bar No. 154211)                    *Counsel for Amici Curiae*
DEMOCRACY 21
1875 I Street, N.W.
Suite 500
Washington, D.C. 20005
(202) 429-2008


*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**SUMMARY OF ARGUMENT** ............................................................................................1

**ARGUMENT** ...............................................................................................................3

    I.     Section 207 Was Enacted to Prevent Circumvention of the LDA. ...........................3

    II.    Lobbying Disclosure Requirements Are Not Subject to Strict Scrutiny. ..................6

    III.   Lobbying Disclosure – including Section 207 – Is Justified by the State Interest in Maintaining the Integrity of the Legislative Process. ..................................................9

    IV.   The NAM Fails to Show that the Burden Imposed by Lobbying Disclosure on its Members Warrants an Exemption From the LDA. ...................................................15

    V.    Section 207 Is Not Void for Vagueness. .................................................................19

**CONCLUSION** ...........................................................................................................22

## TABLE OF AUTHORITIES

**Cases:**

*Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999) ................................6

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...........................................................................6, 8, 16, 18

*Brown v. Socialist Workers '74 Campaign Committee*, 459 U.S. 87 (1982) ..........................17, 18

*Citizens Against Rent Control v. Berkeley*, 454 U.S. 290 (1981) ....................................................8

*Commission on Independent Colleges and Universities v. New York Temporary State Commission*, 534 F. Supp. 489 (N.D.N.Y. 1982) ...........................................................7, 9, 12, 17

*First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) ...........................................................8

*Florida League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457 (11th Cir. 1996) ...............1, 7, 11

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .....................................................................20

*Kimbell v. Hooper*, 164 Vt. 80, 85, 665 A.2d 44 (1995) ....................................................7, 12, 20

*Hill v. Colorado*, 530 U.S. 703 (2000) ..................................................................................19, 21

*McConnell v. FEC*, 540 U.S. 93 (2003)...............................................................6, 9, 13, 16, 20

*McIntyre v. Ohio Elections Comm'n.*, 514 U.S. 334 (1995).................................................6, 11, 14

*Minnesota Citizens Concerned for Life, Inc. v. Kelley*, 427 F.3d 1106 (8th Cir. 2005)............7, 20

*Minnesota State Ethical Practices Board v. Nat'l Rifle Association*, 761 F.2d 509 (8th Cir. 1985).............................................................................................................................7, 11

*NAACP v. Alabama,* 357 U.S. 449 (1958)...........................................................................16, 18

*U.S. v. Harriss*, 347 U.S. 612 (1954)............................................................................... *passim*

**Statutes, Legislation and Legislative History:**

Bipartisan Campaign Reform Act, Pub. L. 107-155, 116 Stat. 81 (2002)......................................9

Federal Election Campaign Act, 2 U.S.C. §§ 431, *et seq.*..............................................................8

Honest Leadership and Open Government Act, Pub. L. 110-81, 121 Stat. 735 (2007) ................1

Lobbying Disclosure Act of 1995, Pub. L. 104-65, 109 Stat. 691 (1995)....................................1

2 U.S.C. § 1602(2)............................................................................................................20

2 U.S.C. § 1602(8)(A).......................................................................................................19

2 U.S.C. § 1602(8)(B)........................................................................................................19

2 U.S.C. § 1602(10)........................................................................................................3, 20

2 U.S.C. § 1602(7).............................................................................................................19

2 U.S.C. § 1603(a)(1)...........................................................................................................3

2 U.S.C. § 1603(a)(3)(A)...............................................................................................3, 17, 20

2 U.S.C. § 1603(b).................................................................................................3, 5, 14, 18

2 U.S.C. § 1603(b)(3).......................................................................................................4, 17

2 U.S.C. § 1604(b)...........................................................................................................4, 20

2 U.S.C. § 1603(b)(3)(1995), *amended by* Pub. L. 110-81 (2007)................................4, 12, 20

S.1, 110th Cong. § 207 (2007)..........................................................................................1, 3

**Other Sources:**

*See* Alison Mitchell, *Loophole Lets Lobbyists Hide Clients' Identity*, N.Y. TIMES (July 5, 2002), *available at* http://query.nytimes.com/gst/fullpage.html?res= 9C02EFDB1031F936A35754C0A9649C8B63&sec=&spon= ......................................................4

Office of the Clerk of the House of Representatives and Office of the Secretary of the Senate, Lobby Disclosure Act Guidance (revised January 25, 2008) ("Guidance"), *available at* http://www.senate.gov/legislative/resources/pdf/S1guidance.pdf......................21, 22

Office of the Clerk of the House of Representatives and Office of the Secretary of the Senate, Lobby Disclosure Act Guidance (Pre-HLOGA) *available at* http://www.senate.gov/legislative/common/briefing/lobby_disc_briefing.htm#1 ........................4

**SUMMARY OF ARGUMENT**

In *U.S. v. Harriss*, 347 U.S. 612 (1954), the Supreme Court upheld the Federal

Regulation of Lobbying Act, holding that it was justified by Congress' interest in gathering

information about "those who for hire attempt to influence legislation or who collect or spend

funds for that purpose." *Id*. at 625-626. Following this seminal decision, federal and state

courts have been almost unanimous in upholding lobbying disclosure statutes based on the

state interest in informing the public of the persons and groups that are attempting to sway the

legislative process.

Despite this near unanimity, the National Association of Manufacturers (the "NAM")

has filed a facial and as-applied challenge to the constitutionality of Section 207 of the Honest

Leadership and Open Government Act ("HLOGA"), Pub. L. 110-81, 121 Stat. 735 (2007).

