## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATIONAL ASSOCIATION OF MANUFACTURERS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No. 08-208 (CKK) |
| HONORABLE JEFFREY A. TAYLOR, United States Attorney for the District of Columbia, et al., | ) ) ) ) | |
| Defendant. | ) ) ) | |

## UNITED STATES ATTORNEY TAYLOR'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT AS A MATTER OF LAW

### INTRODUCTION

The Lobbying Disclosure Act of 1995 ("LDA"), 2 U.S.C. §§ 1601-1612 (2005), as amended in 2007 through the Honest Leadership and Open Government Act of 2007 ("2007 Act"), Pub L. No. 110-81, 121 Stat. 735, fully comports with the First Amendment.[1]  Plaintiff, the National Association of Manufacturers (also "NAM"), a membership trade organization, challenges, under the First Amendment, the portions of the LDA that require it, and other groups like it, to disclose the names, addresses, and principal places of business of member organizations which provide significant support, in time and money, to the group's lobbying efforts.  Plaintiff's Motion for a Preliminary Injunction and Supporting Memorandum of Law

---

[1] The First Amendment reads in relevant part as follows: "Congress shall make no law *** abridging the freedom of speech *** or of the people to peaceably assemble, and to petition the Government for a redress of grievances."

("Pl.'s Brief"), Feb. 6, 2008, Doc. No. 3, at 6-9. It makes two basic claims: (i) the LDA impermissibly burdens its (and its members') rights to speak anonymously, associate, and petition the government; and (ii) the law is so vague as to be unconstitutional. Id. at 24-29.

Neither of plaintiff's claims has merit. The LDA serves a function vital to the operation of our democracy by providing information about those organizations which seek to pressure the political branches to advance their special interests. This information enables policymakers to make more informed choices and enables members of the public to formulate effective counterspeech. It also eliminates the appearance of impropriety otherwise fostered by having lobbyists pursue, at the highest levels of government, the interests of unnamed organizations. In view of this vital purpose, and the well-calibrated manner in which the LDA advances it, the LDA easily passes muster under the First Amendment.

Second, the LDA is not vague. The term in the LDA that plaintiff assails, i.e., "lobbying activities," was not amended in 2007, but has remained the same for more than twelve years. In those twelve years, it has never been challenged on vagueness grounds. The term is not vague. Plaintiff reasons, essentially, that the statute must be vague because it imposes more compliance costs than before, and vague statutes often impose more compliance costs than definite ones. See Pl.'s Brief at 25-27. The flaw in this reasoning is that it overlooks the fact that the statute applies more broadly now than before, in order to close a loophole in the lobbyist disclosure provisions, and so imposes additional compliance costs for that reason, not because it is vague.

For these reasons, as elaborated below, the Court should reject plaintiff's efforts to enjoin the statute's operation and should enter judgment in favor of defendants.[2]  See Defendants Nancy Erickson's and Lorraine C. Miller's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion, February 29, 2008 ("Co-defendant Erickson's Brief").

## **BACKGROUND**

Congress has long required lobbyists to disclose the names of their clients.  See Co-defendant Erickson's Brief § Statutory Background (providing a detailed history of Congress's efforts to establish effective lobbying disclosure mechanisms).  For example, the Federal Regulation of Lobbyists Act ("FRLA"), enacted in 1946, required lobbyists to disclose the "name and address of each person who ha[d] made a contribution of $500 or more" to the lobbyist's efforts.  2 U.S.C. § 305 (1993).  This Act, while salutary, contained a number of loopholes and was replaced by the LDA.  See Jill E. Fisch, How Do Corporations Play Politics?: The Fedex Story, 58 Vand. L. Rev. 1495, 1570 n.1 (2005).  As enacted in 1995, the LDA required lobbyists or organizations that employed one or more lobbyists (collectively "registrants") to disclose not only their clients, but also, in certain circumstances, organizations other than clients which contributed time and money to lobbying efforts, 2 U.S.C. § 1603(b)(3) (2005); these organizations will be referred to as "affiliates."[3]  More specifically, registrants were required to

---

[2]  The statute charges defendant Taylor, as the United States Attorney for the District of Columbia, with the responsibility of bringing actions for civil fines and criminal penalties to ensure compliance with the statute.  §§ 1605(8); 1606 (2008).  The other defendants in this action, the Secretary of the Senate and the Clerk of the House, have the statutory responsibility to refer those not in compliance with the statute to defendant Taylor.  § 1605(8) (2008).

[3]  The LDA excludes individuals from the affiliate category.  §§ 1602(13), (14); 1603(b)(3).

3

disclose limited information about affiliates (names, addresses, and principal places of business) when those affiliates contributed "more than $10,000 toward the lobbying activities of the registrant in a semiannual period" and "in whole or in major part plan[ned], supervise[d] or controll[ed] such lobbying activities." Id. at §§ 1603(b)(3)(A) & (B) (2005). These affiliate disclosure provisions were never challenged on constitutional grounds. See Meredith A. Capps, Note, "Gouging the Government:" Why A Federal Contingency Fee Lobbying Prohibition is Consistent with First Amendment Freedoms, 58 Vand. L. Rev. 1885, 1895 (2005).

