IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

—————————————————— )
  )
NATIONAL ASSOCIATION OF )
MANUFACTURERS, )
  )
  Plaintiff, )
  )
  v. ) No. 08-cv-0208 (CKK)
  )
HONORABLE JEFFREY TAYLOR, *et al.*, )
  )
  Defendants. )
—————————————————— )

**DEFENDANTS NANCY ERICKSON'S AND LORRAINE C. MILLER'S
MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT**

IRVIN B. NATHAN, D.C. Bar # 90449
General Counsel

KERRY W. KIRCHER, D.C. Bar # 386816
Deputy General Counsel

CHRISTINE M. DAVENPORT
Assistant Counsel

RICHARD A. KAPLAN, D.C. Bar # 978813
Assistant Counsel

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700 (tel)
(202) 226-1360 (fax)

Counsel for Defendant Lorraine C. Miller,
Clerk of the House of Representatives

MORGAN J. FRANKEL, Bar #342022
Senate Legal Counsel

PATRICIA MACK BRYAN, Bar #335463
Deputy Senate Legal Counsel

GRANT R. VINIK, Bar #459848
Assistant Senate Legal Counsel

THOMAS E. CABALLERO
Assistant Senate Legal Counsel

Office of Senate Legal Counsel
642 Hart Senate Office Building
Washington, D.C. 20510-7250

(202) 224-4435 (tel)
(202) 224-3391 (fax)

Counsel for Defendant Nancy Erickson,
Secretary of the Senate

February 29, 2008

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PLAINTIFF'S ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATUTORY BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    Congress's First Attempt at Broad Lobbying Disclosure: The Federal
           Regulation of Lobbying Act of 1946. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      B.    Shortcoming of the FRLA and Enactment of the Lobbying Disclosure Act
           of 1995. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      C.    Honest Leadership and Open Government Act of 2007. . . . . . . . . . . . . . . . . . . 12

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I.     The Supreme Court's Decision in *United States v. Harriss* Establishes the
      Constitutionality of the Disclosures Required by Amended Section 1603(b)(3). . . . . . . 18

II.    Section 207's Disclosure Requirements Meet the First Amendment Test of
      *Buckley v. Valeo* and Do Not Violate Individual Rights of Association. . . . . . . . . . . . . 21

      A.    There is a Vital Government Interest in the Disclosure of Organizations
           That Significantly Fund and Actively Participate in the Planning,
           Supervision, or Control of the Lobbying Activities of Another Entity. . . . . . . . 22

      B.    The Disclosure Provision Is Closely Related and Narrowly Tailored to
           Achieve the Governmental Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      C.    Plaintiff Has Not Established a Significant Burden on its Members'
           Associational Rights Arising From the Disclosure Provisions. . . . . . . . . . . . . . 31

III.   The Disclosure Requirements for Lobbying Activities Are Not
      Unconstitutionally Vague. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Attachments

## TABLE OF AUTHORITIES

Cases:                                                                     Page

*AFL-CIO v. Federal Election Comm'n*, 333 F.3d 168 (D.C. Cir. 2003). . . . . . . . . . . . . . . . 21, 31

*Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990). . . . . . . . . . . . . . . . . . . . . . . 28

*Block v. Meese*, 793 F.2d 1303 (D.C. Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87 (1982). . . . . . . . . . . . . . . . 31, 33

*Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182 (1999). . . . . . . . . . . . . . . . . . . 21

*Buckley v. Valeo*, 424 U.S. 1 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088 (9th Cir. 2003). . . . . . . . . . . . . . . 22

*Comm'n on Indep. Colls. & Univs. v. N.Y. Temporary State Comm'n on Regulation of Lobbying*, 534 F. Supp. 489 (N.D.N.Y. 1982). . . . . . . . . . . . . . . . . . . . . . 19

*Connally v. General Construction Co.*, 269 U.S. 385 (1926). . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Federal Election Comm'n v. Wisconsin Right to Life*, 127 S. Ct. 2652 (2007). . . . . . . . . . . . . . 38

*Florida League of Professional Lobbyists, Inc. v. Meggs*, 87 F.3d 457 (11th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22, 24

*Gonzalez v. Carhart*, 127 S. Ct. 1610 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Hynes v. Mayor & Council of Oradell*, 425 U.S. 610 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . 36

*IBEW, Local 1547 v. Alaska Util. Construction, Inc.*, 976 P.2d 852 (Alaska 1999). . . . . . . . . . 32

*Jones v. Unknown Agents of the Federal Election Comm'n*, 613 F.2d 864 (D.C. Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Katzenbach v. Morgan*, 384 U.S. 641 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*McConnell v. Federal Election Comm'n*, 251 F. Supp.2d 176 (D.D.C. 2003). . . . . . . . . . . 30, 33

*McConnell v. Federal Election Comm'n*, 540 U.S. 93 (2003). . . . . . . . . . . . . . . . . 22, 28, 33, 36

*Minnesota Citizens Concerned for Life, Inc. v. Kelley*, 427 F.3d 1106
    (8th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Minnesota State Ethical Practices Bd. v. National Rifle Ass'n*,
    761 F.2d 509 (8th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22, 23, 24

*NAACP v. Alabama*, 357 U.S. 449 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Harriss*, 347 U.S. 612 (1954). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*U.S. Civil Service Comm'n v. Nat'l Assn. of Letter Carriers*, 413 U.S. 548 (1973). . . . . . . . . . 36

*Ward v. Utah*, 398 F.3d 1239 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Statutes:

Federal Regulation of Lobbying Act, Pub. L. No. 79-601, tit. III, 60 Stat. 812 (1946). . . . . . . . . 7

Honest Leadership and Open Government Act of 2007, Pub. L. No. 110-81,
    121 Stat. 735. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Lobbying Disclosure Act of 1995, Pub. L. No. 104-65, 109 Stat. 691. . . . . . . . . . . . . . 10, 11, 12

2 U.S.C. §§ 261-270 (repealed). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

2 U.S.C. §§ 1601-1612 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

2 U.S.C. § 1601 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

2 U.S.C. § 1602 (2000 & Westlaw). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

2 U.S.C. § 1603(b) (2000 & Westlaw). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

2 U.S.C. § 1604 (2000 & Westlaw). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 38

2 U.S.C. § 1605 (2000 & Westlaw). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

2 U.S.C. § 1606 (2000 & Westlaw). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

2 U.S.C. § 1607 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Legislative Materials:

H.R. 4937, 108th Cong. (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

S. 1398, 109th Cong. (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

S. 2349, 109th Cong. (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

H. Con. Res. 18, 79th Cong. (1945). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

H.R. Rep. No. 104-339, pt. 1 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 11, 24, 25, 39

H.R. Conf. Rep. 103-750 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

S. Rep. No. 79-1011 (1946). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

S. Rep. No. 103-37 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*The Federal Lobbying Disclosure Laws: Hearings Before the Subcomm. on
    Oversight of Govt. Management of the Senate Comm. on Governmental
    Affairs*, 102d Cong., S. Hrg. 102-377 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*S. 2279, The Lobbying Disclosure Act of 1992: Hearings Before the Subcomm. on
    Oversight of Govt. Management of the Senate Comm. on Governmental
    Affairs*, 102d Cong., S. Hrg. 102-609 (1992). . . . . . . . . . . . . . . . . . . . . . . . 8-9, 9, 27

92 Cong. Rec. 6368 (1946). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

139 Cong. Rec. 9435 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

140 Cong. Rec. 6532 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-10

140 Cong. Rec. 26782-83 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

141 Cong. Rec. 20007 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 23, 24

141 Cong. Rec. 20022 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

141 Cong. Rec. 20195 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

141 Cong. Rec. 34815-20 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

152 Cong. Rec. S2511 (daily ed. Mar. 29, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

152 Cong. Rec. H3033-38 (daily ed. May 23, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

153 Cong. Rec. S258 (daily ed. Jan. 9, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

153 Cong. Rec. S260 (daily ed. Jan. 9, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

153 Cong. Rec. S746 (daily ed. Jan. 18, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

153 Cong. Rec. H5743 (daily ed. May 24, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

153 Cong. Rec. H9210 (daily ed. Jul. 31, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

153 Cong. Rec. S10691 (daily ed. Aug. 2, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

153 Cong. Rec. S10709 (daily ed. Aug. 2, 2007). . . . . . . . . . . . . . . . . . . . . . . 15, 25, 30, 37

153 Cong. Rec. S10723 (daily ed. Aug. 2, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Miscellaneous:

General Accounting Office, Comparison of Lobbyists Registrations, B-274543
      (GAO/GGD-98-105R, Apr. 28, 1998), *available at*
      http://archive.gao.gov/paprpdf2/160463.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

General Accounting Office, Information on States' Lobbying Disclosure Requirement,
      B-129874 (GAO/GGD-97-95R, May 2, 1997), *available at*
      http://archive.gao.gov/paprpdf1/158621.pdf. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Lobbying Disclosure Act Guidance (effective Jan. 1, 2008)
      http://www.senate.gov/legislative/resources/pdf/S1guidance.pdf. . . . . . . . . . . . . . . 16, 37

Lobbying Disclosure Act Guidance (applicable prior to Jan. 1, 2008),
      http://www.senate.gov/legislative/common/briefing/lobby_disc_briefing.htm. . . . . . . . 12

*NAM Board Votes in Favor of Multinationals in Debate Over China's Currency*,
      13 Manufacturing & Technology News (Oct. 10, 2006),
      *available at* 2006 WLNR 18153813 (Westlaw). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

NAM Board of Directors,
http://namissvr.nam.org/namissvr/namboardofdirectors.aspx
(last visited Feb. 28, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

NAM Coalition Activity,
http://www.nam.org/s_nam/bin.asp?CID=28&DID=201898&DOC=FILE.pdf
(last visited Feb. 22, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Small and Medium Manufacturers Board of Directors,
http://www.nam.org/s_nam/doc1.asp?CID=17&DID=224550,
(last visited Feb. 28, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Atttachments:

1.     NAM Coalition Activity,
       http://www.nam.org/s_nam/bin.asp?CID=28&DID=201898&DOC=FILE.pdf

2.     NAM Board of Directors,
       http://namissvr.nam.org/namissvr/namboardofdirectors.aspx

3.     Small and Medium Manufacturers Board of Directors,
       http://www.nam.org/s_nam/doc1.asp?CID=17&DID=224550

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
NATIONAL ASSOCIATION OF                 )
MANUFACTURERS,                          )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )        No.  08-cv-0208 (CKK)
                                        )
HONORABLE JEFFREY TAYLOR, *et al.*,     )
                                        )
        Defendants.                     )
_____)

## DEFENDANTS NANCY ERICKSON'S AND LORRAINE C. MILLER'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT

### INTRODUCTION

For over half a century, Congress has recognized and attempted to address the substantial pressure that organized interests employing professional lobbyists seek to exert on the public policy process.  First in 1946, and then again in 1995, the House and Senate enacted comprehensive requirements for disclosure of lobbying contacts with government officials.  Such disclosure sheds light on the organized interests that expend significant funds in trying to influence the legislative process and other government decisionmaking.

As part of the lobbying disclosure regime enacted in 1995, Congress mandated that registered lobbyists' employers ("registrants") disclose not only their client, but also any organizations that significantly fund the lobbying activities of their client and that in whole or in major part plan, supervise, or control those lobbying activities.  *See* 2 U.S.C. § 1603(b)(3).  Such disclosure served to prevent evasion of the law's requirements by organizations shielding their

lobbying activities behind another entity such as a coalition or association.  In 2007, as part of a wide array of government ethics reforms in the Honest Leadership and Open Government Act ("HLOGA"), Pub. L. No. 110-81, 121 Stat. 735, Congress amended the 1995 lobbying law to enhance disclosure by registrants and lobbyists, including disclosure of organizations engaged in the lobbying activities of a registrant's client.  HLOGA § 207 amended 2 U.S.C. § 1603(b)(3) to require disclosure of organizations that contribute significantly to the lobbying activities of a client and actively participate in the planning, supervision, or control of those lobbying activities.

Plaintiff National Association of Manufacturers ("NAM") brings this action against Untied States Attorney Jeffrey Taylor, Secretary of the Senate Nancy Erickson, and Clerk of the House of Representatives Lorraine C. Miller, claiming that 2 U.S.C. § 1603(b)(3), as amended, violates the First Amendment because it is not narrowly tailored to serve a compelling government interest and because the term "lobbying activities" is unconstitutionally vague. Although lobbying disclosure has been required for over 60 years, and disclosure of organizations substantially involved in a client's "lobbying activities" – the very term plaintiff challenges as vague here – has been required for over a decade, the NAM contends that mandatory disclosure by associations of member organizations that actively participate in the planning, supervision, or control of the association's lobbying activities imposes such a significant burden on First Amendment rights that the amended provision is unconstitutional.

Plaintiff's legal claims are meritless.  The Supreme Court rejected a First Amendment challenge to lobbying disclosure more than 50 years ago, holding that the minimal burdens that such disclosure imposes are far outweighed by the vital national interest in preserving the integrity of our governmental processes.  *United States v. Harriss*, 347 U.S. 612, 625-26 (1954). As experience under the prior law revealed, the challenged provision is integral to achieving the

2

important goals of lobbying disclosure because it prevents organizations from hiding their lobbying activities from public disclosure simply by directing such lobbying through another entity.  As with the law upheld by *Harriss*, disclosures required by amended section 1603(b)(3) serve vital governmental interests in providing information to the public and public officials about who is paying for and directing lobbying efforts and in avoiding the appearance of corruption from lobbying.  And the challenged provision protects those significant governmental interests not by banning or restricting lobbying by coalitions or associations, but merely by requiring more complete disclosure of the interests behind their lobbying.  Under the First Amendment test established in *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), and its progeny, such a disclosure provision easily passes constitutional muster.  Finally, the term "lobbying activities" as defined in 2 U.S.C. § 1602(7) – unchanged since 1995 – provides ample guidance as to the conduct it covers both on its face and as applied to the NAM under amended section 1603(b)(3).

Accordingly, the NAM's challenge to 2 U.S.C. § 1603(b)(3), as amended by section 207 of the Honest Leadership and Open Government Act of 2007, should be rejected, its complaint dismissed, and judgment granted in favor of defendants.

## PLAINTIFF'S ALLEGATIONS

Plaintiff NAM "is a non-profit trade association [that] promote[s] trade, advocate[s] for economic growth, and represent[s] the interests of its members" to Congress and the executive branch.  Compl. ¶ 4.  The NAM's membership includes "over 11,000 corporate members whose interests are allied with America's manufacturing sector." *Id.* ¶ 14.  Although its website and other publicly available materials "identify some members, including firms represented on its board and in other leadership positions," the NAM does not list publicly all its members. *Id.* ¶ 4.

3

Many of the NAM's activities involve contacts with the federal government "to advance and protect" the interests of its members, and the NAM employs approximately 35 persons who regularly engage in such lobbying.[1]  *Id.* ¶ 15.  The NAM's members "participate in a number of committees and a wide range of related activities to define and advance the NAM's goals."  *Id.* ¶ 14.  In addition, the NAM coordinates "approximately 100 meetings per month" and offers various other activities through which members can participate in the NAM's lobbying.  *Id.*

The NAM's lobbying often addresses issues such as "global warming, nuclear power, or labor relations," which, plaintiff alleges, can "provoke responses beyond civil debate."  *Id.* ¶ 16.  The NAM claims that "[t]aking policy positions that are unpopular with other groups may lead to boycotts, political pressure, shareholder suits, or other forms of harassment" and "can even make a company a litigation target."  *Id.*  Because of this potential, the NAM alleges that its "members . . . will wish to avoid linkage to the association's lobbying activities on particular issues."  *Id.* ¶ 17.  And, "members that are concerned about the possibility of disclosure" linking them with the NAM's lobbying "will limit their support for and participation in the NAM to the extent necessary to avoid the risk of being named in the NAM['s LDA] reports."  *Id.* ¶ 19.

