## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATIONAL ASSOCIATION OF MANUFACTURERS, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 08-cv-00208 (CKK) ) |
| HONORABLE JEFFREY A. TAYLOR, et al. | ) ) |
| Defendants. | ) ) ) |

## PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITIONS AND
## BRIEFS OF AMICI IN OPPOSITION

Thomas W. Kirby  (Bar No. 915231)
    E-mail: tkirby@wileyrein.com
Jan Witold Baran  (Bar No. 233486)
    E-mail: jbaran@wileyrein.com
Andrew G. Woodson  (Bar No. 494062)
    E-mail: awoodson@wileyrein.com

WILEY REIN LLP
1776 K St., NW
Washington, D.C. 20006

202.719.7000

Counsel for Plaintiff

# TABLE OF CONTENTS

**Page**

I. *HARRISS* IS A NARROW HOLDING THAT DOES NOT VALIDATE THE
CHALLENGED REQUIREMENT. ........................................................................ 1

II. DEFENDANTS BEAR A HEAVY BURDEN OF JUSTIFICATION. .................................. 4

III. DEFENDANTS FAIL TO SHOW THAT SECTION 207'S DISCLOSURE
REQUIREMENT SATISFIES THE FIRST AMENDMENT. ................................................ 6

    A. DEFENDANTS MUST PROVE, NOT MERELY ASSERT, THAT THE
    CHALLENGED REQUIREMENT IS NECESSARY, TAILORED, AND PRECISE. .... 6

    B. THE DEFENDANTS OFFER NO PROOF THAT THE NEW REQUIREMENT IS
    JUSTIFIED OR TAILORED........................................................................ 11

        1. THE DEFENDANTS OFFER NO PROOF. .............................................. 12

        2. THE TERMS OF THE LEGISLATION REFUTE THE ASSERTED RATIONALE.
        .................................................................................................... 14

        3. CONGRESS DID NOT EVEN EVALUATE, MUCH LESS JUSTIFY, THE
        BURDENS IMPOSED. ....................................................................... 15

    C. THE DEFENDANTS FAIL TO SHOW THAT SEVERAL KEY TERMS MEET THE
    FIRST AMENDMENT'S DEMANDING STANDARD OF PRECISION..................... 16

        1. THE FIRST AMENDMENT DEMANDS MUCH GREATER PRECISION THAN
        DOES THE DUE PROCESS "ORDINARY INTELLIGENCE" TEST.................... 17

        2. "INTENT" IS VAGUE. ...................................................................... 19

        3. "ACTIVELY PARTICIPATES" IS VAGUE............................................. 22

        4. THE GUIDANCE DOCUMENT DOES NOT CURE THE VAGUENESS. ............ 24

CONCLUSION.................................................................................................... 27

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ACLU v. Ashcroft*, 322 F.3d 240 (3rd Cir. 2003)................................................................15

*Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990) ....................................5

*Baggett v. Bullitt*, 377 U.S. 360 (1964)..............................................................................18

*Big Mama Rag, Inc. v. United States*, 631 F.2d 1030 (D.C. Cir. 1980) ...........................17

*Bowsher v. Synar*, 478 U.S. 714 (1986)..............................................................................26

*Bradley v. Saxbe*, 388 F. Supp. 53 (D.D.C. 1974) ...............................................................3

*Brown v. U.S.*, 327 F.3d 1198 (D.C. Cir. 2003)..................................................................25

*Bryan v. United States*, 524 U.S. 184 (1998).....................................................................21

*Buckley v. Valeo*, 424 U.S. 1 (1976).................................................................5, 17, 18, 19

*Burson v. Freeman*, 504 U.S. 191 (1992)........................................................................4, 5

*Cramp v. Board of Public Instruction*, 368 U.S. 278 (1961)......................................19, 21

*Edenfield v. Fane*, 507 U.S. 761 (1993) ..............................................................................7

*FEC v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986) ............................................7

*FEC v. NRA*, 254 F.3d 173 (D.C. Cir. 2001) ......................................................................7

*Federal Election Commission v. Wisconsin Right to Life, Inc.*,
    127 S. Ct. 2652 (2007)...................................................................................................19

*Fire Fighters Association, District of Columbia v. Barry*,
    742 F. Supp. 1182 (D.D.C. 1990) .................................................................................17

*First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978).........................................4

*Ford Motor Co. v. Texas Department of Transport*,
    264 F.3d 493 (5th Cir. 2001) .........................................................................................18

*Gibson v. Florida Legislative Investigation Committee*,
    372 U.S. 539 (1963)..........................................................................................................6

*Gonzales v. Carhart*, 127 S. Ct. 1610 (2007) ...................................................20

*Hoffman v. Hunt*, 845 F. Supp. 340 (W.D.N.C. 1994) ......................................19

*McConnell v. FEC*, 251 F. Supp. 2d 176 (D.D.C. 2003)............................11, 18

*McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995)......................4, 5

*Montana Chamber of Commerce v. Argenbright*,
   226 F.3d 1049 (9th Cir. 2000) ......................................................................6

*NAACP v. Button*, 371 U.S. 415 (1963)........................................................17, 21

*In re Nofziger*, 925 F.2d 428 (D.C. Cir. 1991)...................................................24

*Perry Education Association v. Perry Local Educators' Association*,
   460 U.S. 37 (1983)...........................................................................................4

*Perry v. Bartlett*, 231 F.3d 155 (4th Cir. 2000) ................................................20

*Planned Parenthood Cincinnati Region v. Taft*,
   459 F. Supp. 2d 626 (S.D. Ohio 2006) .......................................................21

*Quincy Cable TV, Inc. v. FCC*,
   768 F.2d 1434 (D.C. Cir. 1985) .....................................................................7

*Ramirez v. U.S. Customs and Border Protection*,
   477 F. Supp. 2d 150 (D.D.C. 2007)...............................................................7

*Richmond Medical Center for Women v. Gilmore*,
   55 F. Supp. 2d 441 (E.D. Va. 1999) ...........................................................22

*Shaw v. Hunt*, 517 U.S. 899 (1996) ...................................................................15

*Slatky v. Amoco Oil Co.*, 830 F.2d 476 (3rd Cir. 1987)....................................21

*Smith v. Goguen*, 415 U.S. 566 (1974) ..............................................................17

*Turner Broadcast System, Inc. v. FCC*, 512 U.S. 622 (1994) ............................7

*U.S. Civil Service Commission v. National Association of Letter Carriers*,
   413 U.S. 548 (1973)..................................................................................23, 24

*United States v. Barnes*, 295 F.3d 1354 (D.C. Cir. 2002) .................................21

*United States v. Harriss*, 347 U.S. 612 (1954) .....................................1, 2, 3, 20

*United States v. Loy*, 237 F.3d 251 (3rd Cir. 2001) ...........................................................21

*United States v. National Treasury Employees Union*,
   513 U.S. 454 (1995)...........................................................................................7

*United States v. Thomas*, 864 F.2d 188 (D.C. Cir. 1988) ................................................18

*Ward v. Utah*, 398 F.3d 1239 (10th Cir. 2005)...............................................................20

## FEDERAL STATUTES

2 U.S.C. § 1602 ...................................................................................................12

2 U.S.C. § 1602(3) ................................................................................................2

2 U.S.C. § 1602(4) ................................................................................................2

2 U.S.C. § 1602(8) ................................................................................................2

2 U.S.C. § 1602(8)(A)..........................................................................................3, 5

2 U.S.C. § 1603(b)(3) ...........................................................................................22

2 U.S.C. § 1603(b)(3)(B) ........................................................................................3

2 U.S.C. § 1604(b) ...............................................................................................13

2 U.S.C. § 1605(a)(1).............................................................................................25

2 U.S.C. § 1605(b)(1) ............................................................................................19

2 U.S.C. § 1606 ...................................................................................................18

2 U.S.C. § 1606(a)(2).............................................................................................25

2 U.S.C. § 1606(b) ............................................................................................18, 25

21 U.S.C. § 811(b) ...............................................................................................25

Pub. L. No. 104-65, § 2, 109 Stat. 691 (1995)..................................................................10

