# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL ASSOCIATION OF
MANUFACTURERS,

    Plaintiff,

      v.

HONORABLE JEFFREY A. TAYLOR,
United States Attorney for the District of
Columbia, *et al.*,

    Defendants.

Civil Action No. 08-208 (CKK)

## MEMORANDUM OPINION
(April 11, 2008)

Plaintiff, the National Association of Manufacturers ("NAM"), brings this action against

Defendants, the Honorable Jeffrey A. Taylor, United States Attorney for the District of Columbia

("Taylor"), the Honorable Nancy Erickson, Secretary of the Senate of the United States

("Erickson"), and the Honorable Lorraine C. Miller, Clerk of the House of Representatives of the

United States ("Miller," and collectively with Erickson, the "Legislative Defendants"). The

NAM challenges § 207 of the Honest Leadership and Open Government Act of 2007

("HLOGA"), Pub. L. No. 110-81, 121 Stat. 735, which amended § 1603(b)(3) of the Lobbying

Disclosure Act of 1995 ("LDA"), 2 U.S.C. § 1601 *et seq.*, and requires disclosure of

organizations (hereinafter referred to as "affiliates") that contribute significantly to the lobbying

activities of a lobbyist's client and actively participate in the planning, supervision, or control of

those lobbying activities. The NAM argues that § 207 violates the First Amendment by

impermissibly burdening its rights and those of its members to speak, associate, and petition the

government, and further argues that § 207 is unconstitutionally vague both on its face and as applied to the NAM.

The NAM filed its Complaint in this action on February 6, 2008, along with a Motion for a Preliminary Injunction barring Defendants from implementing or enforcing § 207 until this Court issued a final ruling on the merits of the NAM's First Amendment claims. The parties and the Court thereafter agreed to convert the NAM's Motion for a Preliminary Injunction into a decision on the merits, with the NAM's Preliminary Injunction application serving as its opening brief. As a result, this opinion addresses the NAM's motion as one for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c). The Court has conducted a searching review of the NAM's opening brief, the Opposition filed by Defendant Taylor and the Opposition filed by the Legislative Defendants, the two *amici* briefs filed in this case by Citizens for Reform and Ethics in Washington ("CREW") and Campaign Legal Center, Democracy 21, and Public Citizen (jointly the "CLC *Amici*"), and the NAM's Reply brief, as well as the relevant statutes and case law. Based upon the foregoing, the Court concludes that § 207 is narrowly tailored to serve compelling government interests, and is neither vague on its face nor as applied to the NAM. The Court shall therefore DENY [3] the NAM's motion for judgment on the pleadings.

## I: BACKGROUND

### A.    *The Parties*

Plaintiff, the National Association of Manufacturers, is a non-profit trade association founded in 1895 "to promote trade, advocate for economic growth, and represent the interests of its members," to "members and employees of the United States Senate and House of

2

Representatives, as well as policy-level employees and officers of the Executive Branch." Pl.'s Compl. for Decl. and Inj. Relief (hereinafter "Compl.") ¶ 4. The NAM's membership includes "over 11,000 corporate members whose interests are allied with America's manufacturing sector." *Id.* ¶ 14. The NAM asserts that its website and other publicly-available materials make clear the types of interests it represents and identifies some of its members, including those represented on its board and in other leadership positions. *Id.* ¶ 4. Nevertheless, the NAM does not publicly list its members, *id.*, and its membership list has been kept confidential for at least the past 30 years, *see* Decl. of Jan Sarah Amundson, Senior Vice Pres. and Gen. Counsel of the NAM, submitted in support of the NAM's Motion for a Preliminary Injunction (hereinafter "Amundson Decl.") ¶ 8.

The NAM describes itself as a member-led organization, and asserts that "its members participate in a number of committees and a wide range of related activities to define and advance the NAM's goals." *Id.* ¶ 14. These activities include approximately 100 meetings per month and a "wide range of other contacts and activities, including telephone calls, emails, and mailings that provide the opportunity for members to participate in the NAM's lobbying." *Id.* In addition to this member participation, the NAM has approximately 35 employees who regularly engage in lobbying activities and whom it has identified in filings under the LDA since that law was enacted in 1995. *Id.* ¶ 15.

The Honorable Nancy Erickson is Secretary of the Senate of the United States, *id.* ¶ 6(a), and the Honorable Lorraine C. Miller is Clerk of the House of Representatives of the United States, *id.* ¶ 6(b). Under the amended LDA, Defendants Erickson and Miller's official responsibilities include receiving mandatory reports concerning lobbying activities, reviewing

them for any deficiencies, and referring cases of apparent noncompliance to the United States

Attorney for the District of Columbia for enforcement action. *Id.* ¶¶ 6(a)-(b); 2 U.S.C. § 1605(a).

In addition, the Legislative Defendants are directed by the amended LDA to "provide guidance

and assistance on the registration and reporting requirements of [the LDA] and develop common

standards, rules, and procedures for compliance." Compl. ¶ 7; 2 U.S.C. § 1605(a)(1). Pursuant

to this provision, Defendants Erickson and Miller promulgated a document entitled "Lobby

Disclosure Act Guidance," which became effective on January 1, 2008. Compl. ¶ 7; *see*

http://www.senate.gov/legislative/resources/pdf/S1guidance.pdf (hereinafter "LDA Guidance").

As the NAM notes in its Complaint, the Introduction section of that document states that the

LDA "does not provide the Secretary or the Clerk with the authority to write substantive

regulations or issue definitive opinions on the interpretation of the law," and further states that

the "guidance document does not have the force of law, nor does it have any binding effect on the

United States Attorney for the District of Columbia." Compl. ¶ 7; LDA Guidance at 1.

The Honorable Jeffrey A. Taylor is the United States Attorney for the District of

Columbia. Compl. ¶ 6(c). His official responsibilities include enforcing the penalty provisions

of the LDA, which provide that the Legislative Defendants shall "notify the United States

Attorney for the District of Columbia that a lobbyist or lobbying firm may be in noncompliance."

*Id.*; 2 U.S.C. § 1605(a).

      B.     *Statutory Background*

          1.     *Previous Lobbying Disclosure Regulations*

               a.     *The Federal Regulation of Lobbying Act of 1946*

In 1945, Congress established a Joint Committee on the Organization of Congress, which

received numerous complaints about the "attempts of organized pressure groups to influence the decision of Congress on legislation pending before the two Houses or their committees," and found that "professionally inspired efforts to put pressure upon Congress cannot be conducive to well considered legislation." *See* Legis. Defs' Opp'n at 5-6 (citing H. Con. Res. 18, 79th Cong. (1945) and quoting S. Rep. 79-1011, at 26).   The Joint Committee recognized "the right of any citizen to petition the Government for the redress of grievances or freely to express opinions to individual Members or to committees on legislation and on current political issues."  S. Rep. 79-1011, at 26.   Nevertheless, the Joint Committee concluded that it was "possible to improve the situation without impairing in any way this freedom of expression," by providing for disclosure of information that "would prove helpful to Congress in evaluating their representations," and recommended that Congress enact legislation "providing for the registration of organized groups and their agents who seek to influence legislation and that such registration include quarterly statements of expenditures made for this purpose."  *Id.* at 26-27.

Congress reacted to the Joint Committee's recommendations by enacting the Federal Regulation of Lobbying Act ("FRLA"), title III of the Legislative Reorganization Act of 1946, Pub. L. No. 79-601, §§ 301-311, 60 Stat. 812, 839-42, codified at 2 U.S.C. §§ 261-270. *See* Legis. Defs' Opp'n at 7.   The FRLA required persons engaged for pay for the "principal purpose" of attempting to influence the passage or defeat of legislation in Congress to register with the Clerk of the House and the Secretary of the Senate, and to disclose:

> their name and address; the name and address of the client for whom they work; how much they are paid and by whom; all contributors to the lobbying effort and the amount of their contribution; an accounting of all monies received and expended, specifying to whom the money was paid and for what purposes; the names of any publications in which the lobbyist has caused articles or editorials to

be published; and the particular legislation they have been hired to support or
oppose.

*Id.* (citing H.R. Rep. No. 104-339, pt. 1 at 2 (1995)).  The FRLA provided for criminal penalties

for violations.  *See* Pub. L. No. 79-601, § 310, 60 Stat. 842.

In 1954, the Supreme Court reviewed and upheld the constitutionality of the FRLA in

*United States v. Harriss*, 347 U.S. 612 (1954).  The Supreme Court first addressed a due process

vagueness claim, and construed the FRLA to apply to "persons" (1) who had "solicited,

collected, or received contributions;" (2) where "one of the main purposes of such 'person,' or

one of the main purposes of such contributions," was "to influence the passage or defeat of

legislation by Congress;" and (3) where "the intended method of accomplishing this purpose"

was "through direct communication with members of Congress."  *Id.* at 623.  So construed, the

Supreme Court held that the FRLA met "the constitutional requirement of definiteness."  *Id.* at

624.  The *Harriss* Court then considered and rejected a First Amendment challenge to the FRLA,

holding that, as narrowed, the statute "do[es] not violate the freedoms guaranteed by the First

Amendment-freedom to speak, publish, and petition the Government."  *Id.* at 625.  In so doing,

the Supreme Court identified the "vital national interest" that the FRLA was designed to

safeguard by explaining that:

> Present-day legislative complexities are such that individual members of Congress
> cannot be expected to explore the myriad pressures to which they are regularly
> subjected.  Yet full realization of the American ideal of government by elected
> representatives depends to no small extent on their ability to properly evaluate
> such pressures.  Otherwise the voice of the people may all too easily be drowned
> out by the voice of special interest groups seeking favored treatment while
> masquerading as proponents of the public weal.  This is the evil which the
> [FRLA] was designed to help prevent.

*Id.* at 625-26.  Significantly, the Court noted that Congress had "not sought to prohibit these

6

pressures," but had "merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose." *Id.* at 625. According to the Court, Congress "want[ed] only to know who is being hired, who is putting up the money, and how much." *Id.* The Court therefore concluded that the FRLA was constitutional, because Congress had used its "power of self-protection . . . in a manner restricted to its appropriate end." *Id.* at 625-26.

b.    *The Lobbying Disclosure Act of 1995*

Within a few years of the FRLA's adoption, President Harry S. Truman began calling for Congress to make changes to the FRLA in order to close loopholes already evident in the bill. *See* 141 Cong. Rec. S10512 (daily ed. July 24, 1995) (statement of Sen. Levin). Reform efforts continued in each decade through the 1990s, with one or both Houses of Congress passing lobbying reform bills that were never enacted into law. *Id.* Attempts to reform the FRLA picked up steam in the early 1990s, as the Subcommittee on Oversight of Government Management of the Senate Committee on Governmental Affairs ("Senate Subcommittee") held hearings on the FRLA's shortcomings and considered potential reform legislation in 1991 and 1992. *See* Legis. Defs. Opp'n at 8-9 (citing *The Federal Lobbying Disclosure Laws: Hrgs Before the Subcomm. on Oversight of Gov't Mgmt. of the Senate Comm. on Gov'tal Affairs*, 102[d] Cong., S. Hrg. 102-377 (1991), and *S. 2279, The Lobbying Disclosure Act of 1992: Hrgs Before the Subcomm. on Oversight of Gov't Mgmt. of the Senate Comm. on Gov'tal Affairs*, 102[d] Cong., S. Hrg. 102-609 (1992)). Among other things, the testimony before the Senate Subcommittee indicated that "[c]orporations or other organizations occasionally hid their identities behind a coalition established or available for the purpose of preventing the public from learning of their efforts to

influence congressional action.  This plainly circumvents the [FRLA's] public disclosure goals."
S. Hrg. 102-609, at 83 (statement of Thomas M. Susman, Chair, ABA Section of Admin. Law
and Reg. Practice); *see also id.* at 34 (statement of Ann McBride, Sr. Vice Pres., Common
Cause) ("Very often those coalition groups operate under very lovely-sounding names, without
the public or sometimes even the Congress having a clear understanding of the groups that are
backing them.  The public has a right to know who is backing these coalition groups . . .").  The
103[d] Congress came particularly close to passing a lobbying disclosure bill, with both the Senate
and the House passing bills mandating disclosure of affiliates that played a substantial role in
lobbying by an association or coalition.  *See* 139 Cong. Rec. 9435 (1993) (passing S. 349); 140
Cong. Rec. 6532 (1994) (passing S. 349 as amended).[1]

In 1995, Congress finally reached agreement on lobbying reform, passing the Lobbying
Disclosure Act of 1995 without opposition, which was signed into law by President William
Jefferson Clinton.  *See* 141 Cong. Rec. 20195 (1995) (bill passed Senate by vote of 98-0); *id.* at
34815-20 (bill passed House by vote of 421-0).  *Inter alia*, the LDA:

- Expanded coverage of lobbying to include contacts with congressional staff and senior executive officials, *see* Pub. L. No. 104-65, § 3(8), 2 U.S.C. § 1602(8);

- Broadened the definition of lobbyist to include "any individual who is employed or retained by a client for financial or other compensation for

---

[1] In the 103[d] Congress, a conference committee reported a reconciled bill that required disclosure of any affiliate that (a) "contributes more than $5,000 toward the lobbying activities of the registrant in a semiannual period," and (b) "participates significantly in the planning, supervision, or control of such lobbying activities."  *See* H.R. Conf. Rep. No. 103-750 (1994). The conference report was agreed to in the House, *see* 140 Cong. Rec. 26782-83 (1994), but the Senate was unable to close debate to bring the matter to a vote.  As seen below, the affiliate disclosure requirement reported by the conference committee is quite similar to the requirement embodied in § 207 of the HLOGA.