S*ee* S.1, 110th Cong. § 207 (2007), *codified at* 2 U.S.C. § 1603(b). This section strengthens

the Lobbying Disclosure Act of 1995 ("LDA"), Pub. L. 104-65, 109 Stat. 691 (1995), by

requiring lobbying coalitions to identify all member organizations that both finance and

"actively participate[] in the planning, supervision or control of" the coalition's lobbying

activities. Section 207 thus implicates the core interests supporting lobbying disclosure,

namely providing the information necessary to "apprais[e] the integrity and performance of

officeholders and candidates, in view of the pressures they face." *Florida League of Prof'l

Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 460 (11th Cir. 1996).

*Amici* respectfully submit that Section 207 is constitutional, both facially and as

applied. Accordingly, this Court should dismiss the complaint on the merits.

First, the NAM's position is fundamentally inconsistent. The NAM challenges the

constitutionality of Section 207, but accepts the constitutionality of the other disclosure

provisions in the LDA.  To be sure, the NAM can not plausibly request that this Court strike down the LDA on an omnibus basis in light of the *Harriss* decision.  But this puts the NAM in the untenable position of conceding the constitutionality of disclosure for an organization that lobbies on its own, while simultaneously opposing disclosure for two or more organizations that lobby in association with each other.  The NAM never explains why it believes multiple organizations operating in coalition have a right to lobby anonymously, whereas an organization acting independently enjoys no such privilege.

Moreover, Supreme Court authority makes abundantly clear that Section 207 is a properly tailored means to achieve the governmental goals of providing full disclosure of "lobbying pressures," and protecting the integrity of the legislative process.  By requiring the disclosure of member organizations that fund and actively participate in a coalition's lobbying activities, Section 207 prevents evasion of the LDA's registration and reporting requirements.

Nor has the NAM shown that Section 207 will unconstitutionally burden the First Amendment rights of its members, or expose them to threats, reprisals or other forms of harassment.  The NAM's claim that compelled disclosure will cause "mob violence," labor disputes, boycotts and litigation is pure speculation, and should be rejected as such.

Finally, the NAM has not demonstrated that Section 207 is unconstitutionally vague. This section gives a person of ordinary intelligence ample guidance as to what disclosure is required, and relies on terms that have been in effect since the enactment of the LDA in 1995.

For all these reasons, the NAM's motion for a preliminary injunction should be denied, and its complaint dismissed.

## ARGUMENT

### I. Section 207 Was Enacted to Prevent Circumvention of the LDA.

The objective of Section 207 of HLOGA is to provide Congress and the public with information about the membership of lobbying coalitions and associations. To this end, Section 207 amends the LDA to require disclosure of any member organizations of a lobbying coalition that contribute at least $5,000 in a quarterly period toward the coalition's "lobbying activities," and that "actively participate in the planning, supervision or control of such lobbying activities." S*ee* S.1, 110th Cong. § 207 (2007), *amending* 2 U.S.C. § 1603(b).

Section 207 is but one requirement in the larger lobbying disclosure framework established by the LDA. A lobbyist or an organization employing a lobbyist must register with the Secretary of the Senate and the Clerk of the House shortly after the lobbyist is retained or makes lobbying contacts.[1] 2 U.S.C. § 1603(a)(1). The LDA exempts from registration those lobbyists and lobbying organizations that do not meet a minimum financial threshold. A retained lobbyist is required to register only if his or her income connected to a particular client exceeds $2,500 in a quarter; an organization employing lobbyists is required to register only if its total expenses connected to lobbying activities exceed $10,000 in a quarter. 2 U.S.C. § 1603(a)(3)(A). In the registration, a lobbyist or lobbying organization (the "registrant") must provide basic information about the registrant and the registrant's client(s), and a description of the general issues upon which the registrant will lobby. 2 U.S.C. § 1603(b). Importantly for this case, the registration also must include information about clients that operate as lobbying coalitions pursuant to Section 207. 2 U.S.C. §

---

[1]       The LDA defines a "lobbyist" as person who, for compensation, makes more than one lobbying contact with a covered legislative or executive official, and spends at least 20% of his or her time engaged in "lobbying activities" in a quarterly reporting period. 2 U.S.C. § 1602(10).

1603(b)(3).  In addition to registering, lobbyists and lobbying organizations must file quarterly reports providing information about their activities in the reporting period, including the identity of their clients, the specific issues upon which they engaged in lobbying activities, and their income and/or expenses connected to lobbying activities.  2 U.S.C. § 1604(b).

Prior to amendment by HLOGA, the former provision of the LDA governing lobbying coalitions required disclosure of only those member organizations that contributed at least $10,000 to support the coalition's "lobbying activities" in a semiannual period, and that "in whole or in major part plan[ned], supervise[d] or control[led]" such lobbying activities.  2 U.S.C. § 1603(b)(3)(1995), *amended by* Pub. L. 110-81 (2007).  This provision was interpreted narrowly to require identification of only those members that controlled at least 20% or more of the coalition's lobbying activities.  *See* Office of the Clerk of the House of Representatives and Office of the Secretary of the Senate, Lobby Disclosure Act Guidance (pre-HLOGA), *available* at http://www.senate.gov/legislative/common/briefing/ lobby_disc_briefing.htm#3.  Frequently, no single member of a lobbying coalition would meet this threshold, sometimes due to a deliberate strategy of dispersing power in the coalition.  *See* Alison Mitchell, *Loophole Lets Lobbyists Hide Clients' Identity*, N.Y. TIMES, July 5, 2002, *available at* http://query.nytimes.com/gst/fullpage.html?res= 9C02EFDB1031F936A35754C0A9649C8B63&sec=&spon=.  As a result, only the umbrella coalition would be subject to disclosure, and the groups comprising the coalition would remain anonymous.  The public would receive information that an association named, for example, the "Policy & Taxation Group," was making expenditures to influence legislation, but remain in the dark about the key players who funded and operated the association.  *Id*. (noting that Congressional Research Service in 2002 identified 135 lobbying coalitions in

LDA reports for which there was only limited information or no information about membership available).