In 2007, Congress enacted modest, but important, amendments to the affiliate disclosure provisions through the 2007 Act. First, the law reduced the $10,000 disclosure threshold to $5,000, but it also decreased the time period in which the contributions are measured from six months to three months. § 1603(b)(3)(A). Accordingly, because the monetary threshold and relevant time period decreased in the same proportion, this change is not of substantial importance in this case. A second change is more meaningful. The 2007 Act jettisoned the "in whole or in major part" language of the second criteria and replaced it with the phrase "actively participates."[4] § 1603(b)(3)(B). So revised, the statute requires the registrant to disclose the name and address of any affiliate that "contributes more than $5,000 to the registrant or client in the quarterly period to fund the lobbying activities of the registrant; and actively participates in the planning, supervision, or control of such lobbying activities." § 1603(b)(3)(A) & (B). It is important to note, however, that the definition of "lobbying activities" continues unchanged from

---

[4] The phrase "in whole or in major part" does still play a part in § 1603(b), however: It limits an exception to the affiliate disclosure provision. § 1603(b) (explaining that affiliate disclosure that would otherwise be required is not required if the affiliate is listed on the registrant's website, "unless the organization in whole or in major part plans, supervises, or controls such lobbying activities").

the previous iteration of the LDA, first enacted more than 12 years ago. See Pub L. No. 110-81. The term still refers to "lobbying contacts and efforts in support of such contacts, including preparation and planning activities, research and other background work that is intended, at the time it is performed, for use in contacts, and coordination with the lobbying activities of others." 2 U.S.C. § 1607. Also, as before, the statute pertains to lobbying regarding not only pending legislation, but also nominations to positions that require Senate confirmation, pending federal regulations, and other important governmental activities. 2 U.S.C. § 1602(8); Pub L. No. 110-81.

These recent changes, while modest, serve an important public purpose, namely, they help to reveal the organizations behind stealth lobbying groups. The purpose of the affiliate disclosure provision in the LDA is to pull back the curtain to reveal the identity of the organizations that are, in fact, attempting to pull the levers of power. See, e.g., 153 Cong. Rec. S260 (daily ed. Jan. 9, 2007) (statement of Sen. Lieberman). An example illustrates this purpose. Prior to the LDA, a lobbyist would have to disclose that he or she worked for the "Acme Association." But the lobbyist had no obligation to reveal who constituted the "Acme Association." Hence, organizations could hide their role in lobbying efforts behind "fronts." Congress recognized that this loophole in restrictions on lobbyist disclosures disserved the ends of open government. See id. Accordingly, in 1995, the LDA was enacted with its affiliate disclosure provisions. See 2 U.S.C. § 1603(b)(3) (2005). But Congress again concluded that more needed to be done to ferret out the identities of the organizations that were trying to pressure the elected branches to serve their purposes. See 2007 Act. Accordingly, it amended the LDA through the 2007 Act, as described above.

In February 2008, 5 months after the LDA was amended, and more than 12 years after the LDA was first enacted, NAM filed its complaint in this Court. Complaint for Declaratory and Injunctive Relief, Feb. 6, 2008 ("Compl."), Doc. No. 1. The Complaint contains three basic claims, all premised on the First Amendment. Plaintiff first asserts that the amended LDA unconstitutionally burdens its and its members' First Amendment freedoms to speak anonymously, join expressive associations, and petition the government because, plaintiff claims, the LDA's affiliate disclosure provisions are not narrowly tailored to serve a compelling governmental interest. Id. ¶¶ 26(b), (c). Second, plaintiff claims that, under the First Amendment, the LDA is unconstitutionally vague on its face because the meaning of the term "lobbying activities," which has remained unchanged for twelve years, is opaque. Id. ¶ 26(a). Plaintiff asserts that the term is opaque because it turns on an actor's "intention," but does not say which actor's intention. Pl.'s Brief at 25-26. Finally, plaintiff insists that, for the same reason, the LDA is unconstitutionally vague as applied to it. Complaint ¶ 26(a).

In conjunction with the Complaint, plaintiff filed a motion for a preliminary injunction. Pl's Brief. With the agreement of the parties, the Court (i) converted plaintiff's motion for a preliminary injunction into a motion for judgment as a matter of law and (ii) decided that defendants did not need to file dispositive motions in response to that motion to secure a judgment in their favor. Minute Order, Feb. 8, 2008.

**ARGUMENT**

## I.    The Amended LDA Is Constitutional Whether Evaluated Under Intermediate or Strict Scrutiny

Plaintiff argues that the LDA's disclosure provisions burden the freedom of speech in an impermissible manner, claiming that the purported governmental interest served, i.e., the uncloaking of stealth lobbying organizations, is not obviously compelling, and even if it were, that these disclosure provisions are not "narrowly tailored" to that purpose. Pl.'s Brief at 28. As to "tailoring," plaintiff insists that the statute transgresses the First Amendment because it is (1) underinclusive, by not covering (a) groups that rely on their members' lobbyists and (b) individuals, and (2) overinclusive, by governing organizations such as itself with supposedly well-known constituencies. Id. Plaintiff also maintains that the LDA fails the "least restrictive means" element of the narrow-tailoring inquiry because there is no evidence that Congress considered any less restrictive alternatives. Id. at 29.

Plaintiff's arguments are without merit. First, these arguments erroneously presuppose that the strict scrutiny standard applies to the LDA's lobbying disclosure provisions. In fact, the Supreme Court has established a lower standard for lobbying disclosure laws. United States v. Harriss, 347 U.S. 612, 625-26 (1954). Because the LDA serves a vital interest – shedding light on lobbying of the government to facilitate the democratic process – in a manner that does not affect materially more or less speech than is necessary, it easily withstands review under this less demanding standard. Second, even if strict scrutiny applies, the LDA is constitutional: its goal is vital and its means narrow.

7

To be clear, none of plaintiff's arguments should prevail under any standard. Groups that rely on their members' lobbyists to advocate their interests do not present the same concerns as groups that employ separate lobbyists because, in the case of the former, the names of the members are made matters of public record through required disclosures. Nor does the exclusion of individuals from the LDA's scope pose constitutional difficulty: There is no evidence that individuals, unlike organizations, have been hiding behind fronts. In any case, even if the statute is minimally underinclusive by not including individuals, that does not render it unconstitutional. Finally, that Congress did not expressly consider less restrictive alternatives when enacting the 2007 Act does not signify that any exist.[5] In fact, none do.