Because of the consequences the NAM claims that its members face from being linked with its lobbying, and "[b]ecause the amended Act is so vague and broad, some of the NAM's members already are urgently questioning whether continued support for and participation in core petitioning, speech, and associational activities will require disclosure."  *Id.* ¶ 28.  Yet, the "NAM is unable to provide clear guidance to its members as to what activities will or will not require public disclosure."  *Id.* ¶ 17.  Concern over having to disclose some of its members under

---

[1]  The NAM alleges that it has identified these employees on various Lobbying Disclosure Act filings since that law was enacted in 1995.  Compl. ¶ 15.

amended section 1603(b)(3) leads the NAM to "self-censor to avoid initiating lobbying activities that members will be unwilling to support at the risk of disclosure, or that may expose members to undesired disclosure." *Id.* ¶ 20. In addition, the NAM complains that it "has no existing mechanisms to track and identify members who would be subject to disclosure," and that "[a]ttempting to establish such mechanisms would disrupt expressive associational activities and divert unrecoverable resources from core First Amendment activities." *Id.* ¶ 29.

The NAM claims that section 1603(b)(3), as amended by HLOGA § 207, violates the First Amendment because it burdens the NAM's members' rights of speech, petition, and association without being narrowly tailored to serve a compelling governmental interest, and because it is unconstitutionally vague on its face and as applied to the NAM. *Id.* ¶ 26.

## STATUTORY BACKGROUND

To evaluate plaintiff's challenge to 2 U.S.C. § 1603(b)(3), as amended by HLOGA § 207, it is helpful to review first the history of lobbying disclosure regulations enacted by Congress and the genesis of the challenged provision.

### A.    Congress's First Attempt at Broad Lobbying Disclosure: The Federal Regulation of Lobbying Act of 1946

In 1945, Congress established a Joint Committee on the Organization of Congress to study the organization and operation of Congress. *See* H. Con. Res. 18, 79th Cong. (1945); Report of the Joint Committee on the Organization of Congress, S. Rep. No. 79-1011, at 1 (1946). As part of its review, the Joint Committee received numerous complaints over the "attempts of organized pressure groups to influence the decision of Congress on legislation pending before the two Houses or their committees," S. Rep. No. 79-1011, at 26, and it found that "professionally inspired efforts to put pressure upon Congress cannot be conducive to well

considered legislation." *Id.* While the Joint Committee "fully recognize[d] the right of any citizen to petition the Government for the redress of grievances or freely to express opinions to individual Members or to committees on legislation and on current political issues," it concluded that it was "possible to improve the situation without impairing in any way this freedom of expression," by providing for disclosure of information that "would prove helpful to Congress in evaluating their representations." *Id.* Accordingly, the Joint Committee recommended that Congress enact legislation "providing for the registration of organized groups and their agents who seek to influence legislation and that such registration include quarterly statements of expenditures made for this purpose." *Id.* at 27.

The Chairman of the Joint Committee explained that the proposal was "not in any way, shape, or manner to contravene or to reduce the right of petition," but rather to require "the registration of persons using their influence upon the Congress" so that "that there may be a public record of the activity of these pressure groups." 92 Cong. Rec. 6368 (1946) (statement of Sen. La Follette). Accordingly, the proposed legislation "merely requires that [lobbyists] register and disclose the source and purpose of their employment and the amount of their compensation." *Id.* The Joint Committee noted that such disclosure would "enable Congress better to evaluate and determine evidence, data, or communications from organized groups seeking to influence legislative action . . . ." S. Rep. No. 79-1101, at 27. As one Senator explained:

> [I]t is everlastingly true that, unless Members of the Senate and the House of Representatives are able to know who is appealing to them, they never are able properly to evaluate what is said to them or what is written to them. It is absolutely essential, if we are to give the proper weight to whatever comes to our ears or our desks, that we shall know who are the people and what is the interest of the people who are making their representations to us.

92 Cong. Rec. 6368 (1946) (statement of Sen. White).

Congress acted on the Committee's recommendations by enacting the Federal Regulation of Lobbying Act ("FRLA"), title III of the Legislative Reorganization Act of 1946, Pub. L. No. 79-601, §§ 301-311, 60 Stat. 812, 839-42, codified at 2 U.S.C. §§ 261-270. The FRLA required persons engaged for pay for the "principal purpose" of attempting to influence the passage or defeat of legislation in Congress to register with the Clerk of the House and the Secretary of the Senate, disclosing:

> their name and address; the name and address of the client for whom they work; how much they are paid and by whom; all contributors to the lobbying effort and the amount of their contribution; an accounting of all monies received and expended, specifying to whom the money was paid and for what purposes; the names of any publications in which the lobbyist has caused articles or editorials to be published; and the particular legislation they have been hired to support or oppose.

H.R. Rep. No. 104-339, pt. 1, at 2 (1995). The Act provided for criminal penalties for violations of its provisions. *See* Pub. L. No. 79-601, § 310, 60 Stat. 842.

In 1954, the Supreme Court upheld the constitutionality of the FRLA in *United States v. Harriss*, 347 U.S. 612 (1954). After construing the Act to avoid a vagueness based due process claim,[2] the Court rejected a First Amendment challenge, holding that the statute, as construed, "do[es] not violate . . . [the] freedom to speak, publish, and petition the Government," *id.* at 625, as it "merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose." *Id.*

---

[2] The Court interpreted the Act to apply to "persons" (1) who had "solicited, collected, or received contributions"; (2) when "one of the main purposes of such 'person,' or . . . such contribution[]" was to "influence the passage or defeat of legislation by Congress"; and (3) the "intended method of accomplishing this purpose must have been through direct communication with members of Congress." *Id.* at 623. Thus construed, the Court held that the statute met "the constitutional requirement of definiteness" contained within due process. *Id.* at 624.

B.      **Shortcomings of the FRLA and Enactment of the Lobbying
        Disclosure Act of 1995**

The FRLA in practice failed to achieve its goal of broad disclosure of lobbying activities

directed toward the Congress.  Indeed, efforts to reform the 1946 Act's lobbying disclosure

requirements began not long after its passage.  *See* 141 Cong. Rec. 20007 (1995) (statement of

Sen. Levin) (noting that President Truman asked Congress to make changes to improve the law).

Reform efforts continued through the 1950s, the 1960s (when the Senate passed a bill that was

never acted upon by the House), the 1970s (when both Houses passed bills that were never

reconciled in conference), and into the 1980s and 1990s.  *Id.*  As the House Judiciary Committee

recognized in its report on the Lobbying Disclosure Act of 1995, "the Lobbying Regulation Act

[of 1946] has failed to work as intended. . . . [T]he Act has failed to ensure the public disclosure

of meaningful information about individuals who attempt to influence the conduct of officials of

the Federal government."  H.R. Rep. No. 104-339, at 5; *see also* 141 Cong. Rec. 20007 (1995)

("The lobbying disclosure laws that are on the books today are useless.") (statement of Sen.

Levin); *id.* at 20022 (statement of Sen. Cohen) ("[W]e are here today to talk about lobbying

disclosure, because the current system is simply a sham.  It does not work.").

In 1991 and 1992, the Subcommittee on Oversight of Government Management of the

Senate Committee on Governmental Affairs ("Senate Subcommittee") held hearings on the

shortcomings of the FRLA and considered potential legislation for reforming lobbying

disclosure.  *See The Federal Lobbying Disclosure Laws: Hearings Before the Subcomm. on*

*Oversight of Govt. Management of the Senate Comm. on Governmental Affairs*, 102[d] Cong., S.

Hrg. 102-377 (1991), and *S. 2279, The Lobbying Disclosure Act of 1992: Hearings Before the*

*Subcomm. on Oversight of Govt. Management of the Senate Comm. on Governmental Affairs*,

102[d] Cong., S. Hrg. 102-609 (1992).  The Senate Subcommittee received testimony from the

General Accounting Office explaining that large segments of the lobbying community were not

reporting under the Act, and that many of the reports that were filed were submitted late and

lacked required items.  *See* S. Hrg. 102-377, at 58-62.

Testimony before the Senate Subcommittee indicated that gaps in coverage under the

FRLA resulted in ineffectual lobbying disclosure.  Some of the gaps identified were that the Act

applied only to lobbying legislative branch, not executive branch, officials; it covered only efforts

to influence the passage or defeat of legislation, not other congressional activities; it was

interpreted to cover lobbying only of Members of Congress directly, not their staff; and, it

reached only persons whose "principal purpose" was lobbying, which was interpreted to mean

"only people who spen[t] a majority of their time lobbying."  S. Rep. No. 103-37, at 3-4 (1993).

In addition, testimony indicated that "[c]orporations or other organizations occasionally hide

their identities behind a coalition established or available for the purpose of preventing the public

from learning of their efforts to influence congressional action.  This plainly circumvents the

Lobbying Act's public disclosure goals."  S. Hrg. 102-609, at 83 (statement of Thomas M.

Susman, Chair, ABA Section of Admin. Law and Regulatory Practice); *see also id.* at 34

(statement of Ann McBride, Sr. V. Pres., Common Cause) ("Very often those coalition groups

operate under very lovely-sounding names, without the public or sometimes even the Congress

having a clear understanding of the groups that are backing them.  The public has a right to know

who is backing these coalition groups . . .").

In the 103[d] Congress, the Senate and the House passed lobbying disclosure bills, each of

which mandated disclosure of organizations that played a substantial role in lobbying by an

association or coalition.  *See* 139 Cong. Rec. 9435 (1993) (passing S. 349); 140 Cong. Rec. 6532

(1994) (passing S. 349 as amended).  A conference committee reported a reconciled bill, *see* H.R. Conf. Rep. No. 103-750 (1994), which required disclosure on a registration statement of any organization, other than the client, that (a) "contributes more than $5,000 toward the lobbying activities of the registrant in a semiannual period," and (b) "participates significantly in the planning, supervision, or control of such lobbying activities."  *Id.* at 8.  The conference report was agreed to in the House, 140 Cong. Rec. 26782-83 (1994), but the Senate was unable to close debate to bring the matter to a vote.

In 1995, Congress again took up lobbying reform and on this occasion was able to reach agreement.  The Senate passed the Lobbying Disclosure Act of 1995 ("LDA") by a 98-0 vote.  *See* 141 Cong. Rec. 20195 (1995).  The House passed the bill by a 421-0 vote, *see id.* at 34815-20, and it was signed into law by the President.  The LDA, Pub. L. No. 104-65, 109 Stat. 691, codified at 2 U.S.C. §§ 1601-1612, provided more robust lobbying disclosure requirements than those in the FRLA, including:

- Expanded coverage of lobbying to include contacts with congressional staff and senior executive officials.  *See* Pub. L. No. 104-65, § 3(8), 2 U.S.C. § 1602(8);

- A broader definition of lobbyist[3], with a minimum expenditure threshold which triggered disclosure of lobbying activities on behalf of a specific client.[4]  *Id.* §§ 3(7), 3(8), 4, 2 U.S.C. §§ 1602(7), 1602(8), 1603;

---

[3]  Lobbyist is defined in the LDA as "any individual who is employed or retained by a client for financial or other compensation for services that include more than one lobbying contact, other than an individual whose lobbying activities constitute less than 20 percent of the time engaged in the services provided by such individual to that client over a six month period."  Pub. L. No. 104-65, § 3(10), 2 U.S.C. § 1602(10).

[4]  The LDA provided that a person or entity whose "(i) total income for matters related to lobbying activities on behalf of a particular client (in the case of a lobbying firm) does not exceed and is not expected to exceed $5,000; or (ii) total expenses in connection with lobbying activities (in the case of an organization whose employees engage in lobbying activities on its own behalf)

(continued...)

- Semi-annual reporting of (a) the total amount of lobbying-related income from a specific client (or expenditures by an organization lobbying in its own behalf), (b) the specific issues that were the subject of a lobbyist's efforts, including "to the maximum extent practicable" a list of bill numbers, (c) the houses of Congress and the federal agencies contacted by the lobbyist; (d) the employees of the registrant who acted as lobbyists on behalf of the client; (e) whether a lobbyist had been employed in the previous two years as a covered executive branch or legislative branch official. *Id.* §§ 4(b), 5(b), 2 U.S.C. §§ 1603(b), 1604(b);

- Civil penalties for violations of the Act. *Id.* § 7, 2 U.S.C. § 1606.

In addition, the Act required registrants to disclose "the name, address, and principal place of business of any organization, other than the client, that--

    (A) contributes more than $10,000 toward the lobbying activities of the registrant in a semiannual period . . . ; and

    (B) in whole or in major part plans, supervises, or controls such lobbying activities.

*Id.* § 4(b)(3), 2 U.S.C. § 1603(b)(3). The LDA defined "lobbying activities" as "lobbying contacts and efforts in support of such contacts, including preparation and planning activities, research and other background work that is intended, at the time it is performed, for use in contacts, and coordination with the lobbying activities of others." *Id.* § 3(7), 2 U.S.C. § 1602(7). The Act made clear that the term "organization" did not include individuals. *Id.* § 3(13), 2 U.S.C. § 1602(13). As the House Judiciary Committee report explained, the disclosure requirement on associations and coalitions "is intended to preclude evasion of the disclosure requirements of the Act through the creation of ad hoc lobbying coalitions behind which real parties in interest can hide." H.R. Rep. No. 104-339, at 18.

---

[4](...continued)
do not exceed or are not expected to exceed $20,000" in the semiannual period are not required to register with respect to such client. 2 U.S.C. § 1603(a)(3).

In section 8(a) of the LDA, 2 U.S.C. § 1607(a), Congress made explicit that the provisions of the Act were not to be read to infringe on constitutional rights. That section provides that "Nothing in this Act shall be construed to prohibit or interfere with – (1) the right to petition the Government for the redress of grievances; (2) the right to express a personal opinion; or (3) the right of association – protected by the first amendment to the Constitution."

The LDA continued the FRLA procedure of requiring lobbyists to file their reports with the Secretary of the Senate and the Clerk of the House, LDA §§ 4(a)(1), 5(a), 2 U.S.C. §§ 1603(a)(1), 1604(a), and directed those congressional officers to "provide guidance and assistance on the registration and reporting requirements of this Act and develop common standards, rules, and procedures for compliance with this Act." LDA § 6(1), 2 U.S.C. § 1605(1).[5]

## C.    Honest Leadership and Open Government Act of 2007

While the LDA substantially increased the number of individuals and organizations registering as lobbyists and improved the information disclosed in lobbyist filings,[6] in recent Congresses, efforts continued in both Houses to refine the LDA's lobbying disclosure provisions to eliminate loopholes, including disclosure of organizations that actively participate in lobbying coalitions and associations. *See, e.g.*, Legislative Transparency and Accountability Act of 2006,

---

[5] In interpreting the provision "in whole or in major part plans, supervises, or controls such lobbying activities," the Secretary's and Clerk's guidance on the LDA provided that the term "'in major part' means in substantial part. It is not necessary that an organization . . . exercise majority control or supervision in order to fall within Sections 4(b)(3)(B) [2 U.S.C. § 1603(b)(3)(B)] . . . . In general, 20 percent control or supervision should be considered 'substantial' for purposes of these sections." Pre-HLOGA LDA Guidance (applicable prior to Jan. 1, 2008), § 2, http://www.senate.gov/legislative/common/briefing/lobby_disc_briefing.htm.

[6] In the first year under the LDA, the number of organizations and individuals registered or identified as lobbyists more than doubled. *See* General Accounting Office, Comparison of Lobbyists Registrations, No. B-274543 (GAO/GGD-98-105R, Apr. 28, 1998), *available at* http://archive.gao.gov/paprpdf2/160463.pdf.

S. 2349, 109th Cong. § 217 (2006); Lobbying and Ethics Reform Act of 2005, S. 1398, 109th

Cong. § 107 (2005); Stealth Lobbyist Disclosure Act of 2004, H.R. 4937, 108th Cong. (2004).

In the 109th Congress, the Senate passed a bill amending the LDA, including refining the

disclosure requirements for associations and coalitions.  S. 2349, 109th Cong. (2006); 152 Cong.