## LEGISLATIVE MATERIALS

153 Cong. Rec. H9204-H9205 (daily ed. July 31, 2007) ....................................................9

H.R. 2316, 110th Cong. § 206 (2007) ...............................................................................9

H.R. Rep. No. 104-139 (1995)...........................................................................................13

*The Stealth Lobbyist Disclosure Act*, H.R. 804, 110th Cong. § 2 (2007).........................13

## MISCELLANEOUS

Lobby Disclosure Act Guidance (revised January 25, 2008) **............................................**27

*Legislative Proscription of Partisan Political Activity of Civil Employees*,
    87 Harv. L. Rev. 141 (1973) **..........................................................................................**24

The NAM's Complaint and Motion challenged Defendants to carry their heavy First Amendment burden to demonstrate that the new coalition disclosure requirement imposed by the 2007 Amendments to the Lobbying Disclosure Act ("LDA"), facially and as applied to the NAM and similar long-established membership organizations, is necessary, narrowly tailored, and crafted with high precision and clarity. Defendants' two Oppositions[1] and two supporting amicus filings[2] (collectively, the "Oppositions") responded with a total of 107 pages of argument and assertion, but fell fall far short of the showing the First Amendment requires.

## I.    *HARRISS* IS A NARROW HOLDING THAT DOES NOT VALIDATE THE CHALLENGED REQUIREMENT.

The Oppositions mistakenly assert that the challenged provision is validated by *United States v. Harriss*, 347 U.S. 612 (1954). Leg. Opp. 18-20; USADC Opp. 8-13, 17-20. Although the *Harriss* Court upheld certain narrowly-construed reporting obligations, that decision simply does not speak to the intrusive and burdensome requirement challenged here. Moreover, *Harris* was decided before the current First Amendment standards were formulated, it does not mention levels of scrutiny, and the vagueness challenge it addressed was presented and decided solely under the due process clause rather than the First Amendment.[3] *See* CLC Mem. at 6 (the *Harriss* Court "did not specify the level of scrutiny it applied . . . and indeed the case predated the

---

[1]    Defendants Nancy Erickson's and Lorraine C. Miller's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Judgment ("Leg. Opp.") and United States Attorney Taylor's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Judgment As a Matter of Law ("USADC Opp.").

[2]    Brief Amicus Curiae of Citizens for Responsibility and Ethics in Washington In Support of the Defendants ("CREW Mem.") and Memorandum of Campaign Legal Center, Democracy 21 and Public Citizen As *Amici Curiae* in Support of Defendants ("CLC Mem.").

[3]    Justice Douglas's dissent refers to First Amendment precedent that regulations affecting the First Amendment should be "narrowly drawn" and not "cast in such vague and indefinite terms as to cast a cloud on the exercise of constitutional rights." *United States v. Harris*, 347 U.S. 612, 632 (1954). Those terms foreshadow current doctrine, though they are less pointed and demanding. Justice Douglas does not reveal what standards the majority applied.

formalization of different levels of constitutional scrutiny."). Thus, *Harriss* cannot be extended beyond its narrow holding.

One thing *Harris* certainly demonstrates, however, is that Congress historically has been careless of the First Amendment rights of those who lobby. The first thing *Harris* did was to impose a Draconian narrowing construction on the Federal Regulation of Lobbying Act ("FRLA") to avoid due process vagueness and to make the statute as definite as ordinary criminal legislation. To that end, *Harriss* imposed three prerequisites on the FRLA's substantive provisions:

> (1) the "person" must have solicited, collected, or received contributions; (2) one of the main purposes of such "person" or one of the main purposes of such contribution must have been to influence the passage or defeat of legislation by Congress; [and] (3) the intended method of accomplishing this purpose must have been through direct communication with members of Congress.

347 U.S. at 623. *Harriss* said that, as thus limited, the FRLA merely required disclosure of "who is being hired, who is putting up the money, and how much." *Id*. at 625. Without discussing the applicable standard of review, the Court then held that, in light of "[p]resent-day legislative complexities," the narrowed act did "not violate the freedoms guaranteed by the First Amendment." *Id.*

The new requirement challenged by the NAM harkens back in spirit if not in detail to the sweeping and vague statute *Harriss* so drastically curtailed. For example:

- As narrowed by *Harriss*, the FRLA applied only to direct contact with members of Congress, whom the Court found to be too busy to make inquiries in light of the then "[p]resent-day legislative complexities." *Id.* at 625. By contrast, the challenged requirement at issue here applies to contacts with all Congressional personnel, as well as many persons employed in the executive branch. 2 U.S.C. § 1602(3), (4), (8). The

Oppositions neither prove nor even assert that they all are too busy to make appropriate inquiries.

- The narrowed *Harriss* legislation was triggered by only one type of conduct – soliciting, collecting, or receiving contributions. *Harriss*, 347 U.S. at 618-19. By contrast, the challenged new requirement applies to any type of conduct that may be thought to amount to "active" participation in "planning, supervision, or control of . . . lobbying activities." 2 U.S.C. § 1603(b)(3)(B).

- The narrowed *Harriss* legislation applied only to one particular type of communications – those seeking "the passage or defeat of any legislation." *Harriss*, 347 U.S. at 619. By contrast, the challenged requirement applies broadly to all of the following types of actions: "(i) the formulation, modification, or adoption of Federal legislation (including legislative proposals); (ii) the formulation, modification, or adoption of a Federal rule, regulation, Executive order, or any other program, policy, or position of the United States Government; (iii) the administration or execution of a Federal program or policy (including the negotiation, award, or administration of a Federal contract, grant, loan, permit, or license); or (iv) the nomination or confirmation of a person for a position subject to confirmation by the Senate." 2 U.S.C. § 1602(8)(A).

*Harris* emphasized the narrowness of its construction in finding the First Amendment satisfied, 347 U.S. at 619-20, and *Harriss* was understood to require that its narrowing construction be narrowly applied. *See Bradley v. Saxbe*, 388 F. Supp. 53, 57 (D.D.C. 1974) (noting "the narrow ground by which the constitutionality of the [FRLA] was sustained" and that "[t]he narrow interpretation of the [FRLA] should be maintained to assure its constitutionality").

For example, only communications directly supporting or opposing actual, specific pending legislation were covered. CLC Mem. at 10 n.4. In short, *Harriss* does not begin to support the sweeping new restriction challenged here, and the First Amendment standards of review developed since *Harriss* preclude any broad reading.[4]

## II.    DEFENDANTS BEAR A HEAVY BURDEN OF JUSTIFICATION.

The Oppositions do not attempt to distinguish the cases cited in the NAM's opening Memorandum (at 18) applying strict scrutiny to burdens on lobbying. But they profess uncertainty as to whether the challenged requirement should be either "strict" or merely "exacting." Leg. Opp. at 22 n.11; USADC Opp. at 17-20; CLC Mem. at 7-8; CREW Mem. at 5.[5]

In the context of restrictions on core First Amendment rights, "exacting" and "strict" judicial review mean essentially the same thing. *See Burson v. Freeman*, 504 U.S. 191, 198 (1992) (plurality opinion) (quoting *Perry Ed. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (stating exacting scrutiny requires the government to show that the "'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'"). In order to survive "exacting scrutiny," a restriction must be narrowly tailored to serve an overriding or compelling state interest. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) (citing *First Nat'l. Bank of Boston v. Bellotti*, 435 U.S. 765, 786 (1978)) ("[w]hen a law burdens core political speech, we apply 'exacting scrutiny,' and we uphold the

---

[4]    Defendants also have identified a number of lower court decisions that both uphold and strike down various restrictions on lobbying. *See, e.g.*, Leg. Opp. at 22-24; USADC Opp. at 9-10. However, Defendants have not suggested that any of these cases address the same sort of burdensome and intrusive disclosure requirements that are at issue here.