> services that include more than one lobbying contact, other than an individual whose lobbying activities constitute less than 20 percent of the time engaged in the services provided by such individual to that client over a six month period," *id.* § 3(10), 2 U.S.C. § 102(10);

- Added a minimum expenditure threshold that triggered disclosure of lobbying activities on behalf of a specific client, *see id.* §§ 3(7), 3(8), 4, 2 U.S.C. §§ 1602(7), 1602(8), 1603;

- Mandated semi-annual reporting of (a) the total amount of lobbying-related income from a specific client (or expenditures by an organization lobbying in its own behalf), (b) the specific issues that were the subject of a lobbyist's efforts, (c) the Houses of Congress and the federal agencies contacted by the lobbyist, (d) the employees of the registrant who acted as lobbyists on behalf of the client, and (e) whether a lobbyist had been employed in the previous two years as a covered executive or legislative branch official, *id.* §§ 4(b), 5(b), 2 U.S.C. §§ 1603(b), 1604(b); and

- Created civil penalties for violations of the LDA, *id.* § 7, 2 U.S.C. § 1606.

*See* Legisl. Defs' Opp'n at 10-11.

In particular, with respect to affiliates, the LDA required registrants to disclose "the name, address, and principal place of business of any organization, other than the client that--

> (A) contributes more than $10,000 toward the lobbying activities of the registrant in a semiannual period . . . ; and

> (B) in whole or in major part plans, supervises, or controls such lobbying activities.

LDA, § 4(b)(3), 2 U.S.C. § 1603(b)(3).  The LDA defined "lobbying activities" as "lobbying contacts and efforts in support of such contacts, including preparation and planning activities, research and other background work that is intended, at the time it is performed, for use in contacts, and coordination with the lobbying activities of others." *Id.* § 3(7), 2 U.S.C. § 1602(7).[2]

---

[2] As discussed below, this definition of "lobbying activities" remains unchanged by the HLOGA.

The House Judiciary Committee report on the LDA explained that the affiliate disclosure requirement was "intended to preclude evasion of the disclosure requirements of the [LDA] through the creation of ad hoc lobbying coalitions behind which real parties in interest can hide." H.R. Rep. No. 104-339, at 18.  However, the LDA, and the House Judiciary Committee report made clear that the term "organization" did not include individuals, LDA, § 3(13), 2 U.S.C. § 1602(13), and was only intended to require the disclosure of the identity of individual member organizations when those members had "become a client," H.R. Rep. No. 104-339, at 13, 18 (citing *NAACP v. Alabama*, 357 U.S. 449 (1958)).

Further, section 8(a) of the LDA explicitly stated that the provisions of the LDA were not to be "construed to prohibit or interfere with – (1) the right to petition the Government for the redress of grievances; (2) the right to express a personal opinion; or (3) the right of association – protected by the first amendment to the Constitution."  LDA, § 8(a), 2 U.S.C. § 1607(a).  Like the FRLA, the LDA required lobbyists and entities whose employees act as lobbyists on their own behalf to file reports with the Secretary of the Senate and the Clerk of the House, *see* LDA, §§ 3(2), 4(a)(1), 5(a), 2 U.S.C. §§ 1602(2), 1603(a)(1), 1604(a), and directed those officers to "provide guidance and assistance on the registration and reporting requirements of [the LDA] and develop common standards, rules, and procedures for compliance with [the LDA]," *id.* § 6(1), 2 U.S.C. § 1605(1).  *See* Legisl. Defs' Opp'n at 12.[3]

---

[3] The Secretary and Clerk promulgated such guidance, which interpreted the term "in whole or in major part plans, supervises, or controls such lobbying activities," by clarifying that "'in major part' means in substantial part.  It is not necessary that an organization . . . exercise majority control or supervision in order to fall within [the relevant provision] . . . . In general, 20 percent control or supervision should be considered 'substantial' for purposes of these sections." *See* Legisl. Defs' Opp'n at 12 n.5 (citing Pre-HLOGA LDA Guidance (applicable prior to Jan. 1, 2008), § 2, http://www.senate.gov/legislative/common/briefing/lobby_disc_briefing.htm).

2.    *The Honest Leadership and Open Government Act of 2007*

The LDA substantially increased the number of individuals and organizations registering as lobbyists. *See id.* at 12 n.6 ("In the first year under the LDA, the number of organizations and individuals registered or identified as lobbyists more than doubled.") (citing General Accounting Office, Comparison of Lobbyists Registrations, NO. B-274543 (GAO/GGD-98-104R, Apr. 28, 1998), *available at* http://archive.gao.gov/paprpdf2/160463.pdf).  Nevertheless, recent Congresses continued to undertake new efforts to refine the LDA's lobbying disclosure provisions, including disclosure of organizations that actively participate in lobbying coalitions and associations. *See* Legislative Transparency and Accountability Act of 2006, S. 2349, 109th Cong. § 217 (2006); Lobbying and Ethics Reform Act of 2005, S. 1398, 109th Cong. § 107 (2005); Stealth Lobbyist Disclosure Act of 2004, H.R. 4937, 108th Cong. (2004).

Spurred by the 2006 Congressional elections and a series of lobbying-related scandals, the Senate passed a lobbying reform bill (S.1) in the first weeks of the 110th Congress. 153 Cong. Rec. S251 (daily ed. Jan. 9, 2007) (statement of Sen. Feinstein) ("I believe one message that was very clear in the last election was the need for Congress to immediately take steps to restore the public's trust"); *id.* at S252 (statement of Sen. Bennett) ("There is some sense that perhaps we are overreacting to the scandals of [Jack] Abramoff and [Randall "Duke"] Cunningham.  I do not believe that S. 1 is an over reaction . . ."); *id.* at S746 (daily ed. Jan. 18, 2007) (S.1 passed by a vote of 96-2).  That bill would have required disclosure of affiliates that met the contribution threshold and "participate[d] in a substantial way in the planning, supervision, or control of such lobbying activities."  S. 1, 110th Cong. § 217 (as passed by Senate, Jan. 18, 2007).  Later in 2007, both Houses passed an amended version of the Senate bill, *id.* at H9210 (daily ed. Jul. 31, 2007)

(passed House by a vote of 411-8); *id.* at S10723 (daily ed. Aug. 2, 2007) (Senate agreed to House amendments by a vote of 83-14), which was signed into law by President George W. Bush, and became the Honest Leadership and Open Government Act of 2007, Pub. L. No. 110-81, 121 Stat. 735. *See* Legisl. Defs' Opp'n at 13.

The HLOGA includes a comprehensive set of reforms addressing Senate and House ethics rules, post-employment restrictions, gifts and travel restrictions, as well as strengthened lobbying disclosures. *Id.* Significantly, the HLOGA establishes criminal penalties and increased the civil penalties previously provided for in the LDA. HLOGA, § 211. As amended, the LDA requires the Clerk of the House and Secretary of the Senate to "notify any lobbyist or lobbying firm in writing that may be in noncompliance with" the LDA. 2 U.S.C. § 1605(a)(7). Section 1606 then provides for a civil fine of "not more than $200,000, depending on the extent and gravity of the violation," upon proof of a "knowing violation by a preponderance of the evidence" for a registrant who "knowingly fails to– (1) remedy a defective filing within 60 days after notice of such a defect by the Secretary of the Senate or the Clerk of the House . . . ; or (2) comply with any other provision of [the amended LDA]." *Id.* § 1606(a). With respect to criminal penalties, the amended LDA provides that "[w]hoever knowingly and corruptly fails to comply with any provision of [the LDA] shall be imprisoned for not more than 5 years or fined . . . or both." *Id.* § 1606(b).

The NAM's challenge focuses on § 207 of the HLOGA, which amended the affiliate disclosure requirements at 2 U.S.C. § 1603(b)(3) in two ways. First, in light of the HLOGA's new quarterly reporting requirement for registrants, Congress changed the monetary threshold for contributions by affiliates to the client's lobbying activities from $10,000 in a semiannual period

to $5,000 in a quarter, and made clear that the contributions could be to either the registrant or the client. *Id.* at 14; Taylor Opp'n at 4; 2 U.S.C. § 1603(b)(3)(A). Second, the HLOGA replaces the "in whole or in major part" standard for the level of participation in lobbying activities that triggers disclosure with a standard requiring disclosure of those affiliates that "actively participate[] in the planning, supervision, or control of such lobbying activities." Legisl. Defs' Opp'n at 14; Taylor Opp'n at 4; 2 U.S.C. § 1603(b)(3)(B). Amended section 1603(b)(3) now requires registrants to disclose "the name, address, and principal place of business" of any affiliate that (i) "contributes more than $5,000 to the registrant or the client in the quarterly period to fund the lobbying activities of the registrant," and (ii) "actively participates in the planning, supervision, or control of such lobbying activities." 2 U.S.C. § 1603(b)(3). Significantly, however, the HLOGA did not alter the definition of "actively participates," but rather retained the definition in effect since the LDA's enactment in 1995, more than twelve years earlier.[4] That definition had never been subject to a First Amendment challenge, a fact that Senator Feingold noted during floor debate on S.1. *See* 153 Cong. Rec. S736 (daily ed. Jan. 18, 2007) (reciting the LDA definition of "lobbying activities" and stating "[t]his term I just mentioned and defined has been in use for over a decade without controversy.").

Section 207 of the HLOGA also adds another means of affiliate disclosure to 2 U.S.C. § 1603(b)(3), providing that if an organization that "would be identified as affiliated with the client" by meeting the section's disclosure requirement "is listed on the client's publicly

---

[4] In addition, the HLOGA did not alter the scope of activities to which lobbying disclosure requirements applied from that established in the LDA. As under the LDA, section 1603(b)(3)'s disclosure requirements pertain to lobbying regarding nominations to positions that require Senate confirmation, pending federal regulations, and other significant governmental activities, in addition to pending legislation. *See* Taylor Opp'n at 5, 2 U.S.C. § 1602(8).

accessible Internet website as being a member of or contributor to the client," that organization

need not be disclosed in the registrant's filing unless it meets the higher participation standard of

"in whole or in major part" planning, supervising, or controlling the registrant's lobbying

activities. Legisl. Defs' Opp'n at 15; 2 U.S.C. § 1603(b)(3). Section 207 of the HLOGA further

clarifies that nothing in subparagraph (B) of 2 U.S.C. § 1603(b)(3) "shall be construed to require

the disclosure of any information about individuals who are members of, or donors to, an entity

treated as a client by [the HLOGA] or an organization identified under that paragraph." *Id.*

In a joint statement described as a "section-by-section analysis" of S.1, the bill's principal

authors, Senators Feinstein, Lieberman, and Reid, explained that § 207 "closes a loophole that

has allowed so-called 'stealth coalitions,' often with innocuous-sounding names, to operate

without identifying the interests engaged in the lobbying activities." 153 Cong. Rec. S10709

(daily ed. Aug. 2, 2007). Similar pronouncements abounded throughout the floor debate on S.1.

For instance, when the bill was initially introduced, Senator Lieberman explained that it

> would also remove the cloak obscuring so-called stealth lobbying campaigns
> which occur when a group of individuals, companies, unions, or associations ban
> together to form a lobbying coalition. These coalitions frequently have innocent-
> sounding names that give the impression they are promoting positive mom-and-
> pop, apple pie goals. But, in fact, they lobby on a range of issues that could never
> be identified by the name of the coalition.