To prevent circumvention of the LDA and to provide more information to the public, Congress passed Section 207 of HLOGA to clarify that coalition members that fund a coalition's lobbying activities and that "actively participate in the planning, supervision or control" of such activities should be identified in the registration. Thus, any member organization that has an active role in a coalition's lobbying activities is subject to disclosure, not merely those organizations that exercise greater than 20% control over the lobbying activities.

Section 207 also contains a number of safeguards to limit the reporting obligations of lobbying coalitions and to protect the associational rights of individuals and organizations. First, the provision does not change or expand the class of persons or groups who have to register as lobbyists; rather, it only requires lobbyists and lobbying coalitions that are already registered to disclose information about the membership of a lobbying coalition. Section 207 also exempts a registered coalition from identifying any <u>individuals</u> who are members of the coalition or a member organization. 2 U.S.C. § 1603(b). In addition, with large trade associations specifically in mind, Section 207 exempts a registered coalition or trade association from disclosing organizational members whom would otherwise be subject to the disclosure, if the coalition or trade association publishes the names of those organizational members on its Web page. *Id*. However, this internet disclosure is simply an alternative option for a registrant, and is not a required part of the disclosure.

## II.  Lobbying Disclosure Requirements Are Not Subject to Strict Scrutiny.

The NAM argues that Section 207 is "invalid unless the demands of strict scrutiny are met."  Plaintiff's Motion for a Preliminary Injunction and Supporting Memorandum of Law (filed Feb. 6, 2008) ("Pl. Memo") at 18.  There is little basis for this position.  Contrary to the NAM's argument, political disclosure requirements are subject to only an intermediate degree of scrutiny because they represent "the least restrictive means of curbing the evils of … ignorance and corruption."  *Buckley v. Valeo*, 424 U.S. 1, 68 (1976); *see also McConnell v. FEC*, 540 U.S. 93, 196 (2003).[2]

The Supreme Court in *Harriss* did not specify the level of scrutiny it applied to the Federal Regulation of Lobbying Act of 1946, and indeed the case predated the formalization of the different levels of constitutional scrutiny in the Court's First Amendment jurisprudence.

---

[2]    The cases cited by the NAM to support the application of strict scrutiny are distinguishable. The disclosure statutes under review in those cases related to the ballot initiative process, and implicated the privacy rights of individuals.  *See* Pl. Memo at 22 (citing *McIntyre v. Ohio Elections Comm'n.*, 514 U.S. 334 (1995) and *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999)).

In *McIntyre*, the Supreme Court declared unconstitutional an Ohio statute that required ballot initiative literature to identify the author of the literature, even in the case of a private citizen.  The Supreme Court noted that the anti-corruption interest that supports the disclosure of lobbying activities does not support the disclosure of ballot initiative activity, which has no connection to candidates or officeholders.  514 U.S. at 356 n.20.  Further, the Court noted that the Ohio statute was "particularly intrusive" because it required disclosure even "in the case of a handbill written by a private citizen who is not known to the recipient."  *Id.* at 348-49, 355 (emphasis added).  As compared to the instant case, the governmental interest in *McIntyre* was more remote, and the burden on individual speech rights more intrusive.  The *McIntyre* decision therefore does not bear upon the level of scrutiny that should apply to Section 207.

In *American Constitutional Law Foundation*, the Supreme Court invalidated provisions of a Colorado statute which required: (1) sponsors of ballot initiatives to disclose the names and addresses of the paid circulators of ballot petitions, and (2) paid circulators to wear name tags when collecting petition signatures.  The Court concluded that disclosing the names of individual circulators was not particularly informative, and potentially could expose the circulators to personal harassment.  525 U.S. at 197-201, 203.  Because *American Constitutional Law Foundation* considered a statute relating to the ballot initiative process that required the disclosure of individuals, it is also distinguishable from the instant case.

The nature of the Supreme Court's analysis in *Harriss*, however, indicated that the 1946
Lobbying Act was held only to intermediate review. The Court did not evaluate whether the
Act implicated a "compelling state interest," or whether it was properly tailored to serve the
state interest. Instead the Court simply reviewed the purposes of the Act and concluded that
the Act was "plainly within the area of congressional power and [] designed to safeguard a
vital national interest." 347 U.S. at 626.