## A.    The LDA Should Be Evaluated Under An Intermediate Scrutiny Standard

Plaintiff insists that the Court should apply strict scrutiny to the LDA, even though the Supreme Court has set a less demanding standard for evaluating laws that require limited disclosures by lobbyists. In Harriss, the Supreme Court upheld the FRLA against a First Amendment challenge. 347 U.S. at 625-26. Like the LDA, the FRLA required lobbyists to disclose the names of those in whose interests they were acting. In the course of upholding this LDA-like law, "[i]t appears * * * that the Court did not subject lobbying restrictions to the demands of strict scrutiny. Instead, the Court satisfied itself that the government had asserted sufficient interests, specifically, 'maintaining the integrity of a basic governmental process' and

---

[5] Of course, through years of experience with other "less restrictive" legislative regimes that did not work, Congress did, in a meaningful sense, consider other less restrictive alternatives. See Co-defendant Erickson's Brief §§ II.B and Statutory Background.

preserving to Congress 'the power of self-protection.'"[6]  Fla. League of Professional Lobbyists v. Meggs, 87 F.3d 457, 460 (11th Cir.), cert. denied, 519 U.S. 1010 (1996); see also Fair Political Practices Comm'n v. Superior Ct. of Los Angeles, 599 P.2d 46, 54 (1979) (declining to apply strict scrutiny to lobbying disclosure law).

The constitutional test set out by the Harriss Court is a simple one.  A lobbying disclosure law is constitutional if it serves an important governmental purpose and does not affect materially more or less speech than is necessary to serve its important purposes.  See Harriss, 347

---

[6] Tellingly, in laying out the standard that it believes should apply to this case, plaintiff never cites Harriss, the only Supreme Court case to address lobbying disclosures.  Instead, plaintiff tries to derive the appropriate standard for laws addressing lobbying disclosures from more recent cases that do not involve such laws.  Pl.'s Brief at 16-20.  In doing so, plaintiff goes astray:  The Supreme Court's decisions should not be taken to decide questions not addressed.  E.g., U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of America, 508 U.S. 439, 463 n.11 (1993).  To the extent plaintiff may rely on the more recent Supreme Court opinions as having undermined Harriss, that also would be a mistake.  The Supreme Court has instructed lower courts to faithfully apply its precedents even if they seem incompatible with more recent decisions.  Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decision, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").  Harriss, which was decided three years before the Supreme Court first suggested that the government would need to furnish a compelling state interest to justify an action that implicated free speech rights, Sweezy v. New Hampshire, 354 U.S. 234, 262 (1957), has never been overruled.  See Stephen A. Siegel, The Origin of the Compelling State Interest Test and Strict Scrutiny, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=934795#PaperDownload (charting the history of the strict scrutiny standard).

Two courts of appeals have subjected lobbying disclosures to strict scrutiny.  Minn. Citizens Concerned for Life, Inc. v. Kelley, 427 F.3d 1106, 1111 (8th Cir. 2005); Cal. Pro-Life Council, Inc. v. Getman, 328 F.3d 1088, 1101 n. 16 (9th Cir. 2003).  But those courts relied on cases, such as Buckley v. Valeo, 424 U.S. 1, 66 (1976) (addressing campaign related disclosures), in other lines of decisions, and have not even cited Harriss (the only Supreme Court case to address lobbying disclosures) in determining what standard to apply.  Thus, these cases run afoul of the Rodriguez de Quijas principle and are not persuasive.  Plaintiff's efforts to avoid Harriss fail.

U.S. at 625-26 (explaining that the FRLA remedies an important "evil" and does so in a "manner restricted to its appropriate end"); Fla. League, 87 F.3d at 459-461. (This standard closely resembles the modern intermediate scrutiny standard. See Edenfield v. Fane, 507 U.S. 761, 767 (1993).) The LDA easily passes this test. In doing so, it is not alone: Courts have frequently upheld lobbying disclosure laws against broad constitutional attacks like the one advanced by plaintiff here. Minn. Citizens Concerned for Life, Inc. v. Kelley, 427 F.3d 1106, 1111 (8th Cir. 2005); Fla. League, 87 F.3d at 459-461 (collecting cases). Thus, in arguing against the constitutionality of the LDA, plaintiff struggles against and, as shown below, ultimately fails to rebut the strong legal precedents that support Congress's ongoing efforts to shed sunlight on the activities of lobbyists to "maintain the integrity of basic governmental process[es]." Harriss, 347 U.S. at 625.

Turning first to purpose, Congress enacted the LDA to cast light on those who try to move the government to serve their interests. See, e.g., 153 Cong. Rec. S260 (daily ed. Jan. 9, 2007) (statement of Sen. Lieberman). Senator Lieberman, one of the Senate authors of the bill that became the 2007 Act, explained that the purpose of such disclosure provisions is to counteract stealth lobbying coalitions that "frequently have innocent-sounding names that give the impression they are promoting positive mom-and-pop, apple pie goals" when "in fact, they lobby on a range of issues that could never be identified by the name of the coalition." Id. Senator Feinstein, another author of the bill that became the LDA, noted that "[t]he [law] closes a loophole that has allowed so-called 'stealth coalitions,' often with innocuous-sounding names, to operate without identifying the interests engaged in the lobbying activities." 153 Cong. Rec. S10708-09 (daily ed. Aug. 2, 2007).

10

Employing strikingly similar language, the Harriss Court identified this same interest as the primary purpose of the FRLA and concluded that it was important. 347 U.S. at 625-26. In fact, the word "important" is a dramatic understatement. The Court proclaimed that the "full realization of the American ideal of government by elected representatives depends" on identifying those who "pressure" the government. Id. at 625. "Otherwise," the Court continued, "the voice of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal," thereby compromising "the integrity of a basic governmental process." Id.; see also McConnell v. Federal Election Comm'n, 540 U.S. 93, 197 (2003) (questioning how vigorous debate is fostered by groups hiding behind misleading names). Stated in more concrete terms, revealing the pressures that weigh on policymakers allows policymakers to make more informed choices, Harriss, 347 U.S. at 625-26, permits members of the public to formulate effective counterspeech, and diminishes "the appearance of corruption" fostered by allowing lobbyists to act for unknown interests, McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 356 n.20 (1995).