Rec. S2511 (daily ed. Mar. 29, 2006).  The House amended the Senate bill in full with a

companion House bill.  *Id.* at  H3033-38 (daily ed. May 23, 2006).  A conference committee was

not convened to reconcile the bills and no further action on the legislation occurred.

In the 110th Congress, the House and Senate again took up lobbying reform.  The Senate

passed a bill, S. 1, in the first weeks of the new Congress.  153 Cong. Rec. S746 (daily ed. Jan.

18, 2007) (passed by vote of 96-2).  That bill would have amended section 1603(b)(3) to provide

for disclosure of organizations that met the contribution threshold and "participate[d] in a

substantial way in the planning, supervision, or control of such lobbying activities."  Later that

year, both Houses passed an amended version of the Senate bill, *id.* at H9210 (daily ed. Jul. 31,

2007) (passed House by vote of 411-8); *id.* at S10723 (daily ed. Aug. 2, 2007) (Senate agreed to

House amendments by vote of 83-14), which was signed by the President and became the Honest

Leadership and Open Government Act of 2007 ("HLOGA"), Pub. L. No. 110-81, 121 Stat. 735.

HLOGA included a complex set of reforms addressing Senate and House ethics rules,

post-employment restrictions, gifts and travel restrictions, as well as strengthened lobbying

disclosure.  With regard to lobbying, HLOGA, among other things, prohibits registered lobbyists

from providing gifts or travel to Members of Congress and their employees, § 206; reduces the

interval for lobbying reports from semiannually to quarterly[7], § 201; requires new, semiannual

---

[7]  The amendments to the LDA correspondingly alter the amount of lobbying expenses
that triggers the filing requirement from $20,000 in a semiannual period to $10,000 in a quarterly
(continued...)

disclosure of contributions to Members of Congress and other covered officials from registered

lobbyists, § 203; requires electronic filing of lobbying registration and reports, § 205; extends

disclosure of past executive or legislative branch employment of registered lobbyists to positions

held in the previous 20 years, § 208; and, establishes criminal penalties and increases civil

penalties, § 211.

As to disclosure of organizations involved in lobbying by associations and coalitions,

HLOGA § 207 amended the existing provision, 2 U.S.C. § 1603(b)(3), in two ways.  First,

Congress changed the monetary threshold for contributions of the organization to the client's

lobbying activities from $10,000 in a semiannual period to $5,000 in a quarter, to harmonize with

the new quarterly reporting periods for registrants.  In addition, the statute made clear that such

contributions could be to the registrant or the client.  Second, HLOGA modified the standard for

the level of an organization's participation in lobbying activities that triggers disclosure.  Where

the LDA originally set the threshold as "in whole or in major part plans, supervises, or controls

such lobbying activities," HLOGA changed it to "actively participates in the planning,

supervision, or control of such lobbying activities."  HLOGA § 207(a)(1)(B).  Thus, section

1603(b)(3), as amended, now requires disclosure by registrants of:

> [T]he name, address, and principal place of business of any organization, other
> than the client, that –
>
> (A) contributes more than $5,000 to the registrant or the client in
> the quarterly period to fund the lobbying activities of the registrant;
>
> and
>
> (B) actively participates in the planning, supervision, or control
> of such lobbying activities.

---

[7](...continued)
period.  HLOGA § 201(b)(5)(B).

Section 207 of HLOGA further amended 2 U.S.C. § 1603(b)(3) to provide that, if an organization that "would be identified as affiliated with the client" by meeting the disclosure requirement of that section "is listed on the client's publicly accessible Internet website as being a member of or contributor to the client," then that organization need not be disclosed in the registrant's filing with the Secretary and the Clerk unless it meets the higher participation threshold of "in whole or in major part," and not just "actively participates."  In addition, HLOGA § 207 amended 2 U.S.C. § 1603(b)(3) to clarify that nothing in paragraph (B) of that subsection "shall be construed to require the disclosure of any information about individuals who are members of, or donors to, an entity treated as a client by this Act or an organization identified under that paragraph."

In a joint statement, Senators Feinstein, Lieberman, and Reid explained that section 207 "closes a loophole that has allowed so-called 'stealth coalitions,' often with innocuous-sounding names, to operate without identifying the interests engaged in the lobbying activities."  153 Cong. Rec. S10709 (daily ed. Aug. 2, 2007).  HLOGA § 207's new threshold for disclosure by coalitions and associations applies to registrations after January 1, 2008, and to quarterly reports covering activity beginning on January 1, 2008.  HLOGA § 215.[8]

Following HLOGA's enactment, the Secretary and Clerk issued guidance on this provision explaining that "[a]n organization 'actively participates' in the planning, supervision, or control of lobbying activities of a client or registrant when that organization (or an employee of the organization in his or her capacity as an employee) engages directly in planning, supervising, or controlling at least some of the lobbying activities of the client or registrant."

---

[8]  The first set of quarterly reports under the amended section 1603(b)(3) are due on April 21, 2008.  HLOGA § 201(a)(1)(B).

15

LDA Guidance eff. Jan. 1, 2008, http://www.senate.gov/legislative/resources/pdf/S1guidance.pdf at 4.  The guidance provides examples of active participation, including "participating in decisions about selecting or retaining lobbyists, formulating priorities among legislative issues, designing lobbying strategies, performing a leadership role in forming an ad hoc coalition, and other similarly substantive planning or managerial roles, such as serving on a committee with responsibility over lobbying decisions."  *Id.*   The guidance distinguishes such actively participating organizations from those entities "that, though members of or affiliated with a client, have only a passive role in the lobbying activities of the client (or of the registrant on behalf of the client)."  *Id.*  Examples of activities constituting only a passive role include –

> merely donating or paying dues to the client or registrant, receiving information or reports on legislative matters, occasionally responding to requests for technical expertise or other information in support of the lobbying activities, attending a general meeting of the association or coalition client, or expressing a position with regard to legislative goals in a manner open to, and on a par with that of, all members of a coalition or association – such as through an annual meeting, a questionnaire, or similar vehicle.

*Id.*  The guidance further clarifies that –

> [m]ere occasional participation, such as offering an *ad hoc* informal comment regarding lobbying strategy to the client or registrant, in the absence of any formal or regular supervision or direction of lobbying activities, does not constitute active participation if neither the organization nor its employee has the authority to direct the client or the registrant on lobbying matters and the participation does not otherwise exceed a *de minimis* role.

*Id.*

16

**ARGUMENT**

Plaintiff's constitutional challenge to amended section 1603(b)(3) fails as a matter of law. First, the Supreme Court's decision in *United States v. Harriss*, 347 U.S. 612, upholding the constitutionality of lobbying disclosure fully supports the constitutionality of the disclosure provision at issue here.

Second, under the constitutional test for disclosures of political speech under *Buckley v. Valeo*, 424 U.S. 1, the disclosure required by amended section 1603(b)(3) is narrowly tailored to serve the significant governmental interests of providing the public and public officials with necessary information to evaluate the influences on government decisionmaking from lobbying interests and of shining sunlight on lobbying activities to protect against the appearance of corruption. *See id.* at 67-68. The required disclosure imposes a minimal burden on the NAM's member organizations' associational rights that is sufficiently justified by the substantial governmental interests served by the disclosure.

Further, the definition of "lobbying activities" in the law is not unconstitutionally vague on its face or as applied to the NAM. "Lobbying activities" is defined to include lobbying contacts with senior public officials and the efforts in support of such contacts, including planning and research that is intended, at the time it is performed, for use in lobbying contacts. *See* 2 U.S.C. § 1602(7). That definition provides sufficient clarity that "a person of ordinary intelligence," *Buckley*, 424 U.S. at 77, can understand what actions fall within the ambit of "lobbying activities." As applied to plaintiff's activities, the NAM is capable of determining which of its meetings, committees, and planning sessions involve preparation for lobbying, and can appropriately disclose those member organizations that are actively participating in planning, supervision or controlling its lobbying activities as defined by the law. Indeed, for twelve years

17

the NAM has been required to determine what constitutes "lobbying activities" in order to ascertain whether it met the threshold of "in whole or in major part" in prior section 1603(b)(3).

## I.  THE SUPREME COURT'S DECISION IN *UNITED STATES V. HARRISS* ESTABLISHES THE CONSTITUTIONALITY OF THE DISCLOSURES REQUIRED BY AMENDED SECTION 1603(b)(3)

Supreme Court precedent amply supports the constitutionality of the disclosure provision challenged by plaintiff.  The Court in *United States v. Harriss*, 347 U.S. 612, rejected a First Amendment challenge to the lobbying disclosure provisions in the FRLA.  The Court found that requiring disclosure of lobbyists and their clients, and the amount of money spent lobbying to influence the passage or defeat of legislation through "direct communication with Congress," *id.* at 622-23, "d[id] not violate the freedoms guaranteed by the First Amendment – freedom to speak, publish, and petition the Government."  *Id.* at 625.[9]  The Court explained that "full realization of the American ideal of government by elected representatives depends to no small extent on their ability to properly evaluate . . . the myriad pressures to which they are regularly subjected."  *Id.* at 625.  Without the information needed to unmask the attempts of organized groups to influence the legislative process, "the voice of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal."  *Id.*  The lobbying disclosure provisions enacted by Congress, the Court found, were "designed to help prevent" such an "evil" influence on the legislative process.  *Id.*

---

[9]  The Court also rejected a vagueness challenge to the FRLA, after clarifying that the Act applied only to attempts to influence the passage of legislation through direct communication with Members of Congress.  *See Harriss*, 347 U.S. at 621-23.  Such direct communication included money spent on lobbying campaigns "to induce various interested groups and individuals to communicate by letter with members of Congress on  . . . legislation."  *Id.* at 615.

Moreover, the Court noted that the law's disclosure requirement did not amount to a ban on any speech or petitioning:

> Congress has not sought to prohibit these pressures. It has merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose. It wants only to know who is being hired, who is putting up the money, and how much.

*Id.* In requiring such lobbying disclosure, the Court explained, Congress had used its power "to maintain the integrity of a basic governmental process," *id.*, and had done so "in a manner restricted to its appropriate end." *Id.* at 626. Thus, the Court held that the lobbying disclosure provisions "do not offend the First Amendment." *Id.*

All 50 states and the District of Columbia have laws requiring disclosure of lobbying activities, General Accounting Office, Information on States' Lobbying Disclosure Requirement, No. B-0129874 (GAO/GGD-97-95R, May 2, 1997), *available at* http://archive.gao.gov/paprpdf1/158621.pdf, and courts have consistently upheld these laws against First Amendment challenges, relying on the Court's decision in *Harriss*. *See Florida League of Professional Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 460 (11th Cir. 1996) ("Several other courts have similarly interpreted *Harriss* and have rejected broad constitutional attacks on lobbying disclosure requirements." and citing cases); *Minnesota State Ethical Practices Bd. v. Nat'l Rifle Ass'n*, 761 F.2d 509, 511-12 (8th Cir. 1985) ("In light of *Harriss*, we think the State of Minnesota has a compelling interest in requiring lobbyists to register their activities. Accordingly, we reject the appellants' challenge" to state lobbyist registration and disclosure provisions); *Comm'n on Indep. Colls. & Univs. v. N.Y. Temporary State Comm'n on Regulation of Lobbying*, 534 F. Supp. 489, 497-99 (N.D.N.Y. 1982) (upholding New York lobbying law).

The disclosure provision at issue here falls within the scope of lobbying disclosure approved in *Harriss*. The LDA, as amended, applies to direct lobbying contacts with senior public officials and the activities that support those contacts. *Harriss* held that disclosure of such direct contacts could be required without infringing on the First Amendment. Section 207 of HLOGA, which refined the disclosure threshold of section 1603(b)(3) to cover those organizations that significantly fund and actively participate in the planning, supervision, or control of another entity's lobbying activities, is nothing more than a requirement that a registrant disclose "who is being hired, who is putting up the money, and how much." *Harriss*, 347 U.S. at 625. If an organization hired a lobbyist itself and expended funds of $5,000 in a quarter, the organization would have to be disclosed as a client of that lobbyist. Plaintiff does not argue – nor could it under *Harriss* – that requiring such disclosure violates the First Amendment. Section 1603(b)(3), as amended, merely prevents the same organization from circumventing the lobbying disclosure laws by channeling its funds and participation in lobbying activities through another entity, such as an association or coalition.[10] *Harriss*'s approval of lobbying disclosure amply supports the constitutionality of amended section 1603(b)(3), which merely prevents an obvious and simple circumvention of the lobbying regime established by Congress, by requiring the disclosure of the identity of organizations that significantly fund and actively participate in the lobbying activities of a client association or coalition.

---

[10] In *Buckley*, the Court upheld restrictions on campaign volunteers paying for incidental expenses (such as food and beverages for campaign events or their own travel expenses), finding that when volunteers pay for such expenses "[t]he ultimate effect is the same as if the person had contributed the dollar amount to the candidate . . . ." 424 U.S. at 36-37. Consequently, "[i]f, as we have held, the basic contribution limitations are constitutionally valid, then surely these provisions" are also constitutional. *Id.* at 36.

II.    **SECTION 207'S DISCLOSURE REQUIREMENTS MEET THE FIRST AMENDMENT TEST OF *BUCKLEY V. VALEO* AND DO NOT VIOLATE INDIVIDUAL RIGHTS OF ASSOCIATION**

Even aside from *Harriss*, the disclosure requirements challenged here satisfy the First Amendment standard established by Supreme Court precedent over the past thirty years. The Supreme Court established in *Buckley* that compelled disclosures that impinge on privacy of association under the First Amendment "must survive exacting scrutiny." 424 U.S. at 64. Under that standard, the required disclosure must "directly serve substantial governmental interests," *id.* at 68, there must be "a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed," *id.* at 64 (internal footnotes and citations omitted), and the governmental interest must be sufficiently important to justify any burden on individual rights caused by the disclosure. *Id.* at 68; *see also Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 202 (1999) ("In [*Buckley*], we stated that 'exacting scrutiny' is necessary when compelled disclosure of campaign-related payments is at issue [and] upheld, as substantially related to important governmental interests, the recordkeeping, reporting, and disclosure provisions of the Federal Election Campaign Act [FECA]. . . ."); *Jones v. Unknown Agents of the Federal Election Comm'n*, 613 F.2d 864, 875 (D.C. Cir. 1979).   In applying *Buckley*, the D.C. Circuit has instructed that,

> When facing a constitutional challenge to a disclosure requirement, courts . . . balance the burdens imposed on individuals and associations against the significance of the government interest in disclosure and consider the degree to which the government has tailored the disclosure requirement to serve its interests.

*AFL-CIO v. Federal Election Comm'n*, 333 F.3d 168, 176 (D.C. Cir. 2003) (citing *Buckley*, 424

U.S. at 64-68; *Block v. Meese*, 793 F.2d 1303, 1315-16 (D.C. Cir. 1986)).[11]  As explained below, the disclosure requirement at issue here is narrowly tailored to accomplishing a vital government interest that justifies the minimal burden on associational rights of some of the NAM's members.

> **A.    There is a Vital Governmental Interest in the Disclosure of Organizations That Significantly Fund and Actively Participate in the Planning, Supervision, or Control of the Lobbying Activities of Another Entity.**

The LDA registration scheme and the amended provision regarding reporting by associations and coalitions serve two significant interests recognized in *Buckley* as sufficient to justify the incidental burden imposed by disclosure.  First, these provisions "provide[] the electorate with information," particularly regarding where money comes from and where it is spent, so the public and public officials can better evaluate the influence that lobbying has on government decisions.  *Buckley*, 424 U.S. at 66-67.  Second, the disclosure requirements "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity."  *Id.* at 67; *see also McConnell v. Federal Election Comm'n*, 540 U.S. 93, 196 (2003) (upholding disclosure requirements of Bipartisan Campaign Reform Act of 2002 based on same "important state interests that prompted the *Buckley* Court to uphold FECA's disclosure requirements").