[5]    One Defendant asserts that *Harriss* sets a different and lower standard. USADC Opp. at 8-10. As noted above, however, *Harriss* does not even mention or discuss the applicable standard of review.

restriction only if it is narrowly tailored to serve an overriding state interest" or an "interest which is compelling").

Indeed, First Amendment cases use "exacting scrutiny" and "strict scrutiny" interchangeably. *See, e.g.*, *Burson v. Freeman*, 504 U.S. 191, 198-199 (1992) (plurality opinion) (stating first that "[a]s a facially content-based restriction on political speech in a public forum, § 2-7-111(b) must be subjected to exacting scrutiny" and then going on to explain "[t]o survive strict scrutiny, however, a State must do more than assert a compelling state interest – it must demonstrate that its law is necessary to serve the asserted interest.").

*Buckley* described exacting scrutiny as a "strict test," and engaged in an analysis which found that the disclosure requirements at issue "directly serve[d] substantial government interests" and appeared to be "the least restrictive means of curbing the evils . . . that Congress found to exist." *Buckley v. Valeo*, 424 U.S. 1, 64-68 (1976). *Buckley* also demanded objective, bright-line standards. *Id.* at 42-44. Consistent with the cases cited above, the Supreme Court characterized *Buckley*'s "exacting scrutiny" standard as requiring that a restriction on "political speech [be] narrowly tailored to serve a compelling state interest." *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 657 (1990). That is the core of the strict scrutiny test.

Even if there were some marginal difference, Defendants' burden would remain heavy, as it should be. The challenged restriction is explicitly directed at and triggered by "communication" with government officials that address matters of government policy. 2 U.S.C. § 1602(8)(A). That is a content-based limit on the most central type of First Amendment speech. *See also McIntyre*, 514 U.S. at 345-46 (finding that a campaign-related disclaimer statement "was a direct regulation of the content of speech" even though it "applies evenhandedly to advocates of differing viewpoints"). Indeed, the speech is of a category (petitioning) that the

First Amendment singles out for protection. *See Montana Chamber of Commerce v. Argenbright*, 226 F.3d 1049, 1056 n.5 (9th Cir. 2000) ("lobbying by corporations" is protected by the First Amendment) (collecting authority). Moreover, the part of the speech/petition process that is particularly burdened is "active," associational conduct, which the First Amendment also centrally protects. Pl. Mem. at 20-21. Although current jurisprudence may allow the government to burden such core First Amendment rights, it certainly must demonstrate compelling reasons and state what is required with precision.

### III.    DEFENDANTS FAIL TO SHOW THAT SECTION 207'S DISCLOSURE REQUIREMENT SATISFIES THE FIRST AMENDMENT.

#### A.    DEFENDANTS MUST PROVE, NOT MERELY ASSERT, THAT THE CHALLENGED REQUIREMENT IS NECESSARY, TAILORED, AND PRECISE.

Rather than attempting a factual justification of the challenged requirement, the Oppositions argue that the Court should simply defer to the judgment of Congress. There are many difficulties with doing so.

To begin with, such deference is not consistent with the text of the First Amendment. Most provisions of the Bill of Rights simply declare rights without specifying which branch of government is the source of concern. For example, the Fourth Amendment says "[t]he right of the people to be secure in their persons . . . shall not be violated." By contrast, the First Amendment singles out one specific branch, Congress, as the one most specifically to be restrained, saying, "*Congress* shall make no law . . ." (emphasis added). *See also Gibson v. Florida Leg. Investigation Comm.*, 372 U.S. 539, 566 (1963) (Douglas, J., concurring) (quoting Laurent Frantz, *The First Amendment in the Balance*, 71 Yale L. J. 1424 (1961-62)). Where Congress relies on supposed brute necessity to override that explicit constitutional ban directed to it, surely that necessity must be demonstrated, rather than merely asserted.

Moreover, settled precedent requires proof.[6]  Where "important First Amendment rights are involved, the [government] 'must do more than simply posit the existence of the disease sought to be cured.  It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.'"  *FEC v. NRA*, 254 F.3d 173, 191 (D.C. Cir. 2001) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994)).  This "demanding standard" is particularly important because "[w]here at all possible, government must curtail speech only to the degree necessary to meet the particular problem at hand, and must avoid infringing on speech that does not pose the danger that has prompted regulation."  *Id.* at 190-91 (citing *FEC v. Mass. Citizens for Life*, 479 US 238, 265) (1986)).  *See also Quincy Cable TV, Inc. v. FCC*, 768 F.2d 1434, 1455 n.44 (D.C. Cir. 1985) ("in the context of reviewing legislative acts, the Supreme Court has frequently required more than an unsubstantiated assertion of the importance of the governmental interest").  Indeed, even when the government is dealing with its own employees, if "core First Amendment activity" is burdened, then the "courts cannot merely defer to 'the Government's speculation about the pernicious effects' such protected speech might have."  *Ramirez v. U.S. Customs and Border Protection*, 477 F. Supp. 2d 150, 155, 158 (D.D.C. 2007) (quoting *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 475 n.21 (1995)).[7]

---

[6]     As a matter of *stare decisis*, the very limited disclosure requirements affirmed in *Harriss* may be justified by citation to that case.  But the challenged requirement goes much further, and those aspects must be factually justified as to need, tailoring, and precision.

[7]     Moreover, the Supreme Court has cautioned that a court "must identify with care the interests the [government] itself asserts.  Unlike rational-basis review, the court may not supplant the precise interests put forward by the [government] with other suppositions."  *Edenfield v. Fane*, 507 U.S. 761, 768 (1993) (applying this requirement to a statute involving commercial speech, which receives less protection than core political speech).  Thus, the Court should limit its review specifically to those justifications offered in the Oppositions by the Legislative Defendants and the U.S. Attorney that derive from the legislative record.

Defendants assert that the legislative record shows careful and reasoned consideration.  In fact, they do not show that the particular requirement challenged here was the subject of such careful Congressional scrutiny and analysis.  Tellingly, the Legislative Defendants spend over a dozen pages discussing the legislative history of and the justifications for the Federal Regulation of Lobbying Act of 1946 and the Lobbying Disclosure Act of 1995.  Leg. Opp. at 5-12, 18-19, 23-25.   However, these generalities are no substitute for Congress justifying the sweeping change it made to the 1995 disclosure requirements in 2007.[8]

Even when the Legislative Defendants eventually reach the question of identifying the "Vital Government Interest" that § 207 is designed to protect, they do so primarily by referring back to the legislative history surrounding adoption of the LDA, s*ee, e.g.*, Leg. Opp. at 23-24 ("In the LDA itself . . . ", "Congress found in the LDA that . . .", and "The disclosure provisions in the LDA were 'designed to . . . '"), rather than making a serious effort to justify why the disclosure requirement enacted in 2007 was necessary.  But the 1995 Act was adopted to serve the needs then identified.

The history recited by the Legislative Defendants shows that, since 1995, various members have pushed various requirements related to lobbying.  However, that history does not show a reasoned examination of the particular requirement challenged here.  Indeed, Congress as a whole seems to have been relatively indifferent to the prospect of legislation in this area until, in 2007, an overwhelming majority responded to political pressure to do something.  *See* Jeff Zeleny and Carl Hulse, *Congress Votes to Tighten Rules on Lobbyist Ties*, N.Y. Times, Aug. 2,

---

[8]     Contrary to Defendant Taylor's assertions, this statutory change is not simply "modest" and "not so momentous." USADC Opp. at 4, 24 n.17.  If upheld, the new disclosure requirements will have a substantial impact on the First Amendment rights and activities of thousands of individuals and organizations.