153 Cong. Rec. S260 (daily ed. Jan. 9, 2007); *see also id.* at H5743 (daily ed. May 24, 2007)

(statement of Rep. Doggett) ("for over five years I have attempted to close a gaping loophole in

the [LDA] that has permitted various lobbyists to form over 800 stealth or hidden coalitions to

avoid the requirements of the act. . . This stealth lobbyist disclosure provision helps close this

14

loophole.").[5]

Section 207's new affiliate disclosure threshold applies to registrations after January 1, 2008, and to quarterly reports covering activity beginning on January 1, 2008.  HLOGA § 215. The first set of quarterly reports under amended section 1603(b)(3) are due on April 21, 2008. *Id.* § 201(a)(1)(B).  Following the HLOGA's enactment, the Secretary of the Senate and Clerk of the House issued guidance on § 207, which explains that "[a]n organization 'actively participates' in the planning, supervision, or control of lobbying activities of a client or registrant when that organization (or an employee of the organization in his or her capacity as an employee) engages directly in planning, supervising, or controlling at least some part of the lobbying activities of the client or registrant."  LDA Guidance eff. Jan. 1, 2008, http://www.senate.gov/ legislative/resources/pdf/S1guidance.pdf at 4.  The guidance distinguishes actively participating organizations from those that "though members of, or affiliated with a client, have only a passive role in the lobbying activities of the client (or of the registrant on behalf of the client)," and

---

[5] The NAM correctly notes in its Reply that when Representative Doggett made this remark, he was discussing a version of the bill that contained an exemption to the affiliate disclosure requirements for certain 501(c) organizations.  *See* NAM Reply at 9 & n. 9-10. Nevertheless, Representative Doggett's remarks demonstrate that the focus of the amendments as to the affiliate disclosure requirement was on so-called "stealth coalitions."  The NAM does not clearly state whether it would have been exempted from the affiliate disclosure requirements in the House-backed version of the bill, but argues that the House-backed version demonstrates that § 207 was not intended to "apply to an established 501(c) organization like the NAM."  *Id.* at 10. However, the House-backed version was not enacted into law, and therefore does not demonstrate the intended scope of the bill as enacted.  Moreover, the NAM's apparent belief that established 501(c) organizations pose no issues with respect to lobbying is belied by the fact that congressional investigations of the activities of former lobbyist Jack Abramoff "identified the blatant misuse of tax-exempt entities as 'pass-throughs' to distribute money for lobbying and other purposes."  William V. Lunenberg & Thomas M. Susman, *Lobbying Disclosure: A Recipe for Reform*, 33 J. Legis. 32, 48 (2006) (citing Susan Schmidt & James V. Grimaldi, *Nonprofit Groups Funneled Money for Abramoff*, Wash. Post. June 25, 2006, at A1).

provides detailed examples of both active and passive participation. *Id.* The guidance thus echoes a distinction made in the joint statement issued by Senators Feinstein, Lieberman, and Reid, which emphasizes that "[e]ntities or organizations that have only a passive role–e.g., mere donors, mere recipients of information and reports, etc.–would not be considered to be 'actively participating' in the lobbying activities." 153 Cong. Rec. S10709 (daily ed. Aug. 2, 2007).

 C. *The NAM's Allegations*

 The NAM's Complaint asserts that § 207, "if read literally" would require the NAM and other organizations "that petition the federal government for their members to publicly identify their organizational supporters in violation of the First Amendment." Compl. ¶ 8. According to the NAM, hundreds of its "corporate members make annual contributions that, when allocated among the association's activities, meet the financial prong of the amended [LDA's affiliate] disclosure obligations." *Id.* ¶ 14. The NAM further states that "[s]ome of those members have dozens of employees who participate in various committees and other activities." *Id.*

 The NAM asserts that its "lobbying activities often touch on hot-button topics such as global warming, nuclear power, or labor relations that provoke responses beyond civil debate." *Id.* ¶ 16. According to the NAM, "[t]aking policy positions that are unpopular with other groups may lead to boycotts, political pressure, shareholder suits, or other forms of harassment," and may make companies litigation targets. *Id.* The Declaration of Jan Sarah Amundson that the NAM proffers in support of its motion asserts that the NAM's lobbying activities "may lead to adverse consequences for members identified as 'actively participat[ing] in such efforts." Amundson Decl. ¶ 10 (alteration in original). Ms. Amundson supports her assertion with citations to five newspaper articles and one lawsuit involving a labor union. *Id.* However, as the

16

Legislative Defendants correctly note in their Opposition, the lawsuit cited in Ms. Amundson's Declaration involved harassment of a utility construction company in Alaska and its non-union employees by a labor union and its members, but did not include any suggestion that the company involved was a member of the NAM or was subject to harassment for participating in the NAM's lobbying activities. *See* Legisl. Defs' Opp'n at 32 n.20; *IBEW, Local 1547 v. Alaska Util. Constr., Inc.*, 976 P.2d 852 (Alaska 1999). Similarly, the newspaper articles Ms. Amundson cites do not describe participation in the NAM's lobbying activities or harassment resulting therefrom.[6] Thus, neither the NAM's Complaint nor the Declaration supporting its Motion for a Preliminary Injunction describes actual harm or harassment that has befallen either the NAM, or any of its members whose identities are publicly available on the NAM's website, as a result of the NAM's lobbying activities.

Nevertheless, the NAM posits that its members "will wish to avoid linkage to the association's lobbying activities on particular issues." *Id.* ¶ 17. As a result, the NAM asserts, "members that are concerned about the possibility of disclosure will limit their support for and participation in the NAM to the extent necessary to avoid the risk of being named in the NAM reports." *Id.* ¶ 19. Further, the NAM asserts that its members are "urgently questioning whether continued support for and participation in core petitioning, speech, and associational activities will require disclosure." *Id.* ¶ 28. According to the NAM, however, "given the ambiguous

---

[6] The articles Ms. Amundson cites include: David Rising, *Clashes Break Out Ahead of Summit*, Assoc. Press, June 3, 2007; Peter Geier*, Sea Change in Asbestos Torts is Here: New Strategies, New Defendants Seen*, Nat'l Law J., Oct. 31, 2005; Robert Pear, *Doctors in Antitrust Fight Boycott Merck Products*, N.Y. Times, May 23, 2000; Harry Stoffer, *Toyota Joins Detroit 3 in CAFÉ Fight*, Automotive News, July 30, 2007; and Jim Lobe, *ExxonMobil Takes Heat on Global Warming*, Inter Press Service News Agency, July 12, 2005, *available at* http://www.ipsnews.net/print.asp?idnews=29469. *See* Amundson Decl. ¶ 10.

statutory language and the potential breadth of the disclosure requirements, the NAM is unable to provide clear guidance to its members as to what activities will or will not require public disclosure" under § 207.  *Id.* ¶ 17.  The NAM asserts that it will suffer First Amendment injuries as a result, because it relies extensively on member volunteers and "must self-censor to avoid initiating lobbying activities that members will be unwilling to support at the risk of disclosure or that may expose members to undesired disclosure."  *Id.* ¶ 20.  In addition, the NAM claims that it "has no existing mechanisms to track and identify members who would be subject to disclosure," and that "[a]ttempting to establish such mechanisms would disrupt excessive associational activities and divert unrecoverable resources from core First Amendment activities."  *Id.* ¶ 29. Finally, the NAM asserts that it is not the only association facing difficulty, but rather that it has "determined that confusion over the meaning of [§ 207] is widespread."  *Id.* ¶ 23.

The NAM's Complaint and Motion for Preliminary Injunction make three main claims, all premised on the First Amendment.  First, the NAM claims that section 1603(b)(3), as amended by § 207, unconstitutionally burdens the First Amendment rights of the NAM and its members to speak, to petition the government, and to join in expressive associations because it is not narrowly tailored to serve a compelling governmental interest.  *Id.* ¶¶ 26(b)-(c).  Second and third, the NAM claims that § 207 is unconstitutionally vague on its face and as applied to the NAM.  *Id.* ¶ 26(a); NAM Mot. at 25-26.

D.    *Procedural History*

The NAM filed its Complaint and Motion for a Preliminary Injunction on February 6, 2008.  On February 7 and February 8, 2008, the Court held telephone conference calls on the record with counsel for all parties participating, during which the parties and the Court agreed to

18

treat the NAM's preliminary injunction motion as a motion for judgment as a matter of law, with

the NAM's preliminary injunction application to serve as its opening brief.  *See* Minute Order

(D.D.C. Feb. 8, 2008).  Also during those conference calls, the Court set a schedule for the

briefing of the NAM's motion for judgment as a matter of law, as well as for any non-merits

motions that Defendants deemed appropriate.  *Id.*  The Court and the parties agreed, however,

that Defendants would not be required to file dispositive motions, rather, in the event that the

Court ruled in favor of Defendants on the merits, the NAM agreed to a dismissal of this action

with prejudice.  *Id.*  None of the Defendants filed any non-merits motions.  Instead, the

Legislative Defendants and Defendant Taylor filed Oppositions on February 29, 2008, and the

NAM filed its Reply on March 17, 2008.  In addition, CREW and the CLC *Amici* filed motions

for leave to file *amici* briefs, which the Court granted, and those briefs were filed on February 29,

2008.  The NAM's motion for judgment as a matter of law is therefore ripe for review.

## II: LEGAL STANDARD

A motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure

12(c) shall be granted if the moving party demonstrates that "no material fact is in dispute and

that it is entitled to judgment as a matter of law."  *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d

1483, 1485 (D.C. Cir. 1992) (internal quotation omitted).  The standard for reviewing a motion

for judgment on the pleadings is the same as that applied to a motion to dismiss for failure to

state a claim upon which relief can be granted under Rule 12(b)(6).  *Dale v. Exec. Office of the

President*, 164 F. Supp. 2d 22, 24 (D.D.C. 2001).  The Federal Rules of Civil Procedure only

require that a complaint contain "'a short and plain statement of the claim showing that the

pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is

19

and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. ___, 127 S. Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *accord Erickson v. Pardus*, 551 U.S. ___, 127 S. Ct. 2197, 2200 (2007) (per curiam).

Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* at 1964-65; *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986). Instead, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp.*, 127 S. Ct. at 1965 (citations omitted). In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court must construe the complaint in the light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations. *In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994). While the court must construe the Complaint in the Plaintiff's favor, it "need not accept inferences drawn by the plaintiff[] if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). The court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record. *See E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993).

### III:  DISCUSSION

The NAM's Complaint only challenges § 207 of the HLOGA, which, as discussed above, amended the affiliate disclosure requirement of the LDA.  Nevertheless, the NAM's briefs in connection with its motion for judgment on the pleadings describe what it perceives as the potential impact of § 207 in very sweeping terms.  *See, e.g.*, NAM Mot. at 25, NAM Reply at 2-3.  The Court therefore reiterates at the outset what the NAM is *not* challenging in this action.  In the NAM's own words, it "does not challenge the power of Congress to require some registration of professional lobbyists and disclosure of their clients through precise and narrowly-tailored provisions."  Compl. ¶ 24.  Moreover, as Defendants point out, many of the operative elements of § 207–the definition of lobbying activities and the scope of the term lobbying contacts, for instance–have not changed since the LDA was enacted in 1995.  Taylor Opp'n at 4-5, Legisl. Defs Opp'n at 37.  Indeed, as noted above, prior to the HLOGA amendments, the LDA required disclosure of affiliates who contributed more than $10,000 to fund a registrant's lobbying activities within a six-month period and who "in whole or in major part" planned, supervised, or controlled those lobbying activities. 2 U.S.C. § 1603(b)(3) (1995).[7]  The NAM's challenge is thus limited to the LDA amendment embodied in HLOGA § 207 that requires the NAM to disclose those of its organizational members that (1) contribute more than $5,000 in a quarterly period to fund the NAM's lobbying activities, and (2) "actively participate" in the planning, supervision, or control of those lobbying activities.  The Court now turns to that challenge, which

---

[7] As noted above, and as Defendants stress, during the twelve years that the LDA was in effect prior to the enactment of the HLOGA, neither the NAM nor any other entity challenged the LDA's affiliate disclosure requirements (or its corresponding definitions) on constitutional grounds.  Taylor Opp'n at 5.

includes three main arguments: first, that § 207 impermissibly burdens the First Amendment

rights of the NAM and its members;[8] second, that § 207 is unconstitutionally vague on its face;

and third, that § 207 is unconstitutionally vague as applied to the NAM.