      This was also the conclusion of the Court of Appeals for the Eleventh Circuit. After
reviewing *Harriss*, the Eleventh Circuit noted that the Supreme Court had been silent as to the
standard of review, but in effect, had declined to apply strict scrutiny to the 1946 Lobbying
Act. *See Fla. League of Prof'l Lobbyists*, 87 F.3d at 460 ("It appears, however, that the
[*Harriss*] Court did not subject the lobbying restrictions to the demands of strict scrutiny.").
The Eleventh Circuit pointed out that the *Harriss* Court's analysis was limited to analyzing
the governmental interests supporting the 1946 Lobbying Act and weighing the constitutional
injury alleged by the appellants. *Id. See also Commission on Independent Colleges and
Universities v. New York Temporary State Commission*, 534 F. Supp. 489, 498 (N.D.N.Y.
1982) (observing that "lobby disclosure laws are traditionally subject to less scrutiny than
laws that sanction pure speech") (internal citations omitted); *Kimbell v. Hooper*, 164 Vt. 80,
85, 665 A.2d 44, 47 (noting that lobbying disclosure laws "are not subject to the same strict
scrutiny as laws that impinge on pure speech," but nevertheless are supported by "several
compelling interests"). *But see Minnesota State Ethical Practices Board v. Nat'l Rifle
Association*, 761 F.2d 509, 511 (8th Cir. 1985) (assuming without analysis that state lobbying
disclosure law must serve "compelling interest"); *compare Minnesota Citizens Concerned for
Life, Inc. v. Kelley*, 427 F.3d 1106, 1110 (8th Cir. 2005) (affirming lower court decision

which found lobbying disclosure statute constitutional where "government interests [are]

sufficiently <u>important</u> to outweigh the possibility of infringement") (quoting *Buckley*, 424

U.S. at 66) (emphasis added).

 The application of intermediate scrutiny to the LDA comports with the degree of

scrutiny applied to analogous disclosure requirements in the federal campaign finance laws.

In *Buckley*, the Supreme Court applied "exacting scrutiny" to the various disclosure

provisions in the Federal Election Campaign Act ("FECA"), 2 U.S.C. §§ 431 *et seq*., holding

that such provisions are constitutional if there is a "'relevant correlation' or 'substantial

relation' between the governmental interest and the information required to be disclosed."

*Buckley*, 424 U.S. at 64.  The Court deemed this lower standard appropriate because

disclosure requirements "impose no ceiling on campaign-related activities," and "appear to be

the least restrictive means of curbing the evils of campaign ignorance and corruption that

Congress found to exist."  *Id*. at 64, 68.  By contrast, the Court applied strict scrutiny to

FECA's limits on campaign-related expenditures, finding that expenditure limits represent

"substantial … restraints on the quantity and diversity of political speech."  *Id*. at 19.[3]

Similarly, in reviewing the electioneering communications disclosure provisions in the

---

[3] Because campaign finance disclosure requirements are considerably less restrictive than contribution limits or expenditure limits, the Supreme Court subjects the former requirements to less rigorous scrutiny than the latter limits.  *Buckley*, 424 U.S. at 13-23 (discussing limits on expenditures and contributions), 64-68 (discussing disclosure requirements).  As a result, the Court has frequently approved of campaign finance disclosure requirements while simultaneously invalidating more restrictive regulations of political activity.  *See, e.g.*, *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290, 298-99 (1981) (striking down contribution limits governing ballot initiative groups but noting "there is no risk that the Berkeley voters will be in doubt as to the identity of those whose money supports or opposes a given ballot measure since contributors must make their identities known under . . . the ordinance, which requires publication of lists of contributors in advance of the voting"); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 791-92 n.32 (1978) (striking down prohibition on corporate expenditures to support or oppose ballot initiatives but noting that "[i]dentification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected").

Bipartisan Campaign Reform Act ("BCRA"), Pub. L. 107-155, 116 Stat. 81 (2002), the Supreme Court did not apply strict scrutiny or require a "compelling state interest." *See* 2 U.S.C. § 434(f). Instead, the Court upheld the disclosure requirements in BCRA as supported merely by "important state interests." *McConnell*, 540 U.S. at 196.

The conclusion drawn by *Buckley* and *McConnell* that disclosure is the "least restrictive means" to ensure political integrity resonates in the context of lobbying disclosure as well. As pointed out by the *Harriss* Court, Congress did not seek to prohibit "lobbying pressures" when it passed the 1946 Lobbying Act, but merely asked that "a modicum of information" about such pressures be disclosed. 347 U.S. at 625; *see also New York Temporary State Commission*, 534 F. Supp. at 498 (noting that legislature had not sought to "prohibit any type of lobbying" or to "limit the amount of lobbying"). Section 207 similarly does not restrict the lobbying activities of the NAM, nor limit the sources of its funding. Further, the section applies only to member organizations that spend over $5,000 per quarter to fund lobbying activities, thus ensuring that organizations with minimal involvement in lobbying will not trigger disclosure obligations. As was the case with the political disclosure requirements in *Buckley* and *McConnell*, Section 207 represents a marginal burden on First Amendment rights, and consequently, does not warrant the application of strict scrutiny.

### III. Lobbying Disclosure – including Section 207 – Is Justified by the State Interest in Maintaining the Integrity of the Legislative Process.

It is well established that lobbying disclosure serves substantial informational and anti-corruption interests. In upholding the 1946 Lobbying Act in *Harriss*, the Supreme Court articulated the informational purpose the Act served as follows:

> Present-day legislative complexities are such that individual members of
> Congress cannot be expected to explore the myriad pressures to which

> they are regularly subjected. Yet full realization of the American ideal of government by elected representatives depends to no small extent on their ability to properly evaluate such pressures. Otherwise the voice of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal.

*Id*. at 625. The Court pointed out that the Act remedied this problem in a manner which was the least restrictive of speech:

> … Congress has not sought to prohibit these pressures. It has merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose. It wants only to know who is being hired, who is putting up the money, and how much.