Time has not blunted the importance of the purpose identified in Harriss, for the "American ideal of government by elected representative" remains. 347 U.S. at 625. Indeed, plaintiff does not seriously question the validity of this purpose; plaintiff's only defense on this count is to state that defendant bears the burden of establishing a sufficient purpose. Pl.'s Brief at 28. The Supreme Court, however, has already decided this issue; the LDA satisfies the purpose element of the Harriss test.

The LDA not only serves a vital governmental interest, but it does not affect materially more or less speech than is necessary to serve that goal. Harriss, 347 U.S. at 626 (explaining that

11

Congress used its power "in a manner restricted to its appropriate end" and that the hazards of chilling speech were "too remote" to justify invalidating the FRLA); see Fla. League, 87 F.3d at 461 (concluding that the method chosen will further the statute's articulated ends). To the Harriss Court, an important component of the constitutionality of the FRLA was the method chosen by the law to combat the "myriad pressures" placed on the government by unknown actors. 347 U.S. at 625. The law did not seek to "prohibit" the pressures on Congress, but "merely provided for a modicum of information from those who for hire attempt to influence legislation." Id.

The logic that underlay the decision in Harriss applies with full force here. The LDA does not prohibit lobbyists from serving the needs of the people whose interests they represent; it simply requires that lobbyists, in certain circumstances, disclose who those people are. 2 U.S.C. § 1603(b)(3). Harriss's preference for disclosure over prohibition does not stand alone in intermediate scrutiny First Amendment jurisprudence. Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. 626, 651 (1985).[7] The reason for the preference is obvious: Disclosure requirements often restrict speech less than prohibitions because they do not, on their face, disallow speech, id., and they can, in fact, foster more robust debate by increasing the amount of information available to speakers, see McConnell, 540 U.S. at 197.

---

[7] Zauderer addressed disclosures in the context of commercial speech, specifically, attorneys' advertisements. 471 U.S. at 651. The Court concluded essentially that disclosure requirements could facilitate the smooth functioning of the legal market by providing consumers with more information upon which to select attorneys. Id. at 652. Analogously here, the disclosure requirement can facilitate the smooth functioning of the 'political market' by, for example, ensuring that decisionmakers have more information about who is lobbying them and, accordingly, a better idea of the 'demand' for a policy: If the same organization hid behind three different fronts, that could make a policy appear more popular than it really is.

12

Plaintiff does not dispute that the required disclosures do not, by their text, restrict speech. Rather, plaintiff speculates that its members may be subject to reprisals based on its lobbying activities (because they deal with "hot button" topics), and that these potential reprisals may deter its members, and by extension it (as a medium for its members' speech), from speaking or associating. Pl.'s Brief at 11-12.

Plaintiff's argument regarding reprisals finds no support in concrete facts. First, plaintiff does not contend that any lobbying effort that it has engaged in has resulted in reprisals against itself; one is hard pressed to believe that plaintiff's members will face retribution for its speech activities if it has not incurred any. Second, plaintiff does not contend that its members who are known to the public (such as organizations on its board, Compl. ¶ 4) have ever been subject to reprisals. Again, it is difficult to believe that in the future reprisals will follow from plaintiff's speech when there is no evidence that they have in the past. Of course, to demonstrate these points, plaintiff would not have to had reveal the name of any organization whose membership in NAM is, as of yet, secret. The dearth of concrete support offered by plaintiff to support its claim that the threat of reprisals will deter speech militates in favor of the conclusions (i) that the disclosure provisions will not meaningfully deter the speech of any of plaintiff's members or of it (given that it is purely a vehicle for expressing its members' views), and, by extension, (ii) that the law does not burden materially more speech than is necessary to serve its goals. See also Co-defendant Erickson's Brief § II.C (discussing the speculative nature of plaintiff's reprisal claims).

In approving the breadth of the law, the Harriss Court also noted that the FRLA would not materially restrain speech by individuals not intended to be covered by the law. 347 U.S. at 626. The same holds true for the LDA. It carefully specifies the circumstances under which

13

NAM must disclose the participation of affiliates, namely, when they (i) contribute more than $5,000 in a quarter to fund "lobbying activities" and (ii) actively participate in planning, supervising, and controlling "lobbying activities." § 1603(b)(3). This careful specification also ensures that the statute does not miss its target by failing to require disclosures by lobbyists who pursue the interests of unknown organizations. See id.

Plaintiff argues that the LDA's disclosure requirements do not closely fit the purpose of the statute. Plaintiff maintains that the statute goes awry (i) by failing to demand disclosure by (a) groups that use individual members' lobbyists and (b) individuals and (ii) by requiring disclosure by groups like NAM, who "have constituencies everyone understands." Pl.'s Brief at 28. None of these contentions is convincing. Groups that rely on their members' lobbyists are not "stealthy" in any meaningful sense, as lobbyists for the member organizations must disclose who their clients are (i.e., for which organizations they work). See § 1603(b)(2). Thus, one can easily discern whose interests are being represented, even if one does not know that organizations are jointly pursuing certain interests. On the other hand, before the LDA was enacted, there existed circumstances when policymakers and members of the public could not identify the real parties in interest behind some lobbyists' activities.

That lobbyists need not disclose actively involved affiliates when those affiliates are individuals is unremarkable. See 2 U.S.C. § 1603(b)(3) (requiring disclosure of affiliates that are "organization[s]"); § 1602 (13) (excluding individuals from the definition of "organization"); Co-defendant Erickson's Brief § II.B. As an initial matter, there is no indication that individuals have relied on covers to furtively advance their interests. Congress received no evidence

14

suggesting that such a problem exists, and plaintiff has not argued otherwise.  Plaintiff simply

has speculated that the possibility exists.[8]  Pl.'s Brief at 10, 28.