---

[11]  While *Buckley* speaks of "exacting scrutiny," plaintiff argues that strict scrutiny applies to its First Amendment challenge.  *See* Plaintiff's Motion for a Preliminary Injunction and Supporting Memorandum of Law ("Pl.'s Mot.") at 18-19.  Other courts have observed that the "Supreme Court has been less than clear as to the proper level of judicial scrutiny we must apply in deciding the constitutionality of disclosure regulations," *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1101 n.16 (9th Cir. 2003), and have differed on what standard to apply.  *Compare Florida League of Professional Lobbyists*, 87 F.3d at 460-61 (following *Harriss* which "appears" not to have applied strict scrutiny) *with Minnesota State Ethical Practices Bd.*, 761 F.2d at 511-12 (applying strict scrutiny).  Our demonstration of the interests served by the law and the tailored manner by which the law seeks to protect those interests satisfies both "exacting" and strict scrutiny, regardless of any difference between the two standards.

Congress enacted the LDA and the lobbying amendments in HLOGA to provide the public with much needed information to evaluate public officials and the sources of potential influence on their actions. *See* 153 Cong. Rec. S258 (daily ed. Jan. 9, 2007) (statement of Sen. Collins) (explaining that "[t]he knowledge that the public will be able to scrutinize in detail" through lobbying disclosure "will help to provide much needed transparency" and "will allow citizens to decide for themselves what is acceptable and what is not"); 153 Cong. Rec. H5743 (daily ed. May 24, 2007) (statement of Rep. Doggett) ("When deep-pocketed interests spend big money to influence public policy, the public has a right to know. Even a little light can do a lot of good."); 141 Cong. Rec. 20007 (1995) (statement of Sen. Levin) ("[T]he public has a right to know, and the public should know, who is being paid to lobby, how much they are being paid, on what issue."). Such information also enables government officials to evaluate the pressures being brought to bear on their decisionmaking.

In the LDA itself, Congress expressly found that "responsible representative Government requires public awareness of the efforts of paid lobbyists to influence the public decisionmaking process in both the legislative and executive branches of the Federal Government." 2 U.S.C. § 1601(1). Hence, by providing information on "who is being hired, who is putting up the money, and how much," lobbying disclosure serves "to maintain the integrity of a basic governmental process," *Harriss*, 347 U.S at 625, and thus to "safeguard a vital national interest." *Id.* at 626; *Minnesota State Ethical Practices Bd.*, 761 F.2d at 512 (state "has a compelling interest in requiring lobbyists to register their activities"). As the Eleventh Circuit explained in reviewing state lobbying laws, lobbying disclosure serves the "interest of voters (in appraising the integrity and performance of officeholders and candidates, in view of the pressures they face)

23

and legislators (in 'self-protection' in the face of coordinated pressure campaigns)." *Florida League of Professional Lobbyists*, 87 F.3d at 460.

Lobbying disclosure also serves the important interest of avoiding the "appearance of corruption." Congress found in the LDA that "the effective public disclosure of the identity and extent of the efforts of paid lobbyists to influence Federal officials in the conduct of Government actions will increase public confidence in the integrity of Government." 2 U.S.C. § 1601(3). The disclosure provisions in the LDA were "designed to strengthen public confidence in government," H.R. Rep. No. 104-339, pt. 1, at 2, "by ensuring that the public is aware of the efforts that are made by paid lobbyists to influence public policy." 141 Cong. Rec. 20007 (1995) (statement of Sen. Levin); *see also* 153 Cong. Rec. S10691 (daily ed. Aug. 2, 2007) (statement of Sen. Lieberman) ("This sweeping legislation shines much needed light in corners and corridors of this Capitol, too long left in the dark. It should help restore the public's trust now, a trust that is in much need of restoration."); *Minnesota Citizens Concerned for Life, Inc. v. Kelley*, 427 F.3d 1106, 1111 (8th Cir. 2005) ("Both the Supreme Court and this court have upheld lobbyist-disclosure statutes based on the government's 'compelling' interest in . . . avoiding even the appearance of corruption.") (citing *Buckley*, 424 U.S. at 66; *Minnesota State Ethical Practices Bd.*, 761 F.2d at 512).

Thus, lobbying disclosure under the LDA serves two significant governmental interests – providing the public and government officials with information to evaluate the influences and pressures on government decisionmaking and avoiding the appearance of corruption from lobbying interests. The specific disclosure provision at issue here, amended section 1603(b)(3), furthers these interests by ensuring that the LDA's reporting requirements are not easily circumvented. As explained in the legislative history, Congress provided in the LDA for the

disclosure of organizations, other than clients, that fund and participate in lobbying by registrants (particularly associations and coalitions) to "preclude evasion of the disclosure requirements of the Act through the creation of ad hoc lobbying coalitions behind which real parties in interest can hide."  H.R. Rep. No. 104-339, pt. 1, at 18.  In amending the provision in 2007 to refine the disclosure threshold, the legislation's proponents reaffirmed that the provision "closes a loophole that has allowed so-called 'stealth coalitions,' often with innocuous-sounding names, to operate without identifying the interests engaged in the lobbying activities."  153 Cong. Rec. S10709 (daily ed. Aug. 2, 2007) (joint statement of Sen. Feinstein, Sen. Lieberman, and Sen. Reid); *see also id.* at S260 (daily ed. Jan. 9, 2007) (statement of Sen. Lieberman) ("We would also remove the cloak obscuring so-called stealth lobbying campaigns which occur when a group of individuals, companies, unions, or associations ban together to form a lobbying coalition.").

Requiring disclosure of organizations that fund and actively participate in planning, supervising, or controlling a client's lobbying activities is an important part of lobbying disclosure that helps guarantee the registration scheme under the LDA provides both the public and public officials with important information about the true interests lobbying the government. Hence, by closing a loophole in prior law, amended § 1603(b)(3) serves the vital governmental interests of providing information necessary to evaluate the pressures by lobbyists on government policymaking and of avoiding the appearance of corruption from lobbying influences.

## B.    The Disclosure Provision Is Closely Related and Narrowly Tailored to Achieve the Governmental Interest.

The information required to be disclosed by amended section 1603(b)(3) assuredly has a substantial relationship to the governmental interest being served.  That information, "the name, address, and principal place of business" of organizations that contribute more than $5,000 in a

quarter to a client's or registrant's lobbying activities and that actively participate in the planning, supervision, or control of those activities, 2 U.S.C. § 1603(b)(3), is precisely the "who pays, who puts up the money, and how much," that *Harriss* understood to be the purpose of lobbying disclosure. Such information is the minimum disclosure necessary to allow the public and public officials to evaluate the influences on the government from lobbying groups and also to mitigate the appearance of impropriety and public concerns over the secret influence of lobbyists.

Plaintiff does not challenge the relationship of the required disclosure to the government interests furthered by it; rather, plaintiff asserts that the provision is not narrowly tailored to serve that interest because it is both underinclusive and overinclusive. Pl.'s Mot. at 28-29. Plaintiff's argument lacks merit.

As to underinclusiveness, plaintiff first argues that "the amended Act does not reach stealth coalitions unless they happen to hire their own lobbyist(s), rather than relying on the lobbyists of participating organizations." *Id.* at 28. This contention is simply inapposite. Under the LDA, registrants must disclose their client. The concern addressed by section 1603(b)(3), as amended, is that organizations might avoid disclosure as clients by joining in a coalition or association to engage lobbyists – and thereby making only the association or coalition the lobbyist's "client" that must be disclosed in filings under the LDA.[12] The challenged provision is meant to prevent such circumvention by requiring organizations that significantly fund and actively participate in the planning, supervision, or control of the lobbying activities of the client also to be disclosed in LDA filings. If, instead of the coalition or association retaining a lobbying firm on its own behalf, the underlying organizations themselves employ lobbyists to lobby

---

[12] The LDA provides that "[i]n the case of a coalition or association that employs or retains other persons to conduct lobbying activities, the client is the coalition or association and not its individual members." 2 U.S.C. § 1602(2).

26

covered officials on a matter, as plaintiff suggests, then the organizations *will* be disclosed as the

client on the registrant's registration and reports, and the purposes of the disclosure requirements

will have been achieved. Hence, the evasion amended section 1603(b)(3) seeks to prevent will

not be present. Contrary to plaintiff's suggestion, the provision closes, rather than opens, a

loophole in the disclosure requirements.

Plaintiff also argues that the challenged provision is underinclusive because it does not

apply to individuals (but only to organizations) who fund and participate in the planning,

supervision, or control of the lobbying activities of associations or coalitions. *See* Pl.'s Mot. at

28. Congress's decision not to include individuals was an accommodation to both the heightened

sensitivity regarding the potential impact of disclosure on individuals as opposed to organizations

and the concern that organizational entities such as businesses, labor organizations, or issue-

advocacy groups have a substantial influence that they may attempt to conceal. The Senate

Governmental Affairs Subcommittee received expert testimony in 1992 about the need to

balance the fact that "[c]orporations or other organizations occasionally hide their identities

behind a coalition established or available for the purpose of preventing the public from learning

of their efforts to influence congressional action," with "the First Amendment protect[ion]

against the disclosure of the identities of individuals who are members of an organization."

> An appropriate means of striking a balance between the competing interests of the
> public's right to know and an individual's right to petition the government
> without risking harm to his or her well-being or reputation is to focus on
> organization members of coalitions or associations lobbying Congress.

S. Hrg. 102-609, at 83 (statement of Thomas M. Susman, Chair, ABA Section of Admin. Law.

and Regulatory Practice). By striking that balance, Congress tailored the disclosure requirement

to the area of greatest concern (organizations that evade disclosure through coalitions and

associations), while safeguarding individuals' First Amendment rights.[13]  Congress's choice to address the problem it saw as most pressing, while excepting individuals, strengthens, rather than undermines, the constitutionality of the provision.  *Cf. Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 665 (1990) (finding that state law that prohibited corporations from using corporate funds for independent expenditures in support of or opposition to candidates for state office, but did not prohibit independent expenditures by unincorporated unions, was not underinclusive, as state's compelling interest was counterbalancing state-conferred corporate advantages in amassing and using wealth).[14]

Plaintiff also fails to show how the provision is fatally overinclusive.  Plaintiff argues that the disclosure required by section 1603(b)(3), as amended, is overinclusive because it reaches "long-standing, formally-organized groups like the NAM," and not merely short-lived "stealth coalitions."  Pl.'s Mot. at 29.  However, while Congress certainly expressed concern about stealth coalitions, it recognized that organizations could conceal their involvement in lobbying activities through any third-party entity, including established associations.  Section 207 of HLOGA is

---

[13]  In amending the LDA, Congress made clear that nothing in the language regarding the disclosure of organizations that significantly fund and actively participate in the lobbying activities of a client "shall be construed to require the disclosure of any information about individuals who are members of, or donors to, an entity treated as a client by this Act or an organization identified under that paragraph."  HLOGA § 207(b), 2 U.S.C. § 1603(b).

[14]  More generally, in addressing distinctions in eligibility for public campaign financing, the Court in *Buckley* noted "that a statute is not invalid under the Constitution because it might have gone farther than it did, . . . that a legislature need not strike at all evils at the same time, . . ., and that reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind."  424 U.S. at 105 (quoting *Katzenbach v. Morgan*, 384 U.S. 641, 657 (1966)) (internal quotation marks and citations omitted); *see also McConnell*, 540 U.S. at 158 ("We have recognized that the differing structures and purposes of different entities may require different forms of regulation in order to protect the integrity of the electoral process, . . . and we respect Congress' decision to proceed in incremental steps in the area of campaign finance regulation[.] ") (internal quotation marks and citations omitted).

28

entitled "Disclosure of lobbying activities by certain coalitions and *associations*." (emphasis added). The purpose of this provision is to avoid circumvention of disclosure by organizations that lobby Congress, whether by established associations or *ad hoc* coalitions.

Moreover, the line between coalitions and associations is not a bright one on which Congress can legislate. The NAM's webpage indicates that it itself is a member of over 70 coalitions, including "Compete America," "OSHA Fairness Coalition," "Air Quality Coalition," and "The National Coalition to Protect Family Leave," *see* NAM Coalition Activity, http://www.nam.org/s_nam/bin.asp?CID=28&DID=201898&DOC=FILE.PDF (last visited Feb. 22, 2008) [Attachment 1][15], demonstrating that coalitions and associations do not inhabit wholly separate spheres. Including established associations such as plaintiff within the coverage of section 1603(b)(3) is not overinclusive but a necessary part of preventing evasion of the LDA's disclosure requirements.[16]

Furthermore, Congress specifically tailored amended section 1603(b)(3) to avoid capturing mere dues-paying members of established associations. Disclosure is required only if an organization contributes significant funds to the lobbying activities of a client (more than

---

[15] As of February 29, 2008, this page appears to be no longer available on the NAM website.

[16] The NAM argues that disclosure of the member organizations actively participating in planning, supervising, or controlling its lobbying activities is unnecessary because "[t]he public policy interests represented by the NAM are well known and clearly 'advertised' in its name." Pl.'s Mot. at 3; *see also id.* at 28; Compl. ¶ 26(c). However, the NAM has over 11,000 members, *see id.* ¶ 14, and while its name indicates that its membership is composed of manufacturers, the term "manufacturers" encompasses such a broad constituency of companies with a wide variety of interests that it provides scant information as to which particular manufacturing interests are behind the NAM's lobbying efforts. *See, e.g.*, *NAM Board Votes in Favor of Multinationals in Debate over China's Currency*, 13 Manufacturing & Technology News (Oct. 10, 2006), *available at* 2006 WLNR 18153813 (Westlaw) (describing internal controversy between the NAM's domestic and multinational company members over what interests NAM represents on particular trade issues).

$5,000 in a quarter), and actively participates in planning, supervising, or controlling those activities. *See* 153 Cong. Rec. S10709 (joint statement of Sen. Feinstein, Sen. Lieberman, and Sen. Reid) ("mere donors" and "mere recipients of information and reports" not captured by disclosure provision). Most of the NAM's 11,000 corporate members surely do not meet the threshold for disclosure. *See* Compl. ¶ 14 (estimating that "[h]undreds of the NAM's corporate members" out of over 11,000 would meet monetary threshold of disclosure provision).[17] Congress thus carefully narrowed the disclosure requirement to avoid being overinclusive.

Finally, plaintiff argues that defendants must show that "Congress carefully assessed possible alternative approaches" and chose the one placing the least burden on plaintiff. Pl.'s Mot. at 29. As discussed in the background section above, *supra* at 8-13, Congress considered over many years various proposals for disclosure schemes that would best accomplish the vital governmental interests served by lobbying disclosure.[18] Moreover, by providing for disclosure of lobbying instead of prohibiting or limiting it, Congress has pursued the least restrictive means of protecting the public interest. As the Court recognized in *Buckley*, "disclosure requirements certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist." 424 U.S. at 68.[19]

---

[17] As explained *infra* at 34, over 250 of the NAM's corporate members have already disclosed their affiliation with the NAM on the NAM's website.

[18] Such "thoughtful and careful effort by our political branches, over such a lengthy course of time, deserves respect." *McConnell v. Federal Election Comm'n*, 251 F. Supp. 2d 176, 434 (D.D.C. 2003) (opinion of Kollar-Kotelly, J.) (citation omitted).

[19] The Court should reject as well any invitation to second guess the threshold Congress has chosen for triggering disclosure in amended section 1603(b)(3). As the Supreme Court cautioned in *Buckley*, "we cannot require Congress to establish that it has chosen the highest reasonable threshold. The line is necessarily a judgmental decision, best left in the context of this complex legislation to congressional discretion." 424 U.S. at 83.

Accordingly, the disclosure provision plaintiff challenges is narrowly tailored to a compelling government interest and is neither underinclusive nor overinclusive.

### C.    Plaintiff Has Not Established a Significant Burden on its Members' Associational Rights Arising From the Disclosure Provisions.