2007, at A1. There is no evidence that, at that time, the specific requirement at issue here was subject to careful examination, and the timing shows that to be most unlikely.

To show an intent to require disclosures from long-standing, established organizations like the NAM, the Legislative Defendants cite to a statement made by Representative Lloyd Doggett on May 24, 2007. *See* Leg. Opp. at 23 ("When deep-pocketed interests spend big money to influence public policy, the public has a right to know. Even a little light can do a lot of good."). *See also* CREW Mem. at 6, 11 (citing similar portions of Congressman Doggett's May 24, 2007, statement). However, when Congressman Doggett made these remarks, he was actually referring to the House-backed version of lobbying reform, which contained an exemption to the new coalition disclosure requirements for many established 501(c) organizations. *See* H.R. 2316, 110th Cong. § 206 (2007) (as passed by the House).[9] *See also* 153 Cong. Rec. H9204-H9205 (daily ed. July 31, 2007) (statement of Rep. Conyers) (explaining that the *final* version of the bill mandated "the disclosure of contributions in excess of $5,000 by businesses or organizations that actively lobby through <u>certain</u> [ – but not all – ] coalitions and associations.") (emphasis added).[10] None of the other Congressional Record excerpts or

---

[9]      Specifically, the bill contained for exception for 501(c)(3) organizations and any other 501(c) organization "exempt from tax under section 501(a) of [the Internal Revenue Code] and which has substantial exempt activities other than lobbying with respect to the specific issue for which it engaged the person filing the registration statement." H.R. 2316, 110th Cong. § 206 (2007) (as passed by the House).

[10]      As Chairman of the Judiciary Committee, Representative Conyers' views on this provision are particularly important. After receiving protests from members of the lobbying community, Chairman Conyers introduced a manager's amendment during his committee's mark-up to correct a "drafting error" in H.R. 2316 that had left out the general 501(c) exception from the original version of the bill. Alexander Bolton, *Lobbying Bill Could Trigger Hill Firestorm*, The Hill (May 16, 2007); H.R. 2316, 110th Cong. § 206 (2007) (as reported in the House). As Chairman Conyers noted during the committee mark-up, he "never intended that th[e coalition disclosure] provision would apply to nonprofit or not-for-profit organizations." Markup of H.R. 2317, the "Lobbying Transparency Act of 2007"; H.R. 2316, the Honest Leadership and Open Government Act of 2007" *et al.* (statement of John Conyers, Chairman of the House Judiciary Committee).

legislative history cited by any of the Oppositions – all of which simply refer to "stealth coalitions" in a general sense – refute this point. Thus, as the Oppositions' own statements illustrate, it is clear that the scope of the challenged provision – even if it meets all of the other requirements associated with the heightened level of scrutiny – does not apply to an established 501(c) organization like the NAM.

Defendant Taylor defends the challenged provision in part by relying on such nebulous generalizations as the following: "[T]he purpose of the disclosure provision is compelling [since it] helps ensure the full realization of the 'American ideal' of representative government." USADC Opp. at 17. Moreover, along with several of the other Oppositions, Defendant Taylor even goes so far as to suggest that once Congress chooses to regulate lobbying by imposing disclosure obligations – rather than enacting a prohibition on lobbying or imposing certain restrictions on a lobbyist's activities – it is not bound by any particular standards. *See* USADC Opp. at 12; Leg. Opp. at 18-19, 30; CLC Mem. at 9. Put another way, these Oppositions seem content to justify the disclosure obligations by arguing that once the camel has gotten his nose inside the tent of disclosure, nothing further is necessary to justify bringing in the whole camel and his family. But that is not the way the demanding standards of the First Amendment are applied. If Congress wants to impose new constraints on core First Amendment rights, it may do so only by independently demonstrating a vital need for the new restrictions.

With respect to the specific requirement challenged here, the most the legislative record shows are repeated, generalized assertions that more disclosures are needed about the interests represented by stealth coalitions. Leg. Opp. at 23-25; USADC Opp. at 10. In enacting the challenged provision, the 110th Congress did not even set out any "findings of fact" justifying the need for the increased disclosures as it had done in 1995. *See* LDA, Pub. L. No. 104-65, § 2,

10

109 Stat. 691 (1995) (codified at 2 U.S.C. § 1601(2)) ("find[ing] that . . . existing lobbying disclosure statutes have been ineffective because of unclear statutory language, weak administrative and enforcement provisions, and an absence of clear guidance as to who is required to register and what they are required to disclose"). In another case involving core First Amendment speech, *McConnell v. FEC*, a massive evidentiary record was offered to defend the facial validity of the provisions challenged there. 540 U.S. 93, 129-132 (2003) (citing "a six-volume report summarizing the results of an extensive investigation"). The court stressed the importance of that record. *Id.* at 132. *See also McConnell v. FEC*, 251 F. Supp. 2d 176, 438 (D.D.C. 2003), *aff'd in part*, 540 U.S. 93 (2003) (Kollar-Kotelly, J.). By contrast, no such evidence is offered here. The supposed need is not proved or quantified by the Defendants and, as is discussed *infra* at 14-15, is not met by the challenged requirement.

The Legislative Opposition also notes that the bill containing the challenged requirement – along with many other provisions – passed by large margins. Leg. Opp. at 13. But all this shows is that Congress felt political pressure to "do something." As a general proposition, there is nothing wrong with a political branch acting in response to political concerns. But where the resulting law burdens fundamental rights that the Constitution elevates above the political fray and protects from majoritarian pressures, the courts demand a compelling (or exacting) empirical demonstration that the legislation is carefully tailored to a real necessity, and that it is expressed with a great deal of precision. The history recited by the Oppositions does not show that.

### B. THE DEFENDANTS OFFER NO PROOF THAT THE NEW REQUIREMENT IS JUSTIFIED OR TAILORED.

The NAM's challenge targeted the new statutory requirement that associations employing lobbyists publicly disclose each organizational member that, during any calendar quarter, funds

and "actively participate[s] in the planning, supervision or control" of any "lobbying contacts and efforts in support of such contacts, including preparation and planning activities, research, and other background work that is intended, at the time it is performed, for use in contacts, and coordination with the lobbying activities of others." 2 U.S.C. §§ 1602, 1603(b)(3)(A)-(B), 1604(b)(1). The NAM observed that no evidence supported this specific requirement, and that it was not tailored to serve its asserted purpose of requiring so-called "stealth coalitions" to reveal the interests they represent.

### 1.    THE DEFENDANTS OFFER NO PROOF.

Strikingly, the Defendants provide no concrete evidence – or even specific allegations – to justify the new requirement. They rely instead on general assertions, and those glittering generalities overwhelmingly concern the "stealth coalitions" – entities that are supposed to effectively lobby high-ranking legislative and executive personnel without ever answering the simple query: "Now, whom do you represent?"[11] The Defendants offer no proof that "stealth coalitions" are common or that lobbied officials cannot recognize and deal effectively with stealth coalitions, even if such officials actually pay attention to such unknown groups. They do not show that any such organization that wants to remain stealthy will be subject to disclosure. Nor do they show that obvious, less burdensome alternatives could not adequately address any "stealth coalition" problem that might exist.

---

[11]    Interestingly, the example most commonly-cited example mentioned by members of the Democratic leadership is the Health Insurance Association of America, which sponsored the "Harry and Louise" ads. *See, e.g.*, Press Release, Office of House Speaker Nancy Pelosi, *Honest Leadership, Open Government*, *available at*: http://www.speaker.gov/legislation?id=0072 ("Disclosure of stealth lobbying: [the HLOGA c]loses a loophole in current law that permits coalitions – such as the one that funded the extensive 'Harry and Louise' ad campaign that targeted health care legislation in 1993-94 – to avoid disclosing their clients") (emphasis omitted). But that was not a lobbying group dealing with officials who could ask who they represented. Instead, that group relied on advertising, a one-way form of communication that avoids questions about identity and is not regulated by the challenged provision.