> A.     *The NAM's Claim That Section 207 Impermissibly Burdens the First Amendment Rights of the NAM and Its Members*

> 1.     *The Court Shall Apply Strict Scrutiny to Section 207*

The NAM's first argument is that § 207 impermissibly burdens the core First Amendment

rights of the NAM and its members.  The parties (and *amici*) do not agree on the standard to

apply to this challenge.  According to the NAM, § 207 constitutes a burden on three fundamental

First Amendment freedoms–the right to speak (particularly anonymously), the right to petition

the government for the redress of grievances, and the right to expressive and political

association–and thus is only permissible if it survives strict scrutiny.  *See* NAM Mot. at 16-18,

20-23.  Defendants do not dispute the NAM's claim that § 207 implicates the First Amendment

rights of the NAM and its members, but rather argue that *Harriss* and other Supreme Court cases

---

[8] The Court notes that Defendants do not challenge the NAM's standing to bring this action either on its own behalf or on behalf of its members.  Further, it appears that NAM has standing to challenge § 207 and that this controversy is justiciable at this time because the NAM is regulated by the LDA and will be subject to the requirements of § 207.  *See Reg'l Rail Reorg. Act Cases*, 419 U.S. 102, 143 (1974) ("Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect.") (citations omitted); *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) (standing "requirement is met here, as the law [at issue] is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution.") (citations omitted).  Further, the NAM appears to have standing to assert claims on behalf of its members because the NAM's members would otherwise have standing to sue in their own rights, their interests are germane to the NAM's purpose, and the NAM's members claims and the relief sought do not require individualized participation.  *See Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1265 (D.C. Cir. 2004); *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977).

indicate that only intermediate or "exacting" (which Defendants suggest connotes something other than strict) scrutiny applies to the lobbying disclosure requirement at issue.

In *Harris*, the Supreme Court upheld the constitutionality of the FRLA against a facial First Amendment challenge, finding that its disclosure requirement served a "vital national interest" "in a manner restricted to its appropriate end." *See* 347 U.S. 612. Although *Harriss* was less than explicit about the level of constitutional scrutiny applied, it appears that the Supreme Court "did not subject the lobbying restrictions to the demands of strict scrutiny." *Fla. League of Prof. Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 460 (11th Cir. 1996) (hereinafter "*FLPL*"). As a result, a number of lower federal courts and state courts considering state lobbying disclosure requirements have interpreted *Harriss* as requiring less than strict scrutiny, "and have rejected broad constitutional attacks on lobbying disclosure requirements." *Id.*; *see also Comm'n on Indep. Colleges & Univs. v. New York Temp. State Comm'n on Reg'n of Lobbying*, 534 F. Supp. 489, 497 (1982) (hereinafter "*CICU*") (upholding New York lobbying statute); *Kimbell v. Hooper*, 665 A.2d 44, 47-48 (Vt. 1995) (upholding Vermont lobbying statute); *Fair Political Practices Comm'n v. Sup. Ct. of Los Angeles*, 599 P.2d 46, 54 (Cal. 1979) (upholding portions of California lobbying statute). Defendant Taylor argues that this Court should follow that trend and apply the equivalent of the modern intermediate scrutiny standard to § 207. *See* Taylor Opp'n at 9-10; *Edenfield v. Fane*, 507 U.S. 761,767 (1993) (intermediate scrutiny requires asking "whether the State's interests . . . are substantial, whether the challenged regulation advances these interests in a direct and material way, and whether the extent of the restriction on protected speech is reasonable in proportion to the interests served.").

The Legislative Defendants take the *Harriss* argument a step further, asserting that § 207

is constitutional because its disclosure provision "falls within the scope of the lobbying disclosure approved in *Harriss*" because it is "nothing more than a requirement that a registrant disclose 'who is being hired, who is putting up the money, and how much.'" Legisl. Defs' Opp'n at 20 (quoting *Harriss*, 347 U.S. at 625). However, as the NAM correctly points out, *Harriss* was decided before the Supreme Court formulated the levels of scrutiny currently applied in First Amendment challenges, and the provision at issue in *Harriss*, as narrowed by the Supreme Court in light of the vagueness challenge in that case, applied to a narrower scope of activity than § 207 does. As such, the Court cannot conclude that § 207 is constitutional on the basis of *Harriss* alone.

Furthermore, the NAM alleges that § 207 impermissibly burdens its core First Amendment rights and those of its members. Specifically, the NAM argues that § 207 burdens speech itself because its disclosure requirements are triggered by "lobbying contacts," which are defined as "any oral or written communication," and activities undertaken in preparation for such contacts. NAM Mot. at 20; *see also* 2 U.S.C. §§ 1602(8), 1603(b)(3). To be sure, the Supreme Court has emphasized that "there is practically universal agreement that a major purpose of [the First] Amendment is to protect the free discussion of governmental affairs." *First National Bank of Boston v. Belotti*, 435 U.S. 765, 776-77 (1978). In addition, the NAM argues that § 207 burdens its members' "rights of association and of petition" and in particular to join together with others of "common interests" to "freely inform the government of their wishes." *Calif. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972); *E. R.R. Pres. Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137-38 (1961); *see also* NAM Mot. at 20-2. Indeed, the Supreme Court has described the right to political association as "closely allied to freedom of

24

speech and a right which, like free speech, lies at the foundation of a free society." *Buckley v. Valeo*, 424 U.S. 1, 25-26 (1976).[9]

Although the NAM thus identifies at least three First Amendment freedoms–speech, petition, and association–implicated by § 207, it should be noted at the outset that the NAM alleges only an indirect burden on those rights because § 207's disclosure requirements do not in anyway prohibit either the NAM or its members from engaging in protected First Amendment activity. Nevertheless, the Court accepts (as it must on a motion for judgment on the pleadings) the NAM's claim that § 207 allegedly substantially burdens the core First Amendment rights of the NAM and its members, albeit indirectly.[10] In *Buckley*, the Supreme Court considered, among

_____

[9] The NAM also argues that § 207's disclosure requirement impairs its members' rights to anonymous speech, citing *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342-43 (1995) and *Buckley v. Am. Const. Law Found.*, 525 U.S. 182, 203 (1999). *See* NAM Mot. at 22. As the CLC *Amici* point out, however, those cases are distinguishable because they involved compelled disclosures of the identities of individuals involved in ballot initiative processes and rested in part on those individuals' privacy rights. While corporations do have constitutional rights to speech, *see Belotti*, 435 U.S. at 776-77, "corporations can claim no equality with individuals in the enjoyment of a right to privacy." *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950); *see also Resolution Trust Corp. v. Wade*, 18 F.3d 943, 948 (D.C. Cir. 1994). Furthermore, the NAM's argument that § 207 burdens a right to anonymous speech is undercut by the fact that it does not generally challenge the LDA's disclosure requirements. In any event, it appears that the NAM's concerns regarding an alleged burden on anonymous speech are covered by its claim that § 207 unduly burdens its members' rights of political association by compelling disclosure of their affiliation with the NAM. *See NAACP v. Alabama*, 357 U.S. at 461-62. For these reasons, the Court does not separately consider the NAM's claim that § 207 impermissibly burdens its members rights to anonymous speech.

[10] Furthermore, various Supreme Court opinions have suggested–without explicitly concluding as much–that lobbying itself is protected by the First Amendment. *See Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 545 (1983) (stating in dicta that "the government may not deny a benefit to a person because he exercises a constitutional right" in the context of a claim that the Internal Revenue Code's failure to exempt attempts to influence legislation violated the First Amendment); *id.* at 552 (Blackmun, J., concurring) (stating in dicta that "lobbying is protected by the First Amendment") (citing *Noerr*, 365 U.S. at 137-38); *see also Belotti*, 435 U.S. at 792 n.31 (stating in dicta that "the First Amendment protects the right of

other provisions of the Federal Election Commission Act ("FECA"), its requirement that political committees register and disclose the names and addresses of people making contributions or expenditures of over $100 to the political committee. *Buckley*, 414 U.S. at 60-64. The Court upheld FECA's disclosure requirement, but noted that "significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest." *Id.* at 64-65. Rather, "the subordinating interests of the State must survive exacting scrutiny," and there must "be a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed." *Id.* at 65. More recently, in *McConnell v. FEC*, 540 U.S. 93 (2002), the Supreme Court upheld new disclosure requirements included in the Bipartisan Campaign Reform Act ("BCRA") based on the "important state interests" identified by the *Buckley* court. *Id.* at 196.

Thus, as Defendants correctly argue, neither *Buckley* nor *McConnell* utilized the traditional language of the strict scrutiny standard. However, in other contexts, the Supreme Court has indicated that "exacting" and "strict" scrutiny are one and the same. *See McIntyre*, 514 U.S. at 347 ("When a law burdens core political speech, we apply 'exacting scrutiny' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest.") (citing *Belotti*, 435 U.S. at 786); *see also Burson v. Freeman*, 504 U.S. 191, 198 (1992) (determining that the regulation at issue "must be subjected to exacting scrutiny: The State must show that the 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'") (citations omitted). In sum, the relevant case law does not readily reveal the

---

corporations to petition legislative and administrative bodies") (citing *Calif. Motor Transp. Co.*, 404 U.S. at 510-11 and *Noerr*, 365 U.S. at137-38).

level of scrutiny that is properly applied to § 207's disclosure requirement. However, as the D.C.

Circuit recognized when faced with a similarly difficult decision as to whether to apply

intermediate or strict scrutiny, "[i]f the [statute] can withstand strict scrutiny there is no need to

decide the issue." *SEC v. Blount*, 61 F.3d 938, 943 (D.C. Cir. 1995). Therefore, the Court

applies strict scrutiny and, as discussed below, concludes that § 207 survives that level of

review.[11]

> 2. *Section 207 Survives Strict Scrutiny*

In *Blount*, the D.C. Circuit described the strict scrutiny inquiry as involving the following

three parts:

> (1) whether the interests the government proffers in support of [§ 207] are
> properly characterized as 'compelling'; (2) whether the [section] effectively
> advances those interests, i.e., whether [Defendants have] shown that the ills [they
> claim the section] addresses in fact exist and the [section] will materially reduce
> them; and (3) whether [§ 207] is narrowly tailored to advance the compelling
> interests asserted, i.e., whether less restrictive alternatives to the [section] would
> accomplish the government's goals equally or almost equally effectively[.]

---

[11] The Eighth Circuit recently concluded that a "compelling" government interest existed
for a lobbying disclosure requirement in *Minnesota Citizens Concerned for Life, Inc. v. Kelley*,
427 F.3d 1106, 1111 (8th Cir. 2005) (hereinafter "*MCCL*"), and the Ninth Circuit explicitly
applied strict scrutiny to a campaign finance disclosure requirement in *California Pro-Life
Council, Inc. v. Getman*, 328 F.3d 1088, 1101 n.16 (9th Cir. 2003), notwithstanding *Buckley*'s
references to "exacting" scrutiny. Defendant Taylor argues that those courts erred by relying on
*Buckley* rather than *Harriss* because of the Supreme Court's instruction in *Rodriguez de Quijas v.
Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989) that "[i]f a precedent of [the
Supreme] Court has a direct application in a case, yet appears to rest on reasons rejected in some
other line of decision, the [lower court] should follow the case which directly controls, leaving to
[the Supreme] Court the prerogative of overruling its own decisions."). *See* Taylor Opp'n at 9
n.6. The Court is mindful of the Supreme Court's instruction, and certainly does not conclude
herein that *Buckley* or *McConnell* overrules *Harriss*. Rather, because *Harriss* did not clearly
establish the level of scrutiny applied to the FRLA, the Court errs on the side of caution by
applying strict scrutiny. The Court's conclusion that § 207 survives strict scrutiny in turn
obviates the need to rule on whether that section survives lesser intermediate scrutiny.

61 F.3d at 944 (citations omitted).  The Court addresses each requirement of the strict scrutiny standard in turn, ultimately concluding that § 207 meets all three.

a.     *The Government Asserts Legitimate and Compelling Interests*

The Defendants' Oppositions identify two main interests underlying the enactment of § 207.  First, as described above, Congress' professed purpose in enacting § 207 was to "close[] a loophole that has allowed so-called 'stealth coalitions,' often with innocuous-sounding names, to operate without identifying the interests engaged in the lobbying activities."  153 Cong. Rec. S10709 (daily ed. Aug. 2, 2007) (statement of Sens. Feinstein, Lieberman, and Reid); *see also* 153 Cong. Rec. S260 (daily ed. Jan. 9, 2007) (statement of Sen. Lieberman) (explaining that S.1 would "remove the cloak obscuring so-called stealth lobbying campaigns . . . [by] coalitions that . . . lobby on a range of issues that could never be identified by the name of the coalition."); *id.* at H5743 (daily ed. May 24, 2007) (statement of Rep. Doggett).  Indeed, in enacting both the 1995 LDA and the 2007 HLOGA, Congress extolled the virtues of and the need for transparency regarding the influence of lobbyists on government decisions.  *See id.* at S258 (daily ed. Jan. 9, 2007) (statement of Sen. Collins) ("[t]he knowledge that the public will be able to scrutinize in detail the activities of a lobbying firm and contacts between Members and lobbyists will provide much needed transparency in this whole area" and "allow citizens to decide for themselves what is acceptable and what is not."); 141 Cong. Rec. S10513 (daily ed. July 24, 1995) (statement of Sen. Levin) ("the public has a right to know, and the public should know, who is being paid to lobby, how much they are being paid, on what issue.").