*Id*. By providing this crucial information to legislators and assisting them in making legislative decisions, the 1946 Lobbying Act amounted to an exercise by Congress of "the power of self-protection." *Id*.[4]

*Harris* and its progeny also make clear that that lobbying disclosure serves to prevent corruption of the legislative process. As the Court put it in *Harris*, such statutes aim to "maintain the integrity of a basic governmental process." *Id*. In *McIntyre*, a case concerning

---

[4]    The NAM attempts to discount the *Harriss* case by noting "how narrowly it had construed the [lobbying] statute" it upheld. Pl. Memo at 23, 26. The 1946 Lobbying Act required registration from any person who received payment "to influence, directly or indirectly, the passage or defeat of any legislation by the Congress of the United States." 347 U.S. at 619. To avoid finding this language unconstitutionally vague, the Court narrowed its definition of lobbying to include only those activities that the Court believed constituted "lobbying in its commonly accepted sense." *Id*. at 620.

Nevertheless, the 1946 Lobbying Act, even as narrowly construed, went considerably further than the current LDA in certain respects. Expressly included in the category of "lobbying in its commonly accepted sense" were "direct pressures, exerted by the lobbyists themselves or through their hirelings or through an artificially stimulated letter campaign." *Id*. (emphasis added). *See New York Temporary State Commission*, 534 F. Supp. at 496 (noting that *Harriss* "held that indirect lobbying, in the forms of campaigns to exhort the public to send letters and telegrams to public officials, could be included within the definition of lobbying activities"). By contrast, the LDA does not require disclosure of such "grassroots lobbying" activities. Furthermore, lobbying reports under the 1946 Lobbying Act were required to identify each person to whom the lobbyist made an expenditure of $10 or more. *Id*. at 615 n.1. The LDA contains no corresponding provision requiring disclosure of such small expenditures.

disclaimers on ballot measure literature, the Court underscored that anti-corruption rationale of *Harriss* by distinguishing between the ballot initiative process and lobbying activities. It explained that the anti-corruption interest which justified the disclosure of lobbying activities in *Harriss* is not relevant to ballot initiatives because the latter has no nexus to candidates, political parties or officeholders. 514 U.S. at 356 n.20. By contrast, "the activities of lobbyists who have direct access to elected representatives, if undisclosed, may well present the appearance of corruption." *Id*.

In light of the Supreme Court's unequivocal approval of lobbying disclosure, the question of the proper level of review is, for practical purposes, moot. Regardless of the specific level of scrutiny employed, the Supreme Court in *Harriss* made clear that the lobbying disclosure was supported by the state's informational and public integrity interests. Thus, even if this Court were to find that strict scrutiny applies here, *Harriss* instructs that the governmental interests served by lobbying disclosure justify the limited First Amendment burdens associated with such disclosure.

This position is illustrated by lower court decisions which have almost unanimously found that the state interest in lobbying disclosure outweighs the associated burdens, regardless of the level of scrutiny applied. Applying intermediate scrutiny, the court in *Fla. League of Prof'l Lobbyists* upheld a state lobbying disclosure statute in light of legislators' interest in "self protection" in the "face of coordinated pressure campaigns," and the "correlative interest of voters" in "appraising the integrity and performance of officeholders and candidates." 87 F.3d at 460. By the same token, *Minn. State Ethical Practices Board*, applying strict scrutiny, found that "the State of Minnesota's interest in disclosure outweighs any infringement of the appellants' first amendment rights." 761 F.2d at 512. *See also N.Y.*

*Temp. State Lobbying Comm'n*, 534 F. Supp. at 494-95 ("The lobby law serves to apprise the public of the sources of pressure on government officials, thus better enabling the public to access their performance."); *Kimbell*, 164 Vt. at 87 ("Vermont's lobbyist disclosure law is a reasonable means of evaluating the lobbyist's influence on the political process.").

The governmental interests recognized in *Harriss* and the lower court decisions support not only lobbying disclosure in general, but also Section 207 specifically. The state's interest in "know[ing] who is being hired, who is putting up the money, and how much" is not abated simply because two organizations are lobbying in a coalition, instead of individually. *Harriss*, 347 U.S. at 626. The NAM cannot credibly claim that the state has an interest in disclosure of a single organization that retains a lobbyist, but no interest in disclosure of two or more organizations that jointly retain a lobbyist. The purposes of the LDA can not possibly be served by allowing organizations to create a lobbying "front group" behind which the real parties-in-interest can hide.

The goal of Section 207 was to prevent precisely this type of circumvention of the lobbying disclosure requirements. Prior to amendment by HLOGA, the LDA required disclosure of those organizations in a coalition that funded the coalition's lobbying activities, and that "in whole or in major part plan[ned], supervise[d] or control[led]" such activities. 2 U.S.C. § 1603(b)(3)(1995). Frequently, however, no single member in a coalition would meet the "in whole or in major part" threshold, and consequently, members would not be subject to disclosure, even if they were substantially involved in the coalition's lobbying activities. Section 207 amended the LDA to close this loophole by requiring disclosure of any member organizations that fund a coalition's lobbying activities and that "actively participate in the planning, supervision or control of such lobbying activities." *See* Section I *supra*.