More fundamentally, even if the LDA were minimally underinclusive for not including

individuals, that would not render it unconstitutional.  "A regulation is not fatally underinclusive

simply because an alternative regulation, which would restrict *more* speech or the speech of *more*

people, could be more effective."  Blount v. SEC, 61 F.3d 938, 946 (D.C. Cir. 1995) (emphasis

in the original).  "Because the primary purpose of underinclusiveness analysis is simply to ensure

that the proffered state interest actually underlies the law, a rule is struck for underinclusiveness

only if it cannot fairly be said to advance any genuinely substantial governmental interest."  Id.

(citations and quotations omitted).  "Thus, with regard to First Amendment *under*inclusiveness

analysis, neither a perfect nor even best available fit between means and ends is required."[9]  Id.

(emphasis in the original).  Plaintiff insists that the LDA's underinclusiveness proves that it is

not "well-suited to its professed objective."  Pl.'s Brief at 28.  The thrust of plaintiff's argument,

then, is that "a regulation that would restrict more speech" could be more effective.

Underinclusiveness of the sort highlighted by plaintiff, if it exists, is constitutionally irrelevant.[10]

---

[8] Of course, a court will not invalidate a statute on the basis of a plaintiff's unadorned
speculation regarding underinclusiveness.  City of Renton v. Playtime Theatres, Inc., 475 U.S.
41, 52-53 (1986) (concluding that a city ordinance was not underinclusive for failing to regulate
adult businesses other than adult theaters because there was no evidence that there were any kind
of adult businesses other than adult theaters).

[9] Importantly, this is the underinclusiveness standard that applies under the tighter strict
scrutiny test, which is necessarily more demanding than the standard that should apply under
Harriss.

[10] Unlike corporations, individuals have specific and identifiable privacy interests, United
States v. Morton Salt Co., 338 U.S. 632, 652 (1950) (concluding that corporations have no right
to privacy); Resolution Trust Co. v. Walde, 18 F.3d 943, 948 (D.C. Cir. 1994) (same);

Finally as to fit, plaintiff charges that the statute is overinclusive because it applies to groups like NAM "who have constituencies everyone understands" and which are "reflected in their names." Pl.'s Brief at 28. This argument misses the point of the disclosure provisions of the LDA, namely, that groups' names have not functioned as accurate indicators of the interests served by the groups. 153 Cong. Rec. S260 (daily ed. Jan. 9, 2007) (statement of Sen. Lieberman); id. at S10708-09 (Daily ed. Aug. 2, 2007) (statement of Sen. Feinstein). The Supreme Court recognized this problem in McConnell in the course of upholding the provisions of the Bipartisan Campaign Reform Act of 2002 ("BCRA") that require the real parties in interest behind election advertisements to reveal their identities: "Curiously, Plaintiffs want to preserve the ability to run these advertisements while hiding behind dubious and misleading names like: 'The Coalition-Americans Working for Real Change' (funded by business organizations opposed to organize labor), 'Citizens for Better Medicare' (funded by the pharmaceutical industry), and 'Republicans for Clean Air' (funded by brothers Charles and Sam Wyly)." McConnell, 540 U.S. at 197.

Moreover, the "constituency" behind NAM that "everyone understands" is so broad as to provide almost no indication of the interests that NAM's lobbyists are pursuing: NAM has 11,000 members, Compl. ¶ 14, who share the common goal of "enhanc[ing] the competitiveness of manufacturers," Id. ¶ 4 (citations and quotations omitted). Indeed, NAM's members apparently are not even all manufacturers – "The NAM has over 11,000 corporate members whose interest are allied with America's manufacturing sector," Declaration of Jan Sarah Amundson, Feb. 5, 2008 ("Amundson Decl."), ¶ 6 (emphasis added) – a fact that further clouds

Congress's forbearance honors these privacy interests.

the supposedly clear signal sent by NAM's name. In short, application of the LDA, as amended, to groups like NAM makes perfect sense. The purpose of the LDA's disclosure provision is to unmask unidentified organizations that are the real parties in interest behind lobbyists' activities. That purpose applies sensibly to NAM, which could otherwise have unidentified members driving its lobbying agenda.

### B.    The LDA Easily Survives Under "Strict Scrutiny"

Plaintiff's arguments fail even if the Court reviews the LDA under strict scrutiny. Pursuant to this standard, the challenged provisions of the LDA should be upheld if they (i) serve a compelling government interest and (ii) are narrowly tailored to serve that interest, which in the context of strict scrutiny means that they must be the least restrictive means for furthering that purpose. See Sable Communications of Cal., Inc. v FCC, 492 U.S. 115, 126 (1989). "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." Frisby v. Schultz, 487 U.S. 474, 485 (1988). Strict scrutiny is not fatal in the context of statutes that require disclosures. Numerous courts have upheld laws that require the disclosure of the names of the groups who stand behind some quantum of political speech. McConnell, 540 U.S. at 197; Buckley, 424 U.S. at 81-82; Minn. Citizens Concerned for Life, 427 F.3d at 1111-12.

The LDA serves a compelling governmental interest and is narrowly tailored to do so, as it constitutes the least restrictive means for accomplishing that purpose. The NAM does not meaningfully deny that the purpose of the disclosure provision is compelling. As explained above, the LDA helps ensure the full realization of the "American ideal" of representative government. See Harriss, 347 U.S. at 625. The Supreme Court repeatedly has held that this kind

17

of interest is compelling. For example, in Buckley v. Valeo, the Supreme Court upheld under "exacting scrutiny" a provision requiring disclosure of the identities of certain financial contributors to campaigns, reasoning that "[t]here are governmental interests sufficiently important to outweigh the possibility of infringement, particularly when the free functioning of our national institutions is involved." 424 U.S. at 66. Undoubtedly, the political branches of our government constitute "national institutions" whose functioning is protected by the LDA's disclosure provisions. As such, the LDA's disclosure provisions advance a compelling governmental interest.