In considering the burden on the associational rights of members of organizations, the Supreme Court has focused on the harassment and retribution that could be suffered by members of an unpopular association if they were publicly identified as part of that association.  *See NAACP v. Alabama*, 357 U.S. 449, 462-63 (1958); *Buckley*, 424 U.S. at 71-72; *AFL-CIO v. Federal Election Comm'n*, 333 F.3d at 176.  In evaluating the likelihood and severity of potential retribution and harassment, the Court has required a specific factual showing of the threat of harm to members.  In *NAACP*, the association "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility."  357 U.S. at 462.  Similarly, in *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87 (1982), the Court found a state's campaign expenditure and contribution disclosure requirements unconstitutional as applied to the Socialist Workers' Party based on "substantial evidence of past and present hostility from private persons and Government officials," *id.* at 102, including record proof of "threatening telephone calls and hate mail, the burning of [the party's] literature, the destruction of . . . members' property," and "22 [party] members . . . were fired because of their party membership."  *Id.* at 99.

Plaintiff has made no showing of any prospect of harassment and retaliation against its organization members that even remotely approaches the evidentiary showings in *NAACP* or *Socialist Workers '74 Campaign Committee*.  Plaintiff relies on the Declaration of Jan Sarah

Amundson, Senior Vice President and General Counsel of the NAM ("Amundson Decl."), in support of its allegations. In that declaration, Ms. Amundson avers that "[t]he NAM regularly lobbies on a variety of hot-button issues . . . that may lead to adverse consequences for members identified as 'actively participat[ing]' in such efforts." Amundson Decl. ¶ 10 (alterations and quotation marks in original). She goes on to suggest generally that firms associated with "lobbying on issues related to on-going litigation . . . risk becoming litigation targets," and that "[t]aking policy positions that are unpopular with some groups may lead to boycotts, shareholder suits, demands for political contributions or support, and other forms of harassment." *Id.* For support, Ms. Amundson cites five newspaper articles and one lawsuit involving a labor union.[20]

Such allegations are woefully short of demonstrating the reasonable probability of serious harassment and retribution from disclosure of a member's involvement with the NAM and its lobbying activities[21] that could counterbalance the compelling governmental interest furthered by the challenged provision discussed above. Indeed, the Supreme Court rejected such assertions as insufficient in *Buckley*:

---

[20] The lawsuit cited in the declaration, *IBEW, Local 1547 v. Alaska Util. Construction, Inc.*, 976 P.2d 852 (Alaska 1999), involved harassment of a utility construction company in Alaska and its employees, who were non-union, by a labor union and its members. It is not alleged that the company was a member of the NAM, nor that it was subject to retribution because of its participation in the NAM's lobbying activities. Similarly, none of the news articles cited involves harassment against a NAM member because of participation in the NAM's lobbying.

[21] It is important to remember that section 1603(b)(3), as amended, does not require disclosure of the NAM's membership generally, but rather only of those members that contribute more than $5,000 in a quarter to the NAM's lobbying activities and that actively participate in the planning, supervision, or control of those activities. The provision does provide that members that are required to be disclosed by amended section 1603(b)(3), but are already disclosed on the NAM's website, need not be disclosed again in the NAM's LDA filings with the Secretary and Clerk, unless that member organization "in whole or in major part plans, supervises, or controls such lobbying activities." HLOGA § 207(b), 2 U.S.C. § 1603(b).

> [N]o appellant in this case has tendered record evidence of the sort proffered in
> *NAACP v. Alabama*.  Instead, appellants primarily rely on "the clearly articulated
> fears of individuals, well experienced in the political process." . . . At best they
> offer the testimony of several minor-party officials that one or two persons refused
> to make contributions because of the possibility of disclosure.  On this record, the
> substantial public interest in disclosure  . . . outweighs the harm generally alleged.

424 U.S. at 71-72.  Similarly, in *McConnell v. FEC*, the Supreme Court found that the plaintiffs

challenging the disclosures required by a campaign finance law had failed to introduce the

evidence necessary to establish a reasonable probability of retribution or harassment, 540 U.S. at

199, although they offered far more evidence than plaintiff here.[22]

Not only do the NAM's assertions of potential harassment and retribution against its

organizational members from disclosure of their involvement with the NAM's lobbying fail for

lack of an evidentiary basis, but even on their face, the unsupported claims of potential harms do

not rise to the same level as those at stake in *NAACP* or *Socialist Workers '74 Campaign

Committee*.  In both of those cases, the association at issue was one that was seriously disfavored

in the community for espousing "dissident beliefs," *NAACP*, 357 U.S. at 462; *see also Socialist

Workers '74 Campaign Comm.*, 459 U.S. at 91-93; *see also Buckley*, 424 U.S. at 69-71 (concern

with disclosure of organization's membership focused on "minor political parties"), and whose

members faced distinct risks of personal harm from the disclosure of their identities.  Unlike

those cases, the organizational members of the NAM are not disfavored minority interests

---

[22]  The district court in *McConnell* had received testimony from plaintiff organizations as
to the threats of harm facing their members from disclosure.  One organization testified that some
members had voiced concerns over disclosure, that a conspicuous number of members
contributed just below the threshold for disclosure, and that one reason for members' wanting to
avoid disclosure was fear of losing their jobs.  Another organization offered testimony that one of
its officials "had been told" that a number of contributors suffered substantial vandalism after
their names were disclosed.  Other organizations presented evidence of fear that disclosure would
lead to union harassment.  *See McConnell*, 251 F. Supp. 2d at 245-47 (per curiam).  The court
found these attempts to show harassment and retribution from disclosure insufficient under
*Buckley* to demonstrate a significant burden on associational rights.  *See id.* at 247.

holding to "dissident beliefs," but rather mainstream companies that are well-positioned in the public marketplace, and the harms they allegedly face are not personal to an individual but involve the organization's financial status.

Furthermore, the NAM's general allegations regarding potential "adverse consequences" to its members from disclosing that they actively participate in the NAM's lobbying activities are undermined by disclosures routinely and voluntarily made on its own website.  On its website www.nam.org, NAM lists its Board of Directors and Executive Committee Members – a total of 212 persons identified with their respective affiliated member company, *see* NAM Board of Directors, http://namissvr.nam.org/namissvr/namboardofdirectors.aspx (last visited Feb. 28, 2008) [Attachment 2], along with 58 member companies listed on its Small and Medium Manufacturers Board of Directors.  *See* SMM Directors, http://www.nam.org/s_nam/doc1.asp?CID=17&DID=224550 (last visited Feb. 28, 2008) [Attachment 3].  Thus, the NAM already has voluntarily disclosed over 250 of its member organizations.  Despite public disclosure of these organizations, the NAM has offered no evidence of past incidents suggesting that being publicly disclosed as a member of the NAM imposes upon a company a substantial risk of serious harassment and retaliation.[23]  Moreover, the fact that the NAM readily discloses such a substantial number and broad variety of member organizations undermines its general assertions that disclosure of members that significantly fund and actively participate in planning, supervising, or controlling its lobbying activities will likely result in harassment and retaliation.

The NAM further argues that because it lobbies on a wide range of issues and has

---

[23]  It is unclear from the NAM's complaint how many member organizations – that are not among the over 250 disclosed on its website – contribute over $5,000 a quarter to the NAM's lobbying activities *and* actively participate in planning, supervision, or control of those activities.

member organizations that actively participate in its lobbying activities, yet oppose its position

on a particular issue, it will be forced "to identify certain members as actively supporting its

lobbying activities while they were actually opposing such efforts," thus placing the member

company "in a false light."  Pl.'s Mot. at 27.  This concern is misplaced.  Amended section

1603(b)(3) does not require associations to link organizational members to the lobbying issues

that they support, nor does it require disclosure of members that "actively support" the lobbying

positions of the association.  Rather, the provision requires disclosure of organizations that

significantly fund and actively *participate* in the planning, supervision, and control of the

association's lobby activities.  Hence, amended section 1603(b)(3) is not attempting to compel

additional disclosure of individual member organizations' speech; rather, that provision seeks

only to uncover the organized interests that are taking active part in the association's planning,

supervising, or controlling lobbying activities, regardless of the viewpoint those organizations

have on specific legislative or policy matters – a distinction the NAM is free to make clear.

In sum, the NAM has failed to make a credible showing that members that will be

disclosed under section 1603(b)(3), as amended, face a sufficient prospect of retribution or

harassment to outweigh the substantial governmental interest in disclosure.  Hence, the vital

interests served by amended section 1603(b)(3) combined with its narrow tailoring to prevent

evasion of the lobbying disclosure scheme, justifies the minimal burden imposed on the

associational rights of member organizations of associations such as the NAM.

### III. THE DISCLOSURE REQUIREMENTS FOR LOBBYING ACTIVITIES ARE NOT UNCONSTITUTIONALLY VAGUE

Plaintiff also claims that the HLOGA amendment renders section 1603(b)(3)

unconstitutionally vague.  A statute is unconstitutionally vague under the due process clause if it

35

fails "to provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal[.]" *Buckley*, 424 U.S. at 77; *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 629 (1984) (a statute is unconstitutionally vague when it "'either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application . . . .'") (quoting *Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926)).  Where First Amendment rights are implicated, "the general test of vagueness applies with particular force." *Hynes v. Mayor & Council of Oradell*, 425 U.S. 610, 620 (1976).  Even in that context, however, the Court has not hesitated to reject a vagueness challenge where the statutes are "both easily understood and objectively determinable." *McConnell*, 540 U.S. at 194.

Plaintiff's vagueness challenge focuses on the term "lobbying activities."  Pl.'s Mot. at 24.[24]  The LDA defines lobbying activities as:

---

[24]  Plaintiff offhandedly suggests that the term "active participation" is also unconstitutionally vague.  *See* Pl.'s Mot. at 9 ("And as long as participation in such activities is 'active' – whatever that means . . .").  Contrary to plaintiff's assertion, however, such language provides a sufficient understanding of what triggers reporting under amended section 1603(b)(3) – that is, ordinary people can certainly tell what it means.  Indeed, the Supreme Court rejected a First Amendment vagueness challenge to identical terminology regarding restrictions on federal employee campaign activity:

> There might be quibbles about the meaning of taking an "active part in managing" or about "actively participating in  . . . fund-raising" . . . ; but there are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest.

*U.S. Civil Service Comm'n v. Nat'l Assn. of Letter Carriers*, 413 U.S. 548, 577-79 (1973).

Furthermore, the legislative history provides further gloss on the meaning of active participation, explaining that "organizations that have only a passive role – e.g., mere donors,

(continued...)

> [L]obbying contacts and efforts in support of such contacts, including preparation
> and planning activities, research and other background work that is intended, at
> the time it is performed, for use in contacts, and coordination with the lobbying
> activities of others.

2. U.S.C. § 1602(7).  This definition of "lobbying activities" has been part of the LDA since

1995 and has not been amended by HLOGA.  The NAM, along with all other organizational

registrants, has been filing reports for over a decade disclosing their total expenses on (or income

from, in the case of lobbying firms) lobbying activities.  In other words, the NAM is arguing that

a phrase used in the original LDA that has been the basis for hundreds of thousands of filings for

over a decade – including numerous filings by the NAM – is now unconstitutionally vague.

Moreover, the term "lobbying activities" is not just referenced in the affiliated

organization provision in section 1603(b)(3), but also affects many other components of the

LDA's entire regulatory scheme, including:

- who constitutes a "lobbyist," 2 U.S.C. § 1602(10) (excluding from term "lobbyist" individuals "whose *lobbying activities* constitute less than 20 percent of the time engaged in the services" to a client over six-month period)

- whether a lobbyist must register for a specific client, 2 U.S.C. § 1603(a)(3)(A)(i) (no registration required as to a client when "total income for matters related to *lobbying activities* on behalf of a particular client . . . does not exceed and is not expected to exceed $2,500" in a quarterly period[25])

---

[24](...continued)

mere recipients of information and reports, etc. – would not be considered to be 'actively participating' in the lobbying activities."  153 Cong. Rec. S10709 (daily ed. Aug. 2, 2007 ) (joint statement of Sen. Feinstein, Sen. Lieberman, and Sen. Reid).  In addition, the guidance issued by the Secretary and Clerk provides a detailed explanation of active participation, including examples of what conduct would and would not trigger the provision.  *See* LDA Guidance eff. Jan. 1, 2008, http://www.senate.gov/legislative/resources/pdf/S1guidance.pdf (last visited Feb. 28, 2008), at 4, 12-13.

[25]  HLOGA § 201(b)(2)(B) and § 201(b)(5)(A) altered the previous threshold, which was $5,000 in a semiannual period.

- whether an organization that employs lobbyists to lobby on its own behalf has to register, 2 U.S.C. § 1603(a)(3)(A)(ii) (excluding from registration when "total expenses in connection with *lobbying activities* do not exceed or are not expected to exceed $10,000" in a quarterly period[26])

- the amount of income or expenses that must be disclosed on the quarterly reports of registrants, 2 U.S.C. § 1604(b)(3)-(4) (disclosure of income from or expenses for "*lobbying activities*").

Acceptance of the NAM's argument that "lobbying activities" is unconstitutionally vague would effectively gut the law, as the entire statutory scheme hinges on the requirement to disclose "lobbying activities."

Nevertheless, the NAM now complains that the term "lobbying activities" is vague because it depends, in part, on "intent" in determining its application to certain activities in support of lobbying. *See* Pl.'s Mot. at 25.[27]  But the use of intent in the definition of lobbying activities – background work "that is intended, at the time it is performed, for use in [lobbying] contacts" – makes the definition more precise, not less. *Cf. Gonzales v. Carhart*, 127 S. Ct. 1610, 1628 (2007) ("The Court has made clear that scienter requirements alleviate vagueness concerns."); *Ward v. Utah*, 398 F.3d 1239, 1252 (10th Cir. 2005) (requirement of intent rendered statute not unconstitutionally vague).  Congress wanted to capture all the activities that went into lobbying government officials, and recognized that a substantial segment of lobbying work

---

[26]  HLOGA § 201(b)(2)(B) and § 201(b)(5)(B) altered the previous threshold, which was $20,000 in a semiannual period.

[27]  Plaintiff cites a concurring opinion in *Federal Election Comm'n v. Wisconsin Right to Life*, to support its argument that any reliance on intent is impermissibly vague.  Pl.'s Mot. at 25 (citing *Wisconsin Right to Life*, 127 S. Ct. 2652, 2665 (2007) (Roberts, C.J., concurring). However, the Court in that matter was faced with a statute with clear language prohibiting certain speech and was crafting a judicial test to interpret its provisions to prevent restriction of constitutional speech.  The context of the passage cited from *Wisconsin Right to Life* renders it inapposite to the situation here.  *See* United States Attorney Taylor's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Judgment as a Matter of Law at 23-24.

happens prior to actual contacts with government officials. *See* H.R. Rep. No. 104-339, pt. 1, at 4 ("[M]any lobbyists disclose only income and expenses directly associated with [meeting with Members of Congress].").  Accordingly, Congress defined lobbying activities to encompass the background preparation for lobbying contacts – that is, the time spent planning, researching, and preparing for a contact with a covered government official.  At the same time, Congress did not want to include activities that were done for other purposes and then used in lobbying. *See id.* at 14 (preparing materials for a presentation to a Member of Congress is lobbying activity; "[h]owever, the effort that goes into preparing materials for purposes other than lobbying would not become a lobbying activity simply because the materials are subsequently used in the course of lobbying activities.").  Thus, in the LDA, the definition of lobbying activities refers to the purpose for which a certain action was taken, in order to determine whether conduct was done to support lobbying contacts (for which the statute requires disclosure) or for other purposes (which are outside the scope of the law).  A person of "ordinary intelligence" can understand and comply with this distinction.

The NAM further argues that the term "lobbying activities" is vague because the definition applies to "a wide range of subjects far removed from passage or defeat of a specific bill," Pl.'s Mot. at 25, and is implicated by communications with a large number of government officials. *Id.* at 26.  But the breadth of the provision is not relevant to the vagueness question.  Crystal clear statutory language can sweep broadly.  Vagueness is determined not by the range of activities covered by the statute but by whether the statute provides clarity as to which activities are covered and which are not.  The LDA's definition of lobbying activities provides such clarity.