The Oppositions do not dispute that, if a "stealth coalition" avoids hiring its own lobbyist and relies on the lobbyists of one or more members, it is not subject to any disclosure obligations at all. They shrug this off, saying any member whose lobbyists contact government personnel for a coalition would have to file reports. But they do not dispute that such reports are required only to list the houses or agencies the reporting entity has lobbied and the general issues on which the entity has lobbied. The law does not require such a report to identify the coalition or any of its members, no matter how much funding they may have contributed or how active they have been. 2 U.S.C. § 1604(b). What is more, the disclosure the member would provide about itself would not differ materially from that already required by the 1995 Act.

The Oppositions also offer no evidence, or even assertion, that "stealth coalitions" remain stealthy over time. Indeed, one of the Oppositions observes that the challenged provision "closes a loophole" in the LDA that was enacted specifically to deal with the problem of "ad hoc coalitions." Leg. Opp. at 11, 24-25 (citing H.R. Rep. No. 104-339, pt 1, at 18 (1995)).[12] That same Opposition argues that there is no bright line rule as to when the interests represented by stealth coalitions become known. *Id.* at 29. But no Opposition credibly denies that a bright line can be drawn – for example, organizations that have been registered under the Act for less than two years – that will effectively capture "stealth coalitions" while protecting a great many established groups like the NAM. One example already discussed (at 9) was to exclude § 501(c) organizations that have substantial non-lobbying activities and, hence, are not ad hoc stealth

---

[12]    Some versions of the challenged requirement would have excluded entities operating under 501(c) of the Internal Revenue Code. *See, e.g.*, H.R. 2316, 110th Cong. § 206 (2007) (as passed by the House); *The Stealth Lobbyist Disclosure Act*, H.R. 804, 110th Cong. § 2 (2007). Because such entities cannot be primarily political, this would have tended to focus disclosure on ad hoc lobbying groups and protected many established groups like the NAM. The Oppositions do not explain why this or a similar, less restrictive alternative would not work.

associations.  Another obvious approach would be to exclude all groups that have been registered lobbyists for a period of years.  The Oppositions do not cogently explain, much less prove, why restrictions could not be targeted to "stealth coalitions."

      **2.**     **THE TERMS OF THE LEGISLATION REFUTE THE ASSERTED RATIONALE.**

Unable to defend the "stealth coalition" rationale, the Oppositions assert that, when an established group like the NAM lobbies on an issue, Congress has a vital need to know which particular group members are funding and actively participating in the effort.  But absolutely no evidence is provided to establish that need, and the operation of the law itself renders such a claim very doubtful.  Ironically, as the language of § 1603 illustrates:

- If an association lists ten thousand members on an identified web page, Congress does not seek to know which of them actively participate in lobbying activity;

- If a single, unidentified association member contributes 100% of the funding for a massive lobbying activity to be carried out by the association, Congress does not seek to know of that member;

- If an association member is extremely active in and substantially controls an association's lobbying effort but does not directly fund that effort, Congress does not need to know of that member;

- If one or two extremely wealthy individuals fund and actively control a lobbying campaign conducted under a misleading name, Congress does not need to know about them; and

- As discussed above, if "stealth coalitions" operate through the lobbyists of one or more members, Congress does not need disclosure of the coalition, its membership, or activities.

Moreover, as one Opposition points out, even when a lobbying association is required to report, the law does not assure that Congress readily can learn which disclosed member is active in which specific lobbying activity.  Leg. Opp. at 35.  A reporting association provides two separate lists, one of the issues on which the association has lobbied and one of the members who have funded and actively participated with respect to one or more such activities.  *See* Lobbying Report (LD-2DS) Sample Form, *available at*:

http://lobbyingdisclosure.house.gov/help/WordDocuments/lobbyingreportld2dssampleform.htm. Because of factors such as when new lobbying issues and new members first appear and the primary businesses of particular members, third parties often will be able to deduce the linkage. But since disclosure of the linkage is not required and sometimes will be obscure, the law cannot support the notion that Congress needs to know which association members are active with respect to which association issues.  *See Shaw v. Hunt*, 517 U.S. 899, 915 (1996) (noting that the Supreme Court has "always expected that the legislative action would substantially address, if not achieve, the avowed purpose") (collecting authority).

In short, there simply is no evidence that the burdens the Amendment imposes on the expressive associational rights of the NAM and similar organizations – which are virtually the only groups seriously burdened by the new requirements – serve any important purpose at all.

3.    **CONGRESS DID NOT EVEN EVALUATE, MUCH LESS JUSTIFY, THE BURDENS IMPOSED.**

Finally, and vitally, there is no proof that any benefits of the challenged requirement justify the burdens imposed.  *See ACLU v. Ashcroft*, 322 F.3d 240, 265 (3rd Cir. 2003) (emphasizing that "the benefit gained must outweigh the loss of constitutionally protected rights" when Congress regulates First Amendment activity). There is no evidence that Congress made the slightest effort to assess the burdens the challenged requirement would inflict.  And the

Defendant Taylor's Opposition essentially says that it does not matter – that any theoretical interest would permit Congress to impose massive burdens with impunity.  USADC Opp. at 26-27.

Several Oppositions emphasize that the NAM has not identified specific members who would face Draconian consequences if disclosed.  If this action were seeking to excuse specific non-compliance with a facially-justified standard, then the NAM would have offered such evidence.  But this action challenges the requirement itself, facially and as applied to membership groups like the NAM.  For that purpose, the types of burdens relied on in *Buckley* to trigger demanding scrutiny are adequate and clearly present here.

### C.    THE DEFENDANTS FAIL TO SHOW THAT SEVERAL KEY TERMS MEET THE FIRST AMENDMENT'S DEMANDING STANDARD OF PRECISION.

The NAM challenged Defendants to show that the new requirement provides the high degree of precision demanded by the First Amendment, both on its face and as applied to a membership organization like the NAM, where corporate members with conflicting goals are represented by multiple employees on multiple committees that may have more or less to do with lobbying contacts.  Again, the Defendants fall short, as they must given the statutory language.

At the outset, it is important to note that the Oppositions seek to minimize the significance of any vagueness by stressing that the NAM has not accused the Defendants of plotting arbitrary and abusive enforcement.  USADC Opp. at 24 n.18.  If that were important, few vagueness challenges could succeed since even a jaded Washingtonian can hope that most government officials will try to be reasonable most of the time.  As discussed below, the Supreme Court has stressed that those who wish to exercise their First Amendment rights may not be required to gamble on official restraint and reason.  *See infra* at 18-19.  No one knows who will hold Defendants' positions over the years or what interests and pressures may affect

them, and the NAM cannot expose itself to attack for failure to comply with an extreme

interpretation of a vague statute.

1.    **THE FIRST AMENDMENT DEMANDS MUCH GREATER PRECISION THAN DOES THE DUE PROCESS "ORDINARY INTELLIGENCE" TEST.**

Defendants, along with one of the amici, argue that a statute is unconstitutionally vague

only "if it fails 'to provide adequate notice to a person of ordinary intelligence that his

contemplated conduct is illegal[.]'"  Leg. Opp. at 17, 35-36 & n.24 (citing *Buckley*, 424 U.S. at

77).  *See also* USADC Opp. at 20-21; CLC Mem. at 19-21.  However, "[w]hen a statute touches

on First Amendment freedoms, more clarity is required."  USADC Opp. at 21 (citing *Buckley*,

424 U.S. at 77); *Smith v. Goguen*, 415 U.S. 566, 573 & n.10 (1974) (contrasting the "less

stringent requirements of the modern vagueness cases dealing with purely economic regulation"

with those that affect First Amendment rights, noting that "[w]here a statute's literal scope,

unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by

the First Amendment, the doctrine demands a greater degree of specificity than in other

contexts"); *NAACP v. Button*, 371 U.S. 415, 432 (1963) (collecting authority and emphasizing

that "standards of permissible statutory vagueness are strict in the area of free expression").  This

fundamental tenet of First Amendment law – which the Oppositions go to great length

to discount – is echoed not only in the decisions of the U.S. Supreme Court, but in the opinions

of the Court of Appeals, *Big Mama Rag, Inc. v. United States*, 631 F.2d 1030, 1035 (D.C. Cir.