In enacting the 1995 LDA, Congress expressly found that "responsible representative Government requires public awareness of the efforts of paid lobbyists to influence the public

decisionmaking process in both the legislative and executive branches of the Federal

Government." 2 U.S.C. § 1601(1). The *Harris* Court described this very interest as an

"important" and "vital national interest," proclaiming that "full realization of the American ideal

of government by elected representatives depends to no small extent on their ability to properly

evaluate such pressures." 347 U.S. at 625-26; *see also Buckley*, 424 U.S. at 66-67. The Court

thus easily concludes that the interest in providing Congress and the electorate with information

regarding "who is being hired, who is putting up the money, and how much," *Harriss*, 347 U.S.

at 625, is properly described as compelling.

Defendants identify a second interest served by § 207 and other lobbying disclosure

requirements: "avoid[ing] the appearance of corruption by exposing large contributions and

expenditures to the light of publicity." Legisl. Defs' Opp'n at 22 (quoting *Buckley*, 424 U.S. at

67 and citing *McConnell*, 540 U.S. at 196). The Supreme Court has expressly noted that

lobbying disclosures may support this interest, stating that "[t]he activities of lobbyists who have

direct access to elected representatives, if undisclosed, may well present the appearance of

corruption." *McIntyre*, 514 U.S. at 1524 n.20. Congress similarly recognized this interest in

enacting the LDA in 1995, finding that "effective public disclosure of the identity and extent of

the efforts of paid lobbyists to influence Federal officials in the conduct of Government actions

will increase public confidence in the integrity of Government." 2 U.S.C. § 1601(3). That

sentiment was echoed during the floor debates on both the LDA and the HLOGA. *See* 141 Cong.

Rec. S10512-13 (daily ed. July 24, 1995) (statement of Sen. Levin) ("If we want the public to

have confidence in our actions, this business has to be conducted more in the sunshine.

Lobbying disclosures will enhance public confidence in government by ensuring that the public

is aware of the efforts that are made by paid lobbyists to influence public policy."); 153 Cong.

Rec. S258 (daily ed. Jan 9, 2007) (statement of Sen. Collins) (S.1 "would reform the lobbying

and ethics rules to increase disclosure and to ban practices that might be called into question or

create an appearance of wrongdoing.  We need to assure the American people that the decisions

we make are decisions of integrity, in which their interests are put first."); *id.* at S10691 (daily

ed. Aug. 2, 2007) (statement of Sen. Lieberman) ("This sweeping legislation shines much needed

light in corners and corridors of this Capitol too long left in the dark.  It should help restore the

public's trust now, a trust that is in much need of restoration.").

 Again, the Court easily concludes that the interest in avoiding the appearance of

corruption is a compelling one.  As the *Buckley* Court explained, "Congress could legitimately

conclude that the avoidance of the appearance of improper influence 'is also critical . . . if

confidence in the system of representative Government is not to be eroded to a disastrous

extent.'"  424 U.S. at 27 (quoting *CSC v. Letter Carriers*, 413 U.S. 548, 565 (1973)).  Indeed, in

discussing the interests underlying the campaign finance disclosures at issue in that case, the

Court declared that "[t]here are governmental interests sufficiently important to outweigh the

possibility of infringement [on First Amendment rights], particularly when the free functioning

of our national institutions is involved."  *Id.* at 66.  Since *Buckley*, a number of other federal and

state courts have reached the same conclusion in considering lobbying disclosure requirements.

*See MCCL*, 427 F.3d at 1111 ("Both the Supreme Court and this court have upheld lobbyist-

disclosure statutes based on the government's 'compelling' interest in requiring lobbyists to

register and report their activities, and avoiding even the appearance of corruption."); *Kimbell*,

665 A.2d at 48 ("lobbying disclosure laws are supported by several compelling interests"); *cf.*

*CICU*, 534 F. Supp. at 494; *FLPL*, 87 F.3d at 460-61.  Having thus concluded that the

Government has met its first burden under the strict scrutiny standard, the Court turns to the next.

> b.      The Government Has Shown That Section 207 Will Materially
>         Further The Compelling Interests Identified

The NAM does not meaningfully dispute that the interests Defendants identify as

underlying § 207 are compelling.  Rather, the NAM argues that Defendants "'must do more than

simply posit the existence of the disease sought to be cured.  It must demonstrate that the recited

harms are real, not merely conjectural, and that the regulation will in fact alleviate the harms in a

direct and material way.'"  NAM Reply at 7 (quoting *FEC v. NRA*, 254 F.3d 173, 191 (D.C. Cir.

2001) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994))).  The NAM is, of course,

correct.  Nevertheless, the Court concludes that Defendants have done so in a manner appropriate

to the scale of the change actually embodied in § 207.

The Court's discussion above of the compelling interests fostered by lobbying disclosures

sufficiently establishes that the "recited harms are real, not merely conjectural."  *Turner Broad.*

*Sys.*, 512 U.S. at 664.  Moreover, as the Legislative Defendants forcefully argue, "the specific

disclosure provision at issue here, amended section 1603(b)(3) [HLOGA § 207], furthers these

interests by ensuring that the LDA's reporting requirements are not easily circumvented."  Legisl.

Defs' Opp'n at 24.  As discussed above, prior to its 2007 amendment, the LDA required the

disclosure of organizations, other than clients, that funded and participated in lobbying by

registrants in order "to preclude evasion of the disclosure requirements of the [LDA] through the

creation of ad hoc lobbying coalitions behind which real parties in interest can hide."  H.R. Rep.

No. 104-339, pt. 1, at 18.  However, because the LDA only required disclosure of affiliates who

"in whole or in major part plan[ned], supervise[d], or control[led]" a registrant's lobbying

activities, 2 U.S.C. § 1603(b)(3) (1995), where no member of a coalition met that threshold, the

LDA did not require disclosure of even those coalition members who were substantially involved

in the coalition's lobbying activities.  CLC *Amicus* Br. at 12; Alison Mitchell, *Loophole Lets*

*Lobbyists Hid Clients' Identity*, N.Y. Times, July 5, 2002.  Apparently, this very situation applied

to the NAM itself; as a "broad-based association of over 11,000 members, such control by a

member did not occur," and the NAM was consequently not required to disclose the identity of

those members who played a significant role in the NAM's lobbying activities.  NAM Reply at

22.  As Senators Feinstein, Lieberman, and Reid explained in their joint statement, § 207 of the

HLOGA was specifically intended to "close[] a loophole that ha[d] allowed so-called 'stealth

coalitions,' often with innocuous-sounding names, to operate without identifying the interests

engaged in the lobbying activities."  153 Cong. Rec. S10709 (daily ed. Aug. 2, 2007).

The NAM nevertheless argues that Defendants "do not show that the particular

requirement challenged here was the subject of [] careful Congressional scrutiny and analysis,"

and further, that the legislative history of the FRLA and the LDA do not justify the change § 207

represents to the LDA's disclosure requirements.  *See* NAM Reply at 7-11.  The NAM's

argument is unavailing for two reasons.  First, in arguing that the relevant legislative history does

not sufficiently support § 207 in particular, the NAM compares that legislative record to the

evidentiary record offered to defend the facial validity of BCRA in *McConnell*.  *See* NAM Reply

at 10-11.  *McConnell*, however, represented a wholesale challenge to the constitutionality of

BCRA, which in turn constituted a drastic and comprehensive reform of the Congressional

approach to campaign finance regulation.  As such, it is to be expected that the evidentiary record

in that case included "a six-volume report summarizing the results of an extensive record" prepared by the Senate Committee on Governmental Affairs. *McConnell*, 540 U.S. at 129-32. In contrast–and despite the NAM's protestations to the contrary–§ 207 represents simply one component of the overall "sweeping reform legislation" embodied in the HLOGA, which includes changes in "a whole host of areas–gifts, travel, lobbyist disclosure, stealth coalitions, reporting of lobbyist contributions, the revolving door." 153 Cong. Rec. S10716 (daily ed. Aug. 2, 2007) (statement of Sen. Reid). As such, it is not surprising that the depth of the legislative record regarding § 207 pales in comparison to that considered in *McConnell*. Moreover, the Court is unaware of any precedent requiring a particular quantum of legislative record in order to find a measure justified by a compelling government interest. *See CICU*, 534 F. Supp. at 499-500 (rejecting argument that a lobbying disclosure law "must be invalidated because there is not a sufficient legislative record to justify the legislation.").

Second, insofar as the NAM argues that the legislative history of the LDA cannot support the enactment of § 207, that argument is significantly undercut by the fact that many of the operative elements of § 207, including the definition of lobbying activities and the scope of the term lobbying contacts, have not changed since the LDA was enacted in 1995. Taylor Opp'n at 4-5, Legisl. Defs Opp'n at 37. Furthermore, as the Legislative Defendants convincingly explain, through the FRLA, the LDA, and the various proposals to amend those statutes, "Congress considered over many years various proposals for disclosure schemes that would best accomplish the vital governmental interests served by lobbying disclosure." Legisl. Defs' Opp'n at 30 (citing *id.* at 8-13). This "thoughtful and careful effort by our political branches, over such a lengthy course of time, deserves respect." *McConnell v. FEC*, 251 F. Supp. 2d 176, 434 (D.D.C. 2003)

33

(opinion of Kollar-Kotelly, J.); *Nat'l Right to Work Comm.*, 459 U.S. at 209 ("careful legislative

adjustment . . . in a 'cautious advance, step by step,' . . . warrants considerable deference.")

(quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 46 (1937)); *cf. McConnell*, 540 U.S.

at 158 ("we respect Congress' decision to proceed in incremental steps in the area of campaign

finance regulation") (citing, *inter alia*, *Buckley*, 424 U.S. at 105). As such, the Court concludes

that the legislative history of the LDA's 1995 enactment is both relevant to, and supportive of,

Congress' determination that § 207 was necessary to close a loophole left open in the LDA,

which permitted lobbying through stealth coalitions to go unchecked. Significantly, as the D.C.

Circuit has explained, "no smoking gun is needed where, as here, the . . . likelihood of stealth [is]

great, and the legislative purpose prophylactic." *Blount*, 61 F.3d at 945 (citing *FEC v. Nat'l*

*Right to Work Comm.*, 459 U.S. 197, 210 (1982) ("Court will not 'second-guess a legislative

determination as to the need for prophylactic measures where corruption is the evil feared.'")).

The NAM also argues that Defendants have not shown that § 207 will advance Congress'

asserted interest in curbing "stealth coalitions" in order to increase transparency regarding

lobbying activities and avoid the appearance of corruption. *See* NAM Reply at 12-15. However,

as the Legislative Defendants point out, by requiring registrants to disclose the "name, address,

and principal place of business" of affiliates who contribute more than $5,000 in a quarter to

fund a client or registrant's lobbying activities and who actively participate in the planning,

supervision, or control of those lobbying activities, 2 U.S.C. § 1603(b)(3), § 207 provides

precisely the information–"who pays, who puts up the money, and how much"–that *Harriss*

found to be the valid purpose of lobbying disclosures, 347 U.S. at 625.

The NAM nevertheless asserts that § 207 will not advance the Government's asserted

interests because it "does not reach stealth coalitions unless they happen to hire their own lobbyist(s), rather than relying on the lobbyists of participating organizations," and is thus, according to the NAM, fatally underinclusive.  *See* NAM Mot. at 28; NAM Reply at 13.  This argument fails upon further examination.  As the legislative history discussed above makes clear, § 207 aims to prevent organizations from avoiding disclosure as clients by joining in a coalition or association to engage lobbyists, and thereby making only the coalition or association the lobbyist's "client" for purposes of LDA filings.[12]  The situation the NAM describes–where a coalition or association lobbies through its members' lobbyists rather than by hiring its own lobbyists–simply does not present the same concern about stealth, because in that instance the organizations funding the lobbying activities will be disclosed as the lobbyists' clients.  *See* Legisl. Defs' Opp'n at 26-27; Taylor Opp'n at 14.  As Defendant Taylor correctly observes, "one can easily discern whose interests are being represented, even if one does not know that organizations are jointly pursuing certain interests."  Taylor Opp'n at 14.