What the Supreme Court said in *McConnell* with regard to the analogous question of whether it was permissible to require disclosure of "electioneering communications" – some of which, it was claimed, were simply "lobbying" activities – is apt here as well:

> Curiously, Plaintiffs want to preserve the ability to run these advertisements while hiding behind dubious and misleading names like: 'The Coalition-Americans Working for Real Change' (funded by business organizations opposed to organized labor), 'Citizens for Better Medicare' (funded by the pharmaceutical industry), 'Republicans for Clean Air' (funded by brothers Charles and Sam Wyly). . . . <u>Given these tactics, Plaintiffs never satisfactorily answer the question of how 'uninhibited, robust, and wide-open' speech can occur when organizations hide themselves from the scrutiny of the voting public.</u> McConnell Br. at 44. Plaintiffs' argument for striking down BCRA's disclosure provisions does not reinforce the precious First Amendment values that Plaintiffs argue are trampled by BCRA, but ignores the competing First Amendment interests of individual citizens seeking to make informed choices in the political marketplace." 251 F.Supp.2d at 237.

540 U.S. at 196-97 (quoting *McConnell v. FEC*, 251 F.Supp.2d 176, 237 (D.D.C. 2003) (emphasis added)).

The NAM's allegation that Section 207 is not sufficiently tailored to serve the governmental interests recognized in *Harriss* also does not withstand scrutiny. The NAM first claims that Section 207 is underinclusive, complaining that Section 207 does not require disclosure from a "stealth" coalition which does not itself retain lobbyists, and instead only relies upon on the lobbying activities of its members. Pl. Memo at 9, 14, 28. This argument makes no sense. If organizations do not establish a lobbying coalition and instead lobby individually, there is no lobbying coalition for the purposes of the LDA. The law is not unconstitutionally underinclusive because it does not require lobbying disclosure from a coalition that does not exist and does no lobbying. Moreover, the individual organizations in this imaginary "coalition" will individually be subject to disclosure if they spend in excess of the LDA's financial thresholds to retain or employ a lobbyist.

Nor is Section 207 poorly tailored because it does not require the disclosure of individuals in a lobbying coalition, only organizational members. 2 U.S.C. § 1603(b). This aspect of Section 207 serves as an additional safeguard for associational rights based on Congress' recognition that individuals, in certain contexts, are vulnerable to personal threats and harassment if their associational alliances are made public. *See* Section IV *infra*. It is illogical to argue that because the amended Act includes additional protections for the First Amendment rights of individuals, it for that reason violates the First Amendment rights of organizations. Further, unlike the disclosure of organizations or corporations, the identification of private individuals is of limited utility in certain contexts. *McIntyre*, 514 U.S. at 348-49 (finding that "in the case of [ballot initiative literature] written by a <u>private citizen</u> who is not known to the recipient, the name and address of the author add little, if anything to the reader's ability to evaluate the document's message") (emphasis added).

Also lacking basis is the NAM's claim that Congress intended to regulate only temporary, "stealth" coalitions, and not more permanent associations. The legislative purpose that the NAM ascribes to Congress is belied by the clear terms of Section 207. This section, on its face, applies to all lobbying coalitions that meet its requirements, not simply to temporary, "stealth" coalitions with "innocent-sounding names" as the NAM alleges. Pl. Memo at 7. Both legislators and the public benefit from disclosure of the membership of permanent lobbying coalitions – even those with allegedly more informative names, such as the NAM. For example, the title "National Association of Manufacturers" hardly makes clear which companies fund or participate in the NAM's lobbying efforts, or the industries or regions they represent. Indeed, given the political clout and wealth of many "long-standing and well-known" lobbying associations, Pl. Memo at 4, Congress and the public have an

arguably greater interest in disclosure of their membership than in disclosure of *ad hoc* groups with limited influence.

### IV. The NAM Fails to Show that the Burden Imposed by Lobbying Disclosure on its Members Warrants an Exemption From the LDA.

The NAM claims that compelled disclosure of its membership will cause a laundry list of "adverse consequences" to befall its members, including "mob violence," labor disputes, boycotts, shareholder suits, demands for political contributions and "other forms of harassment." Pl. Memo at 11-12. Fear of these consequences, in turn, will "chill participation by the NAM's members who have good reason not to be publicly connected to the association's lobbying activities." Pl. Memo at 3.

The NAM offers not a single factual allegation to support its claims of hardship. Its unsupported speculation about vague and incredible injuries does not render Section 207 facially unconstitutional, nor provide grounds for an as-applied exemption from these requirements.

Indeed, the NAM makes precisely the same type of "hypothetical" allegations of injury that the *Harriss* Court dismissed in considering the facial constitutionality of the 1946 Lobbying Act. To be sure, the *Harriss* Court recognized that disclosure may potentially chill the exercise of First Amendment rights. 347 U.S. at 626. However, it found that simply "conjuring up" "hypothetical borderline situations" of a chilling effect did not suffice to show an unconstitutional burden. The Court concluded that "the restraint is at most an indirect one resulting from self-censorship" which was "too remote to require striking down a statute" on its face. *Id*.

Further, the NAM's speculative claims certainly do not meet the high threshold established by the Supreme Court for an as-applied exemption to a political disclosure requirement. In *Buckley*, the Supreme Court held that the First Amendment prohibits the government from compelling disclosure from a group that can show a "reasonable probability" that the disclosure will subject those persons identified to "threats, harassment, or reprisals from either Government officials or private parties." 424 U.S. at 74. *See also McConnell*, 540 U.S. at 198, 199 (reiterating *Buckley*'s standard for as-applied challenges). Although the *Buckley* Court noted that a group should "be allowed sufficient flexibility in the proof of injury," it required a factual showing of "specific evidence of past or present harassment of members due to their associational ties or of harassment directed against the organization itself." *Id*. at 74. The *Buckley* Court drew these principles from *NAACP v. Alabama,* 357 U.S. 449 (1958), which held that a court order requiring the Alabama NAACP to produce records, including names and addresses of all members, violated its members' right of association. *Id*. at 69-70. The Court's conclusion in *NAACP*, however, was based in part upon the NAACP's "uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *NAACP*, 357 U.S. at 462.