Plaintiff contends that the LDA's disclosure provisions are not the least restrictive means for accomplishing the statute's purpose because (i) the statute is underinclusive and overinclusive and (ii) there is no evidence that Congress considered less restrictive means. Pl's Brief at 28-29. This argument fails. As demonstrated above, plaintiff's arguments regarding underinclusiveness and overinclusiveness are unconvincing. See supra pp. 14-17. And that Congress did not expressly identify less restrictive alternatives in the course of enacting the 2007 Act does not establish that there are any such alternatives.[11] Instead, that Congress did not specifically consider any less restrictive alternatives suggests that none feasibly exist.[12] To that end, plaintiff has not put forth any less restrictive means for accomplishing the purpose of the LDA's

---

[11] See supra note 5 (explaining that Congress's experience with "less restrictive," and less effective, disclosure regimes amounts to consideration of less restrictive alternatives).

[12] In § 1607 of the LDA, Congress demonstrated its cognizance of the role of the First Amendment in this area of the law by mandating that the law be construed to be consistent with First Amendment protections. This demonstrated awareness of the First Amendment supports the conclusion that Congress did not explicitly consider less restrictive alternatives in the course of enacting the 2007 Act because none exist.

18

disclosure provision, even though it had strong incentive to do so.[13]  The history of Congress's efforts to deal with the problem of lobbyists' influence on the legislative process shows Congress's sensitivity to tailoring its restrictions.  Moreover, in the analogous context of campaign related disclosures – analogous because the disclosures in that context are meant to protect the integrity of our political processes by revealing the pressures that act on the political branches – the Supreme Court concluded "that disclosure requirements certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist."  Buckley, 424 U.S. at 68.  Buckley's observation holds true in this case.  No less restrictive way exists to identify the interests that drive registrants than to have them, in certain circumstances, identify those interests.[14]

The LDA easily passes the applicable Harriss test because it serves an important purpose and does not affect materially more or less speech than is necessary to accomplish that purpose.

---

[13] The declaration attached to plaintiff's motion suggests that "a more-tailored [disclosure] standard might focus on [the] length of existence" of a coalition because "stealth coalitions tend to be short lived."  Amundson Decl. ¶ 25.  At least two problems beset this suggestion.  First, declarations should not contain legal arguments and so should be ignored to the extent that they do.  See Fed. R. Civ. P. 56(e); Silver v. Executive Car Leasing Long-Term Disability Plan, 466 F.3d 727, 732 n.2 (9th Cir. 2006).  Second, the approach proposed by the declarant is not a less-restrictive alternative.  For an approach to be considered a less-restrictive alternative, it must be at least as effective as the means chosen.  Reno v. ACLU, 521 U.S. 844, 874 (1997).  The approach suggested by Ms. Amundson would not be as effective as the approach chosen by Congress.  Long-existing groups like NAM can present the very problem that Congress sought to remedy, given that they can have undisclosed members driving their lobbying agenda, and such groups would go undetected in Ms. Amundson's proposed regime.  Any "length of existence" criterion would be subject to criticism.

[14] This point is reinforced by the fact that plaintiff has not demonstrated that the disclosure provisions are likely to meaningfully deter speech.

19

If the Court were to apply strict scrutiny to the LDA, the conclusion should not change – the statute is constitutional.

## II.    The LDA, as Amended, Is Not Unconstitutionally Vague on its Face

Plaintiff argues that the LDA is unconstitutionally vague on its face. At bottom, plaintiff's argument rests on two pillars, (i) the supposed ambiguity of the word "inten[t]" in the definition of "lobbying activity," and (ii) its interpretation of a recent Supreme Court case, Federal Election Comm'n v. Wisconsin Right to Life, Inc. ("WRTL"), 127 S.Ct. 2652 (2007), which it asserts jettisoned intention-based standards from First Amendment jurisprudence.[15] Neither of these pillars supports plaintiff's argument. There is no ambiguity about whose intent matters – it is the affiliates'. No other reading of the statute would make sense of the provisions' purpose of casting light on unseen organizations who support registrants' activities with time and money. Second, the Court in WRTL did not remake First Amendment jurisprudence; it decided an as-applied challenge to a statute not at issue in this case.[16] 127 S.Ct. at 2658-59. The LDA is not unconstitutionally vague on its face.

If a statute does not implicate the freedom of speech, then a court will conclude that the statute is not unconstitutionally vague if it (i) provides people of ordinary intelligence with a

---

[15] Plaintiff's brief could also be read to suggest that the term "actively participates" is too vague under the First Amendment. Pl.'s Brief at 8. The Court need not tarry long over this suggestion. For one thing, a suggestion is not an argument, and the Court need not address mere suggestions. Schneider v. Kissinger, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005). For another, the suggestion is wrong. See co-defendant Erickson's Brief § III.

[16] There was no majority opinion in WRTL. Therefore, the opinion that concurs in the judgment on the narrowest grounds controls. Marks v. United States, 430 U.S. 188, 193 (1977). Chief Justice Roberts penned that opinion. As such, this memorandum treats the Chief Justice's opinion as the decision of the Court (with respect to the eschewal of the intent-based standard).

20

reasonable opportunity to determine what conduct is required (or prohibited) and (ii) does not

admit of arbitrary or discriminatory enforcement. Hill v. Colorado, 530 U.S. 703, 732 (2000).

When a statute touches on First Amendment freedoms, more clarity is required. Buckley, 424

U.S. at 77. But "perfect clarity and precise guidance have never been required even of

regulations that restrict expressive activity." Ward v. Rock Against Racism, 491 U.S. 781, 794

(1989). "Condemned to use words, we can never expect mathematical certainty in our

language." Grayned v. City of Rockford, 408 U.S. 104, 110 (1972). The vagueness inquiry is a

contextual one: A court deciding whether a statute passes muster "often considers factors such as

the enactment's purpose, the harm it attempts to prevent, whether there is a scienter requirement,

and the interpretations of individuals charged with enforcement." Jordan v. Pugh, 425 F.3d 820,

824-25 (10th Cir. 2005) (McConnell, J.). And to establish that a statute is unconstitutionally

vague on its face (as opposed to as-applied), a plaintiff must show "that the potential chilling

effect on protected expression is both real and substantial." Id. at 828. Courts are to be cautious

when addressing facial challenges because declaring a statute facially invalid is strong medicine.