Plaintiff also suggests that the definition of lobbying activities is "so broad and elastic that it invites ludicrous applications." *Id.*  As an example of such a ludicrous application,

plaintiff offers a hypothetical where the health of a Presidential nominee before the Senate has become an issue in the confirmation process.  In such a situation, "exchanging common pleasantries – e.g., 'How are you feeling,'" – with such a person, plaintiff claims, would be "background research" that  "could qualify as reportable activity" under the statute's definition. *Id.*  This example is not a ludicrous application of the statute – but rather a ludicrous example. The definition of "lobbying activities" specifically provides that activities such as background research only constitute lobbying activity when such effort "is intended, at the time it is performed, for use in [lobbying] contacts."  2 U.S.C. § 1602(7).  An inquiry into someone's well-being done as an "exchange of pleasantries" would, therefore, *not* conceivably constitute a reportable event.  The fact that plaintiff must resort to such a strained example to create a supposed anomaly demonstrates the weakness of its facial vagueness challenge.

Plaintiff also claims that the term "lobbying activities" is unconstitutionally vague as applied to it in amended section 1603(b)(3)'s requirement to disclose organizations that significantly fund and actively participate in the planning, supervision, or control of its lobbying activities.  *See* Pl.'s Mot. at 27.  Plaintiff objects that large associations like the NAM face particular hardships in complying with this requirement because of  "the difficulty of attempting to review all of the activities of the NAM's 100+ monthly meetings, plus other ad hoc groups, to see if this standard has been met."  *Id.*  But even if the NAM is correct that it faces a heightened administrative burden in complying with the challenged provision, that is inapposite to the vagueness question.  Precise statutory terms can impose significant administrative burdens on

40

regulated entities as much as vague terms. The question is the definiteness of the statute's terms, not the burden they impose.[28]

The NAM claims that it is difficult to know the intent of all the members attending a meeting held by NAM, for instance "some members [may] be participating with the intent of preventing lobbying on an issue, while others may be actively pressing for the NAM to lobby, and still others may form their positions in response to the discussion . . ." Pl. Mot. at 27. The fact that representatives of NAM member organizations may have different goals does not make the statute vague. The relevant question is whether an organization member actively participated in the planning, supervision, or control of the NAM's lobbying activities, not whether it supports or opposes the particular lobbying position or strategy the NAM pursues. Therefore, disclosing organizational members who meet the "active participation" and funding test under amended section 1603(b)(3) does not mislead Congress or the public.

Accordingly, the NAM fails to demonstrate that the term "lobbying activities" is vague on its face or as applied to the NAM in amended section 1603(b)(3).

---

[28] Plaintiff further asserts that the effort it would take to comply with the law "distracts the NAM from its constitutionally-protected goal of developing and carrying out speech on behalf of the manufacturing economy." Pl.'s Mot. at 27. Simply because some compliance cost is required in meeting this provision does not make it vague. Complying with other government mandates, such as employee tax withholding and the Family and Medical Leave Act, also costs the NAM resources it might rather use for its "constitutionally-protected goal," but that does not make those statutory requirements unconstitutional.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion should be denied, the complaint dismissed, and judgment granted in favor of defendants.

Respectfully submitted,

| | /s/ |
| IRVIN B. NATHAN, D.C. Bar # 90449 | MORGAN J. FRANKEL, Bar #342022 |
| General Counsel | Senate Legal Counsel |

KERRY W. KIRCHER, D.C. Bar # 386816
Deputy General Counsel

PATRICIA MACK BRYAN, Bar #335463
Deputy Senate Legal Counsel

/s/
CHRISTINE M. DAVENPORT
Assistant Counsel

GRANT R. VINIK, Bar #459848
Assistant Senate Legal Counsel

RICHARD A. KAPLAN, D.C. Bar # 978813
Assistant Counsel

THOMAS E. CABALLERO
Assistant Senate Legal Counsel

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700 (tel)
(202) 226-1360 (fax)

Office of Senate Legal Counsel
642 Hart Senate Office Building
Washington, D.C. 20510-7250

(202) 224-4435 (tel)
(202) 224-3391 (fax)

Counsel for Defendant Lorraine C. Miller,
Clerk of the House of Representatives

Counsel for Defendant Nancy Erickson,
Secretary of the Senate

February 29, 2008

ATTACHMENT 1

# NAM Coalition Activity

## TAX AND DOMESTIC ECONOMIC POLICY

### *Tax and Budget*

1. **AMT Coalition for Economic Growth**
   NAM leads coalition with long-term goal of repealing the corporate alternative minimum tax (AMT). Pending full repeal, coalition advocates for continued AMT relief, such as faster use of unused AMT credits.

2. **R&D Credit Coalition**
   As Executive Secretary, NAM is a highly visible member of the coalition's elected leadership. NAM manages the coalition's email list, serves as the coalition's event organizer, coordinates multisignature company/association letters, and assists with media and publicity support. The current credit expires 12/31/05, and the coalition advocates a permanent and strengthened R&D tax credit.

3. **Family Business Estate Tax Coalition**
   NAM is a co-director of broad-based coalition lobbying for permanent death tax repeal.

4. **Retirement Savings Network**
   NAM is on Steering Group of coalition on pension reform.

5. **Tax Relief Coalition**
   NAM is co-founder of this 1,000 plus member coalition supporting permanent, broad-based tax relief.

6. **The Pension Coalition**
   NAM is a co-founder and on the steering committee of this broad-based employer community coalition focused on advancing retirement security through voluntary employer-sponsored plans. Primary concerns include defined benefit plan funding rules, hybrid or cash-balance plan rules, defined contribution plans and pension accounting. The NAM hosts the coalition website at www.thepensioncoalition.org.

7. **Industry Coalition on Sales Tax Simplification & BAT Nexus**
   NAM participates, advocating a legislative remedy to the Business Activity Tax issue and monitoring the Sales Tax Streamline initiative.

8. **Homeland Investment Act Coalition**
   NAM participates. Advocates technical changes and regulations on provision enacted in 2004 that temporarily reduces tax rate (from 35 percent to 5.25 percent) on foreign earnings to encourage companies to bring foreign profits home to the United States rather than investing them elsewhere.

9. **COMPETE Coalition**
   NAM participates. Advocates for legislation to overturn Sixth Circuit holding in Cuno v. Daimler Chrysler that an Ohio investment tax credit was unconstitutional.

*Current as of February 2006*

# NAM Coalition Activity

## TAX AND DOMESTIC ECONOMIC POLICY

*Technology Continued*

18. **High-Tech Broadband Coalition**
NAM is a member. Aim is to promote broadband deployment.

19. **TeleCONSENSUS (www.teleconsensus.com)**
The NAM is a member. The group promotes broad amendments to the Communications Act to bring economic regulation of the telecommunications industry to an end while updating social regulation, and supports national video franchising so that new entrants in video services do not have to face thousands of separate regulatory actions.

20. **High-Tech Digital Television Coalition (www.dtvcoalition.com)**
NAM is a member. The group successfully supported legislation to end the dual broadcasting of analog and digital TV signals by a hard date so as to free up the 700MHz spectrum band for broadband and public safety use. With the passage of the omnibus budget reconciliation legislation that contains a hard date of February 19, 2009, the coalition achieved its objective and has gone into a monitoring status.

21. **Alliance for Science and Technology Research in America (ASTRA) (www.aboutastra.org)**
NAM served as original Vice Chair. This permanent 501 (c) (3) organization promotes balanced federal funding of all scientific fields.

22. **Task Force on the Future of American Innovation (www.futureofinnovation.org)**
NAM is a member. Building on the work of ASTRA, it is conducting a public relations campaign to raise the salience of the federal R&D budget and issued a widely-noticed Benchmarks report in 2005.

## INTERNATIONAL ECONOMIC AFFAIRS

23. **USTrade Coalition**
The NAM coordinates this group of 400 companies and associations -- the largest free trade group lobbying for congressional passage of trade legislation and supporting World Trade Organization (WTO) negotiations.

24. **Zero Tariff Coalition**
This NAM-led coalition is the principal group working with the U.S. government to use the Doha Round of WTO negotiations to eliminate tariffs on industrial trade in major industry sectors. Companies and associations representing 25 major U.S. industry sectors participate.

*Current as of February 2006*

# NAM Coalition Activity

## INTERNATIONAL ECONOMIC AFFAIRS

25. **Transatlantic Business Dialogue**
The NAM co-chairs the Transatlantic Business Dialogue's (TABD) regulatory cooperation working group that seeks to reduce and eliminate regulatory and standards barriers to U.S.-European trade and investment. The TABD is a unique group of U.S. and European companies that seek common objectives and lobby on both sides of the Atlantic.

26. **Business Coalition on Foreign Investment Protection**
The NAM has played a key role in mobilizing business support to lobby for strong protection for U.S. investors in U.S. investment agreements and trade agreements, including the right to use international arbitration where local courts are inadequate.

27. **Coalition for a Sound Dollar**
The NAM initiated and coordinates this coalition, which presses for world currencies to be market-determined, with special attention to the currency practices of our major Asian trading partners. The coalition is comprised of over 100 trade associations covering both manufacturing and agriculture, and is credited with influencing the Administration to shift its policy on the dollar, stressing it would not intervene to hold the dollar at a high level as well as the Administration's engagement with the Chinese government to address the serious undervaluation of the Chinese currency.

28. **U.S.-Thailand Free Trade Agreement Business Coalition**
The NAM is a founding member and co-staffs the secretariat of this business coalition of more than 120 companies and associations that advocate passage of the U.S.-Thailand free trade agreement.

29. **Coalition on Employment Through Exports (CEE)**
The NAM is an active member. The group seeks to support a healthy Export-Import Bank, the Overseas Private Investment Corporation, and the Trade Development Agency (TDA). The coalition also seeks more realistic and simplified export control procedures.

30. **USA-Engage Coalition**
The NAM is an active member. The group seeks alternatives to unilateral U.S. foreign policy sanctions and seeks to promote the benefits of U.S. engagement abroad.

31. **WTO Action Group**
The WTO Action Group is organized to represent the interests of the U.S. manufacturing and industrial sector in the Doha Round of WTO negotiations. The major objective of this Action Group is to ensure that the priorities and commercial interests of the U.S. and global industrial sector – which represents 75% of global trade – are fully realized in the outcome of the Doha Round.

*Current as of February 2006*

# NAM Coalition Activity

## HUMAN RESOURCES POLICY

32.   **Alliance for Worker Retirement Security (AWRS)**
      NAM houses the Coalition.  Inactive at the present time.

33.   **Compete America**
      NAM chairs and houses the Coalition.

34.   **Coalition for Job Opportunities (former Minimum Wage Coalition)**
      NAM is an active member.

35.   **OSHA Fairness Coalition**
      NAM Co-Chairs the Committee.

36.   **National Coalition on Ergonomics**
      NAM is on Steering Committee.

37.   **The Coalition on Catastrophic and Chronic Health Care Costs (HC$^5$)**
      NAM houses and chairs

38.   **The Health Care Coordinating Group**
      NAM houses and chairs.

39.   **Health Benefits Coalition**
      NAM is a founding member and serves on the steering committee.  NAM also chairs the Lobbying
      Subcommittee.

40.   **Employers Coalition on Medicare (ECOM)**
      NAM is on the Steering Committee and chairs the Lobbying Committee.

41.   **Medicare Rx Education Network**
      NAM is on the Steering Committee

42.   **Alliance to Improve Medicare**
      NAM is on the Steering Committee.

43.   **Fair Share Health Care Working Group**
      NAM chairs.

44.   **Health Savings Account (HSA) Workgroup**
      NAM is on the Steering Committee

45.   **Association Health Plan Coalition**
      NAM is an active member.

*Current as of February 2006*

# NAM Coalition Activity

## RESOURCES AND ENVIRONMENTAL POLICY

*Environment Continued*

55.   **Particulate Matter (PM) Coalition**
      The PM Coalition is an ad-hoc group of trade associations informally headed by American Iron and Steel Institute. The PM Coalition has been incorporated into the Air Quality Coalition for management and accounting purposes. NAM plays a leadership role in advocacy for the coalition.

56.   **Business Network For Environmental Justice (BNEJ)**
      NAM chairs and is a founding member.

57.   **Clean Water Industry Coalition**
      NAM is a member of the Steering Committee.

58.   **RCRA Multi-Industry Coalition**
      NAM is a member.

59.   **New Source Review**
      NAM is leading an ad-hoc coalition for NSR reform in the Administration, Congress and courts.

60.   **Mercury Regulation**
      NAM is leading a small informal coalition advocating review of the EPA's health standard for mercury.

61.   **High-Tech Air Freight Shippers' Coalition**
      NAM serves on leadership group.

62.   **Industry Transportation Security Ad Hoc Group**
      NAM is a member. Meets to discuss transportation security issues.

63.   **Inland Waterways Coalition**
      The NAM is founding member and chairs the group.

*Energy*

64.   **Climate Change**
      NAM is co-leading (with the Chamber) an informal coalition opposing mandatory carbon regulation.

65.   **Alliance for Energy and Economic Growth (AEEG)**
      NAM is a founding member and member of the Management Committee.

*Current as of February 2006*

# NAM Coalition Activity

## HUMAN RESOURCES POLICY

46. **Genetic Information Non-Discrimination in Employment Coalition**
    NAM is on the Steering Committee.

47. **Rx Benefits Coalition**
    NAM is on the Steering Committee.

48. **Medical Records Confidentiality Coalition**
    NAM is on Steering Committee.

49. **The National Coalition to Protect Family Leave**
    NAM is on the Steering Committee.

## PUBLIC AFFAIRS

50. **BIPAC's Prosperity Project**
    The NAM is a founding executive committee member and key sponsor of the Prosperity Project –
    a cooperative effort to encourage business and industry to get more involved in American politics.

51. **American Energy Alliance Grassroots Committee**
    Inactive at the present time. Manages grassroots activities for the American Energy Alliance, a
    group originally formed to defeat proposed broad-based energy taxes. It may expand its activities
    into other areas.

52. **PAC Working Group** *(not an official name)*
    Inactive at present time; Group meets monthly (NAM, BIPAC, AMA, NABPAC and others);
    coordinates testimony/positions on campaign finances, discusses PAC activities and procedures
    for FEC compliance.

53. **The Coalition: Americans Working For Real Change**
    NAM is a founding member. Inactive at the present time.

## RESOURCES AND ENVIRONMENTAL POLICY

*Environment*

54. **Air Quality Coalition (AQC)**
    NAM is a founding member and a member of the Executive Committee. NAM provides
    administrative support for the Coalition and leads issue specific working groups.

*Current as of February 2006*

# NAM Coalition Activity

## REGULATORY AND COMPETITION POLICY

66. **Regulatory Improvement Council**
    NAM serves on steering committee.  Seeking enactment of various regulatory reform measures.

67. **Small Business Liability Reform Coalition**
    NAM is an active member.

68. **Coalition for Uniform Product Liability Laws**
    NAM is an active member.  Supports various legal reform measures.

69. **Lawsuit Abuse Reduction Act**
    The NAM is a founding member and serves on the Steering Committee.

70. **Obesity Lawsuit Coalition**
    The NAM sits on the Steering Committee.

71. **Competition in Contracting Act Coalition**
    NAM is a member.  Seeks reform of procurement laws governing Federal Prison Industries (UNICOR).

72. **Coalition for a 21st Century Postal Service**
    NAM is an active member.  Supports reforming the postal service.

73. **National Uniformity for Food Coalition**
    NAM is an active member.  Supports uniform labeling of food products.

## SMALL AND MEDIUM MANUFACTURERS

74. **Family Business Estate Tax Coalition**
    NAM is co-director of the coalition.  FBETC is lobbying for full and permanent repeal of the estate tax.

## COUNCIL OF MANUFACTURING ASSOCIATIONS

75. **NAM Consumer Product Safety Commission Coalition**
    NAM leads.  Follows CPSC issues and acts as necessary.

76. **Voluntary Consensus Standards Coalition**
    NAM participates.  Coalition of standards development organizations (SDOs) pressing for enactment of federal legislation to protect SDOs from negligence claims in developing industry standards.