1980) (vagueness standards "are especially stringent, and an even greater degree of specificity is

required, where . . . the exercise of First Amendment rights may be chilled by a law of uncertain

meaning") and this court, *Fire Fighters Ass'n, District of Columbia v. Barry*, 742 F. Supp. 1182,

1196 (D.D.C. 1990) ("where the regulation touches on expression protected by the [F]irst

[A]mendment, Courts require an even greater degree of specificity to withstand a vagueness

challenge"). This increased level of precision is particularly important where the exercise of First Amendment rights may lead to punishment. *See* 2 U.S.C. § 1606 (providing for criminal and civil penalties under the LDA); *United States v. Thomas*, 864 F.2d 188 (D.C. Cir. 1988) ("[w]hen the criminal penalty at issue applies to activity that furthers First Amendment interests, . . . the court is obliged to review the challenged enactment with particular care" against a vagueness challenge).[13]

The necessary degree of precision is demonstrated by the Supreme Court in its analysis in *Buckley*, which imposed an "express advocacy" construction on an otherwise vague statute. 424 U.S. at 45. Society cannot afford to have speakers hedge, trim and steer clear of protected core First Amendment activity. *Id.* at 41 n.48, 43. In *Buckley*, the Court rejected half-measures, holding that the D.C. Circuit's adoption of the standard "advocating the election or defeat" moved in the right direction, but fell short because it still turned on subject matter as to which there could be disagreement. *Id.* at 42. Instead, it demanded an objective, bright line. *Id.* at 42-44. *See also McConnell*, 251 F. Supp. 2d at 600-01 (Kollar-Kotelly, J.) (noting that *Buckley* demanded a "clear boundary" and a "bright line.").[14]

Contrary to the position taken by the Oppositions, vagueness cannot be justified by the characteristics of present regulators. *See Baggett v. Bullitt*, 377 U.S. 360, 373 (1964) (because experience teaches that someone will always push legal standards to their limit, "[w]ell-

---

[13]    The potential for hundreds of thousands of dollars in civil penalties, standing alone, would require relatively strict scrutiny. *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493 (5th Cir. 2001). Here, the civil penalties are integrated into a provision that also threatens serious and explicitly criminal penalties. 2 U.S.C. § 1606(b). The great potential for self-censorship and chill in exercising core rights demand the strictest standard of precision.

[14]    *Buckley* stresses that the precise meaning of a First Amendment restriction must be established "before" a court can hold that it is justified and tailored. 424 U.S. at 40 (quoted in *McConnell*, 251 F. Supp. 2d at 598 (Kollar-Kotelly, J.) (quoting and emphasizing "before").

intentioned prosecutors and judicial safeguards do not neutralize the vice of a vague law");

*Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 286-87 (1961). Significantly, the newness of the

disclosure provision – along with the corresponding criminal penalties – gives this statute

particular "vigor and potential potency. . . . Its youth counsels not that it will go unenforced, but

[that the NAM is] faced with a statute that is alive and well, and backed by a [government]

poised to fully enforce it and a known constituency very eager to have it enforced." *Hoffman v.*

*Hunt*, 845 F. Supp. 340, 347 (W.D.N.C. 1994). *See also* 2 U.S.C. § 1605(b)(1) (requiring the

Attorney General to report to Congress "the aggregate number of enforcement actions taken by

the Department of Justice . . . and, by case, any sentences imposed"); Susan Crabtree, *Lobbying*

*Watchdogs Push Enforcement*, The Hill, Nov. 28, 2007 (noting that a letter sent by reform

groups to the Legislative Defendants "stresses the need to crack down on disclosure

requirements for 'stealth coalitions'").

The reason for demanding such exceptional precision is simple. The free exercise of

First Amendment rights is very important to society. But the exercise of such rights is easily

deterred. *Buckley*, 424 U.S. at 41 n.48. Society cannot afford to have speakers hedge, trim or

steer clear of lawful speech to avoid a possible legal risk: the constitutional cost is too high. *Id.*

at 43.

## 2.    "INTENT" IS VAGUE.

Although the NAM discussed the problems with the statute's "intent" standard at some

length, *see* Pl. Mem. at 8, 25-27, the Oppositions filed by the Defendants and amici are largely

silent on this critical question. As an initial matter, Defendants fail to demonstrate why the

disapproval of intent standards in *Buckley*, 424 U.S. at 43-44, and *Federal Election Comm'n v.*

*Wisconsin Right to Life, Inc.* ("*WRTL II*"), 127 S. Ct. 2652, 2665 (2007), should not control. *See*

Pl. Mem. at 25.[15]  Why is the NAM a better judge of how regulators will assess intent than the speakers protected by *Buckley*?

The Legislative Defendants (at 38) argue that intent is used in other statutes – as, of course, it is.  But neither case cited by the Defendants involved the direct regulation of core First Amendment rights.  *See Gonzales v. Carhart*, 127 S. Ct. 1610, 1628 (2007) ("[t]he Act requires the [abortion] doctor deliberately to have delivered the fetus to an anatomical landmark"); *Ward v. Utah*, 398 F.3d 1239, 1249-54 (10th Cir. 2005) (statute "aimed at conduct unprotected by the First Amendment" required a disorderly person to act "with the intent to intimidate").

Moreover, those statutes made clear whose intent controls.  Although the amici joining in the CLC Memorandum were "active in the drafting and debate of HLOGA in Congress, including providing policy papers and legal memorandum, and lobbying individual Senators and Members," CLC Mot. at 3,[16] they make no effort to answer this fundamental question posed by the NAM.  Nor do the Legislative Defendants offer any other meaningful arguments that would save the statute's intent provision from Plaintiff's vagueness challenge.

Only Defendant Taylor's Opposition actually attempts to squarely address the intent issue, arguing that "it is the affiliate organization's intention that" controls.  USADC Opp. at 22.  If that is so, then the NAM must correctly assess, not its <u>own</u> intent, but that of a large number of other organizations.  And organizational intent is a particularly elusive concept.  *See, e.g.*, *Perry v. Bartlett*, 231 F.3d 155, 161 (4th Cir. 2000) ("discerning the 'intent' of an

---

[15]    Although *Harriss* used "purpose" as an element, it did so to satisfy basic due process, seeking to make the statute there as clear as ordinary criminal laws.  347 U.S. at 617-18.  The Court did not address the heightened clarity that current law demands of First Amendment regulation.

[16]    Motion of the Campaign Legal Center, Democracy 21 and Public Citizen to Participate As Amici Curiae with Supporting Memorandum of Points and Authorities ("CLC Mot.").

organization . . . can be problematic, even if some in the organization 'admit' their intent");

*Slatky v. Amoco Oil Co.*, 830 F.2d 476, 485 (3rd Cir. 1987) ("intentions are always difficult to

discern, especially when we deal not with the intentions of individuals but of organizations").