The NAM also argues that § 207 is underinclusive–and thus does not materially advance its asserted purposes–because it does not require disclosure of individuals, even if they fund and actively control a client or registrant's lobbying activities.  NAM Mot. at 4, 28; NAM Reply at 14; *see also* 2 U.S.C. § 1603(b).  As an initial matter, the NAM offers only speculation that individuals may rely upon misleading names to conceal efforts to advance their interests. Moreover, as the Legislative Defendants explain "Congress'[] decision not to include individuals was an accommodation to both the heightened sensitivity regarding the potential impact of

---

[12] The LDA provides that "[i]n the case of a coalition or association that employees or retains other persons to conduct lobbying activities, the client is the coalition or association and not its individual members."  2 U.S.C. § 1602(2).

disclosure on individuals as opposed to organizations and the concern that organizational entities

. . . have a substantial influence that they may attempt to conceal."  Legisl. Defs' Opp'n at 27

(citing S. Hrg. 102-609, at 83 (statement of Thomas M. Susman, Chair, ABA Section of Admin.

Law. and Reg. Practice during 1992 Senate Subcommittee hearings) ("An appropriate means of

striking a balance between the competing interests of the public's right to know and an

individual's right to petition the government without risking harm to his or her well-being or

reputation is to focus on organization[al] members of coalitions or associations lobbying

Congress.")).  Indeed, "corporations can claim no equality with individuals in the enjoyment of a

right to privacy," *Morton Salt Co.*, 338 U.S. at 652, and Defendants explain that § 207's

exemption of individuals is designed to recognize that disparity.  *See* Legisl. Defs' Opp'n at 27-

28; Taylor Opp'n at 15 & n.10.  In the absence of any evidence that individuals contributing to

lobbying coalitions or associations pose the same types of problems as organizational entities, the

Court cannot conclude that Congress struck an improper balance by taking the privacy rights of

such individuals into account.  *See Blount*, 61 F.3d at 946-47 (rejecting underinclusiveness

argument where "petitioner ha[d] pointed to nothing that call[ed] . . . into serious question"

Congress' judgment to leave "loopholes" due to "'sensitivity' to First Amendment concerns.").

   The Court therefore does not accept the NAM's arguments regarding § 207's purported

underinclusiveness.  Even if it did, however, "a regulation is not fatally underinclusive simply

because an alternative regulation, which would restrict *more* speech or the speech of *more*

people, could be more effective.  The First Amendment does not require the government to

curtail as much speech as may conceivably serve its goals."  *Id.* at 946.  Rather, the "primary

purpose of underinclusiveness analysis is simply to 'ensure that the proffered state interest

36

actually underlies the law,'" and a law is therefore "struck for *under*inclusiveness only if it

cannot 'fairly be said to advance any genuinely substantial government interest.'" *Id.* (emphasis

in original) (quoting *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 677 (1990) and

*FCC v. League of Women Voters*, 468 U.S. 364, 396 (1984)).  The NAM's underinclusiveness

arguments certainly do not convince the Court that § 207 cannot "fairly be said" to advance the

Government's asserted interests.

       While not couching them in terms of underinclusiveness, the NAM also argues that other

aspects of § 207 demonstrate that it will not materially advance the Government's asserted

purposes.  Most significantly, the NAM focuses on the fact that amended § 207 does not require

the disclosure of an affiliate who otherwise meets the amended disclosure threshold, but who is

listed on the client's publicly accessible website as being a member of or contributor to the client,

unless the affiliate meets the higher standard of "in whole or in major part plan[ning],

supervis[ing], or control[ling]" the client's lobbying activities.  NAM Reply at 14; 2 U.S.C. §

1603(b).  According to the NAM, this belies Defendants' claim that "Congress has a vital need to

know which particular group members are funding and actively participating" in a coalition's

lobbying efforts.  NAM Reply at 14.  This argument fails, however, for the same reason as the

NAM's previous argument regarding coalitions that lobby through their members: the exemption

for affiliates who are listed on a client association or coalition's publicly available website still

serves § 207's asserted goals because members of the public and Congress can discern that the

association or coalition's lobbying efforts may be on behalf of the affiliate, even if they cannot

discern the affiliate's precise level of participation in those lobbying efforts.

       Finally, the NAM argues that § 207 will not advance its asserted purposes because "even

when a lobbying association is required to report, the law does not assure that Congress can readily learn which disclosed member is active in which specific lobbying activity." *Id.* at 15. The NAM is correct that § 207 "does not require associations to link organizational members to the lobbying issues that they support." Legisl. Defs' Opp'n at 35. However, the professed interest underlying § 207 is providing the public and members of Congress with information regarding the funding of lobbying efforts. That Congress concluded this interest was advanced by the disclosure of only "the name, address, and principal place of business" of affiliates meeting the amended disclosure thresholds, without requiring the additional disclosure of affiliates' particular lobbying positions, i.e., *more* speech, does not demonstrate that § 207 cannot "fairly be said" to advance the Government's asserted interests.[13]

In sum, the Court concludes that Defendants have met the second requirement of the strict scrutiny standard by showing that the harms § 207 aims to remedy in fact exist and that § 207 will materially reduce those harms. *See Blount*, 61 F.3d at 944. The Court therefore turns to considering whether § 207 is narrowly tailored to advance the compelling government interests asserted.

---

[13] The NAM also argues that § 207 will not advance Defendants' proffered interests because "Congress does not seek to know" "[i]f a single, unidentified association member contributes 100% of the funding for a massive lobbying activity to be carried out by the association," or "[i]f an association member is extremely active in and substantially controls an association's lobbying efforts but does not directly fund that effort." NAM Reply at 14. This argument is in essence a claim that "an alternative regulation, which would restrict *more* speech or the speech of *more* people could be more effective." *Blount*, 61 F.3d at 946. The Court therefore cannot conclude that Congress' choice of a compound lobbying disclosure threshold that requires both substantial funding and active participation in lobbying activities renders § 207 fatally underinclusive.

c.    *Section 207 Appears to Be Narrowly Tailored and to Represent the*
     *Least Restrictive Means*

In addition to arguing that § 207 is underinclusive, the NAM claims that it is

overinclusive, and thus fails to meet the strict scrutiny standard's narrow tailoring requirement

because it reaches "long-standing, formally-organized [sic] groups like the NAM that hold tax

exempt status" in addition to short-lived "stealth coalitions."  NAM Mot. at 28-29.   According to

the NAM, it "is not a stealth coalition" because it has "constituencies everyone understands,"

which are reflected in its name.  *Id.* at 28.  Nevertheless, even if the NAM's name accurately

discloses the interests it represents, that does not establish that other association and coalitions'

names are equally revealing.  Further, if the use of a "long-standing" associational name was the

test for requiring disclosure, stealth coalitions could easily evade detection by co-opting older,

more established names.  Indeed, Congress enacted § 207 due to a professed concern that groups'

names had not functioned as accurate indicators of the interests they served.  *See* 153 Cong. Rec.

S260 (daily ed. Jan. 9, 2007) (statement of Sen. Lieberman).[14]

Moreover, Congress certainly could not draw a "bright-line" rule based on some loose

conception of whether an association or coalition's name accurately represented its

constituencies.  To prove the point, despite the NAM's claims regarding its purportedly

transparent and well-understood name, the organization has a broad constituency of over 11,000

---

[14] The Supreme Court also recognized the significance of a similar problem regarding groups that fund election-related advertisements in *McConnell* when it stated: "Curiously, Plaintiffs want to preserve the ability to run these advertisements while hiding behind dubious and misleading names like: 'The Coalition-Americans Working for Real Change' (funded by business organizations opposed to organized labor), 'Citizens for Better Medicare' (funded by the pharmaceutical industry), 'Republicans for Clean Air' (funded by brothers Charles and Sam Wyly)."  540 U.S. at 197.

members and its name reveals only that those members are likely to be in some way connected to manufacturing interests. While the NAM's constituencies may, in fact, be understood by Members of Congress and executive branch officials, it is doubtful that the general public (whose informational interests § 207 supports) have an equally thorough understanding. The Court therefore cannot conclude that § 207's application to the NAM demonstrates that § 207 is overly broad.

The NAM also argues that Defendants fail to establish either that Congress considered less restrictive alternatives before enacting § 207, or that no such alternatives exist. *See* NAM Mot. at 28-29. To the contrary, Congress did consider less restrictive alternatives, in the form of the FRLA, the LDA, and the various reform proposals considered over the years, concluding ultimately that those disclosure regimes did not sufficiently capture the "stealth coalitions" underlying § 207's goal of transparency. Further, the fact that Congress did not explicitly reject other alternatives before enacting § 207 does not establish that any actually exist. Indeed, while the NAM suggests what it perceives as two other bright-line rules that would be less restrictive, there is no reason to conclude that either of those alternatives "would be even *almost* equally effective." *Blount*, 61 F.3d at 947. Specifically, although the NAM suggests an exemption for "§ 501(c) organizations that have substantial non-lobbying activities and, hence, are not ad hoc stealth associations," NAM Reply at 13-14, such an exemption might well precipitate significant circumvention of the LDA's lobbying disclosure requirements through the misuse of tax-exempt entities. *See* William V. Lunenberg & Thomas M. Susman, *Lobbying Disclosure: A Recipe for Reform*, 33 J. Legis. 32, 48 (2006) (stating that congressional investigations of the activities of former lobbyist Jack Abramoff "identified the blatant misuse of tax-exempt entities as 'pass-

throughs' to distribute money for lobbying and other purposes.") (citing Susan Schmidt & James V. Grimaldi, *Nonprofit Groups Funneled Money for Abramoff*, Wash. Post. June 25, 2006, at A1).  Likewise, while the NAM suggests drawing a line based on the time an organization has been in existence, on the theory that long-standing organizations are less likely to be stealth, *see* NAM Mot. at 4, as the CLC *Amici* point out, Congress and the public may have an arguably greater interest in disclosure of the members actively participating in and funding the lobbying activities of such long-standing groups in light of their significant political clout and wealth. CLC *Amici* Br. at 14-15.

In sum, the Court concludes that Defendants have met their burden of showing that § 207 "is 'closely drawn' and thus 'avoid[s] unnecessary infringement' of First Amendment rights." *Blount*, 61 F.3d at 947 (quoting *Buckley*, 424 U.S. at 25).  By crafting a compound lobbying disclosure threshold that requires a combination of substantial funding of, and active participation in, a client or registrant's lobbying activities, Congress specifically tailored § 207 to avoid capturing mere dues-paying members of established organizations.  *See* 153 Cong. Rec. S10709 (joint statement of Sens. Feinstein, Lieberman, and Reid).  Moreover, § 207 only requires the disclosure of "the name, address, and principal place of business" of affiliates that meet the disclosure threshold, and thus appropriately seeks only the information necessary to reveal "who pays, who puts up the money, and how much," which *Harriss* found to be the valid purpose of lobbying disclosures, 347 U.S. at 625.  In so doing, "Congress has not sought to prohibit [lobbying,] [i]t has merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose."  *Id.*  For that very reason, the Supreme Court observed in *Buckley* that "disclosure requirements certainly in

41

most applications appear to be the least restrictive means of curbing the evils . . . that Congress found to exist." 414 U.S. at 68. In this instance, at least, the Court concludes that Defendants have met their burden of showing that § 207 complies with strict scrutiny because it is narrowly tailored to advance compelling government interests.

> d.     *The NAM Has Not Made a Factual Showing of Potential Harm to Its Members*

Having already concluded that § 207 survives strict scrutiny, out of an abundance of caution, the Court briefly addresses the Legislative Defendants' additional argument that the NAM's challenge to § 207 fails insofar as it rests upon the alleged burden to its members' associational rights, because the NAM has not made a factual showing of potential harassment and retaliation against its members. *See* Legisl. Defs' at 31-35. The NAM responds to this assertion by stating that it need not proffer such evidence because this "action challenges [§ 207] itself, facially and as applied to membership groups like the NAM," and "[f]or that purpose, the types of burdens relied on in *Buckley* to trigger demanding scrutiny are adequate and clearly present here." NAM Reply at 16.