The NAM has not met the rigorous standard set by the *Buckley* and *NAACP* decisions for an as-applied exemption from a political disclosure statute. Indeed its allegations of injury are pure conjecture, and it offers no specific instance in which the NAM or a member organization has suffered threats or harassment for their lobbying activities. *See New York Temporary State Commission*, 534 F. Supp. at 498-99 (noting that plaintiffs had made no

16

factual showing of "economic reprisals, loss of employment, threats, or other manifestations of hostility" and thus any chilling effect described by the plaintiff fell "largely into the category of self-censorship as outlined in *United States v. Harriss*").  Furthermore, the NAM does not explain why disclosure is more burdensome for lobbying coalitions, like the NAM, than for organizations that lobby independently.  Presumably, organizations that directly retain or employ a lobbyist also potentially face the disapproval of the public.  If it is constitutional to require disclosure of an organization that individually spends more than $2,500 to retain a lobbyist, it cannot be unconstitutional to require disclosure of two groups that each spend $5,000 to retain a lobbyist, but do so in a coalition.  *Compare* 2 U.S.C. § 1603(a)(3)(A) *to* § 1603(b)(3).

     The inadequacy of NAM's allegations is brought into relief by a review of the evidence of injury offered by the Ohio Socialist Workers Party ("SWP") in *Brown v. Socialist Workers '74 Campaign Committee*, 459 U.S. 87 (1982), where an exemption to disclosure was granted.  In *Socialist Workers*, the SWP brought an as-applied challenge to the constitutionality of Ohio's state political disclosure law, arguing that compelled disclosure of its contributors and payees would expose them to harassment and reprisals.  The SWP had introduced proof of specific incidents of private and government hostility toward the SWP and its members within the four years preceding the trial, including threatening phone calls and hate mail, the burning of SWP literature, the destruction of SWP members' property, police harassment of a party candidate, and the firing of shots at an SWP office.  *Id*. at 99.  In the year before trial, four Ohio SWP members were fired because of their party membership. *Id*.  The District Court also found a past history of government harassment, including FBI surveillance of both the national party and the Ohio SWP, and interference with their political

activities.  *Id.* at 99-100.   The Supreme Court concluded that in light of the "substantial

evidence of past and present hostility from private persons and government officials against

the SWP," Ohio's disclosure law could not be constitutionally applied to the SWP.

Any attempt by the NAM to equate its allegations of injury to the evidence of harm in

*Socialist Workers* would be laughable.  Even if the NAM's speculative allegations of labor

disputes, boycotts and "other forms of harassment" were credited, these "injuries" amount to

nothing more than instances of political disagreement.  If an organization's general and

unsubstantiated fear of public disapproval is sufficient to warrant an exemption from

disclosure, almost every lobbying organization could qualify.  Such a loosely conferred as-

applied exemption to lobbying disclosure would swallow the rule.

Lastly, the legal authority in this area has only acknowledged exemptions to disclosure

statutes for <u>individuals</u> fearing harassment, not for organizations or corporations.  *Buckley,*

424 U.S. at 69-72*; NAACP,* 357 U.S. at 462.   Section 207 only requires disclosure of

organizations that fund and "actively participate" in lobbying coalitions, and any individuals

associated with a coalition or its member organizations are exempted from the disclosure

requirement.  2 U.S.C. § 1603(b) ("Nothing in [§ 1603(b)(3)(B)] shall be construed to require

the disclosure of any information about individuals who are members of, or donors to, an

entity treated as a client by this Act or an organization identified under that paragraph.").  The

amended Act by its terms does not implicate the privacy of individuals, and therefore does not

fall in the purview of *NAACP* and *Socialist Workers*.  This is not to say that organizations and

corporations do not enjoy First Amendment rights, *see* Pl. Memo at 21, but the possible injury

a corporation may sustain as a result of disclosure is not comparable to the personal threats,

reprisal or violence potentially suffered by an individual.

**V.  Section 207 Is Not Void for Vagueness.**

The NAM argues that the "challenged provision is vague on its face," *see* Pl. Memo at 27, specifically the language "actively participates in the planning, supervision, or control of [] lobbying activities" in Section 207.  The NAM also argues that the definition of "lobbying activities," *i.e.* "lobbying contacts and efforts in support of such contacts, including preparation and planning activities, research and other background work that is intended, at the time it is performed, for use in contacts," impermissibly relies on an "intent and effect test."  Pl. Memo at 25.[5]

The Supreme Court has set a high bar for a plaintiff claiming a statute is facially void for vagueness.  Even where First Amendment rights are implicated, a statute will only be struck down on its face if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or "authorizes or even encourages arbitrary and discriminatory enforcement."  *Hill v. Colorado*, 530 U.S. 703, 732 (2000).  The NAM fails to meet this standard.