New York v. Ferber, 458 U.S. 747, 769 (1982). The medicine is strong, of course, because it is

fatal to the statute: The statute may not be applied in any circumstance, even in those situations

when it would be constitutional, if it is deemed facially invalid. See id.

Plaintiff claims that the LDA is unconstitutionally vague because whether a registrant

needs to disclose information about an affiliate depends on the affiliate's involvement in

"lobbying activities," and the term "lobbying activities" is vague. Pl.'s Brief at 25-27. The term

is vague, plaintiff continues, because the LDA defines it by reference to a party's intentions

without defining which intentions – its own, its affiliate's, a small group the affiliate is working

with, or some objective intent – matter. Id. at 26. Also, plaintiff adds, the Supreme Court banished intention-based standards from First Amendment jurisprudence in WRTL. Pl.'s Brief at 25. Finally, plaintiff concludes that "the vagueness is particularly acute" because the statute relates not only to dealings with Members of Congress and the passage of bills, but also to executive personnel and a range of other subjects, such as the adoption of federal regulations and the nominations of individuals to positions that require Senate confirmation. Id.

Plaintiff's argument is without merit. The statute provides adequate notice of what it requires and when. The purpose of the LDA is to shed sunlight on whose interests are driving lobbyists. See supra pp. 5, 10. This being so, it is the affiliate organization's intention that matters. If an affiliate did not intend for its background work to be used for lobbying, then it is fair to say that that organization is not pulling (or trying to pull) the levers of power through its lobbyists, and that organization need not be revealed to facilitate counterspeech and more informed decisionmaking by policymakers, or to dispel any appearance of impropriety. (Objective intent is irrelevant for the same reason.) NAM's intention does not matter because NAM is a medium for its members' speech, and nothing more. See Compl. ¶ 4 (explaining that NAM exists to represent its members' interests). And the intention of a small group within NAM matters only to the extent that individual members of the group (individual affiliates) share the collective intention of the group, because it is their interests that NAM will be pursuing.

The legislative history from the LDA's enactment twelve years ago supports this commonsense proposition. In explaining the meaning of this term, the House Judiciary Committee report furnished the following example: "[I]f an organization prepares an extensive issue brief for presentation to Members of Congress and their staffs both through formal

testimony [which is not considered to be a covered activity] and in informal meetings [which is considered to be a covered activity], the effort of preparing that brief would be a 'lobbying activity.'" H. Rept. 104-39, Part I, at 13-14 (1995). The report focuses on the intent of the organization drafting the issue brief; it looks merely at to whom and when that organization intends to distribute the brief. It also notes that with regard to this intention element, the definition of "lobbying activities" is intended to track the regulations defining "lobbying expenditures" under the Internal Revenue Code, 26 C.F.R. § 56.4911-2. H.R. Rept. 104-39, Part I, at 14. Under these regulations, for example, the money spent preparing a study primarily for a non-lobbying use does not become a "lobbying expenditure" simply because the study is later used for lobbying purposes, and in determining the primary purpose of such studies, the regulations refer to the intention of the organization that prepares the study. § 56.4911-2 (b)(v)(C).

Experience confirms what reasons reveals: The definition of lobbying activities is not unconstitutionally vague. The definition of "lobbying activities" included in the amended LDA is not new. The LDA has employed this same definition, with its reference to intent, for 12 years. And for 12 years, no one (to defendant's knowledge) has filed suit claiming that the definition is so inscrutable as to be unconstitutional. That the term "lobbying activities" has gone

untested for so long suggests that it is not, in fact, too vague.[17] New York Trust Co. v. Eisner, 256 U.S. 345, 349 (1921) (noting that "a page of history is worth a volume of logic").

NAM's argument that the supposed vagueness of the intent standard is particularly acute because the LDA applies to lobbying other than that conducted on Capitol Hill is without merit. Pl.'s Brief at 26. The specificity of the intent standard with respect to whose intention matters does not change whether the "background work [ ] is intended" to facilitate lobbying on Capitol Hill regarding legislation or whether it is intended to facilitate lobbying on an important agency rule. § 1602(7). Thus, the scope of the statute does not make the supposed "vagueness" any more or less acute. At bottom, NAM's argument regarding the scope of the provision is a complaint about compliance costs. See Pl.'s Brief at 26. But increased compliance costs do not render a statute impermissibly vague.[18]

Contrary to plaintiff's arguments, WRTL does not control this case. The Supreme Court in WRTL decided a narrow question, namely, what should be the standard for deciding certain as-applied challenges regarding advertisements under the BCRA. 127 S.Ct. at 2658-59. The

---

[17] The 2007 Act did change a surrounding term so as to make "lobbying activities" more important for determining whether disclosures need to be made; that is, as an affiliate need play an active part rather than a major role in the lobbying activities, see supra at pp. 4-5, the scope of disclosure has been expanded, making the term "lobbying activities" more important. But that change was not so momentous that the now-challenged phrase could have never mattered in thousands of reports filed over 12 years; common sense must prevail. See Co-defendant Erickson's Brief § Statutory Background (B).

[18] Nor does the statute admit of arbitrary or discriminatory enforcement. Indeed, plaintiff never argues that it does, and for good reason: The statute places real limits on the discretion of those who enforce it. It explains what sort of conduct can constitute a lobbying activity. 2 U.S.C. § 1602(7). It notes the time at which intention matters – the time when the conduct occurs. Id. And it leaves no doubt about whose intention matters, namely, the affiliates'. See id. Accordingly, the statute does not lend itself to selective enforcement. See Hill, 530 U.S. at 733.

24

Court did not address the LDA, nor did it make any sweeping pronouncements about the use of intention-based standards under the First Amendment. The Court did conclude that an intention-based standard for determining whether an advertisement is an issue ad or a campaign ad is not appropriate given what it concluded to be the inherent difficulty of drawing a line between these two different kinds of advertisements. Id. at 2659, 2664-66.