*Current as of February 2006*

# NAM Coalition Activity

## LAW DEPARTMENT

77.    **Asbestos Alliance**
The NAM manages and chairs the Asbestos Alliance, a coalition of companies and associations seeking to enact legislation to reduce runaway asbestos liability while preserving the rights of those truly sick individuals to their just compensation.

*Current as of February 2006*

ATTACHMENT 2



**National Association of Manufacturers**

## NAM Board of Directors

### Chairman of the Board

**Charles E. Bunch**
*Chairman and CEO*
PPG Industries Inc

### Vice Chairman of the Board

**Michael E. Campbell**
*Chairman, President and Chief Executive Officer*
Arch Chemicals, Inc.

### President

**John Engler**
*President and CEO*
National Association of Manufacturers

### Executive Committee Members

**Mary Andringa**
*President and Chief Executive Officer*
Vermeer Mfg. Co.

**Ursula M. Burns**
*President*
Xerox Corporation

**John W. Conway**
*Chairman of the Board, President and CEO*
Crown Holdings, Inc.

**William H. Downey**
*President and Chief Executive Officer*
Kansas City Power & Light Company

**Russell M. Flaum**
*Executive Vice President*
Illinois Tool Works Inc.

**Michael R. Gambrell**
*EVP, Basic Plastics and Chemicals, Manufacturing & Engineering*
The Dow Chemical Company

**James W. Griffith**
*President and Chief Executive Officer*
The Timken Company

**William V. Hickey**
*President and Chief Executive Officer*
Sealed Air Corporation

**John Hofmeister**
*President*
Shell Oil Company

**Kellie Johnson**
*President*
ACE Clearwater Enterprises

**Kendig K. Kneen**
*Chief Executive Officer/Owner*
Al-jon, Inc.

**W. Kirk Liddell**
*Chairman, President & CEO*
Irex Corporation

**John A. Luke Jr.**
*Chairman & Chief Executive Officer*
MeadWestvaco Corporation

**Charles G. McClure**
*Chairman, CEO and President*
ArvinMeritor, Inc.

**Dyke F. Messinger**
*President and Chief Executive Officer*
Power Curbers, Inc.

**Stacey J. Mobley**
*SVP-Chief Administrative Officer & General Counsel*
DuPont

**Michael G. Morris**
*Chairman, President and CEO*
American Electric Power

**Larry Nichols**
*Chairman & Chief Executive Officer*
Devon Energy Corporation

**Steve D. Pryor**
*President*
ExxonMobil Refining & Supply Co.

**Alfred M. Rankin Jr.**
*Chairman, President & Chief Executive Officer*
NACCO Industries, Inc.

**Lee J. Styslinger III**
*President & CEO*
Altec, Inc.

**William G. Walter**
*Chairman, President & Chief Executive Officer*
FMC Corporation

**Mike Williams**
*Executive VP, General Counsel and
Secretary*
Sony Electronics Inc.

**William D. Zollars**
*Chairman, President & Chief Executive Officer*
YRC Worldwide Inc.

## Board Members

**Karla F. Aaron**
*President*
Hialeah Metal Spinning, Inc.

**Gerard M. Anderson**
*President & Chief Operating Officer*
DTE Energy Company

**Edward H. Arlin**
*Executive Vice President, Global GM Account*
UGS Corp.

**Stan A. Askren**
*Chairman, President & Chief Executive Officer*
HNI Corporation

**Brent Baglien**
*Vice President, Government Affairs*
ConAgra Foods

**Tim Bailey**
*Vice President, Product Supply*
The Clorox Company

**William H. Belden Jr.**
*Chairman and Chief Executive Officer*
The Belden Brick Company

**Richard Bell**
*Chairman*
The Gates Corporation

**Michael L. Bennett**
*President & Chief Executive Officer*
Terra Industries Inc.

**Rolf Biekert**
*President and Chief Executive Officer*
Trumpf, Inc.

**Ronald W. Boles**
*President*
General & Automotive Machine Shop, Inc.

**Gregory H. Boyce**
*Chairman and CEO*
Peabody Energy Corporation

**Angelo Brisimitzakis**
*President & Chief Executive Officer*
Compass Minerals International

**Michael J. Bullinger**
*President*
Western Products, Inc.

**Ronald D. Bullock**
*Chairman and Chief Executive Officer*
Bison Gear and Engineering Corporation

**Ken Burnes**
*Chairman*
Cabot Corporation

**Barry Caldwell**
*SVP, Govt Affairs & Corporate Communications*
Waste Management

**Leonard J. Cali**
*Senior Vice President -- External Affairs*
AT&T

**A. Bruce Clarke**
*President and CEO*
Capital Associated Industries, Inc.

**Christopher M. Connor**
*Chairman & Chief Executive Officer*
The Sherwin-Williams Company

**David M. Cordani**
*President, Cigna Healthcare*
Cigna Corporation

**Paul Cunningham**
*Executive Vice President of Worldwide Sales and Distribution*
PTC

**Walter P Czarnecki**
*Executive Vice President*
Penske Corporation

**Darl Davidson**
*Vice President, U.S. Manufacturing Industry*
EDS

**Bruce Davis**
*President*
Kanawha Manufacturing Co.

**Nick DeTura**
*SVP of North America Supply Chain, Logistics & Procurement*
Alcatel-Lucent

**Richard M. Doyle**
*President and Chief Executive Officer*
International Sleep Products Association

**Arthur J. Dyer**
*President*
Metal Products Company

**Lisa Caldwell**
*EVP, Global Mfg. Business & Consumer Products*
BearingPoint, Inc.

**Susan Capps Morris**
*Senior Vice President, Operations, The Americas*
Merck & Company, Inc.

**Ken W. Cole**
*Vice President, Global Public Policy and Government Relations*
General Motors Corporation

**Len Cooper**
*Senior Vice President, Supply Chain*
Halliburton Energy Services

**Steven A. Cosse'**
*Executive Vice President & General Counsel*
Murphy Oil Corporation

**William G. Currie**
*Executive Chairman of the Board*
Universal Forest Products, Inc.

**Richard E. Dauch**
*Co-Founder, Chairman and Chief Executive Officer*
American Axle & Manufacturing

**Peter Davidson**
*Senior VP, Federal Government Relations*
Verizon

**Steven J. Demetriou**
*Chairman, President and Chief Executive Officer*
Aleris International, Inc.

**Mark T. Dobbins**
*Senior Vice President, HR & General Affairs*
SUMCO Phoenix Corporation

**Brett S. Dungan**
*President*
Master Marine, Inc.

**Thomas V. Easterday**
*Senior Vice President, Secretary & General Counsel*

Subaru of Indiana Automotive, Inc.

**Douglas Engel**
*Vice Chairman & US Manufacturing Industry
Leader*
Deloitte & Touche USA LLP

**John J. Engel**
*Senior Vice President and Chief Operating
Officer*
WESCO International, Inc.

**Sheldon R. Erikson**
*Chairman & Chief Executive Officer*
Cameron International Corporation

**Dwight H. Evans**
*President, External Affairs Group*
Southern Company

**Eric C. Fast**
*President, Chief Executive Officer & Director*
Crane Co.

**Mary Lynn Fayoumi**
*President & Chief Executive Officer*
The Management Association of Illinois

**John A Fees**
*President & CEO, The Babcock & Wilcox
Companies*
McDermott International Inc.

**Fred Festa**
*President & Chief Operating Officer*
W. R. Grace & Co.

**William C. Foote**
*Chairman & Chief Executive Officer*
USG Corporation

**Kerry A. Galvin**
*Sr. Vice President & General Counsel*
LyondellBasell Industries

**Walter J. Galvin**
*Senior Executive Vice President and Chief
Financial Officer*
Emerson

**David L. Garin**
*Group Vice President, Industrial Products*
BNSF Railway Company

**William E. Gaskin CAE**
*President*
Precision Metalforming Association

**Richard Gimmel**
*President*
Atlas Machine and Supply, Inc.

**Clarence Gooden**
*Executive Vice President-Sales & Marketing and
Chief Commercial Officer*
CSX Corporation

**James E. Green Esq.**
*Executive Vice President, Corporate Affairs*
King Pharmaceuticals, Inc.

**Kevin Greenawalt**
*President-North America*
Novelis Inc.

**Drew Greenblatt**
*President & Owner*
Marlin Steel Wire Products Llc

**Mary Beth Gustafsson**
*Senior Vice President, General Counsel &
Secretary*
Trane Inc.

**Kirk S. Hachigian**
*Chairman, President & Chief Executive Officer*
Cooper Industries, Inc.

**Michael S. Hanley**
*Global Automotive Leader*
Ernst & Young

**Roger A. Hannay**
*President*
Hannay Reels, Inc

**Stephanie Harkness**
*Chairman/Chief Executive Officer*
Pacific Plastics & Engineering

**Larry H. Harmsen**
*Managing Director, No. American Capital
Deployment*

ProLogis

**R. Keith Harrison Jr.**
*Global Product Supply Officer*
The Procter & Gamble Company

**C. Thomas Harvie**
*Senior Vice President, General Counsel & Secretary*
The Goodyear Tire & Rubber Company

**Derek C. Hathaway**
*Chairman & Chief Executive Officer*
Harsco Corporation

**Carl Hausmann**
*President & Chief Executive Officer*
Bunge North America

**Kathryn J. Hayley**
*Chief Executive Officer and Co-Head, Aon Consulting U.S.*
Aon Consulting, Inc.

**Curt Hebert Jr.**
*Executive Vice President, External Affairs*
Entergy Corporation

**Herbert L. Henkel**
*Chairman, President & Chief Executive Officer*
Ingersoll-Rand Company Ltd.

**Robert K. Henry**
*Executive Vice President and Chief Operating Officer*
Harris Corporation

**Ted M. Henry**
*Chairman & Chief Executive Officer*
Henry Brick Company, Inc.

**Barbara C. Higgens**
*Executive Director*
Plumbing Manufacturers Institute

**John P. Hiler**
*President*
Hiler Industries, Inc.

**Randy Hoffman**
*Sr. Vice President, Global Sales & Marketing*
AGCO Corporation

**Alan M. Holaday**
*VP, Manufacturing Operations North American Region*
Whirlpool Corporation

**R. David Hoover**
*Chairman, President and CEO*
Ball Corporation

**Jerry Howard**
*Senior Vice President, Corporate Affairs*
Marathon Oil Corporation

**Mary L. Howell**
*Executive Vice President*
Textron Inc.

**Tod R. Hullin**
*Senior Vice President, Communications and Public Policy*
The Boeing Company

**Hannes Hunschofsky**
*President*
Hoerbiger Corporation of America

**Kevin J. Hunt**
*Co-Chief Executive Officer and President*
Ralcorp Holdings, Inc.

**Gary D. Huss**
*President*
Hudapack Metal Treating, Inc.

**Collie L. Hutter**
*Chief Operating Officer/Owner*
Click Bond, Inc.

**William B. Inglee**
*Vice President, Plans and Policy*
Lockheed Martin Corporation

**Al Jennings**
*Chairman and Chief Executive Officer*
EFCO Corp.

**Stephen M. Johnson**
*Senior EVP & Member, Office of the Chairman*
Washington Group International, Inc.

**Jill Jones**
*Senior Vice President - Managing Director*
*Global Production*
Brown-Forman Corporation

**Hannah Kain**
*Chief Executive Officer*
ALOM Technologies

**D.T. (Dee) Kapur**
*President, Truck Group*
Navistar International Corporation

**Patrick J. Kiely**
*President*
Indiana Manufacturers Association, Inc.

**Douglas A. Kittenbrink**
*Executive Vice President*
Allegheny Technologies Incorporated

**Lewis Kling**
*President and Chief Executive Officer*
Flowserve Corporation

**John J. Koraleski**
*EVP, Marketing and Sales*
Union Pacific Corporation

**Thomas R. Lalla Jr.**
*SVP, Legal and Administrative Affairs and*
*General Counsel*
Pernod Ricard USA

**Edwin Lange**
*Executive Vice President*
SAP America, Inc.

**Steven F. Leer**
*Chairman & Chief Executive Officer*
Arch Coal, Inc.

**Gail A. Lione**
*Executive Vice President, General Counsel &*
*Secretary*
Harley-Davidson, Inc.

**Robert A. Lonergan**
*Executive Vice President, General Counsel and*
*Corporate Secretary*
Rohm and Haas Company

**Daniel Juneau**
*President*
Louisiana Association of Business & Industry

**Pamela Kan**
*President*
Bishop Wisecarver Corporation

**Christopher J. Kearney**
*Chairman, President & Chief Executive Officer*
SPX Corporation

**Luther (Luke) C. Kissam IV**
*Senior Vice President, Manufacturing and Law*
Albemarle Corporation

**Ward Klein**
*Chief Executive Officer*
Energizer Holdings, Inc.

**Linda Knoll**
*Executive Vice President - Worldwide Ag*
*Manufacturing*
Case New Holland Inc.

**Theodore L. Kosloff**
*Chairman*
Roosevelt Paper Company

**John C. Landgraf**
*President, Global Pharmaceutical Operations*
Abbott Laboratories

**Alan F. Lapoint**
*President*
U.F. Strainrite

**Terrence G. Linnert**
*Executive Vice President, Administration and*
*General Counsel*
Goodrich Corporation

**Paul Loftus**
*Partner*
Accenture

**David H. Long**
*President, Commercial Markets*
Liberty Mutual Insurance Companies

**08cv0208 (CKK)**
**Def. Erickson's and Miller's Opp. to Pltf's Motion**
**Attachment 2**

**Leslie Longoria**
*President*
Form-Cove Mfg. Co., Inc.

**Al T. Lubrano**
*President*
Technical Materials, Inc.

**William Mansfield**
*Chairman, President & Chief Executive Officer*
Valspar Corporation

**Darcy D. Massey**
*Senior Vice President, Global Product Supply*
S.C. Johnson & Son, Inc.

**Michael W. McLanahan**
*Chairman and Chief Executive Officer*
McLanahan Corporation

**Chris E. McNeil Jr.**
*President & Chief Executive Officer*
Sealaska Corporation

**Albert R. Miller**
*President*
Phoenix Closures, Inc.

**Attila Molnar**
*President and Chief Executive Officer*
Bayer Corporation

**David C. Moran**
*EVP; President and CEO, Heinz North America*
H.J. Heinz Company

**Randy Mullett**
*Vice President, Government Relations*
Con-way Inc.

**Thomas Murphy**
*Executive Vice President - Mfg & Wholesale Dist.*
RSM McGladrey, Inc.

**Douglas R. Oberhelman**
*Group President*
Caterpillar Inc.

**Jerome D. Okarma**
*Vice President, Secretary and General Counsel*
Johnson Controls, Inc.

**F. Joseph Loughrey**
*President and Chief Operating Officer*
Cummins Inc.

**John F. Lundgren**
*Chairman and Chief Executive Officer*
The Stanley Works

**Charles A. Martin**
*President & Treasurer*
Bommer Industries, Inc.

**Donald A. McCabe**
*Senior Vice President, Manufacturing & Performance Excellence*
Corning Incorporated

**Stewart G. McMillan**
*President*
Task Force Tips

**Mark A. Medley**
*President and Chief Executive Officer*
Control Technology, Inc

**Samuel J. Mitchell**
*Vice President, Ashland Inc., President, Ashland Consumer Markets*
Ashland Inc.

**Ronald M. Moquist**
*President & Chief Executive Officer*
Raven Industries, Inc.

**A. Newth Morris III**
*President*
Dixie Printing & Pkg. Corp.

**Philip S. Mullin**
*Chief Executive Officer*
Garner Industries

**Kenneth Murtha**
*Vice President, Business Operations*
AstraZeneca Pharmaceuticals LP

**Ziad S. Ojakli**
*Group Vice President, Corporate Affairs*
Ford Motor Company

**Peter M. Perez**
*President*
Carter Products Company, Inc.

**08cv0208 (CKK)**
**Def. Erickson's and Miller's Opp. to Pltf's Motion**
**Attachment 2**

**K. Scott Portnoy**
*Corporate Vice President*
Cargill, Incorporated

**Bruce W. Pulkkinen Sr.**
*Chief Executive Officer*
Windham Millwork, Inc.

**A. F. Raimondo**
*Chairman*
Behlen Mfg. Co.

**Richard K. Reece**
*Executive Vice President and Chief Financial
Officer*
Acuity Brands, Inc.

**Natale Ricciardi**
*President/Team Leader PGM*
Pfizer Inc

**Mark A. Roche**
*Senior Vice President, General Counsel &
Secretary*
Fortune Brands, Inc.

**William R. Sauey**
*Chairman*
Nordic Group of Companies, Ltd.

**Louis L. Schorsch**
*CEO Flat Products Americas*
ArcelorMittal

**David W. Schroeder**
*President & Chief Executive Officer*
Intermatic, Inc.

**John Scruggs**
*Vice President, Government Affairs*
Altria Corporate Services, Inc.

**John Seeger Jr.**
*Chief Executive Officer*
Dayton Rogers Manufacturing Co.

**Michael G. Severns**
*President and Chief Executive Officer*
Mountain States Employers Council

**Norris P. Sneed**
*Senior Vice President, Human Resources,*

**Rice Powell**
*CO-CEO, Fresenius Medical Care NA*
Fresenius Medical Care

**Thomas H. Quinn**
*President & Chief Operating Officer*
Jordan Industries, Inc.

**Gary L. Rainwater**
*Chairman, President and CEO*
Ameren Corporation

**Robert (Bobby) K Reeves**
*Sr. Vice President, General Counsel & Chief
Administrative Officer*
Anadarko Petroleum Corporation