Defendant Taylor asserts that this vagueness actually protects the NAM, saying that

enforcement authorities would find it difficult to prove that any alleged mis-assessment was

"knowing."  USADC Opp. at 28 n.20.  To the extent this is so, it shows the requirement is a

scarecrow that will serve primarily to induce self-censorship.  But the reality is that the existence

of the statute makes possible proceedings for civil and criminal punishment, and the burden and

disruption of such a threat can burden speech as effectively as actual convictions.  *NAACP v.*

*Button*, 371 U.S. 415, 433 (1963) (collecting authority).

That punishment applies only to "knowing" violations, § 1606, is of no help since the

Supreme Court has made clear that "the knowledge requisite to [a] knowing violation of a statute

is factual knowledge as distinguished from knowledge of the law."  *United States v. Barnes*, 295

F.3d 1354, 1367 (D.C. Cir. 2002) (citing *Bryan v. United States*, 524 U.S. 184, 192 (1998)).  The

key vagueness problem is that the NAM and others cannot confidently assess the facts because

the legal standard is unclear.  *See Planned Parenthood Cincinnati Region v. Taft*, 459 F. Supp.

2d 626, 633, 638 (S.D. Ohio 2006) (noting that a law that "implicates the exercise of [a]

constitutionally protected right" could not be saved from a vagueness challenge because a

"scienter requirement applied to an element that is itself vague does not cure the provision's

overall vagueness").[17]

---

[17]    Moreover, even a directly relevant scienter requirement does "not cure all defects for all
purposes," particularly when constitutionally-protected rights are at stake.  *United States v. Loy*,
237 F.3d 251, 265 (3rd Cir. 2001) (citing *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 286
(1961), which struck down a loyalty oath notwithstanding the fact that the "oath-taker was
required only to affirm that he or she had never 'knowingly'" engaged in certain conduct).  This

The Oppositions assert that the NAM's prior filings under the pre-2008 version of the LDA demonstrate that its statutory language was not vague. Leg. Opp. at 37; CLC Mem. at 19-20. However, under the 1995 version of the Act, coalitions were required to disclose only those members that "in whole or in major part plan[ned], supervise[d] or control[led]" such "lobbying activities" (the term that includes work "intended . . . for use in [lobbying] contacts"). 2 U.S.C. § 1603(b)(3) (1995). As the Campaign Legal Center's brief points out, for some organizations, the application of this "in whole or major part" standard meant that "no single member . . . would meet this threshold . . . . As a result, only the umbrella coalition would be subject to disclosure[.]" CLC Mem. at 4. For the NAM, a broad-based association of over 11,000 members, such control by a member did not occur. Thus, there simply was little need to dispute the meaning of words like "intended." After all, constitutional litigation like this case is enormously expensive, and constitutional issues may often go unchallenged until they become critical.

### 3.    "ACTIVELY PARTICIPATES" IS VAGUE.

The Oppositions seek to wish away the vagueness inherent in a vague standard like "active" participation by asserting the NAM did not challenge it. In fact, the NAM's papers repeatedly and explicitly challenged the term as a vague element of the requirement to report member lobbying activities.[18]

---

understanding "is necessary if the void-for-vagueness doctrine is to have any teeth at all. Indeed, a contrary view would suggest that a legislature may avoid vagueness challenges altogether by simply including a scienter requirement in every enactment." *Richmond Medical Center for Women v. Gilmore*, 55 F. Supp. 2d 441, 498 (E.D. Va. 1999) (collecting authority) (internal citations omitted).

[18]    The Complaint explicitly alleged that "actively participating" was vague (¶¶ 9, 17-19, 26(a). The NAM's Memorandum argued (at 3-4) that the Act's reference to "actively participating" in lobbying activity was "vague and sweeping," noting (at 8) that "actively participates" was not defined. It explained (at 11, 13-14) that members participate "in different

The Legislative Defendants argue that *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 577-79 (1973), establishes that the term "'actively participat[es]' . . . provides a sufficient understanding of what triggers reporting" under the LDA.  *See* Leg. Opp. at 36 n.24.  Understandably absent from the Legislative Defendants' analysis of this decision, however, is the primary reason that the Supreme Court upheld the Hatch Act against a vagueness challenge.  When Congress defined the nebulous term "active part[icipation]" in the statute, it did so by explicitly incorporating a set of standards that had been developed by the Civil Service Commission over a period of five decades, largely through the process of written adjudicatory opinions – over 3,000 in all – defining the contours of the law.  *Letter Carriers*, 413 U.S. at 571 (majority); *id.* at 595-96 (dissenting opinion of Justice Douglas).  Based on those opinions, the Civil Service Commission had compiled a detailed set of guidance that "fleshed out the meaning of [the prohibition on active participation] and so developed a body of law with respect to what partisan conduct by federal employees was forbidden by" that restriction.  *Id.* at 572.  It was only after linking the statutory prohibition back to the body of work produced by the Civil Service Commission that the Supreme Court found that the "active part[icipation]" language avoided vagueness concerns:

> It is to these regulations purporting to construe [the statute containing the phrase "active part"] as actually applied in practice, as well as to the statute itself, with its various exclusions, that we address ourselves in rejecting the claim that the Act is unconstitutionally vague and overbroad. . . . [T]he plain import of the 1940 amendment to the Hatch Act is that the proscription

---

ways in multiple NAM committees and other activities," the Act's "vague and broad" language prevented the NAM from advising its members "as to what activities will or will not lead to public disclosure," and that determining "if a member has participated 'actively … in the planning, supervision, or control'" of lobbying poses a "vagueness defect."  The Amundson Declaration ("AmDec"), explains in several paragraphs (¶¶ 16-17) that the NAM cannot "determine if member conduct is 'active' or not."

> against taking an active part in the proscribed activities <u>is not open-ended but is limited to those rules and proscriptions that had been developed under Civil Service Rule I</u> up to the date of the passage of the 1940 Act.

*Letter Carriers*, 413 U.S. at 575-76 (emphasis added).  *See also Legislative Proscription of Partisan Political Activity of Civil Employees*, 87 Harv. L. Rev. 141, 143-44 (1973) (noting that "[t]he *Letter Carriers* Court did not challenge the assertion that, standing alone, the 'active part' formulation fails to provide unambiguous guidance, but reasoned that the selective enforcement and periodic summary of the statute's incorporated Civil Service Commission rulings add sufficient clarity to refute the allegation of vagueness.").

Here, in sharp contrast to the thousands of decisions and other interpretive statements defining the contours of "active part[icipation]," the Legislative Defendants are tellingly able to point only to a single, generic statement in the legislative history that provides two examples of "passive participati[on]"  Leg. Opp. at 36-37 n.24.  Moreover, in contrast to the Hatch Act, the lobbying statute does not itself contain "various exclusions" to the definition of "actively participates."  413 U.S. at 575.  And finally, unlike in *Letter Carriers*, there is no record of adjudicatory proceedings or other binding restatements of the law for the NAM to rely on in the absence of any clear, definitive guidance in the statute (or any guidance at all, for that matter).

### 4.    THE GUIDANCE DOCUMENT DOES NOT CURE THE VAGUENESS.

The Oppositions then assert that any vagueness in the concept of active participation is cured by the guidance document prepared by the Legislative Defendants.  CREW Mem. at 11-14, CLC Mem. at 21-22, Leg. Opp. at 36 n.24.  They make absolutely no response, however, to the NAM's demonstration that the guidance document explicitly denies that it has any legal effect or that anyone is entitled to rely upon it.  Pl. Mem. at 6 n.2.  *See In re Nofziger*, 925 F.2d

428, 448-49 (D.C. Cir. 1991).[19]  Moreover, the Department of Justice has repeatedly emphasized

that decisions and guidance materials issued by "an agent of Congress[] are of course not binding

on the executive branch," including Defendant Taylor.  16 Op. Off. Legal Counsel, 1992 OLC

LEXIS 34, *17 n.10.  *See also* 21 Op. Off. Legal Counsel, 1997 OLC LEXIS 41, *3 (confirming

that "the opinions and legal interpretations of the Comptroller General[, an agent of Congress,]

are not binding upon departments or agencies of the executive branch").[20]  This is particularly

important where, as here, the U.S. Attorney has the independent authority to prosecute certain

violations of the LDA without a referral from the Legislative Defendants.  *See* 2 U.S.C.