The Legislative Defendants are correct that in *Buckley*, the Supreme Court rejected a challenge to FECA's disclosure requirements as applied to minor parties. 424 U.S. 71-72. In so doing, the *Buckley* Court determined that the plaintiffs had not "tendered record evidence of the sort proffered in *NAACP v. Alabama*" but instead "primarily rel[ied] upon 'the clearly articulated fears of individuals, well experienced in the political process[,]'" amounting to the "testimony of several minor-party officials that one or two persons refused to make contributions because of the possibility of disclosure." *Id.*; *see also McConnell*, 540 U.S. at 199 (rejecting challenge to

BCRA disclosure requirement where "the evidence did not establish the requisite 'reasonable probability' of harm to any plaintiff group or its members"). However, as discussed above, both *Buckley* and *McConnell* applied an "exacting" scrutiny standard, in which the Supreme Court balanced the burdens imposed upon the plaintiffs in those cases with the government interests involved, ultimately concluding that "the substantial public interest in disclosure identified by the legislative history of [the Acts in question] outweigh[ed] the harm generally alleged." *Buckley*, 424 U.S. at 72. That "exacting" scrutiny standard appears to be somewhat more lenient than the strict scrutiny standard applied by this Court above, pursuant to which the Court has already concluded that, on its face, § 207 survives strict scrutiny.

If the Court were to apply *Buckley*'s "exacting" scrutiny, however, it would agree with the Legislative Defendants that the NAM's allegations fail to meet *NAACP v. Alabama* and *Buckley*'s requirement of a showing of a "reasonable probability that the compelled disclosure of [the NAM members'] names will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Buckley*, 424 U.S. at 74. In *NAACP v. Alabama*, the organization "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members [had] exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." 357 U.S. at 462. Similarly, in *Brown v. Socialist Workers '74 Campaign Committee*, 459 U.S. 87 (1982), the plaintiffs proffered "substantial evidence of past and present hostility from private persons and government officials," *id.* at 102, including "proof of specific incidents" such as "threatening phone calls and hate mail . . . burning of [] literature . . . destruction of [] members' property. . . police harassment . . . the firing of shots," and the firing of 22 party members from their

employment, *id.* at 99.

Here, in contrast, the NAM offers only speculation that harm may befall its members if they are disclosed as connected to the NAM's lobbying activities. As discussed above, the NAM asserts that, "[t]aking policy positions that are unpopular with other groups may lead to boycotts, political pressure, shareholder suits, or other forms of harassment," and may make companies litigation targets, Compl. ¶ 14, and supports that assertion with Ms. Amundson's Declaration. However, the newspaper articles and lawsuit to which Ms. Amundson points in her Declaration in no way indicate that any member of the NAM (or the NAM itself) has suffered harm or retaliation as a result of the NAM's lobbying activities. *See* Amundson Decl. ¶ 10; Legisl. Defs' Opp'n at 32 n.20; *IBEW, Local 1547 v. Alaska Util. Constr., Inc.*, 976 P.2d 852 (Alaska 1999). Moreover, as the Legislative Defendants note, the NAM's website already lists its Board of Directors and Executive Committee Members (a total of 212 persons and their affiliated member companies), along with another 58 member companies that are part of the NAM's Small and Medium Manufacturers Board of Directors. *See* Legisl. Defs' Opp'n at 34 (citing Attach. 2 (printout of NAM Board of Directors website) and Attach. 3 (NAM Small and Medium Manufacturers Board of Directors website)). Although the NAM's website thus already discloses the membership of over 250 organizations in the NAM, the NAM proffers no evidence of any past incidents suggesting that public affiliation with the NAM leads to a substantial risk of "threats, harassment, or reprisals from either Government officials or private parties." *Buckley*, 424 U.S. at 74.[15]

---

[15] The NAM also suggests its members may be placed "in a false light" if they are "identified as actively supporting [the NAM's] lobbying activities while they are actually opposing such efforts." NAM Mot. at 27. As an initial matter, § 207 only requires the disclosure

As discussed above, the Court's application of strict scrutiny to § 207 obviates the need to balance the NAM's showing of harm against the interests asserted by Defendants. Were the Court to do so, however, it would easily conclude that, in light of the speculative nature of the NAM's allegations, "the substantial public interest in disclosure identified by the legislative history of [§ 207 and other disclosure requirements] outweigh[s] the harm generally alleged." *Id.* at 72.

B.    *The NAM's Vagueness Challenges*

The NAM's Complaint and Motion for a Preliminary Injunction assert that § 207 is unconstitutionally vague, both on its face and as applied to the NAM. *See* Compl. ¶¶ 26, 26(a); NAM Mot. at 24. The NAM's vagueness challenge is generally premised upon a claim that because § 207 allegedly "does not provide a precise standard by which compliance obligations can be determined . . . the NAM can only guess at what must be disclosed." Compl. ¶ 26(a). With respect to its as-applied challenge, the NAM additionally asserts that "the [alleged] vagueness becomes much greater when the provision is applied to an organization like the NAM," due to the administrative efforts that compliance with § 207 would purportedly require. NAM Mot. at 27. Defendant Taylor argues that the NAM does not mount a true as-applied challenge because it offers no distinction between the application of § 207 to the lobbying activities of the NAM and its members and to every other group that must file reports under the LDA. Taylor Opp'n at 26-27 (citing *See Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) ("An as-applied challenge contends that the law is unconstitutional as applied to the

_____

of those affiliates that substantially fund and actively *participate* in (rather than support) the NAM's lobbying activities. 2 U.S.C. § 1603(b)(3). Moreover, as discussed above, § 207 does not require the NAM to link affiliates to particular lobbying positions. *Id.*

litigant's particular speech activity, even though the law may be capable of valid application to others.")).  The Court agrees with Defendant Taylor that the NAM's as-applied challenge essentially amounts to a claim that complying with an allegedly facially vague statute will be particularly burdensome for the NAM.  As a result, the success of both vagueness challenges appears to hang on the NAM's claim of facial vagueness.  Nevertheless, Defendant Taylor has not proffered case law demonstrating that the NAM can only bring an as-applied challenge by claiming that § 207 imposes a different, as opposed to a more severe, burden on it.  The Court therefore addresses the NAM's facial vagueness challenge, and then considers the NAM's allegations regarding the potential burden it faces in complying with § 207.

 In considering the NAM's facial vagueness challenge, the Court is cognizant of the Supreme Court's recent reminders "that a facial challenge must fail where the statute has a 'plainly legitimate sweep,'" *Wash. State Grange v. Wash. State Repub. Party*, --- U.S. ---, 128 S. Ct. 1184, 1190 (2008) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 739-40 (1997)), and that "[i]n determining whether a law is facially invalid, [the Court] must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases," *id.* (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)); *see also Hill v. Colorado*, 530 U.S. 703, 733 (2000) ("speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications'") (quoting *Raines*, 362 U.S. at 32); *cf. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982) (Outside of the First Amendment context, "[t]o succeed . . . the complainant must demonstrate that the law is impermissibly vague in all of its applications.").

A statute is vague where it fails to "provide adequate notice to a person of ordinary intelligence that his conduct is illegal," *Buckley*, 424 U.S. at 77, or imposes "standards of conduct so indeterminate that it is impossible to ascertain just what will result in sanctions," *Blount*, 61 F.3d at 948 (quoting *Timpinaro v. SEC*, 2 F.3d 453, 460 (D.C. Cir. 1993)). "Where First Amendment rights are involved, an even 'greater degree of specificity' is required," *Buckley*, 424 U.S. at 77 (quoting *Smith v. Goguen*, 415 U.S. 566, 573 (1974)), because "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked," *Grayned v. City of Rockford*, 408 U.S. 104, 109-10 (1972) (internal quotation omitted). Nevertheless, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) (citing *Grayned*, 408 U.S. at 110 ("[c]ondemned to the use of words, we can never expect mathematical certainty in our language")).

As discussed above, § 207 requires registrants to disclose affiliates that (i) contribute more than $5,000 in a quarter to fund the registrant's lobbying activities and (ii) actively participate in the planning, supervision, and control of those lobbying activities. 2 U.S.C. § 1603(b)(3). In turn, the phrase "lobbying activities" is defined to encompass "lobbying contacts and efforts in support of such contacts, including preparation and planning activities, research and other background work that is intended, at the time it is performed, for use in contacts, and coordination with the lobbying activities of others." *Id.* § 1602(7). Focusing on the use of the word "intended" in the definition of lobbying activities, the NAM asserts that amended 2 U.S.C. § 1603(b)(3) "poses an immediate vagueness defect because standards turning on an assessment of 'intent and of effect' are impermissible" under the Supreme Court's recent decision in *FEC v.*

*Wisconsin Right to Life, Inc.*, --- U.S. ---, 127 S. Ct. 2652 (2007) (hereinafter "*WRTL*").  NAM

Mot. at 25 (quoting *WRTL.*, 127 S. Ct. at 2665).  *WRTL*, however, is distinguishable from the

instant case in a number of ways, and thus does not mandate the conclusion that § 207 is

rendered unconstitutionally vague by virtue of its reference to intent.[16]

As an initial matter, the discussion of an intent standard in *WRTL* arose in the context of

an as-applied challenge to BCRA's provision making it "a federal crime for any corporation to

broadcast, shortly before an election, any communication that names a federal candidate for

elected office and is targeted to the electorate."  127 S. Ct. at 2658-59.  While *WRTL* "decline[d]

to adopt a test for as-applied challenges [under BCRA] turning on the speaker's intent to affect

an election," *id.* at 2665-66, it did so in the limited context of that case, i.e., in attempting to

distinguish between campaign ads (which may be regulated consistent with the First

Amendment) and pure issue ads (which may not).  *WRTL* did not generally prohibit the use of

intent-based standards.  Furthermore, the role played by intent in the standard considered in

*WRTL* differs significantly from the manner in which intent factors into § 207's disclosure

requirement.  In *WRTL*, the Supreme Court concluded that the test for distinguishing issue ads

from campaign ads could not turn solely on the speaker's intent to affect an election because the

only evidence of a speaker's intent might reside in his or her own head.  As such, when applied

to an ad equally susceptible of two meanings, a subjective intent-based test would leave the

speaker entirely at the mercy of his listeners, and "could lead to the bizarre result that identical

---

[16] The Supreme Court did not issue a majority opinion in *WRTL*.  "[T]he holding of the
Court" in the case is therefore the "position taken by those Members who concurred in the
judgments on the narrowest grounds," which is the opinion by Chief Justice Roberts (joined by
Justice Alito).  *Marks v. United States*, 430 U.S. 188, 192-93 (1977).

ads aired at the same time could be protected speech for one speaker, while leading to criminal

penalties for another." *Id.* at 2666.

In contrast, the reference to intent in the LDA's definition of lobbying activities suggests

a much more objective standard. The LDA defines lobbying activities as "lobbying contacts and

efforts in support of such contacts, including preparation and planning activities, research and

other background work that is *intended, at the time it is performed*, for use in contacts, and

coordination with the lobbying activities of others." *Id.* § 1602(7) (emphasis added). Viewed in

context, then, the LDA's reference to intent serves to distinguish activities undertaken in support

of lobbying contacts (which may require disclosure) from those undertaken for other purposes

(which do not). The House Judiciary Committee Report on the LDA confirms this

understanding, explaining that:

> activities in support of lobbying contacts would be 'lobbying activities,' even if
> they also support communications that are excluded from the definition of
> 'lobbying contacts.' For example, if an organization prepares an extensive issue
> brief for presentation to Members of Congress and their staffs both through formal
> testimony and informal meetings, the effort of preparing that brief would be a
> 'lobbying activity.' However, the effort that goes into preparing materials for
> purposes other than lobbying would not become a lobbying activity simply
> because the materials are subsequently used in the course of lobbying activities.

H.R. Rep. No. 104-339, pt. 1, at 13-14.[17] As an example, if an affiliate commissioned a study for

a purpose unrelated to lobbying efforts and the study was not immediately used in lobbying

efforts, the affiliate's commission of the study would not constitute lobbying activity because it

was not "intended, at the time it [was] performed" for use in lobbying contacts. In the event that

---

[17] The House Judiciary Committee's Report on the LDA remains relevant because the
NAM's vagueness challenge to § 207 focuses in large part on the reference to intent in the
definition of "actively participates" and, as discussed above, that definition has not changed since
the LDA was enacted in 1995.

the study was later presented to covered executive or legislative branch officials, the presentation itself would constitute lobbying activity, but the affiliate's original commission of the report would not be transformed into lobbying activity. *Id.*

This example highlights the contrast between the intent-based standard considered in *WRTL* and the reference to intent in the LDA's definition of lobbying activities. In the former, the only evidence of a speaker's intent in running an ad susceptible of two meanings might well reside in his or her own head. In contrast, in determining whether a particular affiliate's activity was "intended, at the time it [was] performed" for use in lobbying contacts, an LDA registrant can look to objective indicators such as contemporaneous descriptions of the work in question and how the work is put to immediate use. As such, although the standard considered in *WRTL* and the LDA's definition of lobbying activities both include references to intent, the former involves a subjective state of mind, while the latter connotes a far more objective question of purpose or design.