First, the definition of "lobbying activities" criticized by the NAM has been in effect since the enactment of the LDA in 1995.  *See* 2 U.S.C. § 1602(7).  The HLOGA did not amend this definition, and it appears in multiple sections of the LDA relating to registration requirements, *see* § 1603(a)(3)(A), the contents of quarterly reports, *see* § 1604(b), and other definitions, *see* § 1602(2), (10).  The former provision of the LDA governing the disclosure of

_____

[5]     "Lobbying contacts" is itself a defined term in the statute, and means "any oral or written communication (including an electronic communication) to a covered executive branch official or covered legislative branch official that is made on behalf of a client" with regard to the formulation, modification or adoption of Federal legislation, a Federal regulation, an Executive Order or a Federal program; or the administration or execution of a Federal program or policy; or the nomination or confirmation of a person for a position subject to confirmation.  2 U.S.C. § 1602(8)(A).  The statute then lists 29 specific exceptions to the definition.  *Id.* § 1602(8)(B).

lobbying coalitions also used this defined term.  2 U.S.C. § 1603(b)(3)(1995) (requiring disclosure of organizations which "in whole or in major part plan, supervise or control such lobbying activities") (emphasis added).  Insofar as the NAM has registered and reported under the LDA in the past, it has been able to operate under this definition despite its alleged constitutional infirmity.  It strains credulity for a registered lobbying organization, like the NAM, to claim after years of compliance with the LDA that the definition of "lobbying activities" now fails to provide sufficient guidance.  *See also Kimbell*, 164 Vt. at 83 n.1, 88-90 (finding sufficiently clear a state lobbying law which required disclosure of expenditures "in connection with lobbying, including research, consulting and other lobbying preparation" since reasonable person could understand statutory terms); *Minnesota Citizens Concerned for Life,* 427 F.3d at 1111 (holding that state statute requiring lobbyists to report receipts "used for the purpose of lobbying" was not vague).

The language "actively participates in the planning, supervision, or control of such lobbying activities" in Section 207 is also not unconstitutionally vague.  It is important to note that this language only applies to member organizations that contribute more than $5,000 in a quarter to fund the coalition's lobbying effort.  The member organizations are thus already substantially connected to the coalition's lobbying activities.  In this context, this language "provide[s] explicit standards for those who apply them" and "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited."  *Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972).  *See also McConnell,* 540 U.S. at 170 n.64 (rejecting claim that BCRA provision regulating speech that "promotes, attacks, supports or opposes" a candidate is unconstitutionally vague, particularly as provision applies only to political party committees).  The NAM's attempt to conjure up hypothetical overbroad

applications of Section 207 does not change this analysis.  Pl. Memo at 26 (arguing that

vagueness of LDA would make the exchange of "common pleasantries" with a government

official a "reportable activity").  As recognized by the Supreme Court, "speculation about

possible vagueness in hypothetical situations not before the Court will not support a facial

attack," if the statute is valid in the majority of its applications.  *Hill*, 530 U.S. at 733 (quoting

*United States v. Raines*, 362 U.S. 17, 23 (1960)).

Further, the statute authorizes the Secretary of the Senate and Clerk of the House to

provide "guidance and assistance" on the registration and reporting requirements, including

on Section 207.[6]  Indeed, these authorities have already provided extensive guidance

interpreting this section.  *See* Office of the Clerk of the House of Representatives and Office

of the Secretary of the Senate, Lobby Disclosure Act Guidance (revised January 25, 2008)

("Guidance"), *available* at http://www.senate.gov/legislative/resources/pdf/S1guidance.pdf.

For example, the Guidance sets forth a detailed definition of the language "Actively

Participates."  The definition includes numerous examples of actions that would constitute

"active participation," including "participating in decisions about selecting or retaining

lobbyists, formulating priorities among legislative issues, designing lobbying strategies,

performing a leadership role in forming an ad hoc coalition, and other similarly substantive

planning or managerial roles, such as serving on a committee with responsibility over

lobbying decisions."  Guidance at 4.  The Secretary of the Senate also provides instances

where a member organization would not be deemed "actively participating," *i.e.* by "merely

donating or paying dues to the client or registrant, receiving information or reports on

legislative matters, occasionally responding to requests for technical expertise or other

---

[6]    2 U.S.C. § 1605(a)(1) (directing the Secretary of the Senate and the Clerk of the House to "provide guidance and assistance on the registration and reporting requirements of this chapter and develop common standards, rules, and procedures for compliance with this chapter").

information in support of the lobbying activities, attending a general meeting of the association or coalition client, or expressing a position with regard to legislative goals in a manner open to, and on a par with that of, all members of a coalition or association." *Id*.  In addition, the Guidance contains an entire section providing additional information about registration and reporting as an association or coalition, including five illustrative fact patterns. *See* Guidance, at 12-13.

Given the limited class of organizations regulated by Section 207 and the extensive guidance already available, the "actively participates" language, as well as the definition of "lobbying activities," is unmistakably clear.

## CONCLUSION

For the foregoing reasons, Section 207 of HLOGA, *see* S.1, 110th Cong. § 207 (2007), *codified at* 2 U.S.C. § 1603(b), is not unconstitutional, either facially or as applied. Accordingly, this Court should dismiss the complaint on the merits.

**Respectfully submitted**,


<u>/s/ J. Gerald Hebert</u>
J. Gerald Hebert
(D.C. Bar No. 447676)
Paul S. Ryan
(D.C. Bar No. 502514)
THE CAMPAIGN LEGAL CENTER
1640 Rhode Island Ave., NW
Suite 650
Washington, D.C.  20036
Tel: (202) 736-2200

Donald J. Simon
(D.C. Bar No. 256388)
SONOSKY, CHAMBERS, SACHSE,
ENDRESON & PERRY, LLP
1425 K Street, N.W.
Suite 600
Washington, D.C. 20005
(202) 682-0240

Fred Wertheimer
(D.C. Bar No. 154211)
DEMOCRACY 21
1875 I Street, N.W.
Suite 500
Washington, D.C. 20005
(202) 429-2008

*Counsel for Amici Curiae*

**Dated:  February 29, 2008**