The Court's holding does not assist plaintiff in this case because the context here differs meaningfully from that in WRTL.[19] There is no inherent uncertainty in distinguishing between those activities that are done in support of lobbying activities and those that are not – plaintiff does not suggest otherwise. Marshaling objective evidence to evince intent would not be difficult and there is no need to forsake the intention-based test. The ability to proffer solid objective evidence of intention decreases a speaker's fear regarding the operation of the statute and blunts any potential chilling effect. And preserving the intention-based test is important, for this test well serves the purpose of the statute: Revealing those who seek to "push" or " pull" the political branches to serve their own purposes. See supra at pp. 5, 10.

Plaintiff suggests that the terms "research and other background work," § 1602(7), render the statute unconstitutional because they could be read to capture a lobbyist's quotidian exchanging of pleasantries with a person who has been nominated for a job that requires Senate confirmation. Pl.'s Brief at 26. Asking the nominee "how he is feeling," plaintiff suggests, could amount to research on the nominee's health. Id. Plaintiff correctly points out that this is

---

[19] As explained earlier, context matters. Jordan, 425 F.3d at 824-25. For example, in McConnell, the precursor to WRTL, the Court applied an intent-based test in the course of deciding that the regulation of advertisements at issue in WRTL was not facially overbroad. WRTL, 127 S.Ct. at 2664-65.

not what the law means, but plaintiff continues, "that is what it says." Id. Plaintiff's latter

statement is wrong.   Individuals don't exchange pleasantries to discover facts, but to be pleasant.

See New Shorter Oxford English Dictionary 2558 (1993) (defining "research" as "searching

carefully for a specified thing or person" and as "[a] search or investigation undertaken to

discover facts and reach new conclusions by the critical study of a subject").   More

fundamentally, statutes are to be read in a commonsense fashion, not a nonsensical one. See,

e.g., Smith v. Zachary, 255 F.3d 446, 450 (7th Cir. 2001) ("[N]o canon of statutory interpretation

requires us to abandon common sense.") .   Accordingly, this argument fails.

III.    **The LDA Is Not Unconstitutionally Vague as Applied**

     Plaintiff alleges that, as amended, the LDA is unconstitutionally vague as applied "to an

organization like the NAM." Pl's Brief at 27. Plaintiff asks the Court to "imagine the difficulty

of attempting to review all of the activities" of the NAM's many meetings and ad hoc groups to

"see if this standard has been met." Id. It asks, "how can the NAM determine what each

member representative intended at the time of each possible-reportable activity?" Id. In

bolstering this argument, plaintiff explains that its efforts to comply with the statute will be

frustrated by the fact that different members at its meeting can have different intentions and,

moreover, that any given member can silently change its intention over the course of a meeting.

Id. "Accurate compliance," plaintiff concludes, "would be literally impossible." Id.

     In this argument, plaintiff repeats an error that was detected earlier:  The conflation of

compliance costs with unconstitutional vagueness. See supra pp. 24. As an initial matter,

plaintiff's argument does not truly represent an as-applied challenge: Plaintiff offers no

distinction between the application of the LDA to the "lobbying activities" of its members and to

26

every other group that must file reports under the LDA. See Foti v. City of Menlo Park, 146 F.3d 629, 635 (9th Cir. 1998) ("An as-applied challenge contends that the law is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others."). Plaintiff does not, for example, argue that the intention inquiry presents any special challenges with respect to any of its individual members vis-à-vis members of other organizations. See Pl.'s Brief at 27. Thus, this argument merely represents a restatement of its facial vagueness argument. And as with the earlier version of this argument, plaintiff's "as-applied"-version of the argument does not center on vagueness, but on compliance costs. Plaintiff contends that it has a lot of members and so will have to expend substantial resources to comply the law. See id. But that plaintiff's affiliates may undertake much potentially relevant background work does not establish that the LDA provides insufficient notice of its requirements or constraints on those who enforce it. That fact simply establishes that plaintiff may incur more compliance costs than other organizations. "Compliance costs" is not a legal synonym for vagueness.

In any event, plaintiff exaggerates the burden of compliance. First, plaintiff suggests that every comment at every meeting constitutes a potentially reportable activity. Pl.'s Brief at 27. This is not so. The LDA premises disclosure (in part) on "active[ ] participat[ion]" in the planning, supervision, and control of "lobbying activities." § 1603(b)(3)(B). Second, plaintiff overinflates the difficulty of identifying a member's intention. Asking the member would seem to suffice, as plaintiff does not suggest that its members would not be truthful regarding their

intentions.[20] In short, compliance costs do not equal vagueness, and plaintiff's compliance costs

will not be that great anyway.  The Court should reject this argument.

## CONCLUSION

For the above stated reasons, the Court should deny plaintiff's motion, dismiss its

Complaint, and enter judgment in favor of defendants.


Dated:  February 29, 2007                          Respectfully submitted,

                                                   JEFFREY S. BUCHOLTZ
                                                   Acting Assistant Attorney General

                                                   JEFFREY A. TAYLOR
                                                   United States Attorney

                                                   THEODORE C. HIRT
                                                   Assistant Director,
                                                   Federal Programs Branch

                                                   s/ Justin M. Sandberg
                                                   JUSTIN M. SANDBERG
                                                   (Ill. Bar. No. 6278377)
                                                   Trial Attorney, Federal Programs Branch
                                                   Civil Division
                                                   U.S. Department of Justice
                                                   P.O. Box 883
                                                   Washington, D.C. 20044
                                                   (202) 514-3489 (telephone)
                                                   (202) 616-8202 (facsimile)

                                                   Counsel for Defendant U.S. Attorney Taylor

---

[20] Also, reasonably relying on the statements of its members would not put plaintiff at any
risk under the statute, for any failure to disclose an affiliate as required by the statute would not
be "knowing[ ]." § 1605.

28