**Jeannine M. Rivet**
*Executive Vice President*
UnitedHealth Group Incorporated

**Thomas J. Sabatino Jr.**
*Executive Vice President & General Counsel*
Schering-Plough Corporation

**Matt Schlapp**
*Executive Director, Federal Government
Affairs*
Koch Industries, Inc.

**Rick Schostek**
*Senior Vice President, Business Operations*
Honda Manufacturing of Alabama, LLC

**Mary E. Schroeder**
*President and Chief Executive Officer*
American Society of Employers

**Donald W. Seale**
*Executive Vice President and Chief Marketing
Officer*
Norfolk Southern Corporation

**Stephen J. Senkowski**
*Executive Vice President*
Armstrong World Industries, Inc.

**Wallace E. Smith**
*President*
E & E Manufacturing Co., Inc.

**W. Fletcher Steele**
*President*

*Communications & Public Affairs*
Eastman Chemical Company

**Al Stimac**
*President*
Metal Essence, Inc.

**John P. Surma**
*Chairman, President, & Chief Executive Officer*
United States Steel Corporation

**Kenneth Taormina**
*Sr. Vice President, Global Mfg. Solutions Group*
SATYAM Computer Services

**Philip M. Tredway**
*President*
Erie Molded Plastics, Inc.

**Lloyd Trotter**
*Vice Chairman; President and Chief Executive Officer*
GE Industrial

**Frank W. Wagner**
*Co-Owner and Executive Vice President*
Davis Boat Works, Inc

**Thomas M. Welsh**
*Senior Vice President*
FirstEnergy Corp.

**Chuck Wetherington**
*President*
BTE Technologies, Inc.

**Della H. Williams**
*President & Chief Executive Officer*
Williams-Pyro, Inc.

**James M. Wiseman**
*Vice President, External Affairs*
Toyota Motor Engineering & Manufacturing North America, Inc.

**John K. Woodworth**
*SVP, Corporate Supply Chain Operations*
3M Company

Pine Hall Brick Co., Inc.

**Thomas R. Stone**
*President, Traction Group*
Dana Corporation

**Gregory T. Swienton**
*Chairman and Chief Executive Officer*
Ryder System, Inc.

**Dennis H. Treacy**
*Vice President, Environmental & Corporate Affairs*
Smithfield Foods, Inc.

**Keith Trent**
*Group Executive and Chief Strategy, Policy and Regulatory Officer*
Duke Energy Corporation

**Gary Veurink**
*Director*
Dow Corning Corporation

**Timothy R. Wallace**
*Chairman, President & Chief Executive Officer*
Trinity Industries Inc.

**Sandra Westlund-Deenihan**
*President/Design Engineer*
Quality Float Works, Inc.

**Richard L. Wilkey**
*President*
Fisher Barton, Inc.

**John Williamson**
*President, ITT Residential and Commercial Water*
ITT Corporation

**John L. Wittstock**
*CEO*
MMI Products Inc.

**Karen Buchwald Wright**
*President & Chief Executive Officer*
Ariel Corporation

ATTACHMENT 3



## SMM Directors



**Mary Vermeer Andringa, Chair**
President and CEO
Vermeer Manufacturing Company
Pella, Iowa
Product Line: Agricultural and
industrial equipment
No. of employees: 1,450





**Karla F. Aaron**
President
Hialeah Metal Spinning, Inc.
Hialeah, Florida
Product Line: Metal forming,
specializing in deep drawing and
spinning
No. of employees: 12





**William H. Belden, Jr.**
Chairman & Chief Executive Officer
The Belden Brick Company
Canton, Ohio
Product Line: Building brick
No. of employees: 800



Photo not
available

**Rolf Biekert**
President and Chief Executive Officer
TRUMPF, Inc.
Farmington, CT
Product Line: Sheet metal
processing, laser-based production
processes, electronic applications,
and hospital equipment
No. of employees: 640

Logo not available

Photo not
available

**Ronnie Boles**
President
General & Automotive Machine Shop,
Inc.
Huntsville, AL
Product Line: Internal combustion
engine parts.
No. of employees: 20
Website:

Logo not available

**Angelo Brisimitzakis**

08cv0208 (CKK)
Def. Erickson's and Miller's Opp. to Pltf's Motion
Attachment 3



President and Chief Executive Officer
Compass Mineral International
Overland Park, KS
Product Line: Production and
distribution of inorganic minerals.
No. of employees: 1,541





**Michael Bullinger**
President
Western Products, Inc.
Fargo, North Dakota
Product Line: Seamless steel siding
No. of employees: 300





**Ronald D. Bullock**
Chairman & CEO
Bison Gear & Engineering
Corporation
St. Charles, Illinois
Product Line: Electric and gear
motors
No. of employees: 150





**Wm. Brewster Davis, PE**
President
Kanawha Manufacturing Company
Charleston, West Virginia
Product Line: Metal fabrication and
machine job shop
No. of employees: 100





**Mark Dobbins**
Senior Vice President, Human
Resources & General Affairs
SUMCO USA Corporation
Phoenix, Arizona
Product Line: Silicon wafers for the
semiconductor industry
No. of employees: 1,800



Photo not
available

**Brett Dungan**
President
Master Marine, Inc.
Bayou La Batre, AL
Product Line: Ship Building and
Repair
No. employees: 20

Logo not available

**Arthur J. Dyer**

08cv0208 (CKK)
**Def. Erickson's and Miller's Opp. to Pltf's Motion**
**Attachment 3**



President
Metal Products Company
McMinnville, Tennessee
Product Line: Sheet metal work,
metal stampings
No. of employees: 110





**Richard Gimmel**
President
Atlas Machine and Supply, Inc.
Louisville, KY
Product Line: Manufacturing
industrial machinery, sheet
metalwork, and wholesale industrial
equipment welding repair.
No. of employees: 176





**Drew Greenblatt**
President and Owner
Marlin Steel Wire Products, LLC.
Baltimore, MD
Product Line: Wire baskets, rack
hooks, and shelf wire.
No. of employees: 27





**Roger Hannay**
President
Hannay Reels, Inc.
Westerlo, New York
Product Line: Cable reels, metal
hoses
No. of employees: 145





**Stephanie Harkness**
Chairman/CEO
Pacific Plastics & Engineering
Soquel, California
Product Line: Plastic injection
molders
No. of employees: 84





**Ted M. Henry**
Chairman & CEO
Henry Brick Company, Inc.
Selma, Alabama
Product Line: Building brick
No. of employees: 90



08cv0208 (CKK)
Def. Erickson's and Miller's Opp. to Pltf's Motion
Attachment 3

Photo not available

**John P. Hiler**
President
Hiler Industries, Inc.
La Porte, Indiana
Product Line: Metal casting foundry
No. of employees: 165





**Hannes Hunschofsky**
President
Hoerbiger Corporation of America
Pompano Beach, FL
Product Line: High Performance
Compressor Components
No. of employees: 400





**Gary D. Huss**
President
Hudapack Metal Treating, Inc.
Elkhorn, Wisconsin
Product Line: Heat treating
No. of employees: 150





**Collie Hutter**
COO/Owner
Click Bond, Inc.
Carson City, Nevada
Product Line: Mechanical/adhesive
fastening
No. of employees: 180





**Albert J. Jennings**
Chairman, President & CEO
EFCO Corporation
Des Moines, Iowa
Product Line: Steel forms for
concrete
No. of employees: 1,200





**Kellie Johnson**
President
Ace Clearwater Enterprises
Torrance, California
Product Line: Aerospace parts
No. of employees: 168



**Pamela Kan**
President
Bishop Wisecarver Corporation
Pittsburg, CA
Product Line: Guide wheels and

Logo Not Available

**08cv0208 (CKK)**
**Def. Erickson's and Miller's Opp. to Pltf's Motion**
**Attachment 3**



guided motion technologies.
No. of employees: 54



**Hannah Kain**
Chief Executive Officer
ALOM Technologies
Fremont, California
Product Line: Contract packaging
and fulfillment services
No. of employees: 77





**Kendig K. Kneen**
CEO/Owner
Al-jon, Inc.
Ottumwa, Iowa
Product Line: Scrap metal & solid
waste processing equipment
No. of employees: 110





**Theodore L. Kosloff**
Chairman
Roosevelt Paper Company
Mt. Laurel, New Jersey
Product Line: Paper supplier to
printers, publishers and converters
No. of employees: 500





**Alan Lapoint**
President
UF Strainrite, Inc.
Auburn, Maine
Product Line: Liquid filtration
systems
No. of employees: 120





**Leslie D. Longoria**
President
Form-Cove Manufacturing Company
Rio Rancho, New Mexico
Product Line: Laminated glass,
cultured marble
No. of employees: 75



08cv0208 (CKK)
**Def. Erickson's and Miller's Opp. to Pltf's Motion**
**Attachment 3**



**Al T. Lubrano**
President
Technical Materials, Inc.
Lincoln, Rhode Island
Product Line: Specialty metal systems
No. of employees: 200





**Charles A. Martin**
President & Treasurer
Bommer Industries
Landrum, South Carolina
Product Line: Door hinges, mailboxes, parcel lockers, key cabinets
No. of employees: 190





**Michael W. McLanahan**
Chairman & CEO
McLanahan Corporation
Hollidaysburg, Pennsylvania
Product Line: Capital equipment for the mining industry
No. of employees: 155





**Stewart G. McMillan**
President
Task Force Tips
Valparaiso, Indiana
Product Line: Fire suppression equipment
No. of employees: 115



Photo Not
Available

**Chris E. McNeil, Jr.**
President & Chief Executive Officer
Sealaska Corporation
Bellevue, Washington
Product Line: Communications systems, holding companies, general investors
No. of employees: 800





**Mark A. Medley**
President & CEO
Control Technology, Inc.
Knoxville, Tennessee
Product Line: Peripheral products for industrial computers
No. of employees: 70



08cv0208 (CKK)
Def. Erickson's and Miller's Opp. to Pltf's Motion
Attachment 3



**Dwight F. Messinger**
President & CEO
Power Curbers, Inc.
Salisbury, North Carolina
Product Line: Mechanized curb-
gutter and paving machines
No. of employees: 104





**Albert Miller**
President
Phoenix Closures, Inc.
Naperville, Illinois
Product Line: Plastic bottle caps, jar
lids
No. of employees: 330





**Ronald Moquist**
President & Chief Executive Officer
Raven Industries, Inc.
Sioux Falls, South Dakota
Product Line: Plastic products,
aircraft
No. of employees:  765





**A. Newth Morris, III**
President
Dixie Printing & Packaging
Corporation
Glen Burnie, Maryland
Product Line: Paperboard packaging
No. of employees: 100





**Philip S. Mullin**
CEO
Garner Industries
Lincoln, Nebraska
Product Line: Plastic injection
molding, tool & die
No. of employees: 100





**Thomas Murphy**
Executive Vice President
Mfg.& Wholesale Distribution
RSM McGladrey, Inc.
Minneapolis, Minnesota
Product Line: Business Serivces

RSM McGladrey

**Peter Perez**
President

08cv0208 (CKK)
Def. Erickson's and Miller's Opp. to Pltf's Motion
Attachment 3

Photo Not Available

Carter Products Company, Inc.
Grand Rapids, MI
Product Line: Woodworking accessory products.
No. of employees: 15

Logo Not Available

**Bruce W. Pulkkinen**
Chief Executive Officer
Windham Millwork, Inc.
Windham, Maine
Product Line: Wooden casework, millwork and store fixtures
No. of employees: 65





**Anthony F. Raimondo**
Chairman
Behlen Mfg. Co.
Columbus, Nebraska
Product Line: Livestock equipment, steel, metal buildings
No. of employees: 1,450



**William R. Sauey**
Chairman
Nordic Group of Companies, Ltd.
Baraboo, Wisconsin
Product Line: Plastic molding, seating products and golf utility vehicles
No. of employees: 2,200





**David W. Schroeder**
President and Chief Executive Officer
Intermatic, Inc.
Spring Grove, Illinois
Product Line: Timers for pool and spa controls, portable burglar alarms nightlights
No. of employees: 1,800

Photo Not Available



**John Seeger, Jr.**
CEO
Dayton Rogers Manufacturing
Minneapolis, Minnesota
Product Line: Metal stampings
No. of employees: 425





**Wallace E. Smith**
President and Owner
E&E Manufacturing Company, Inc.
Plymouth, Michigan
Product Line: Metal based, die-stamped fastening solutions for the automobile industry



**08cv0208 (CKK)**
**Def. Erickson's and Miller's Opp. to Pltf's Motion**
**Attachment 3**



No. of employees: 275



**W. Fletcher Steele**
President
Pine Hall Brick Company
Winston-Salem, North Carolina
Product Line: Building brick
No. of employees: 400





**Alfredo Stimac**
President
Metal Essence, Inc.
Sanford, Florida
Product Line: Precision CNC turning
& milling, sheet metal fabrication
No. of employees: 78





**Philip M. Tredway**
President
Erie Molded Plastics, Inc.
Erie, Pennsylvania
Product Line: Custom plastics,
injection molding
No. of employees: 43





**Frank W. Wagner**
Co-Owner and Executive Vice
President
Davis Boat Works, Inc.
Newport News, Virginia
Product Line: Small boat repairs
No. of employees: 110





**Sandra Westlund-Deenihan**
President/Design Engineer
Quality Float Works, Inc.
Schaumburg, Illinois
Product Line: Metal floats and
vessels
No. of employees: 17



Photo Not

**Chuck Wetherington**
President
BTE Technologies, Inc.

08cv0208 (CKK)
Def. Erickson's and Miller's Opp. to Pltf's Motion
Attachment 3

Available

Hanover, MD
Product Line:  Work Simulation and
Physical Therapy equipment.
No. employees: 60





**Richard L. Wilkey**
President
Fisher Barton, Inc.
Watertown, Wisconsin
Product Line: Industrial machinery
No. of employees: 500





**Della Williams**
President & CEO
Williams-Pyro Controls
Fort Worth, Texas
Product Line: Weapon systems
testing equipment, fire safety
products
No. of employees: 39



**Karen B. Wright**
CEO, President & Owner
Ariel Corporation
Mount Vernon, Ohio
Product Line: Compressors for
pipeline and gas storage markets
No. of employees: 619

© 2008 National Association of Manufacturers

**08cv0208 (CKK)**
**Def. Erickson's and Miller's Opp. to Pltf's Motion**
**Attachment 3**