§ 1606(b).[21]  Defendants can attempt to ignore both fundamental constitutional principles as well

---

[19]     In addition to the Defendants' general arguments concerning the proper role of the guidance issued by the Legislative Defendants, CREW's amicus filing makes two separate assertions that, while easily refuted, are nevertheless important to address.  First, contrary to CREW's assertion (at 12-13), the Secretary of the Senate and the Clerk of the House are authorized to issue non-binding "guidance," not formal advisory opinions or rulings.  *Compare* 2 U.S.C. § 1605(a)(1) (the Legislative Defendants may issue "guidance and assistance on the registration and reporting requirements") *with* 2 U.S.C. § 437d (the Federal Election Commission "has the power . . . to render advisory opinions [and] to make, amend, and repeal such rules . . . as are necessary to carry out" the campaign finance laws).

Second, citing *Brown v. U.S.*, 327 F.3d 1198 (D.C. Cir. 2003), CREW argues that the guidance provided by the Legislative Defendants "is entitled to 'deference equal to its power to persuade.'"  *Id.* at 1205.  However, as CREW's brief itself states, the court's decision in *Brown* discusses an agency's guidance on a statute "they are entrusted to enforce," CREW Mem. at 13, which is not the case here.  By the statute's plain terms, it is the Attorney General who is entrusted with enforcing the law.  The Secretary of the Senate and the Clerk of the House are not an "agency" and have no enforcement responsibilities.  Thus, *Brown* is of no help to Defendants here.

[20]     By contrast, the Controlled Substances Act ("CSA") expressly provides that another agency shall give binding guidance to the Attorney General.  *See* 21 U.S.C. § 811(b) ("The recommendations of the Secretary to the Attorney General [concerning which substances shall be covered by the CSA] shall be binding on the Attorney General as to such scientific and medical matters, and if the Secretary recommends that a drug or other substance not be controlled, the Attorney General shall not control the drug[.]").

[21]     Section 1606(a)(2), which permits the Justice Department to seek a civil penalty for violating "any other provision of the" LDA, may also be read to authorize the U.S. Attorney to independently prosecute a defective filing by a registrant when no notice of a defective filing is issued by the Clerk of the House or the Secretary of the Senate.  This reading of the statute was supported by the Department of Justice, which reasoned that a bill that "would provide that an

as the plain language of their own guidance, but this does not remedy the vagueness defect inherent in the statute.

Reliance on the informal guidance provided by the Legislative Defendants also raises other concerns. Unbound by the normal constraints of the Administrative Procedure Act, the Legislative Defendants are free to modify or amend their guidance at any time, as they have already done. *See* CLC Mem. at 21 (citing the revised guidance). There is nothing to stop the Legislative Defendants – either the current officeholders or their successors – from reissuing new guidance to interpret the relevant statutory terms in a more (or admittedly less) restrictive manner. *See e.g.*, Tory Newmyer, *Associations Say Sunshine Too Bright: Trade Groups Complaint Ethics Law Mandate to Disclose Membership Is Unfair*, Roll Call, Nov. 7, 2007 (the Superintendent of the Senate Office of Public Records stated that "we don't do rulemaking the way the executive branch does because we're not them. . . . The only thing I can tell you is that the guidance is coming and there will be ample time to digest the nature of the change"). Defendants' other problem, of course, is that vesting the power to give legally effective guidance in purely legislative officers would raise serious separation of powers obstacles, doubly so since the challenged requirement extends to executive branch contacts that have absolutely nothing to do with Congress.[22]

---

action for one type of civil offense could be initiated against a lobbyist only if the congressional agents, pursuant to their interpretation of the statute, issued a notice finding the lobbyist's filing to be deficient" would "raise serious constitutional problems [in that] Congress may not provide for its agents to execute the law." *See* Letter from Andrew Fois, Assistant Attorney General, to the Honorable Henry Hyde, Chairman, House Committee on the Judiciary, (Nov. 7, 1995), contained in H.R. Rep. No. 104-139 at 27 (1995).

[22] "Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law." *Bowsher v. Synar*, 478 U.S. 714, 733 (1986). Thus, requiring the Legislative Defendants to issue "supplemental guidance," as CREW suggests (at 12), would only exacerbate the separation of powers problem.

Although the guidance document cannot provide legal protection for those who rely on it, it does serve as a useful admission by Defendants that the concept of active participation – like other parts of the Amendments – is not facially clear.  Indeed, the examples from the guidance document discussed by the Oppositions make clear that, for participation to be active, it must involve some unspecified degree of substantiality and/or continuity.  For example, the guidance document says that "*occasionally* responding to requests for technical expertise or other information in support of lobbying activities," "attending a *general* meeting," or "expressing a position . . . in a manner open to, *and on par with* that of all members," is not active.  *Lobby Disclosure Act Guidance* at 4, 12-13 (rev. Jan. 25, 2008), *available at*:

http://www.senate.gov/legislative/resources/pdf/S1guidance.pdf (emphasis added).  This is not precise language where core First Amendment rights are restricted on pain of criminal penalty.[23]

## CONCLUSION

The legislation challenged here strikes at the heart of the First Amendment.  It targets those who associate to speak to government officials about vital issues of policy, including redress of grievances.  It compels such expressive associations to collect information concerning and to make difficult judgments about such matters as the intent of other organizations.  It backs up its requirements with the threat of punishment, including possible criminal liability.

---

[23]    The new lobbying registration form compounds the overall vagueness problems inherent in the challenged provision.  Line 13 asks: "Is there an entity other than the client that contributes more than $5,000 to the lobbying activities of the registrant in a quarterly period and either actively participates in and/or in whole or in major part plans, supervises or controls the registrant's lobbying activities?"  *See* Lobbying Registration (LD-1DS) Sample Form, *available at*:
http://lobbyingdisclosure.house.gov/help/WordDocuments/lobbyingregistrationld1dssampleform.htm.  These instructions conflate the standards that apply when a member is listed on a specified Internet website with the standard that otherwise applies.

When such legislation was challenged in *McConnell,* its defenders introduced extensive evidence that the parties and the courts then exhaustively analyzed.  *WRTL II* then made clear that the restriction approved in *McConnell* went only as far as the justifying evidence and no further.

Defendants here provide nothing like the *McConnell* record.  Nor do they even provide clear explanations of precisely what problem Congress was addressing, how the challenged requirement effectively alleviates that particular problem, why less burdensome alternatives will not work, or how the statutory standards confidently can be applied to avoid self-censorship, generally and in the context of membership-driven associations like the NAM.  When all is said and done, their argument boils down to (i) *Harriss* allowed certain very narrow lobbying disclosure, (ii) the congressional focus on "stealth coalitions" should not be taken seriously, (iii) the Court should assume that Congress acted properly, and (iv) precision is not that important after all.

That will not do.  Although the First Amendment may not be absolute, legislation burdening its core rights is serious business and demands much more than has been offered here. The challenged requirement should be declared invalid and Defendants should be enjoined from enforcing it.

Respectfully submitted,

/s/

Thomas W. Kirby  (Bar No. 915231)
E-mail: tkirby@wileyrein.com
Jan Witold Baran  (Bar No. 233486)
E-mail: jbaran@wileyrein.com
Andrew G. Woodson  (Bar No. 494062)
E-mail: awoodson@wileyrein.com

WILEY REIN LLP
1776 K St., NW
Washington, D.C. 20006
202.719.7000

Dated:  March 17, 2008

Counsel for Plaintiff