The Court therefore concludes that *WRTL*'s disapproval of an intent-based standard does not compel the same outcome in the instant case, and turns to the NAM's other arguments that the definition of lobbying activities is unconstitutionally vague. First, returning to the definition's reference to intent, the NAM maintains that the section is vague because it does not specify whose intent is relevant. However, in the context considered above (and in light of the House Judiciary Committee Report on the LDA), it is apparent that the relevant intent is that of the affiliate who undertakes the "preparation and planning activities, research [or] other background work" at issue, because the question being asked is whether those activities were undertaken for use in connection with lobbying contacts. *See* Taylor Opp'n at 22-23.

Next, taking umbrage with the suggestion that a registrant like the NAM must assess its affiliates' intent in order to determine whether they meet § 207's disclosure threshold, the NAM asserts that "organizational intent is a particularly elusive concept," NAM Reply at 20, and that "various participants in a meeting may have different intents, and the intent of the group as a whole may be hard to ascertain," NAM Mot. at 26. As the discussion above makes clear, however, registrants should be able to assess the relevant question of intent through objective evidence. Furthermore, it appears that in many (if not most) situations, § 207 does not require registrants to reach the question of their affiliates' intent at all. Significantly, if a registrant's affiliate actively participates in the planning, supervision, or control of the registrant's lobbying contacts *and* contributes more than $5,000 in a quarter to fund those activities, § 207 clearly requires the registrant to disclose that member. Likewise, if a registrant's affiliate actively participates in the planning, supervision, or control of background work that is obviously directed towards eventual lobbying contacts *and* contributes more than $5,000 in a quarter to fund those activities, § 207 again leaves no question that the registrant must disclose that member. As such, the affiliate's intent is only implicated if the background work in which the affiliate is involved is not clearly undertaken in support of eventual lobbying contacts *and* that same affiliate has donated more than $5,000 in a quarter to fund the registrant's lobbying efforts.

In that limited situation, any ambiguity caused by the reference to intent in the definition of lobbying activities may be mitigated by the scienter requirements included in the revised penalty provisions of the LDA. *See Village of Hoffman Estates*, 455 U.S. at 499 & n.14 ("the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."); *Gonzales v.*

*Carhart*, --- U.S. ---, 127 S. Ct. 1610, 1628 (2007) (same).  The NAM is correct that the cases

discussing the impact of a scienter requirement on the vagueness inquiry do not involve

regulation of First Amendment activity.  NAM Reply at 26.  Nevertheless, it is undoubtedly

significant that, under the amended LDA, civil penalties only apply to registrants who

"knowingly fail[]" to remedy defective registration filings within 60 days after notice of a defect

by the Secretary of the Senate or Clerk of the House, or knowingly fail to comply with another

provision of the LDA.  2 U.S.C. § 1606(a).  Similarly, criminal penalties are only available under

the amended LDA where a registrant "knowingly and corruptly" fails to comply with a provision

of the LDA.  *Id.* at § 1606(b).  As such, any concern that registrants will be forced to "hedge and

trim" their First Amendment activity due to the alleged vagueness of the definition of "lobbying

activity," *see Buckley*, 424 U.S. at 44, is alleviated to a large degree by the reality that if a

registrant, in good faith, misinterprets the purpose of research or background work performed by

one of its affiliates (who also contributes more than $5,000 in a quarter to fund the registrant's

lobbying efforts), the registrant cannot be found to have knowingly (or "knowingly and

corruptly") failed to disclose that affiliate.

Further, the NAM's claim that the definition of lobbying activities in some way renders §

207 unconstitutionally vague (as well as its professed confusion about applying that definition) is

undermined by the fact that the definition has been in effect, unchanged, since the LDA was

enacted in 1995.  As such, the NAM and other registrants have been forced to grapple with the

definition's reference to intent for the past twelve years.  The NAM explains that it was not

concerned by the definition's reference to intent prior to the enactment of § 207 because none of

its members met the higher threshold of "in whole or in major part" planning, supervising, or

controlling the NAM's lobbying activities, and as a result "there was simply little need to dispute the meaning of words like 'intended.'" NAM Reply at 22.  The NAM's particular situation is not dispositive on its facial challenge, and in any event, the fact remains that the definition has not been subject to a constitutional challenge in over a decade, suggesting that it has not proven difficult for registrants to interpret.  *See* 153 Cong. Rec. S736 (daily ed. Jan. 18, 2007) (statement of Sen. Feingold) (reciting the LDA definition of "lobbying activities" and stating "[t]his term I just mentioned and defined has been in use for over a decade without controversy.").[18]

Similarly, the NAM asserts that § 207's alleged vagueness is "particularly acute" because of the breadth of activities encompassed within the definition of "lobbying contacts" that underlies the term "lobbying activities," and the fact that lobbying contacts include communications with a variety of legislative and executive branch personnel.  NAM Mot. at 25 (citing 2 U.S.C. §§ 1602(3), (4), and (8)); *see also* NAM Reply at 2-3 (comparing the scope of the LDA to that of the FRLA, as interpreted in *Harriss*).  However, the scope of activities encompassed in the phrase "lobbying contacts" has not changed since the LDA was enacted in 1995, *see* Taylor Opp'n at 5, and in that time, the phrase "lobbying activities"–of which the

---

[18] The NAM also suggests that the definition of lobbying activities is unconstitutionally vague because the terms "research and other background work" are not further defined and therefore invite ludicrous applications.  NAM Mot. at 26.  According to the NAM, § 207 could be read to capture a lobbyist's exchanging of pleasantries with a nominee for a position that requires Senate confirmation because asking the nominee how he is feeling might be deemed "research" on the nominee's health.  *Id.*  The NAM is correct that this example is "ludicrous."  It is also incorrect, because innocently asking a nominee how he is feeling would not conceivably be meant for use in lobbying contacts, and thus would not constitute lobbying activity.  2 U.S.C. § 1602(7).  In any event, the NAM's example cannot demonstrate that § 207 is unconstitutionally vague on its face because, as noted above, "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'"  *Hill*, 530 U.S. at 733 (quoting *Raines*, 362 U.S. at 32).

phrase "lobbying contacts" is an integral part–has never been challenged as vague, *id.* at 2.

Section 207 has undoubtedly lowered the threshold governing when a registrant must disclose its

affiliate's participation in lobbying activities, and may therefore increase registrants' compliance

costs by requiring them to examine the role that more of their affiliates play in their lobbying

activities. Nevertheless, as the Legislative Defendants cogently explain, "the breadth of the

provision is not relevant to the vagueness question. Crystal clear statutory language can sweep

broadly. Vagueness is determined not by the range of activities covered by the statute but by

whether the statute provides clarity as to which activities are covered and which are not." Legisl.

Defs' Opp'n at 39.

        Finally, in addition to challenging the definition of "lobbying activities" underlying §

207, the NAM's Motion takes passing issue with § 207's use of the phrase "actively

participates," noting that the term "active" is not directly defined in the statute and that there is

no requirement that "active" participation also be substantial. NAM Mot. at 9. The NAM's

argument is unavailing, however, because the legislative history of § 207 provides a significant

gloss on the term, explaining that "[e]ntities or organizations that have only a passive role–e.g.,

mere donors, mere recipients of information and reports, etc.–would not be considered to be

'actively participating' in the lobbying activities." 153 Cong. Rec. S10709 (daily ed. Aug. 2,

2007) (joint statement of Sens. Feinstein, Lieberman, and Reid). In light of this gloss, the Court

concludes that § 207 adequately provides fair notice of the type of activities encompassed by the

section's disclosure threshold.[19] Mindful of the fact that "mathematical certainty" cannot be the

_____

        [19] In addition, the Court notes that the legislative history's gloss on the term "actively
participates" is consistent with the guidance promulgated by the Secretary of the Senate and the
Clerk of the House following HLOGA's enactment. Although that document does not have the

standard for statutory vagueness, the Court therefore finds that the phrase "actively participates" does not render § 207 facially vague.

In sum, "a facial challenge must fail where the statute has a 'plainly legitimate sweep,'" *Washington State Grange*, 128 S. Ct. at 1190. The foregoing discussion demonstrates that § 207 is sufficiently "easily understood and objectively determinable," *McConnell*, 540 U.S. at 194, as to provide the NAM and other organizations like it with fair and clear notice of what § 207 requires of them. The Court therefore rejects the NAM's claim that § 207 is unconstitutionally vague on its face.

Lastly, the Court briefly considers the NAM's claim that § 207 is unconstitutionally vague as applied to the NAM. That claim is based upon the alleged difficulty the NAM will face in "attempting to review all of the activities of the NAM's 100+ monthly meetings, plus other ad hoc groups, to see if [§ 207's] standard has been met." NAM Mot. at 27. The NAM further asserts that it "has no existing mechanisms to track and identify members who would be subject to disclosure . . . and creating such mechanisms would be disruptive of, and irreparably consume

---

force of law, it is persuasive and represents a reasonable interpretation of § 207. That document explains that "[a]n organization 'actively participates' in the planning, supervision, or control of lobbying activities of a client or registrant when that organization (or an employee of the organization in his or her capacity as an employee) engages directly in planning, supervising, or controlling at least some part of the lobbying activities of the client or registrant." LDA Guidance eff. Jan. 1, 2008, http://www.senate.gov/legislative/resources/pdf/S1guidance.pdf at 4. In addition, the guidance distinguishes actively participating organizations from those that "though members of, or affiliated with a client, have only a passive role in the lobbying activities of the client (or of the registrant on behalf of the client)," and provides detailed examples of both active and passive participation. *Id.* The NAM suggests that the guidance's explanation of the phrase "actively participates" confirms that § 207 is facially vague. NAM Reply at 27. In contrast, the Court believes that the consistency between the guidance and the legislative history demonstrates that the phrase provides individuals of ordinary intelligence a reasonable opportunity to know what § 207 requires, and thus indicates that the statute is not facially vague. *See Grayned*, 408 U.S. at 108.

resources intended for, core First Amendment activities." Compl. ¶ 29. As discussed above, the NAM's as-applied argument essentially asserts that compliance with § 207's allegedly facially vague standards will be particularly costly or difficult for the NAM. *See* Taylor Opp'n at 26-27. However, as Defendant Taylor correctly points out, these claims do "not center on vagueness, but on compliance costs." *Id.* at 27. The Court has not found § 207 to be unconstitutionally vague on its face, and the fact that the NAM's members may be involved in a significant degree of activity that meets § 207's amended disclosure threshold "does not establish that the LDA provides insufficient notice of its requirements or constraints on those who enforce it." *Id.* at 27.

In addition, the Court reiterates that any concern that § 207 will lead to an impermissible chill on the NAM's First Amendment activities is alleviated by the scienter requirements included in the amended LDA. 2 U.S.C. § 1606. Further, while the NAM's Complaint and briefs describe the alleged chilling effect that § 207 may have on the First Amendment activity of the NAM's members, *see, e.g.*, Compl. ¶ 19, § 207 only provides for criminal or civil penalties for registrants, not for affiliates. The focus of the vagueness inquiry is on "provid[ing] adequate notice to a person of ordinary intelligence that his conduct is illegal" or likely to result in sanctions. *Buckley*, 424 U.S. at 77; *see also Blount*, 61 F.3d at 948. As such, the NAM's vagueness challenge must be considered with respect to the NAM (and other registrants') ability to understand what § 207 requires. In light of the conclusion that § 207 is not unconstitutionally vague on its face, the Court agrees with Defendants that it is not rendered vague as applied to the NAM simply because it may be more costly for the NAM than for other registrants to comply with its requirements.

**IV:  CONCLUSION**

Having rejected the NAM's claim that § 207 impermissibly burdens the First Amendment activity of the NAM and its members, as well its claims that § 207 is unconstitutionally vague on its face and as applied to the NAM, the Court shall DENY [3] the NAM's motion for judgment on the pleadings.  Pursuant to the agreement of the parties, the Court shall dismiss the instant case in its entirety.

Date:   April 11, 2008

                                                    /s/
                                                    COLLEEN KOLLAR-KOTELLY
                                                    United States District Judge